1  JOSE L. PATIÑO, CA Bar No. 149568
      jpatiño@foley.com
2  NICHOLAS J. FOX, CA Bar No. 279577
      nfox@foley.com
3  MIKLE S. JEW, CA Bar No. 316372
      mjew@foley.com
4  FOLEY & LARDNER LLP
5  3579 VALLEY CENTRE DRIVE, SUITE 300
   SAN DIEGO, CA 92130
6  TELEPHONE:   858.847.6700
7  FACSIMILE:   858.792.6773

8  Attorneys for Plaintiff
   Workplace Technologies Research, Inc.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| WORKPLACE TECHNOLOGIES RESEARCH, INC., | Case No. **'18CV1927 JM    KSC** |
|---|---|
| Plaintiff, | **COMPLAINT** |
| v. | 1. Breach of Contract |
| PROJECT MANAGEMENT INSTITUTE, INC., | 2. Breach of Implied Covenant of Good Faith and Fair Dealing |
| Defendant. | 3. Fraudulent Misrepresentation |
| | 4. Tortious Interference with Prospective Business Relations |
| | **JURY TRIAL DEMANDED** |

4848-5716-1583.4

Plaintiff Workplace Technologies Research, Inc. ("WTRI" or "Plaintiff"), by and through its undersigned attorneys, for its Complaint against Project Management Institute, Inc. ("PMI" or "Defendant"), and demanding trial by jury, hereby alleges as follows:

## THE PARTIES

1. Plaintiff Workplace Technologies Research, Inc. ("WTRI" or "Plaintiff") is a Delaware corporation with its principal place of business at 3333 Camino Del Rio S, Suite 320 in San Diego, California.

2. On information and belief, Defendant Project Management Institute, Inc. ("PMI" or "Defendant") is a Pennsylvania corporation with its principal place of business at 14 Campus Boulevard in Newtown Square, Pennsylvania, and registered to do business in California.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. 1332(a)(1) in that this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. This Court has specific personal jurisdiction over PMI because PMI's activities in California are directly related to—and give rise to—WTRI's claims asserted against PMI in this action.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(a)(2) and (b)(2), as a substantial part of the events or omissions giving rise to WTRI's claims occurred in this judicial district.

## FACTUAL BACKGROUND

6. In late 2013, WTRI approached PMI, seeking a letter of support for a forthcoming grant proposal to the National Science Foundation ("NSF") for WTRI's immersive "accelerated learning" technology platform featuring single-player and multi-player experience in a virtual world to support project management education.

7. The NSF is a prestigious organization that can, literally, make or break any

1

1 given up-and-coming technology.

2 8. In early 2014, then Vice President of Corporate Markets, Craig Killough, and his team at PMI contacted WTRI to initiate discussions for PMI to invest in and co-develop WTRI's innovative gaming technology.

9. Following a number of demonstrations by WTRI of its accelerated learning technology, PMI offered to co-develop and integrate WTRI's software into PMI's enterprise system.

10. PMI agreed to be responsible for sales of the integrated system.

11. Additionally, PMI agreed in principle to pay $10,000,000 to WTRI for an interest in the completed software, to integrate WTRI's technology into PMI's enterprise system, and to act as the exclusive sales channel for the finished product.

12. PMI made its letter of support to the NSF contingent on an agreement in principle between PMI and WTRI to enter into a software development and purchase agreement.

13. Finding PMI's terms acceptable, in reliance on PMI's good faith, and with PMI's knowledge, WTRI advised the NSF of the forthcoming grant proposal of an enterprise-based, virtual world system tailored for project management education that would be supported by WTRI's new technology partner, PMI.

14. After declaring PMI's support to the NSF, a new PMI team—led by PMI's Vice President of Individual Markets, Brian Weiss—was brought in to negotiate the software development and purchase agreement that had been agreed to in principle with Mr. Killough and his team.

15. The change in personnel required more ramp up time to reach a deal, and over the course of time, PMI changed the terms that were previously agreed to in principle.

