UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WORKPLACE TECHNOLOGIES RESEARCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> PROJECT MANAGEMENT INSTITUTE, INC., <br><br> Defendant. | Case No.: 18cv1927 JM (MSB) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |

Defendant Project Management Institute, Inc. ("PMI") moves the court to dismiss Plaintiff's First Amended Complaint for lack of personal jurisdiction and failure to state a claim. (Doc. No. 14.) Plaintiff Workplace Technologies Research, Inc. ("WTRI") opposes. (Doc. No. 18.) Having carefully considered the moving papers and case record, the court denies PMI's motion to dismiss for lack of personal jurisdiction and grants its motion to dismiss for failure to state a claim.

## BACKGROUND[1]

This action arises out of a joint endeavor to develop educational project management software. Plaintiff WTRI is a Delaware corporation with its principal place of business in

---

[1] These facts are drawn from the First Amended Complaint, unless otherwise noted, and are accepted as true to the extent that they are well pleaded.

California. (FAC ¶ 1.) WTRI develops educational virtual reality software. Defendant PMI is a Pennsylvania corporation with its principal place of business in Pennsylvania. (FAC ¶ 2; Doc. No. 14-3, Carter-Bey Decl. ¶ 3.) PMI is a membership association for the project management profession that also develops project management products, among other activities. (Id.) PMI is registered to do business in California, (FAC ¶ 2), but does not own or lease any property in California and has never been sued in or party to litigation in any state or federal court located in California, other than the present action. (Doc. No. 14-2, Bakewell Decl. ¶¶ 2-3.)

In late 2013, WTRI approached PMI to ask for a letter of support for a grant proposal WTRI intended to submit to the National Science Foundation ("NSF"). (FAC ¶ 6.) NSF is a prestigious organization that funds research and education projects. (See id.) WTRI sought funding for development of "accelerated learning" software in the project management sector. (Id.) The software would create a virtual world that would allow players to build their project management skills. (Id.) In early 2014, PMI contacted WTRI to discuss investing in and co-developing the accelerated learning software. (FAC ¶ 8.) PMI conditioned its letter of support to the NSF on WTRI agreeing to enter into a software development and purchase contract. (FAC ¶ 15.) PMI agreed to pay at least $10,000,000 to WTRI for development of the software, an interest in the completed software, and the exclusive sales channel for the finished product. (FAC ¶ 14.) WTRI then informed the NSF of its forthcoming joint grant proposal with PMI. (FAC ¶ 16.) The NSF ultimately invested $1,250,000 in the proposal, with $500,000 of that amount representing a matching contribution to PMI's first payment of $1,000,000 under the parties' proposed development agreement. (FAC ¶ 17.) After PMI knew that WTRI had committed to the NSF, PMI reduced the amount it was willing to pay to $4,000,000. (FAC ¶ 21.) WTRI alleges that it was unable to decline this offer as it had already committed to the NSF. (FAC ¶ 25.)

In August 2015, PMI hired Neudesic LLC ("Neudesic") to integrate the software into PMI's enterprise system and "develop the technical architecture for the joint development project." (Doc. No. 18-1, DiBello Decl. ¶ 2.) Neudesic is a technology

development company headquartered in Irvine, California. (FAC ¶ 40.) After PMI hired Neudesic, WTRI and Neudesic developers had held "nearly daily" meetings in Irvine, California. (DiBello Decl. ¶ 3; FAC ¶ 41-42.) At these meetings, WTRI and Neudesic worked on coding for the software. (DiBello Decl. ¶ 4.) PMI documented these meetings in the work order system it used to track the joint development project. (Id.)

On September 8, 2015, PMI and WTRI executed a Software Technology Development and Purchase Agreement (the "Development Agreement"). (Doc. No. 12-1, "Dev. Agree.") The Agreement provided that WTRI would develop the virtual reality software in collaboration with PMI for a payment of up to $4,000,000. (Dev. Agree. at 2, 4.)[2] The software would be developed in seven different stages: five different "Alpha" versions, a "Beta" version, and a final "Charlie" version. (Id. ¶ 2.5; Doc. No. 12-2, Exh. A-1 at 11.) PMI would make separate payments after its acceptance of the fifth Alpha version and the final Charlie version, and at the one year anniversary of its acceptance of the Charlie version. (Dev. Agree. ¶ 2.5.) PMI also had the option to reject these versions of the software. (Id.)

Joint development of the software did not begin smoothly. "PMI personnel assigned to the joint project were new to the technology at issue and unfamiliar with the respective responsibilities of the parties." (FAC ¶ 30.) This resulted in significant development delays. (FAC ¶ 31.) It also required WTRI to finance third-party licenses and artwork, and support the scaling, maintenance, and positioning of PMI's enterprise system. (FAC ¶ 32.) By December 2015, "all aspects of development were delayed and continued to be plagued by negligent performance by PMI personnel assigned to the project." (FAC ¶ 33.)

That month, PMI Director of Certification, Victor Carter-Bey; Lead Instructional Designer, Karen Holloway; and Betsey Redden[3] traveled to San Diego to address WTRI's concerns. (FAC ¶ 36.) The parties conducted meetings at WTRI's office in San Diego

---

[2] All page number citations refer to those generated by the CM/ECF system.
[3] The FAC does not identify Ms. Redden's role at PMI.

3

from December 14 through December 18, 2015.  (FAC ¶ 36.)  During these meetings, Holloway represented that she had to use volunteers at workshops to design the software content because PMI had not provided her with sufficient resources.  (FAC ¶¶ 37-38.)

