UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WORKPLACE TECHNOLOGIES RESEARCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> PROJECT MANAGEMENT INSTITUTE, INC., <br><br> Defendant. | Case No.: 18cv1927 JM (MSB) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

Defendant Project Management Institute, Inc. ("PMI") moves the court to dismiss Plaintiff's Second Amended Complaint ("SAC") for failure to state a claim. (Doc. No. 28.) Plaintiff Workplace Technologies Research, Inc. ("WTRI") opposes. (Doc. No. 29.) For the reasons discussed below, the court grants in part and denies in part PMI's motion to dismiss.

**BACKGROUND**

The court hereby incorporates the detailed recitation of alleged facts in its prior order. (Doc. No. 24.) In short, this action arises out of an unsuccessful endeavor to jointly develop educational project management software. On September 8, 2015, PMI and WTRI executed a Software Technology Development and Purchase Agreement (the "Development Agreement") memorializing the parties' agreement to jointly develop educational software. (Doc. No. 25-1, "Dev. Agree.") The Development Agreement provided that WTRI would develop virtual reality software in collaboration with PMI for

1

a payment of up to $4,000,000. (Dev. Agree. § 2.5.)  The Agreement envisioned five initial stages of software development—"Alpha 1" through "Alpha 5."  (SAC ¶ 35; Dev. Agree. §§ 2.5, 5.)  If the final Alpha 5 version met all "Acceptance Criteria" and PMI accepted the Alpha 5 software, WTRI agreed to develop a "Charlie" software. (Dev. Agree. §§ 2.5, 5.)[1] WTRI alleges PMI failed to fulfill many of its obligations under this Agreement and prevented development of the Alpha 5 version of the software.  After allegedly failing to perform its obligations under the Development Agreement, PMI demanded a pilot study to assess the marketability of the software before it would move forward with software development.  On November 30, 2016, the parties amended the Development Agreement to provide that if PMI rejected the Alpha 5 software and retained ownership of the software, the parties would execute a "Services Agreement" in lieu of monetary payment to WTRI. (Doc. No. 25-3, Exh. B, "Amend.")  On December 2, 2016, PMI informed WTRI it would exercise its right to reject the Alpha 5 software and retain ownership.  (SAC ¶ 75.)  On December 15, 2016, the parties executed a "Services Agreement," memorializing the parties' agreement to perform a pilot study of the software. (Doc. No. 25-4, Exh. C, "Serv. Agree.")  WTRI alleges PMI then failed to perform its obligations under the Services Agreement, which damaged WTRI's business relationships, and further refused to continue development of the original software under the Development Agreement.

WTRI filed this action on August 20, 2018.  On October 4, 2018, PMI moved to dismiss the complaint. (Doc. No. 10.)  WTRI responded by filing a First Amended Complaint ("FAC"). (Doc. No. 12.)  On November 8, 2018, PMI moved to dismiss the FAC for lack of personal jurisdiction and failure to state a claim.  The court denied PMI's motion on personal jurisdiction grounds but granted its motion to dismiss the FAC for failure to state any claim. (Doc. No. 24.)  On April 2, 2019, WTRI filed the SAC, which

---

[1] The "Acceptance Criteria" are 76 "product description and specifications" mutually agreed upon by the parties and memorialized in Exhibit A to the Development Agreement. (Dev. Agree. § 5.1; Doc. No. 25-1, Exh. A at 22-39.)

PMI now moves to dismiss for failure to state a claim.

## LEGAL STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the pleadings. To overcome such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Facts merely consistent with a defendant's liability are insufficient to survive a motion to dismiss because they establish only that the allegations are possible rather than plausible. Id. at 678-79. The court must accept as true the facts alleged in a well-pled complaint, but mere legal conclusions are not entitled to an assumption of truth. Id. The court must construe the pleading in the light most favorable to the non-moving party. Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995).