16. With knowledge that WTRI was already committed to the NSF, and that WTRI now needed the support of PMI for the grant proposal, PMI refused to proceed with the original agreed-to amount of investment ($10,000,000), reducing it by sixty

percent (60%) to $4,000,000, with only $1,000,000 payable upfront.

17. On information and belief, the $1,000,000 upfront payment was an effort by PMI to provide the minimum amount necessary for WTRI to pursue NSF funding, with the remainder of PMI's financial commitment to be contingent on acts only PMI could control—including, *inter alia*, finalizing its work on the software and/or making a sale.

18. Given the commitment to the NSF, WTRI found itself unable to decline and proceeded under duress with the expectation that PMI would fulfill its contractual obligations in good faith and make the necessary investments of technology and staff support to fully perform the required tasks.

19. Accordingly, on or about September 8, 2015, PMI and WTRI entered into and executed a Software Technology Development and Purchase Agreement (the "Development Agreement"), dated September 8, 2015. A true and correct copy of the Development Agreement is attached hereto as **Exhibit A**.

20. When the joint project began in September 2015, the PMI personnel staffed to move the project forward were unaware of the terms of the Development Agreement and the respective obligations of PMI and WTRI.

21. The development of the enterprise-based WTRI software to be integrated into PMI's enterprise system was code-named "Alpha," with the contractual intention that it would go through version builds from Alpha 1, to Alpha 2, etc. until reaching the completed, integrated enterprise-based virtual world gaming software, the "Alpha 5" software. *See* Exhibit A, §§ 1.1, 1.4.

22. Given the development schedule concerning the Alpha builds, acceptance criteria, including descriptions of each party's tasks, were established along with regular review cycles to monitor advancement of the Alpha builds, and to document transition to the next Alpha level based on completed tasks. *See* Exhibit A, § 5.

23. On information and belief, the PMI IT personnel assigned to the joint project were new to the technology at issue and unfamiliar with the respective responsibility of the parties.

3

24. Extensive delay ensued as a result, as WTRI worked to bring the new PMI team up to speed, but with only limited success.

25. In order to keep the joint project relatively on schedule, WTRI was forced to expend significant financial and human resources by performing PMI's obligations under the Development Agreement, including, *inter alia*, financing needed third party licenses, 3D artwork, and otherwise supporting the scaling, maintenance and positioning of the enterprise-based system for commercialization.

26. By December 2015, just three months into the joint project, all aspects of development were delayed and continued to be plagued by negligent performance by PMI personnel assigned to the project.

27. For example, the content development team, headed by PMI's Lead Instructional Designer, Karen Holloway, was materially off track and the first Alpha build could not be completed without completion of this content work for which PMI was responsible.

28. It became apparent that Ms. Holloway was not competent to manage the content creation when it was revealed at a meeting between WTRI and PMI in San Diego that Ms. Holloway was several months behind schedule and out of sync with the rest of the development activities.

29. At this meeting, which occurred in mid-December 2015, when Ms. Holloway was pressed on PMI's failure to provide content, she had an emotional episode, and confessed that she could not perform the necessary work with the resources provided by PMI.

30. Specifically, Ms. Holloway was required to use volunteer PMI members to design content in workshops, a process that was not organized to accommodate game design.

31. PMI thereafter removed Ms. Holloway, and in order to advance the Alpha 1 testing and release process, WTRI was forced to take over content design at a material cost in human and financial resources.

4

32. PMI was so incapable of performing its obligations that around the time of execution of the Development Agreement in 2015, PMI brought in a systems integrator—Neudesic, LLC ("Neudesic"), a technology development company headquartered in Irvine, California, to perform the integration of the WTRI software with PMI's enterprise system.

33. Bringing Neudesic onboard only caused further delay, more missed milestones by PMI, and additional expense borne by WTRI to perform PMI's contractual obligations in order to keep the project moving forward.