Over the course of 2016, PMI representatives met with WTRI representatives in San Diego on multiple occasions.  On February 21 through February 26, 2016, PMI representatives held meetings with WTRI employees in San Diego, California.  (FAC ¶ 47.)  On June 28 through June 30, 2016, PMI senior management visited WTRI's office in San Diego, California.  (FAC ¶ 45.)  Carter-Bey visited San Diego "in furtherance of the Development Agreement" on multiple occasions, including March 1 through March 2, 2016, April 19, 2016, and September 22 through September 23, 2016.  (FAC ¶ 48.)  PMI Vice President of Individual Markets, Brian Weiss, also visited WTRI's San Diego office on two occasions to discuss the software.  (FAC ¶ 49.)

Prior to April 2016, WTRI alleges that PMI transferred management of many of its obligations under the Development Agreement to WTRI.  (FAC ¶ 50.)  PMI allegedly required WTRI to "create the code base for PMI's enterprise system to integrate the Alpha software."  (FAC ¶ 51.)  In addition, PMI focused almost exclusively on development of a single-player mode for the virtual software and performed little to no work on the multi-player mode.  (FAC. ¶ 55.)  The joint project missed "multiple milestones" in 2016.  (FAC ¶ 52.)  WTRI was unable to complete some of its milestones because PMI refused to grant WTRI access to PMI's enterprise-based server and coding until early 2017.  (Id.)  As a result, by August 2016, "WTRI had performed all of the work to support Alpha 5 that it could without PMI's performance on its remaining obligations."  (FAC ¶ 53.)

In June 2016, PMI fired Neudesic.  (FAC ¶ 44.)  WTRI alleges Neudesic had been "unable to work with PMI's enterprise system with any kind of agility."  (Id.)

On November 4, 2016, WTRI issued a report on development of the Alpha software, which indicated that the software had not progressed beyond the Alpha 3b stage.  (FAC ¶ 56-57.)  The report also stated that WTRI had already completed its primary obligation for the Alpha software—development of the accelerated learning components.  (FAC ¶ 57.)

4

On November 30, 2016, WTRI and PMI executed the First Amendment to Software and Technology Development and Purchase Agreement (the "Amendment"). (Doc. No. 12-3, Exh. B., "Amend.") The Amendment provided, in relevant part, that if PMI rejected the Alpha 5 version of the software, it could retain ownership of the rejected version as long as it entered into a "Service Agreement" with WTRI. (Id. at 2.) If a Service Agreement was executed under this provision, PMI would not owe WTRI any other payments under the Development Agreement. (Id.) In the alternative, the Amendment provided, if PMI rejected Alpha 5 and did not retain ownership, PMI would not owe WTRI any payments or be required to enter into a Services Agreement. (Id.)

On December 2, 2016, PMI Director of Certification, Carter-Bey, sent WTRI an email stating that PMI would "reject the fifth (version) Alpha software and retain ownership of the rejected version, in accordance with the option to reject and retain interest set forth in [Section] 5 of the Development Agreement, as amended by the Amendment dated November 30, 2016." (FAC ¶ 59.) At this time, the software was only at the Alpha 3b stage and the Alpha 5 version did not exist. (FAC ¶ 60.)

In response, WTRI requested the parties agree to move forward with development of the Alpha 5 version. (FAC ¶ 65.) PMI demanded a pilot study to assess the marketability of the software before it would agree to continue developing the Alpha software. (FAC ¶ 66.) If the study showed the software was marketable, "PMI promised to accelerate development of the Alpha software toward completion." (Id.)

On December 15, 2016, the parties executed a "Services Agreement" to test the marketability of the software. (Doc. No. 12-4, Exh. C, "Serv. Agree.") The Services Agreement required WTRI to develop a new "Proteum" version of the software and create a pilot study to test its marketability. (Serv. Agree. ¶¶ 2.1-2.2; FAC ¶ 68.) WTRI alleges that the Services Agreement also required PMI to recruit a diverse range of organizations for the pilot program, (FAC ¶ 70), and complete the coding for a new "Agile" version of the software. (FAC ¶ 71.) The Agile software was an incentive for companies to take part in the pilot study. (FAC ¶ 72.)

PMI ultimately delivered the Agile software six months late, but the software did not function properly. (FAC ¶¶ 73-74.) PMI then ceased working on the Agile software. (FAC ¶ 75.)[4] WTRI alleges that this caused it serious reputational harm as it had to advise the companies it recruited for the pilot program that the anticipated Agile software would not be forthcoming. (FAC ¶ 76.) WTRI alleges that PMI never intended to comply with the Services Agreement. (FAC ¶ 79.)

On March 15, 2018, after months of discussion between the parties, PMI indicated that it would not complete development of the Alpha 5 or Charlie versions of the software envisioned by the Development Agreement. (FAC ¶ 85.) On June 18, 2018, WTRI sent PMI a notice of termination of the Development Agreement. (FAC ¶ 86.) On August 20, 2018, WTRI filed this action. (FAC ¶ 87; Doc. No. 1.)

## DISCUSSION

### I. Personal Jurisdiction

PMI moves to dismiss the FAC for lack of personal jurisdiction. The court denies Defendant's motion to dismiss on this basis.

### A. Legal Standards

Federal Rule of Civil Procedure 12(b)(2) allows a district court to dismiss an action for lack of personal jurisdiction. "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.'" Ranza v. Nike, Inc., 793 F.3d 1059, 1068 (9th Cir. 2015) (quoting CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1073 (9th Cir. 2011)). "A plaintiff may not simply rest on the 'bare allegations of [the] complaint.'" Ranza, 793 F.3d at 1068 (quoting Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004)). "But uncontroverted allegations must be taken as true, and '[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.'" Id.