## DISCUSSION

WTRI asserts claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud, and (4) tortious interference with prospective economic advantage. PMI moves to dismiss each claim.[2]

### I. Breach of Contract

To state a breach of contract claim, WTRI must allege "(1) the [existence of a] contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." Richman v. Hartley, 224 Cal. App. 4th 1182, 1186 (2014). WTRI alleges PMI breached its duties under the Development Agreement, Development Plan, and Services Agreement. (SAC ¶¶ 139-148.) PMI argues WTRI fails to meet the third element, breach, as it fails to allege which

---

[2] For the reasons stated in its order denying PMI's motion to dismiss the FAC, the court applies California law to WTRI's contract claims. (Doc. No. 24 at 16-18.)

contractual obligations were breached and how PMI breached these obligations.

**A. Development Agreement**

In its prior order, the court dismissed WTRI's breach of contract claim without prejudice as the FAC contained only conclusory allegations that failed to identify which precise obligations under the Development Agreement PMI failed to perform. (Doc. No. 24 at 18-20.)[3] WTRI now alleges PMI breached Section 1.1 of the Development Agreement and 36 duties enumerated in the Development Plan. (SAC ¶¶ 139-140.) Section 1.1 provides, in relevant part, that the "Parties shall work together in a joint effort to accomplish the tasks and objectives set forth in the Development Plan. . . ." (Doc. No. 25-1, "Dev. Agree." § 1.1.) Section 1.4 of the Development Agreement provides in relevant part—

> [PMI] agrees to perform all tasks assigned to [PMI] as set forth in the Development Plan or otherwise agreed to by the Parties, and to provide all assistance and cooperation to [WTRI] in order to complete the development, testing and production, timely and efficiently, of the Software.

(Dev. Agree. § 1.4.) PMI argues that the SAC fails to identify "actual obligations" it was required to perform and fails to allege what actions by PMI constituted a breach of these obligations. (Doc. No. 28-1 at 14.) The court disagrees.

First, the SAC specifically identifies which obligations PMI failed to perform. As with the Development Agreement provisions discussed in the court's prior dismissal order, §§ 1.1 and 1.4 require PMI to perform tasks enumerated elsewhere in the parties' agreements. (See Doc. No. 24 at 18-20.) To ground these general provisions in specific contractual obligations, WTRI identifies 36 distinct duties assigned to PMI by the Development Plan. (SAC ¶¶ 40-41, 44-51, 66, 139.) The Development Plan is an addendum to and incorporated into the Development Agreement. (Doc. No. 25-2, "Dev. Plan" at 2.) The Development Agreement defines the appended Development Plan as the "summary outline" of "[t]hat written plan agreed to by the Parties setting forth (i) the design

---

[3] Page citations in this order refer to those generated by the court's CM/ECF system.

and development responsibilities of the Parties, (ii) the timelines therefor, (iii) the specifications for the Software, and such other pertinent matters as the Parties may agree." (Dev. Agree. § 1.2.) Furthermore, § 1.1 of the Development Agreement specifically requires the parties to work together to complete the tasks set forth in the Development Plan and § 1.4 requires PMI to perform all tasks assigned to it by the Development Plan. (Dev. Agree. §§ 1.1, 1.4.) The SAC sufficiently identifies each obligation PMI failed to perform as it states the section number and category of each task in the Development Plan. The SAC also sufficiently alleges PMI was responsible, at least jointly, for each of these tasks.[4] Second, the SAC alleges PMI failed to perform these obligations. (SAC ¶¶ 40-41.) The conduct amounting to breach in this case is inaction—PMI's failure to perform. At the pleading stage, such allegations are sufficient to state a breach of contract claim. See Fed. R. Civ. P. 8(a).

PMI also argues that WTRI fails to state a claim because "the Development Agreement explicitly states that: (1) PMI and WTRI agreed to 'work together in a joint effort to accomplish the tasks and objectives set forth in the Development Plan,' see SAC, Ex. A at § 1.1; . . . (2) PMI was free to 'elect following any review cycle to reject the software (Alpha or Charlie),' see id. at § 5.2[; (3)] PMI also retained the right to 'evaluate the desirability of modifying remaining aspects of the Development Plan' as work under the Development Plan moved from stage to stage[,] [s]ee id. at § 1.2"; and (4) the Development Agreement did not require the parties to split the work equally. (Doc. No. 28-1 at 16.) First, the fact that PMI and WTRI agreed to work together in a "joint effort" does not obviate PMI's agreement to perform the tasks assigned to it by the Development Plan. Second, although PMI could reject the software following a review cycle, as is discussed further below, it could only do so if the software failed to meet the Acceptance

---

[4] The Development Plan identifies the "person responsible" for each of these cited tasks as one of the following: PMI, a specific individual the SAC identifies as a PMI associate, or PMI and WTRI as jointly responsible. (SAC ¶¶ 40-41; Dev. Plan at 4-7.)