34. Neudesic was unable to work with PMI's enterprise system with any kind of agility, and PMI eventually fired Neudesic in June 2016 with little headway made against the Alpha milestones charged to PMI.

35. When PMI recognized that it could not perform many of the required tasks by April 2016, PMI transferred management of the core software suite under integration to WTRI for WTRI's assistance with PMI's obligations.

36. Among other things, PMI required WTRI to create the code base for PMI's enterprise system to integrate the Alpha software in contravention of the contract.

37. WTRI did its best to keep the project moving forward in 2016, but there were multiple milestones that could not be accomplished without access to PMI's enterprise-based server and coding, which PMI guarded jealously until early 2017 after realizing that WTRI needed access to perform PMI's obligations under the Development Agreement.

38. As a result, by August 2016, WTRI had performed all of the work to support Alpha 5 that it could without PMI's performance on its remaining obligations.

39. There were over forty distinct open items that only PMI could resolve for the integration that remained outstanding as of August 2016, as the parties neared the one-year anniversary of the Development Agreement.

40. Importantly, PMI had begun to focus almost exclusively on the development of a single-player mode for the system—doing little to nothing to advance the far more

5

valuable multi-player environment—and concealed this detrimental redirection of focus and resources from WTRI until late 2016.

41. Given PMI's default in performance, the software never proceeded beyond Alpha 3b in development, apparent from the final report issued on November 4, 2016, by WTRI to PMI regarding the development of the Alpha software.

42. The final report issued on November 4, 2016, disclosed that the accelerated learning aspect of the project—which was WTRI's primary obligation to complete by Alpha 5—was completed by Alpha 3b.

43. In response to WTRI's final report sent to PMI on November 4, 2016, a non-executive employee of PMI, Victor Carter-Bey, sent an email to WTRI on December 2, 2016, purporting to elect on behalf of PMI "to reject the fifth (version) Alpha software and retain ownership of the rejected version, in accordance with the option to reject and retain interest set forth in [Section] 5 of the Development Agreement, as amended by the Amendment dated November 30, 2016."

44. Mr. Carter-Bey made this election despite the fact that multiple unfinished tasks were required to be performed by PMI in order to move the work on the Alpha software from Alpha 3b to Alpha 5.

45. On November 30, 2016, WTRI and PMI executed the First Amendment to Software Technology Development and Purchase Agreement (the "Amendment"). A true and correct copy of the Amendment is attached hereto as **Exhibit B**.

46. By purporting to reject Alpha 5 when it did not exist, PMI interfered with WTRI's contractual right to obtain a $1,000,000 progress payment upon acceptance of Alpha 5. *See* Exhibit A, § 2.5(b)(i).

47. In addition, PMI's purported election deprived WTRI of compensation ($1,500,000) due to WTRI in the event that Alpha 5 was rejected and accompanied by an election by PMI to retain rights—as PMI purportedly did—because such payment became due only *after* a "first sale or licensing of the Software by [PMI]." *See* Exhibit A, § 2.5(b)(ii).

48. Accordingly, there will be no sale or licensing of an incomplete product by PMI, which PMI kept mired in Alpha 3b, with no resources or competent staff on hand by PMI to reach Alpha 5 or advance its commercialization.

49. In an attempt to mitigate the harm to its innovative software, which had taken years to develop, WTRI pressed PMI for a resolution to the lack of progress on reaching Alpha 5 in late 2016.

50. In response, PMI demanded market assurances from WTRI before committing to the additional work necessary to complete the Alpha phase development, despite the fact that PMI was already contractually required to perform.

51. Specifically, PMI demanded a pilot study to prove marketability of the enterprise-based accelerated learning technology platform, and, upon proof of market acceptance, PMI promised to accelerate development of the Alpha software toward completion.

52. Accordingly, on December 15, 2016, WTRI and PMI entered into and executed a Services Agreement (the "Services Agreement") with the goal of proving the market acceptance of the software. A true and correct copy of the Services Agreement is attached hereto as **Exhibit C**.