_____

[4] The FAC does not indicate when PMI delivered the Agile software.

A court's power to exercise personal jurisdiction over a non-resident defendant is limited by two independent constraints: the applicable state personal jurisdiction statute and constitutional principles of due process. Sher v. Johnson, 911 F.2d 1357, 1361 (9th Cir. 1990); see also In re W. States Wholesale Natural Gas Antitrust Litig., 715 F.3d 716, 741 (9th Cir. 2013) ("[p]ersonal jurisdiction over a nonresident defendant is proper if permitted by a state's long-arm statute and if the exercise of that jurisdiction does not violate federal due process."). "Under California's long-arm statute, California state courts may exercise personal jurisdiction 'on any basis not inconsistent with the Constitution of this state or of the United States.'" Daimler AG v. Bauman, 571 U.S. 117, 125 (2014) (quoting Cal. Civ. Proc. Code Ann. § 410.10 (West 2004)). Thus, the inquiry centers on whether the court's exercise of jurisdiction over PMI comports with due process.

"The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 923 (2011). Due process requires an out-of-state defendant have certain "minimum contacts" with the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations and citation omitted). There are two categories of personal jurisdiction: (1) general jurisdiction and (2) specific jurisdiction. Goodyear, 564 U.S. at 919. WTRI concedes that the allegations in the FAC do not support the exercise of general jurisdiction, so the court only addresses specific jurisdiction.

Specific jurisdiction comports with due process when the action "arises out of or relates to the defendant's contacts with the forum." Daimler AG, 571 U.S. at 127 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, n. 8 (1984)) (alterations omitted). Specific jurisdiction is focused on the "relationship among the defendant, the forum, and the litigation." Daimler AG, 571 U.S. at 133. "[T]here must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" Bristol-Myers Squibb Co. v.

7

Superior Court of Cal., S.F. Cnty., 137 S. Ct. 1773, 1781 (2017) (quoting Goodyear, 564 U.S. at 919). This "relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." Walden, 571 U.S. at 284 (quoting Burger King Corp. v. Rudzewicz, 471 U. S. 462, 475 (1985)) (emphasis in original). "Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant — not the convenience of plaintiffs or third parties." Walden, 571 U.S. at 284.

The Ninth Circuit uses a three-part test to determine whether specific personal jurisdiction over a non-resident defendant satisfies due process: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." Schwarzenegger, 374 F.3d at 802. The plaintiff bears the burden of establishing the first two prongs, and if successful, the burden shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable. Id. (citing Burger King Corp., 471 U.S. at 476-78).

## B. Discussion

### 1. PMI Purposefully Availed Itself of the Forum

WTRI's claims for breach of contract and breach of the implied covenant of good faith and fair dealing sound in contract. "For claims sounding in contract, we generally apply a 'purposeful availment' analysis and ask whether a defendant has 'purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Picot v. Weston, 780 F.3d 1206, 1212 (9th Cir. 2015) (quoting Schwarzenegger, 374 F.3d at 802). "A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." Schwarzenegger, 374 F.3d at 802. But "[a] contract alone

does not automatically establish minimum contacts in the plaintiff's home forum." Picot, 780 F.3d at 1212 (quoting Boschetto v. Hansing, 539 F.3d 1011, 1017 (9th Cir. 2008)). Rather, "[a] defendant must have 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" Picot, 780 F.3d at 1212 (quoting Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990)).

"[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." Burger King Corp., 471 U.S. at 473 (quoting Travelers Health Assn. v. Virginia, 339 U.S. 643, 647 (1950)). "In determining whether such contacts exist, we consider 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" Picot, 780 F.3d at 1212 (quoting Burger King, 471 U.S. at 479). For example, in Burger King, the United States Supreme Court held that a franchisee purposefully availed himself of the forum state, Florida, when he entered into a franchise agreement with a large Florida corporation, Burger King, even though the franchisee had never physically visited the state. Id. at 479-82. The Court held that "[i]n light of [the franchisee's] voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the 'quality and nature' of his relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" Id. at 480 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

PMI purposefully availed itself of the forum state. Like the defendant in Burger King, PMI deliberately established substantial and ongoing contacts in California when it created a continuing relationship and obligations to WTRI over the course of several years. PMI is registered to do business in California. There is no question that PMI knew WTRI

/ / /

/ / /

/ / /

/ / /

was based in California.[5]  In early 2014, PMI reached out beyond Pennsylvania and negotiated with a California-based company to "jointly" and "collaboratively" develop, market, and sell software.  Although WTRI reached out to PMI regarding a letter of support for its NSF grant, it was PMI who first proposed joint development of the software.

During negotiations, the parties envisioned future consequences in California. WTRI's CEO, Dr. DiBello, declares that while negotiating the Development Agreement, the parties understood that PMI and WTRI would hold content development and regular team meetings in WTRI's San Diego offices.  (Doc. No. 18-1, DiBello Decl. ¶ 16.)[6]  Before executing the Development Agreement, PMI hired Neudesic, a California company, to assist with software development and perform some of its obligations.  Dr. DiBello declares that the parties understood that software development meetings would take place at Neudesic's offices in Irvine, California.  (Id.)  As anticipated, during the course of the parties' dealings, Neudesic and WTRI did in fact hold almost daily meetings in California.[7]

---

[5] The Development Agreement makes clear that WTRI was headquartered in California and all notices should be sent to its offices in San Diego.  (Dev. Agree. at 2, 11.) Furthermore, PMI representatives visited these offices on numerous occasions.