Criteria. (Dev. Agree. § 5.2.) This right does not alter the duties assigned to PMI by the parties' agreements. Third, any modifications to the Development Plan are effective only upon written agreement between the parties. (Dev. Agree. § 1.2.) PMI does not argue that a written agreement modified its duties under the Development Plan. Lastly, WTRI does not allege that the Development Agreement required the parties to equally split the work.

**B. Services Agreement**

The SAC newly alleges a claim for breach of the Services Agreement. WTRI alleges PMI breached the Services Agreement by failing to develop a functional "Agile" software product, recruit customers to participate in the pilot study, or collect feedback from participating organizations. (SAC ¶¶ 143-148.) PMI argues only that "WTRI fails to identify specific contract provisions and PMI's purported conduct that constitutes a breach of those provisions." (Doc. No. 28-1 at 17.) The court disagrees.

An addendum to the Services Agreement contains an "Activity Chart," which "identifies specific outputs and deliverables." (Serv. Agree., Exh. C at 19.) WTRI alleges PMI failed to perform three obligations imposed on it by the Activity Chart.[5] First, the SAC alleges PMI breached its obligation to recruit organizations for the pilot study. The Activity Chart states that "PMI, coordinating with WTRI," is responsible for "[r]ecruitment of Pilot program organizations" and that "[a] diverse range of organizations will be targeted across different buyer profiles in the PMO and HR function through 1-2-1 meetings or inclusion in the WTRI recruiting/solicitation demo event." (Serv. Agree., Exh. C at 20.) The "objective" of this recruitment was to "[s]ecure[ ] participation in [the] pilot program to reflect [a] diverse range of organizations and buyer profiles." (Id.) The "Services

---

[5] In its opposition, WTRI argues the SAC alleges PMI also breached the training obligations imposed on it by the Activity Chart. (Doc. No. 29 at 17.) Although the SAC identifies the parties' joint obligation to train team members and facilitators, the SAC does not allege that PMI failed to fulfill this obligation. (See SAC ¶¶ 90-102, 143-148.) Accordingly, to the extent WTRI intended to assert a breach of contract claim on this basis it fails to allege sufficient facts to do so.

Detail" section of the addendum further states that PMI is to recruit approximately 6 organizations through the "[Human Resources] function" and approximately 6 organizations through the "[Project Management Office] function." (Serv. Agree., Exh. C at 22.) The SAC alleges PMI breached its obligations under this section because it "failed to bring any customers to test the software." (SAC ¶ 94.) Accordingly, the SAC sufficiently alleges PMI breached its duty to recruit organizations for the pilot study.

Second, the SAC alleges PMI failed to meet the product development obligations imposed by the Activity Chart. The Chart tasks "PMI and WTRI" with product "[d]evelopment of new rehearsal" software, referred to as the "Agile" software. (Serv. Agree., Exh. C at 21.) This new software was to include a single- and mutli-player product with one new "cognitive agility assessment test." (Id.) The SAC alleges PMI breached the Services Agreement by delivering the new software six months behind schedule and because the software "did not comply with the learning model, failed to meet the standards expected by WTRI's C-suite customers, and did not function properly in direct contravention of the deliverables owed by PMI pursuant to the 'Product Development' section of the Activity Chart." (SAC ¶¶ 99-100.) After delivery of the "nonfunctional" software, PMI ceased all further development of the software. (SAC ¶ 101.)