53. Per the pilot study under the Services Agreement, WTRI was required to recruit at least 12 organizations to participate "at the C suite level" to try the product in development, now branded as "Proteum."

54. WTRI fully complied with the Services Agreement, keeping PMI informed of the customer-testing events, but PMI failed to bring any customers to test the Alpha software, nor did PMI fully comply with its obligations under the Services Agreement.

55. PMI, for its part, was required to recruit 12 to 24 companies comprising a "diverse range of organizations" with "different buyer profiles in the PMO and HR function[s]."

56. In addition, PMI was also required to complete the coding of the "Agile" product, for which WTRI designed the content and for which PMI was to do all of the

7

technical development.

57. The promise of a follow-on Agile product was an incentive for getting the C-suite customers to try Proteum and sign up for the pilot study.

58. PMI produced the Agile product six months behind schedule.

59. Notably, the Agile product that was ultimately delivered to WTRI did not comply with the learning model, failed to meet the standards expected by WTRI's C-suite customers, and did not function properly.

60. After delivery of the subpar product, PMI ceased all further development of the Agile product despite its nonfunctional state.

61. PMI's failure to deliver the Agile product as promised caused serious reputational harm to WTRI.

62. As with the Development Agreement, PMI defaulted on its obligations and left WTRI with an incomplete product that PMI now fraudulently claims as its own.

63. PMI's bad faith conduct left WTRI with a material reputational crisis with the C-suite level customers it had asked to test Proteum, and with the NSF—which was increasingly asking pointed questions about the shabby state of affairs of the partnership between PMI and WTRI.

64. On information and belief, PMI never intended to comply with the Services Agreement, and had already redirected resources needed to comply with the pilot study requirements, doing so with the knowledge that WTRI's reputation and standing before the NSF and the educational gaming industry was at risk in light of PMI's misconduct, and with the knowledge of the tremendous expense in multi-year development of the Alpha software WTRI would lose if it did not accede to PMI's extra-contractual demands.

65. WTRI engaged in efforts to resolve its issues with PMI, including offering to pick up more expenses and sensitizing PMI management to the difficulties caused to WTRI in its critical relationship with the NSF as a result.

66. However, PMI attempted to re-characterize WTRI's remedial efforts as a

8

request to "buy back" the ownership of the Alpha software for $10,000,000, to which WTRI refused and continued to seek compliance with the shared responsibilities of the parties under the Development Agreement.

67. WTRI was later informed that Murat Bicak, the new Senior Vice President of Strategy for PMI, had made the decision "some time ago" to "fix things" and "transform" PMI by, in part, "killing" the Alpha software project.

68. Present and former personnel confided in WTRI that "for months" PMI had no intention of ever selling the product, and as a result, it saw no reason to add to its investment notwithstanding its failed performance and behavior designed to encourage WTRI to "pull the plug."

69. Following months of discussion and promises to work something out, WTRI gave PMI a deadline of March 15, 2018, to make a decision.

70. In response, PMI repudiated its obligations on March 15, 2018, indicating that it would neither complete development of the Alpha software, nor the follow-on "Charlie" product to be finalized after Alpha 5 under the Development Agreement.

71. On June 18, 2018, WTRI sent PMI a demand letter with notice of WTRI's termination of the Development Agreement for cause pursuant to section 9.4, in light of PMI's misrepresentations, false pretenses, and sabotage, as well as the steps taken by PMI to conceal its misconduct. *See* Exhibit A, § 9.4.

72. As of the date of this filing, PMI has not acknowledged or responded to WTRI's Notice of Termination, notwithstanding its obligation under the Development Agreement to do so.

73. As to the limitation of liability provision in the Development Agreement limiting consequential and extra-contractual damages, that is unenforceable because of PMI's intentional bad faith conduct, including, *inter alia*, intentionally misrepresenting its intent to perform under the Development Agreement and Service Agreement in an effort to compel WTRI to "pull the plug."