[6] PMI Director of Certification, Carter-Bey, declares that he "understood that any of PMI's obligations pursuant to the Development Agreement were to be performed in Pennsylvania."  (Carter-Bey Decl. ¶ 9.)  To the extent this blanket statement conflicts with Dr. DiBello's statement that the parties anticipated regular meetings would occur in California, the court resolves this conflict in WTRI's favor.  See Schwarzenegger, 374 F.3d at 800.

[7] PMI argues that its contract with Neudesic does not support the court's exercise of personal jurisdiction, citing Walden v. Fiore, 571 U.S. at 286.  In Walden, plaintiffs from Nevada sued a Georgia police officer for intentionally and wrongfully seizing their funds while they were passing through the Atlanta airport.  Id.  The Supreme Court held that the defendant did not have sufficient contacts with Nevada for the court to exercise personal jurisdiction.  Id. at 288-89.  The defendant's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections."  Id. at 289.  Here, the court's analysis focuses on *PMI's* contacts with California.  PMI affirmatively reached out to Neudesic for assistance with the software development process.  PMI also understood that software development meetings would take place at Neudesic's offices in California.

The contracts at issue are not one-time transactions. The parties' contracts envisioned the joint and collaborative development of software over a period of several years. The Development Agreement, executed on September 8, 2015, required the parties to "work together in joint effort" to develop the software. (Dev. Agree. ¶ 1.1.) The parties' obligations under the Development Agreement were overlapping and interconnected.[8] After issues arose under the Development Agreement, on November 30, 2016, the parties negotiated the Amendment instead of terminating their relationship. In December 2016, the parties negotiated the Services Agreement, which required WTRI to "jointly develop" and "collaborate with PMI to design and develop" the pilot program. (Serv. Agree. ¶ 2.2.)

Lastly, PMI representatives visited WTRI's offices in California on numerous occasions. In 2015 and 2016, numerous PMI representatives, including executives and senior management, spent over twenty days in San Diego holding meetings with WTRI. Moreover, between 2014 and 2017, PMI Director of Certification, Carter-Bey, declares that he personally communicated with WTRI employees approximately 20 to 30 times per month. (Carter-Bey Decl. ¶ 9.) The "quality and nature" of PMI's relationship to WTRI and its contacts in California "can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" Burger King, 471 U.S. at 480 (quoting Hanson, 357 U.S. at 253).

PMI relies on Picot v. Weston, 780 F.3d at 1206, to argue that "PMI's ability to do business in California and occasional attendance at California meetings are not sufficient to establish personal jurisdiction." (Doc. No. 14-1 at 18.) In Picot, a Michigan-based defendant worked with a plaintiff domiciled in California to develop and market new technology. Picot, 780 F.3d at 1210. "The [parties'] agreement was formed in Michigan, where [defendant] lived, where it was understood [defendant] would perform the majority of his work, and where [defendant] did indeed discharge most of his contractual duties."

---

[8] For example, the Development Agreement provides that PMI must "provide all assistance and cooperation to [WTRI] in order to complete the development, testing and production, timely and efficiently, of the Software." (Dev. Agree. ¶ 1.4.)

Id. at 1212. Aside from his interaction with the plaintiff, the defendant's only contacts with California were two trips to help the plaintiff demonstrate the product to prospective buyers. Id. at 1210. Neither trip was contemplated in the original agreement and both were made at the plaintiff's request. Id. Ultimately, "given 'the limited nature of the transaction at issue,'" the Court determined that those two trips to California were not sufficient contacts between the defendant and California to confer personal jurisdiction. Id. at 1213 (quoting Boschetto, 539 F.3d at 1017). Unlike the defendant in Picot, PMI representatives made numerous trips to WTRI offices in California and PMI had an ongoing contractual relationship with WTRI that spanned years and specifically required the parties to collaborate on software development.

PMI argues that the Development Agreement was primarily negotiated and executed through mail, e-mail, and telephone calls, and that the PMI staff involved were not located in California. (Carter-Bey Decl. ¶ 6.) But PMI created "continuing obligations" between itself and residents of the forum and may not avoid jurisdiction merely because the contracts were not *physically* negotiated in California. See Burger King, 471 U.S. at 476.

In sum, WTRI has met its burden to establish that PMI purposefully availed itself of the forum.

## 2. WTRI's Claims Arise Out of PMI's California Activities

Second, WTRI must demonstrate that its claims arise from PMI's forum-related activities. Schwarzenegger, 374 F.3d at 801-02. WTRI must establish that it would not have suffered an injury "but for" PMI's forum-related conduct. See Menken v. Emm, 503 F.3d 1050, 1058 (9th Cir. 2007). WTRI's breach of contract and breach of the implied covenant of good faith and fair dealing claims relate to PMI's failure to perform its obligations under the Development Agreement, interference with WTRI's ability to perform its obligations under the Services Agreement, and discontinuation of the Alpha software. (FAC ¶¶ 96-108.) PMI's contacts with California arise from its creation of a collaborative, contractual relationship with WTRI and its performance of duties under both agreements. Moreover, the FAC alleges that at a meeting in San Diego, PMI's Lead

Instructional Designer, Karen Holloway, revealed that PMI had failed to provide her with sufficient resources to complete PMI's content development work for the Alpha software. (FAC ¶¶ 37-38.) Following this meeting, PMI removed Ms. Holloway from the project, and WTRI alleges that it was forced to take over PMI's content design obligations to keep the project on track. (FAC ¶ 39.) WTRI also alleges that PMI hired Neudesic, a California company, to perform some of PMI's software development obligations under the Development Agreement. (FAC ¶ 40.) WTRI alleges that Neudesic was unable to work with PMI's enterprise system, which required WTRI to take on these obligations. (FAC ¶¶ 43-44.) But for PMI's contacts with California, WTRI's claims would not have arisen.