The "Product Development" section does not clearly divide duties between the parties or state the parties' expectations for development of this new software. However, WTRI alleges that "pursuant to the 'Product Development' section of the Activity Chart, PMI understood at all relevant times that it was required to complete the coding of the [new] 'Agile' product, for which WTRI designed the content and for which PMI was to do all of the technical development." (SAC ¶ 96.) The new software "was supposed to be a product that would teach customers 'Agile' project management methods when in charge of software development projects, and it was referred to as 'Agile' or the 'Agile product' for convenience by the parties." (SAC ¶ 97.) "The promise of a follow-on, polished Agile product was an incentive for recruiting the C-suite customers to try sign up for the pilot study, as they expected to be able to purchase the finished 'Agile' product once it was

completed." (SAC ¶ 98.) PMI does not dispute or address these allegations. At the motion to dismiss stage, these allegations are sufficient to state a claim that PMI breached its product development obligations under the Services Agreement. See Cal. Civ. Code § 1649 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.").

Lastly, WTRI argues PMI breached the Services Agreement by failing to collect user feedback from participating organizations. The Activity Chart contains a "Pilot Program Operations" section that charged "PMI with support as required from WTRI" with "[c]ollection of feedback from organizations." (Serv. Agree., Exh. C at 20-21.) The "objective" of this activity was the "[c]ollection of useful feedback." (Serv. Agree., Exh. C at 20.) The SAC alleges PMI failed to collect any feedback from pilot study participants. (SAC ¶ 147.) WTRI sufficiently alleges breach on this basis.

Accordingly, PMI's motion to dismiss WTRI's breach of contract claim is denied.

## II. Breach of Implied Covenant of Good Faith and Fair Dealing

California law implies a covenant of good faith and fair dealing into every contract. Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., 2 Cal. 4th 342, 371 (1992). "In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." Racine & Laramie, Ltd. v. Dep't of Parks & Recreation, 11 Cal. App. 4th 1026, 1031-32 (1992) (quoting Love v. Fire Ins. Exchange, 221 Cal. App. 3d 1136, 1153 (1990)) (emphasis in original). "The covenant of good faith and fair dealing . . . exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 349 (2000) (emphasis in original). It "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." Id. at 349-50.

As an initial matter, PMI argues the SAC fails to state a claim for *tortious* breach of the implied covenant of good faith and fair dealing. However, any fair reading of the SAC's implied covenant of good faith and fair dealing claim and WTRI's opposition to PMI's motion to dismiss makes it clear WTRI is not alleging a *tortious* breach occurred. Rather, and properly so, WTRI acknowledges PMI's conduct is of the type that frustrates a party's rights to the benefits of a contract while not technically amounting to an express breach of contract. (Doc. No. 29 at 14 et seq.)[6] Finally, the SAC does not specifically assert a tort claim, nor does it allege a "special relationship" giving rise to tort liability existed between the parties. See Pension Tr. Fund for Operating Engineers v. Fed. Ins. Co., 307 F.3d 944, 955 (9th Cir. 2002) ("Generally, no cause of action for the tortious breach of the implied covenant of good faith and fair dealing can arise unless the parties are in a 'special relationship' with 'fiduciary characteristics.'") (quoting Mitsui Mfrs. Bank v. Superior Court, 212 Cal. App. 3d 726, 730 (1989)).

WTRI alleges PMI breached the covenants of good faith and fair dealing implied in both the Development Agreement and the Services Agreement. PMI argues that WTRI fails to state a claim because the SAC pleads insufficient facts and this claim is duplicative of WTRI's breach of contract claim.[7]

WTRI states a claim for breach of the covenant of good faith and fair dealing implied in the Development Agreement. The SAC alleges PMI breached this implied covenant by "knowingly and willfully misrepresenting its intent to perform its obligations under the Development Agreement and Development Plan; . . . and interfering with WTRI's efforts to finalize development of the software under the Development Agreement." (SAC ¶ 153.) WTRI alleges PMI's Senior Vice President of Strategy, Murat Bicak, decided to "fix

---

[6] To the extent WTRI intended to assert a tortious breach, this claim is dismissed without prejudice as WTRI fails to respond to PMI's argument that it cannot state a tort claim.
[7] PMI also argues the SAC does not identify the contracts at issue, but the SAC plainly alleges that PMI frustrated the purposes and terms of the Development Agreement and Services Agreement. (SAC ¶ 153.)