74. Instead of choosing to anticipatorily repudiate or terminate the Development

Agreement at an earlier stage to minimize economic and reputational damages to WTRI, PMI recklessly and intentionally withheld information from WTRI, thereby prolonging the harm caused to WTRI by PMI's inevitable breach of the Development and Services Agreements.

75. In light of PMI's misrepresentations, false pretenses used to have WTRI take on expenses belonging to PMI, PMI's sabotage of the development effort in secret, and steps taken by PMI to conceal its misconduct, WTRI has suffered consequential damages for loss of goodwill, including the loss of future profits and harm to its business reputation.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

76. WTRI realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77. On or about September 8, 2015, PMI and WTRI entered into and executed the Development Agreement.

78. To the extent possible and notwithstanding PMI's refusal to perform, WTRI has fully complied with and performed all of its obligations under the terms of the Development Agreement.

79. PMI has refused to perform and continues to refuse to perform its obligations under the Development Agreement. The obligations that PMI has failed to perform and continues to fail to perform include, but are not limited to:

    a. Defaulting on performance obligations, requiring WTRI to take on performance tasks for PMI to keep the product development moving forward;

    b. Failing to make the investments necessary to ensure that it was sufficiently staffed in order to fulfill its obligations;

    c. Terminating or reassigning key staff members as the product development approached critical milestones;

      d.      Returning management of the core Proteum software suite to WTRI, making it effectively impossible for PMI to carry out its own obligations; and

      e.      Knowingly defaulting on its obligations with the understanding that it would no longer be able to satisfy its obligations to develop Alpha software as contracted.

80. PMI did all of the above with knowledge of WTRI's reliance on PMI's performance to secure a return for WTRI's development of the Alpha software.

81. As a result of PMI's breach of the Development Agreement, WTRI has incurred and continues to incur damages, including, *inter alia*, monetary and reputational damages.

82. By virtue of the foregoing, WTRI is entitled to an award of damages in an amount to be determined at trial, in an amount exceeding $75,000, and subject to proof at trial.

## SECOND CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

83. WTRI realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84. Inherent in every contract—including the Development Agreement and Services Agreement—is the implied covenant of good faith and fair dealing.

85. At all relevant times, PMI had a duty to act fairly and in good faith with WTRI in meeting its responsibilities under the Development Agreement.

86. PMI breached its obligation to act fairly and in good faith toward WTRI by, *inter alia*, knowingly and willfully misrepresenting its intent to perform its obligations under the Development Agreement; sabotaging WTRI's ability to perform under the pilot study as agreed to in the Services Agreement; and interfering with WTRI's efforts to finalize development of the Alpha software under the Development Agreement.

87. As a direct and proximate result of PMI's breach of the implied covenant of

11

good faith and fair dealing, WTRI has incurred and continues to incur damages, including, *inter alia*, monetary and reputational damages.

88. By virtue of the foregoing, WTRI is entitled to an award of damages in an amount to be determined at trial, in an amount exceeding $75,000, and subject to proof at trial.

## THIRD CAUSE OF ACTION
## (Fraudulent Misrepresentation)

89. WTRI realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 88 of this Complaint as if fully set forth herein.

90. As a condition to agreeing to execute the Services Agreement, PMI demanded market assurances from WTRI before committing to the additional work necessary to complete the Alpha phase development, despite the fact that PMI was already contractually required to perform.

91. Specifically, PMI demanded a pilot study to prove marketability of the enterprise-based accelerated learning technology platform, and, upon proof of market acceptance, PMI promised to accelerate development of the Alpha software toward completion.

92. At the time PMI made these representations, PMI knew that WTRI would continue investing significant financial and human resources into the development of the Alpha software.

93. At the time PMI made these representations, PMI had no intent of performing under the requirements of the Development Agreement.