### 3. The Court's Exercise of Jurisdiction Is Reasonable

Lastly, PMI must present a "compelling case" that it would be unreasonable for the court to exercise personal jurisdiction over it. Burger King, 471 U.S. at 476-78. "To evaluate reasonableness, we use a seven-factor balancing test that weighs: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp., 905 F.3d 597, 607 (9th Cir. 2018).

After considering these factors, the court finds that PMI has not met its burden. The first factor weighs in favor of exercising jurisdiction. As discussed above, PMI purposefully availed itself of the forum. Moreover, PMI routinely organizes and hosts large conferences in California and has held at least one board meeting in San Diego.[9]

---

[9] In 2018, PMI held its "flagship event," the "PMI Global Conference," and a "SeminarWorld" event in California. (Doc. No. 18-3, Exh. A; Doc. No. 18-4, Exh. B.) In

PMI argues that the second factor weighs in its favor because litigating this action in California would place a substantial burden on PMI as its executives and employees are primarily located in Pennsylvania and will have to travel to California. Modern transportation and technology have significantly eased the burden of litigating in another state. See Burger King, 471 U.S. at 474. Moreover, PMI executives and board members have traveled to California on PMI business over the last few years. PMI fails to identify a more specific burden than the general burden of travel. This factor does not support PMI.

PMI argues that the third factor weighs in its favor because (1) the Development Agreement identifies New York law as controlling, and (2) the Services Agreement identifies Pennsylvania law as controlling and states that the parties consent to jurisdiction of the Eastern District of Pennsylvania. First, PMI fails to identify a conflict with New York, which is not its state of citizenship. As discussed above, nothing else in the FAC or the parties' agreements indicate that the parties intended to litigate disputes in New York. Second, the Services Agreement does not contain the Pennsylvania jurisdictional provision PMI cites. This provision is contained in a separate "License Agreement" that does not form the basis of WTRI's claims. (See Doc. No. 12-4 at 17.)[10]

---

2017, PMI hosted "SeminarWorld" and "Standard for Program Management" events in California. (Doc. No. 18-5, Exh. C; Doc. No. 18-9, Exh. G.) In 2016, PMI held an "Academy of Management Annual Meeting," "PMO Symposium," "SeminarsWorld" conference, and "Standards Member Advisory Group" event in California. (Doc. No. 18-6, Exh. D; Doc. No. 18-7, Exh. E; Doc. No. 18-8, Exh. F; Doc. No. 18-10, Exh. H.) In September 2016, PMI held a board of directors meeting in San Diego. (DiBello Decl. ¶ 7.)

[10] The License Agreement is appended to the Services Agreement and provides WTRI with a license to use the software for the pilot program. (See Serv. Agree. § 2.3; Doc. No. 12-4 at 10-17, "License Agree.") Section 8.6 of the License Agreement provides that the contract is governed by Pennsylvania law and that the parties consent to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania. (License Agree. § 8.6.) There is no reference to the License Agreement in the FAC and WTRI confirms in its supplemental briefing that the License Agreement does not form the basis of any of its claims. (Doc. No. 22 at 6.) PMI fails to identify any reason why this provision would govern the separate Services Agreement and erroneously attributes § 8.6 to the Services Agreement instead of the License Agreement.

PMI fails to address the fourth, fifth, and sixth factors, and does not dispute that many witnesses are located in California. PMI received fair notice that it may be subject to suit in California and fails to meet its burden to establish that jurisdiction in this forum would be fundamentally unfair.

### 4. Tort Claims

WTRI also asserts fraudulent misrepresentation and tortious interference with prospective business relations. As discussed below, WTRI fails to state a claim for fraudulent misrepresentation and tortious interference with prospective business relations. This failure to plead sufficient facts somewhat hinders the court's jurisdictional analysis on these claims. Nonetheless, the court may exercise personal jurisdiction over PMI for these claims under the doctrine of pendent personal jurisdiction as they arise out of a common nucleus of operative facts. Wash. Shoe Co. v. A-Z Sporting Goods Inc., 704 F.3d 668, 673 (9th Cir. 2012) (courts may "exercise 'jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction'") (quoting Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180 (9th Cir. 2004)); 28 U.S.C. § 1367(a) (providing district courts with supplemental subject matter jurisdiction for claims so related that they "form part of the same case or controversy").

## II. Failure to State a Claim

PMI moves to dismiss the FAC for failure to state a claim. The court grants PMI's motion, dismissing the FAC with leave to amend.

### A. Legal Standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the pleadings. To overcome such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Facts merely consistent with a defendant's liability are insufficient to survive a motion to dismiss because they establish only that the allegations are possible rather than plausible. <u>Id.</u> at 678–79. The court must accept as true the facts alleged in a well-pled complaint, but mere legal conclusions are not entitled to an assumption of truth. <u>Id.</u> The court must construe the pleading in the light most favorable to the non-moving party. <u>Concha v. London</u>, 62 F.3d 1493, 1500 (9th Cir. 1995).