things" at PMI, in part, by "killing" the parties' joint software development project. (SAC ¶¶ 154-156.) To frustrate WTRI's software development efforts, PMI uploaded hundreds of false "bug" reports in the parties' JIRA work tracking system hours before WTRI's development milestone deadlines. (SAC ¶¶ 157-158.) PMI also failed to complete many of the tasks assigned to it under the Development Agreement "by redirecting resources and personnel elsewhere" to undermine the project. (SAC ¶ 155.) Lastly, PMI rejected the Alpha 5 software before that version of the software existed. On November 4, 2016, WTRI issued a report finding that the software had not progressed beyond the Alpha 3b phase. (SAC ¶ 73.) On November 30, 2016, the parties executed an amendment to the Development Agreement. (SAC ¶ 74.) The amendment provided, in relevant part, that if PMI rejected the Alpha 5 version of the software, it could retain ownership of the rejected version so long as it entered into a "Service Agreement" with WTRI. (Doc. No. 25-3, Exh. B, "Amend." at 2.) If a Service Agreement was executed under this provision, PMI would not owe WTRI any other payments under the Development Agreement. (Id.) The Amendment also provided that if PMI accepted the Alpha 5 version of the software, it owed WTRI a $1,000,000 payment. (Id.) On December 2, 2016, PMI informed WTRI it would "reject the fifth (version) Alpha software and retain ownership of the rejected version, in accordance with the option to reject and retain interest set forth in [Section] 5 of the Development Agreement, as amended by the Amendment dated November 30, 2016." (SAC ¶ 75.) At that time, the Alpha 5 version did not exist. (SAC ¶ 160.) Accordingly, WTRI alleges, it was denied the benefit of the $1,000,000 payment upon PMI's acceptance of the Alpha 5 software.[8]

---

[8] The SAC also alleges that WTRI was denied the benefit of $1,500,000 payment in the event PMI rejected the Alpha 5 software and elected to retain ownership of the software. (SAC ¶¶ 81, 162.) But WTRI relies on the original version of § 2.5(b) of the Development Agreement. (See Dev. Agree. § 2.5(b).) That section was revised and superseded by the Amendment, which provides, as discussed above, that if PMI rejected the Alpha 5 software and retained ownership, it would enter into a "Service Agreement" with WTRI (in lieu of monetary payment). (Amend. at 2.)

Development of the Alpha 5 software was the lynchpin of the Development Agreement. PMI's alleged rejection of the Alpha 5 software before that version of the software actually existed denied WTRI the ultimate benefit of the Development Agreement—a finished Alpha 5 software product. WTRI also plausibly alleges it was denied the benefit of a $1,000,000 payment upon acceptance of the Alpha 5 software. PMI's right to reject the software was conditioned on the software's failure to meet the Acceptance Criteria. (Dev. Agree. §§ 2.5, 5.2, 5.3.)[9] PMI's alleged sabotage of the joint development project and rejection of an incomplete software deprived WTRI of the opportunity to develop an Alpha 5 version of the software that complied with the Acceptance Criteria. WTRI alleges PMI sought to frustrate the software development project, chose not to fulfill its own obligations, sought to impede WTRI's ability to fulfill its obligations, and impermissibly exercised its right to reject the software in bad faith. At the motion to dismiss stage, these allegations are sufficient to state a claim. See Marsu, B.V. v. Walt Disney Co., 185 F.3d 932, 937-38 (9th Cir. 1999) (breach of the implied covenant of good faith and fair dealing claim supported by Disney's failure to merchandise

---

[9] PMI argues it had an "unfettered right" to reject Alpha 5. (Doc. No. 31 at 8.) The Development Agreement's language does not support PMI's interpretation. The Agreement, as amended, provides "[i]n the event that [PMI] rejects either the fifth (version) Alpha Software or the Charlie Software *in accordance with the foregoing review procedure*, [PMI] shall be entitled, in its sole discretion, to elect . . . to retain ownership of the rejected version of the software." (Amend. § 5.3) (emphasis added.) The "foregoing review procedure" provides in relevant part: "Upon delivery of the Software (Alpha or Charlie) by [WTRI] to [PMI], [PMI] agrees to conduct immediately good faith testing of the Software (Alpha or Charlie) to determine that the Software meets the applicable Acceptance Criteria (for Alpha or Charlie). In the event that the Software (Alpha or Charlie) fails to meet the Acceptance Criteria, [PMI] may either reject the Software following such initial testing or choose in its sole discretion to provide to Seller a written list of items that must be corrected and the reason(s) why such items fail to comply with the Acceptance Criteria." (Dev. Agree. § 5.2.) This language cabins PMI's right to reject the software. PMI must determine whether the software meets the Acceptance Criteria, and if it does not, PMI is entitled to reject the software. Moreover, even if PMI had the right to reject the software, it was required to exercise this discretion in good faith.