94. Specifically, WTRI was informed that Murat Bicak, the new Senior Vice President of Strategy for PMI, had made the decision "some time ago" to "fix things" and "transform" PMI by, in part, "killing" the Alpha software project.

95. Additionally, present and former personnel confided in WTRI that "for months" PMI had no intention of ever selling the product, and as a result, it saw no reason to add to its investment notwithstanding its failed performance and behavior

designed to encourage WTRI to "pull the plug."

96. At all relevant times, WTRI believed that PMI's representations were true and that PMI would perform its obligations under both the Development Agreement and Services Agreement.

97. After execution of the Services Agreement, WTRI justifiably relied on PMI's assurances that it would resume performance to move the Alpha software project forward.

98. Despite its representations, PMI failed to perform its contractual obligations under both the Development Agreement and Services Agreement while WTRI continued to invest substantial financial and human resources into the development of the Alpha software.

99. As a direct and proximate result of PMI's intentional misrepresentations, WTRI has incurred and continues to incur damages, including, *inter alia*, monetary and reputational damages.

100. PMI's conduct was and continues to be willful, malicious, despicable, and intentionally fraudulent, thereby warranting the imposition of punitive and exemplary damages.

101. By virtue of the foregoing, WTRI is entitled to an award of damages in an amount to be determined at trial, in an amount exceeding $75,000, and subject to proof at trial.

## FOURTH CAUSE OF ACTION

**(Tortious Interference with Prospective Business Relations)**

102. WTRI realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103. At all relevant times, PMI had full knowledge that WTRI was seeking to maintain a business relationship with the NSF through the development and marketing of an enterprise-based, virtual world system tailored for project management education.

104. At all relevant times, PMI had full knowledge that WTRI intended to partner

13

with PMI to co-develop the accelerated learning technology platform with the goal of obtaining grant funding from the NSF.

105. By intentionally reneging on its obligations under the Development Agreement, and through intentional misrepresentations to WTRI and attempted concealment of its wrongdoing, PMI severely damaged WTRI's professional reputation and business relations with the NSF and other entities in the educational gaming industry.

106. PMI intentionally mispresented to WTRI its intent to perform under the Development Agreement and Service Agreement in an effort to push WTRI to "pull the plug" on the Alpha software project.

107. As a direct and proximate result of PMI's tortious acts and intentional wrongdoing, WTRI has incurred and continues to incur damages, including, *inter alia*, loss of good will and damage to WTRI's business relations with the NSF, as well as other monetary and reputational damages.

108. By virtue of the foregoing, WTRI is entitled to an award of damages in an amount to be determined at trial, in an amount exceeding $75,000, and subject to proof at trial.

## DEMAND FOR JURY TRIAL

Plaintiff Workplace Technologies Research, Inc., demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Workplace Technologies Research, Inc., seeks judgment as against Defendant Project Management Institute, Inc., as follows:

A. Compensatory damages resulting from PMI's breach of the parties' Development Agreement in an amount exceeding $75,000;

B. Consequential damages resulting from PMI's bad faith conduct;

C. Punitive damages according to proof;

D. Pre-judgment interest to the extent permitted by law, and an award of post-judgment interest until the judgment is fully satisfied;

E. The costs of this action;

F. Reasonable attorneys' fees; and

G. Such other relief as the Court may deem just and proper.

Dated: August 20, 2018

Respectfully submitted,

FOLEY & LARDNER LLP

*/s/ Jose L. Patiño*
Jose L. Patiño (CA Bar No. 149568)
  jpatiño@foley.com
Nicholas J. Fox (CA Bar No. 279577)
  nfox@foley.com
Mikle S. Jew (CA Bar No. 316372)
  mjew@foley.com
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130-3302

Attorneys for Plaintiff
Workplace Technologies Research, Inc.

15

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served to all counsel of record, who are deemed to have consented to electronic service via the court's CM/ECF system per CivLR 5.4(d).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on August 20, 2018.

*/s/Jose L. Patiño*
Jose L. Patiño