## B. Choice of Law

The court requested supplemental briefing on which state's law governs WTRI's claims as the parties cited both California and New York law without taking a position on which law applied. (Doc. No. 21.) The Development Agreement and Services Agreement each contain a provision stating that the respective agreements "shall be governed by and construed in accordance with the laws of the State of New York, excluding that body of law applicable to choice of law." (Dev. Agree. § 14.6; Serv. Agree. § 10.6.)[11]

Because the court has diversity jurisdiction over WTRI's claims and the agreements specifically exclude New York's choice of law rules, the choice of law rules of the forum state govern. <u>See</u> <u>Hatfield v. Halifax PLC</u>, 564 F.3d 1177, 1182 (9th Cir. 2009). Thus, the court applies California's choice of law rules. "In determining the enforceability of . . . contractual choice-of-law provisions, California courts shall apply the principles set forth in the Restatement (Second of Conflict of Laws) section 187 which reflects a strong policy favoring enforcement of such provisions." <u>Nedlloyd Lines B.V. v. Superior Court</u>, 3 Cal. 4th 459, 464 (1992). Section 187 provides, in pertinent part, that:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties['] choice, or (b) application of the law of the

---

[11] Throughout its motion, PMI cites a Pennsylvania choice of law provision in a "License Agreement" that is attached to the Services Agreement. (Doc. No. 12-4, License Agree. § 8.6.) But this agreement, as discussed above, does not form the basis of WTRI's claims.

> chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the role of section 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (2d) of Conflict of Laws § 187(2) (1998). In determining the enforceability of a contractual choice of law provision, the court must first determine (1) whether the chosen state has a substantial relationship to the parties or transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. <u>Nedlloyd</u>, 3 Cal. 4th at 465-66. "If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law." <u>Id</u>. at 466.

WTRI argues that California law governs as neither its claims nor the parties have a substantial tie to New York. PMI is a Pennsylvania entity with its principal place of business in that state. WTRI is a Delaware corporation with its principal place of business in California. WTRI argues that its contractual claims do not arise from any events that took place in New York and that it suffered all injuries in California. PMI does not take a position on which state's law applies and instead argues that "California and New York laws are sufficiently similar on the issues presented by PMI's Motion to render the choice of law issue irrelevant as WTRI fails to plead its claims adequately under either state's laws." (Doc. No. 23 at 6.)

The parties have not identified any facts that would allow the court to find that New York has a substantial relationship to the parties or transaction. Nor have the parties identified a reasonable basis for the New York choice of law provision. The FAC does not fill this gap. Thus, the court declines to enforce the New York choice of law provision. "In the absence of an effective choice-of-law agreement, California choice-of-law rules permit a court to apply the decisional rules of its forum state 'unless a party litigant timely invokes the law of a foreign state.'" <u>JMP Sec. LLP v. Altair Nanotechnologies Inc.</u>, 880 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012) (quoting <u>Washington Mut. Bank, FA v. Superior Court</u>, 24 Cal. 4th 906, 919 (2001)). As PMI fails to invoke New York law and

instead states that there is no material difference between the laws of California and New York, the court applies California law.

### C. Breach of Contract

To state a breach of contract claim, WTRI must allege "(1) the [existence of a] contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." Richman v. Hartley, 224 Cal. App. 4th 1182, 1186 (2014). PMI argues that WTRI fails to plead the third element, breach. The court agrees as WTRI fails to allege that PMI breached any specific provision of the contract.

First, WTRI argues that PMI breached § 1.4 of the Development Agreement and failed to fulfill its obligations under Exhibit A to the Development Agreement. Section 1.4 provides in relevant part:

> [PMI] agrees to perform all tasks assigned to Purchaser as set forth in the Development Plan or otherwise agreed to by the Parties, and to provide all assistance and cooperation to Seller in order to complete the development, testing and production, timely and efficiently, of the Software.

(Dev. Agree. § 1.4.) Exhibit A to the Development Agreement is a 27-page document that includes, among other terms, 79 distinct "Acceptance Criteria." (Doc. No. 12-1 at 13-39.) The FAC pleads, in general terms, that PMI personnel were "unfamiliar with the respective responsibilities of the parties" and PMI failed to perform or "default[ed] on its obligations." (FAC ¶¶ 27, 30, 40, 50, 52-54, 60, 99.) These conclusory allegations fail to identify precisely which obligations under the Development Agreement PMI failed to perform. WTRI also alleges that it was forced to take on PMI's duties of, "*inter alia*, financing needed third-party licenses, 3D artwork, and otherwise supporting the scaling, maintenance, and positioning of the enterprise-based system for commercialization," management of the Proteum software, creation of "the code base for PMI's enterprise system to integrate the Alpha software," development of both a single- and multi-player mode, development of the "accelerated learning aspect of the project," and "management

of the core software suite under integration." (FAC ¶¶ 32, 50, 55, 58, 99.)[12]  But the FAC and WTRI's opposition fail to identify why PMI was obligated to perform any of these tasks.  To the extent these obligations are buried in the 63 pages that comprise the Development Agreement and its attachments, the court declines to hunt through the parties' agreement in search of these contractual provisions and specific responsibilities.  Paragraph 99 exemplifies the FAC's deficient pleading.  In that paragraph, WTRI purports to identify "[t]he obligations that PMI has failed to perform and continues to fail to perform," but instead alleges only that PMI "[d]efault[ed] on performance obligations, requiring WTRI to take on performance tasks," "knowingly default[ed] on its obligations," and did not perform obligations that WTRI fails to ground in the contract.  (FAC ¶ 99.)  Such conclusory and circular allegations, without citation to contract provisions enumerating the allegedly breached obligations, are insufficient.  As stated above, it is not the court's responsibility to mine the record to determine what obligations the contract provisions create.