plaintiff's cartoon character in good faith, as demonstrated by, *inter alia*, evidence of Disney's decision to focus on other opportunities that were "more important both financially and strategically" and its use of inexperienced employees).

This claim is not duplicative of WTRI's breach of contract claim. "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." Careau & Co. v. Sec. Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1395 (Ct. App. 1990). "Thus, absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery." Id. Here, WTRI's claim for breach of the covenant of good faith and fair dealing implied in the Development Agreement goes beyond its breach of contract claim. In addition to PMI's alleged failure to fulfill its contractual obligations, WTRI alleges PMI acted in bad faith when it frustrated development of the Alpha software and rejected the nonexistent Alpha 5 software.

WTRI fails to state a claim, however, for breach of the covenant of good faith and fair dealing implied in the Services Agreement. The sole basis for WTRI's claim is that PMI breached the covenant by "sabotaging WTRI's ability to perform under the pilot study as agreed to in the Services Agreement." (SAC ¶ 153.) This vague allegation fails to identify the facts underlying WTRI's claim. To the extent WTRI intended to allege PMI sabotaged WTRI's ability to perform the pilot study by failing to perform its own obligations under the Services Agreement, this claim is duplicative of WTRI's breach of contract claim as it is based on the same alleged actions and seeks the same relief. See Careau, 222 Cal. App. 3d at 1395. See also Guz, 24 Cal. 4th at 352 ("A breach of the contract may also constitute a breach of the implied covenant of good faith and fair dealing. But insofar as the employer's acts are directly actionable as a breach of an implied-in-fact contract term, a claim that merely realleges that breach as a violation of the covenant is

superfluous.").[10]  Accordingly, WTRI fails to state a claim on this basis.

In sum, PMI's motion to dismiss WTRI's claim for breach of the implied covenant of good faith and fair dealing is denied as to the covenant implied in the Development Agreement but granted as to the covenant implied in the Services Agreement.

### III. Fraudulent Misrepresentation

The elements of fraud in California are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."  Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 990 (2004).  PMI contends WTRI fails to state a fraud claim and fails to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement, which applies to state causes of action made in federal court.  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  In cases involving misstatements, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged."  Vess, 317 F.3d at 1106 (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)).  "A plaintiff must set forth more than the neutral facts necessary to identify the transaction.  The plaintiff must set forth what is false or misleading about a statement, and why it is false."  Id. (internal quotations omitted).

WTRI alleges that in the negotiations leading up to execution of the Services Agreement, PMI demanded assurances about the marketability of the software in exchange for PMI's promise to complete development of the software under the Development Agreement.  (SAC ¶¶ 166-67.)  At that time, PMI allegedly "had no intent of performing under the requirements of Services Agreement, or the Development Agreement and

---

[10] As discussed above, the SAC does not state a claim for tortious breach of the implied covenant of good faith and fair dealing.

13

18cv1927 JM (MSB)

Development Plan, and misrepresented to WTRI that it would continue to perform under these agreements in good faith." (SAC ¶ 169.) PMI ultimately failed to perform its contractual obligations under the Development Agreement and Services Agreement, "while WTRI continued to invest substantial financial and human resources into the development of the software." (SAC ¶ 172.) WTRI was later informed of PMI's intent not to perform "through various text messages and phone calls with Mr. Carter-Bey and Ms. Redden in late 2017 through early 2018—that Murat Bicak, the new Senior Vice President of Strategy for PMI, had made the decision 'some time ago' to 'fix things' and 'transform' PMI" by "'killing' the software project by redirecting resources and personnel elsewhere." (SAC ¶¶ 173-174.) "For example, Mr. Carter-Bey confided in WTRI that 'for months' PMI had no intention of ever selling the software, and as a result, PMI saw no reason to add to its continued investment in developing the software notwithstanding its failed performance, omissions, and misrepresentations inducing WTRI to reasonably rely to its detriment and known harm, as set forth above." (SAC ¶ 175.)