Second, WTRI argues that PMI breached § 1.5 of the Development Agreement, which provides in relevant part:

> [PMI] and [WTRI] shall each assign a Project Manager for managing the development of the Software.  The Project Managers shall be responsible for: (i) managing the day-to-day activities under this Agreement, (ii) serving as liaisons between the Parties, (iii) assigning and scheduling the appropriate personnel to perform the required services under this Agreement . . . .

(Dev. Agree. § 1.5.)  WTRI alleges that PMI failed to adequately staff the joint development program and "[t]erminat[ed] or reassign[ed] key staff members as software development approached critical milestones."  (FAC ¶ 99.)  WTRI alleges that PMI removed the Lead Instructional Designer from its content development team after PMI

---

[12] The court notes that much of the lexicon used throughout the FAC, although perhaps easily understood by a software developer, is not readily accessible to the layperson.  The FAC is particularly difficult to decipher because it contains both conclusory allegations and esoteric lexicon.

learned that the team was several months behind schedule. (FAC ¶¶ 34-39.) As a result, WTRI alleges, it "was forced to take over content design." (FAC ¶ 39.) Presumably, WTRI argues that PMI Project Managers failed to "assign[ ] and schedul[e] the appropriate personnel <u>to perform the required services under th[e] Agreement</u>." (Dev. Agree. § 1.5) (emphasis added). These allegations suffer from the same deficiencies identified above—WTRI fails to state which obligations under the Development Agreement PMI failed to perform because of its alleged staffing issues. Moreover, these allegations are extremely vague as they identify only one staff member that was reassigned.

In sum, WTRI fails to allege sufficient facts to allow the court to draw the reasonable inference that PMI breached the Development Agreement. <u>See</u> <u>Iqbal</u>, 556 U.S. at 668.

## D. Breach of Implied Covenant of Good Faith and Fair Dealing

California law implies a covenant of good faith and fair dealing into every contract. <u>Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.</u>, 2 Cal. 4th 342, 371 (1992). "In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." <u>Racine & Laramie, Ltd. v. Dep't of Parks & Recreation</u>, 11 Cal. App. 4th 1026, 1031-32 (1992) (quoting <u>Love v. Fire Ins. Exchange</u>, 221 Cal. App. 3d 1136, 1153 (1990)) (emphasis in original). "The covenant of good faith and fair dealing . . . exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." <u>Guz v. Bechtel Nat'l, Inc.</u>, 24 Cal. 4th 317, 349 (2000) (emphasis in original). To state a claim for breach of the duty of good faith and fair dealing, WTRI must allege: "(1) the existence of a contract; (2) [its] performance of the contract, or a legally cognizable excuse for nonperformance; (3) defendants' breach; and (4) resulting damage." <u>Grant v. Aurora Loan Servs., Inc.</u>, 736 F. Supp. 2d 1257, 1266 (C.D. Cal. 2010) (citing <u>First Commercial Mortgage Co. v. Reece</u>, 89 Cal. App. 4th 731, 745 (2001)).

PMI argues that WTRI fails to state a claim because (1) the FAC does not identify

the contracts or specific provisions giving rise to the implied covenant, (2) the FAC pleads insufficient factual allegations, and (3) this claim is duplicative of WTRI's breach of contract claim. WTRI alleges that PMI breached its duty to act fairly and in good faith for three reasons. First, by "knowingly and willfully misrepresenting its intent to perform its obligations under the Development Agreement." (FAC ¶ 106.) The FAC states that PMI never intended to comply with the Services Agreement and that WTRI was informed, at some unstated point of time by an unnamed person, that PMI's Senior Vice President "had made the decision 'some time ago' to 'fix things' and 'transform' PMI by, in part, 'killing' the Alpha software project." (FAC ¶ 82.) The FAC further alleges that "[p]resent and former PMI personnel confided in WTRI that 'for months' PMI had no intention of ever selling the product, and as a result, PMI saw no reason to add to its investment notwithstanding its failed performance and behavior designed to encourage WTRI to 'pull the plug.'" (FAC ¶ 83.) "Instead of choosing to anticipatorily repudiate or terminate the Development Agreement at an earlier stage to minimize economic and reputational damages to WTRI, PMI recklessly and intentionally withheld information from WTRI, thereby prolonging the harm caused to WTRI by PMI's inevitable breach of the Development Agreement and Services Agreement." (FAC ¶ 89.) These vague allegations are insufficient to state a claim. WTRI fails to identify any specific actions PMI took to "kill" the Alpha program or encourage WTRI to "pull the plug." Moreover, the FAC does indicate what benefit of the contract WTRI was denied.

Second, WTRI alleges that PMI breached the implied covenant by "sabotaging WTRI's ability to perform under the pilot study as agreed to in the Services Agreement." (FAC ¶ 106.) The FAC alleges that under the Services Agreement, PMI was obligated to (1) recruit 12 to 24 companies for the pilot study, and (2) complete the coding and technical development of an "Agile" program. WTRI alleges that PMI failed to perform these tasks, thus depriving WTRI of the benefits of the contract. As with WTRI's breach of contract claim, the FAC fails to identify what provision(s) of the Services Agreement obligated PMI to perform these tasks. The implied covenant of good faith and fair dealing "is limited to

assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." Spinks v. Equity Residential Briarwood Apartments, 171 Cal. App. 4th 1004, 1033 (2009) (quoting Pasadena Live v. City of Pasadena, 114 Cal. App. 4th 1089, 1094 (2004)). The FAC fails to root these alleged obligations in the terms or purpose of the Services Agreement.