WTRI fails to allege its fraud claim with the specificity required by Rule 9(b). First, WTRI fails to identify precisely what conduct by PMI amounts to fraud. The SAC titles WTRI's third cause of action as "Fraudulent Misrepresentation" and the SAC and WTRI's opposition refer to various "misrepresentations" by PMI, but WTRI's opposition argues that the heart of WTRI's claim is one of fraudulent concealment and omission. The SAC further contains allegations suggesting PMI fraudulently induced WTRI to enter into a contract and WTRI cites to a fraudulent inducement case in its opposition. These mixed references to PMI's alleged misrepresentations, concealment, and inducement leave the court guessing at the precise conduct WTRI alleges was fraud.

Second, WTRI's failure to specifically identify the alleged fraudulent conduct raises other pleading issues. A plaintiff must establish different elements to state a claim for each of the three subtypes of fraud claims WTRI may be asserting. See Bank of Am. Corp. v. Superior Court, 198 Cal. App. 4th 862, 870 (2011) (elements of fraudulent concealment claim); Vess, 317 F.3d at 1106 (standards applicable to fraudulent misrepresentation

claim); Moncada v. W. Coast Quartz Corp., 221 Cal. App. 4th 768, 776 (2013) (standard for promissory fraud claim). WTRI fails to establish the elements of any of these claims. To the extent WTRI asserts a fraudulent concealment claim, it fails to establish PMI had a duty to disclose its intent not to perform its contractual obligations and does not plausibly allege PMI intentionally concealed this decision with the intent to defraud WTRI. See Bank of Am. Corp., 198 Cal. App. 4th at 870 (fraudulent concealment requires that "the defendant must have been under a duty to disclose the fact to the plaintiff . . . [and] the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff"). Cf. Erlich v. Menezes, 21 Cal. 4th 543, 551 (1999) ("[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law."). At most, WTRI alleges a senior vice president (with unknown involvement or decision-making power in the parties' joint development project) expressed (at an unstated time) a desire to "kill" the software development project and did not inform WTRI of his decision. To the extent WTRI alleges a fraudulent misrepresentation claim for PMI's representation that it intended to perform its contractual obligations, the SAC's conclusory allegations fail to identify when these statements were made, who made these statements, or what was said. Vess, 317 F.3d at 1106 ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.") To the extent WTRI alleges it was fraudulently induced to enter into a contract with PMI, WTRI fails to sufficiently allege that PMI's intent not to perform its contractual duties arose before the relevant contract was executed. Moncada, 221 Cal. App. 4th 776 (promissory fraud requires a promise made without the intent to perform); Yield Dynamics, Inc. v. TEA Sys. Corp., 154 Cal. App. 4th 547, 576 (2007) ("Mere nonperformance of a promise does not establish that the promise was fraudulent when made.").[11]

---

[11] The SAC alleges WTRI was informed in late 2017 through early 2018 that Bicak had decided to "kill" the joint software development project, but the SAC fails to indicate when

## IV. Tortious Interference with Prospective Business Relations

To state a claim for tortious interference with prospective business relations, WTRI must allege: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (2003) (quoting Westside Center Associates v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507, 521-22 (1996)). "[T]he act of interference with prospective economic advantage is not tortious in and of itself," and ". . . inclusion of the word 'designed' in the third element of the tort does not necessarily mean that this tort contains a specific intent requirement." Korea Supply Co., 29 Cal. 4th at 1155, 1159. Defendant's conduct must be "wrongful by some legal measure other than the fact of interference itself." Id. at 1153 (quoting Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376 (1995)). "[W]rongful conduct is sufficient to support a business interference claim if it is proscribed by 'some constitutional, statutory, regulatory, common law, or other determinable legal standard' where it amounts to 'independently actionable conduct.'" Popescu v. Apple Inc., 1 Cal. App. 5th 39, 63 (2016) (quoting Korea Supply Co., 29 Cal. 4th at 1159).