Lastly, WTRI alleges that PMI breached the implied covenant by "interfering with WTRI's efforts to finalize development of the Alpha software under the Development Agreement." (FAC ¶ 106.) The FAC and WTRI's opposition fail to identify any specific factual allegations supporting this vague allegation. The court notes that the FAC contains allegations relating to PMI's purported rejection of the Alpha 5 software when that version of the software did not exist, which might form the basis of such a claim. However, neither party identifies or relies upon these facts in their briefing.

### E. Fraudulent Misrepresentation

The elements of fraud in California are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 990 (2004). PMI contends WTRI fails to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement, which applies to state causes of action made in federal court. Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In cases involving misstatements, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Vess, 317 F.3d at 1106 (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)). "A plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." Id. (internal quotations omitted).

WTRI alleges that "PMI promised to accelerate development of the Alpha software toward completion" if the pilot study proved the software was marketable. (FAC ¶ 111.) In addition, PMI "intentionally misrepresent[ed] its intent to perform under the Development Agreement and Service Agreement in an effort to compel WTRI to 'pull the plug.'" (FAC ¶ 88.) At the time PMI made these misrepresentations, WTRI alleges, PMI had no intent of performing its obligations under the Development Agreement. (FAC ¶ 113.) "Specifically, WTRI was informed that Murat Bicak, the new Senior Vice President of Strategy for PMI, had made the decision 'some time ago' to 'fix things' and 'transform' PMI by, in part, 'killing' the Alpha software project." (FAC ¶ 114.) WTRI further alleges that "present and former PMI personnel confided in WTRI that 'for months' PMI had no intention of ever selling the product, and as a result, it saw no reason to add to its investment notwithstanding its failed performance and behavior designed to encourage WTRI to 'pull the plug.'" (FAC ¶ 115.)

WTRI fails to meet the pleading requirements of Rule 9(b). WTRI focuses on Mr. Bicak's statement about "killing" the software development project and the statements of current and/or former PMI employees that PMI did not intend to sell the software and instead wanted WTRI to "pull the plug." But these statements, made at unknown times and reported to WTRI by unknown sources, are not misrepresentations PMI made to WTRI. The FAC identifies two alleged misrepresentations: (1) "PMI promised to accelerate development of the Alpha software toward completion," and (2) PMI "intentionally misrepresent[ed] its intent to perform under the Development Agreement and Service Agreement." (FAC ¶¶ 88, 111.) The FAC fails to allege what specific statements were made, who at PMI made these representations, or when or where the statements were made. See Vess, 317 F.3d at 1106; Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009) (dismissing claim when complaint failed to identify what specifically was stated, when, by whom, and where).

### F. Tortious Interference with Prospective Business Relations

To state a claim for tortious interference with prospective business relations, WTRI

must allege: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (2003) (quoting Westside Center Associates v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507, 521-22 (1996)). "[T]he act of interference with prospective economic advantage is not tortious in and of itself." Korea Supply Co., 29 Cal. 4th at 1159. Defendant's conduct must be "wrongful by some legal measure other than the fact of interference itself." Id. at 1153 (quoting Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376 (1995)). "[W]rongful conduct is sufficient to support a business interference claim if it is proscribed by 'some constitutional, statutory, regulatory, common law, or other determinable legal standard' where it amounts to 'independently actionable conduct.'" Popescu v. Apple Inc., 1 Cal. App. 5th 39, 63 (2016) (quoting Korea Supply Co., 29 Cal. 4th at 1159).

WTRI alleges that PMI tortiously interfered with its relationship with the National Science Foundation ("NSF"). This claim suffers from numerous deficiencies. As an initial matter, the FAC fails to allege PMI's conduct was "wrongful by some legal measure other than the fact of interference itself." Korea Supply Co., 29 Cal. 4th at 1159. WTRI stakes its tortious interference claim on its claims for breach of the implied covenant of good faith and fair dealing and fraudulent misrepresentation. As discussed above, WTRI fails to allege sufficient facts to state either of these claims, and thus, fails to allege an independently wrongful act here.

Second, the FAC does not allege that WTRI's relationship with the NSF was actually disrupted. WTRI alleges that it sought grant funding from the NSF and that at some point the NSF began to ask "pointed questions about the shabby state of affairs of the partnership between PMI and WTRI." (FAC ¶ 78.) The FAC does not state that it was denied grant funding as a result of PMI's actions. To the contrary, WTRI alleges that the NSF ultimately

24

invested $1,250,000 in the software development project. (FAC ¶ 17.) Moreover, "pointed questions" do not constitute harm to the relationship.

Lastly, to the extent WTRI alleges a claim for interference with its relationship with "other entities in the educational gaming industry," it plainly fails to state a claim as the FAC does not identify these other entities. (See FAC ¶ 125.)

## CONCLUSION

PMI's motion to dismiss for lack of personal jurisdiction is denied, but its motion to dismiss for failure to state a claim is granted. The court grants WTRI leave to amend. WTRI may file any amended complaint within fourteen days of this order.

IT IS SO ORDERED.

DATED: March 18, 2019

JEFFREY T. MILLER
United States District Judge

18cv1927 JM (MSB)