Here, WTRI alleges PMI tortiously interfered with its relationship with the National Science Foundation ("NSF") and the pilot program participants. (SAC ¶ 194.) PMI

---

Bicak made these statements. (SAC ¶¶ 173-174.) The SAC further pleads that a PMI employee told WTRI that "'for months' PMI had no intention of ever selling the software," but again fails to indicate when this statement was made. (SAC ¶ 175.) The Development Agreement was executed on September 8, 2015, (SAC ¶ 26), and the Services Agreement was executed on December 15, 2016, (SAC ¶ 86). Assuming WTRI learned of PMI's intent in late 2017 through early 2018, this was one year after the parties executed the Services Agreement. The court cannot reasonably assume from these allegations that PMI's intent not to perform arose prior to execution of either contract.

allegedly interfered with these relationships by failing to perform its obligations under the parties' contracts, "intentionally misrepresenting its intent to perform," and "sabotaging" the Development Agreement by uploading false "bug" reports into the JIRA system. (SAC ¶¶ 184, 188-193.) "[T]he essential nature of the conduct determines whether the action sounds in contract or in tort." JRS Prod., Inc. v. Matsushita Elec. Corp. of Am., 115 Cal. App. 4th 168, 182 (2004). "[M[otive, regardless of how malevolent, remains irrelevant to a breach of contract claim and does not convert a contract action into a tort claim exposing the breaching party to liability for punitive damages." Id.

Fundamentally, WTRI complains that PMI unjustifiably breached the parties' contracts. As noted above, such a complaint sounds in contract, not tort. WTRI's tortious interference claim as well as its opposition to PMI's motion to dismiss emphasize that WTRI's breaches (1) made it impossible for WTRI to deliver software under an NSF grant, and (2) caused other companies to stop working with WTRI. These allegations and arguments recite business consequences experienced by WTRI but fall short of identifying independently wrongful acts by PMI designed to disrupt WTRI's relationships. See Korea Supply Co., 29 Cal. 4th at 1155-59. The alleged wrongdoing is simply WTRI's breach of contract claim. WTRI may not transmute its contract claim into a tort claim by alleging PMI wrongfully breached the parties' contract. See Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co., 47 Cal. App. 4th 464, 479 (1996) ("A contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business."); JRS Prod., Inc., 115 Cal. App. 4th at 183 ("Like the general contractor in Arntz, JRS assails Panasonic for a multitude of sins. But fundamentally, as in Arntz, JRS complains that Panasonic terminated the contract without good cause. This complaint sounds in contract, not tort."); Khoury v. Maly's of California, Inc., 14 Cal. App. 4th 612, 618 (1993) ("If a contract plaintiff could plead in a conclusory way that the defendant maliciously intended to drive the plaintiff out of business, the tort of interference with prospective business advantage would be routinely pleaded in breach of contract cases."). Accordingly, WTRI

fails to state a claim for tortious interference with prospective business relations.

### V. Leave to Amend

WTRI is granted leave to amend as it may be able to cure the deficiencies identified by the court. See Fed. R. Civ. P. 15(a) (stating that leave to amend "shall be freely given when justice so requires"); Novak v. United States, 795 F.3d 1012, 1020 (9th Cir. 2015) ("Nevertheless, the general rule that parties are allowed to amend their pleadings . . . does not extend to cases in which any amendment would be an exercise in futility or where the amended complaint would also be subject to dismissal.") (quotations and citation omitted). WTRI is cautioned, however, that further unsuccessful attempts to amend the complaint may demonstrate that its dismissed claims cannot be cured by amendment.

### CONCLUSION

PMI's motion to dismiss is granted in part and denied in part as follows: denied as to WTRI's breach of contract claim; denied as to WTRI's claim for breach of the implied covenant of good faith and fair dealing implied in the Development Agreement, but granted as to the covenant implied in the Services Agreement; and granted as to WTRI's fraud and tortious interference with prospective business relations claims.

IT IS SO ORDERED.

DATED: August 13, 2019

JEFFREY T. MILLER
United States District Judge