# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WORKPLACE TECHNOLOGIES RESEARCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> PROJECT MANAGEMENT INSTITUTE, INC., <br><br> Defendant. | Case No.: 18cv1927 JM (MSB) <br><br> **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS CLAIMS IN THIRD AMENDED COMPLAINT** |

Defendant Project Management Institute, Inc. ("PMI") moves the court to dismiss the claims in the Third Amended Complaint ("TAC") for: (1) breach of the implied covenant of good faith and fair dealing in the Services Agreement; (2) fraudulent misrepresentation; and (3) tortious interference with prospective business relations. (Doc. No. 38.) Plaintiff Workplace Technologies Research, Inc. ("WTRI") opposes. (Doc. No. 39.) For the below reasons, PMI's motion is **GRANTED**.

## BACKGROUND

The court hereby incorporates the detailed recitation of alleged facts in its prior two orders. (Doc. Nos. 24, 32.) In short, this action arises out of an unsuccessful endeavor to jointly develop educational project management software. On September 8, 2015, PMI and WTRI executed a Software Technology Development and Purchase Agreement (the

1

"Development Agreement") memorializing the parties' agreement to jointly develop educational software. (Doc. No. 37-2, "Dev. Agree.") The Development Agreement provided that WTRI would develop virtual reality software in collaboration with PMI for a payment of up to $4,000,000. (Dev. Agree. § 2.5.) The Agreement envisioned five initial stages of software development – "Alpha 1" through "Alpha 5." (TAC ¶ 35; Dev. Agree. §§ 2.5, 5.) If the final Alpha 5 version met all "Acceptance Criteria" and PMI accepted the Alpha 5 software, WTRI agreed to develop a "Charlie" software. (Dev. Agree. §§ 2.5, 5.)[1] WTRI alleges PMI failed to fulfill many of its obligations under this Development Agreement and prevented development of the Alpha 5 version of the software. After allegedly failing to perform its obligations under the Development Agreement, PMI demanded a pilot study to assess the marketability of the software before it would move forward with software development. On November 30, 2016, the parties amended the Development Agreement to provide that, if PMI rejected the Alpha 5 software and retained ownership of the software, the parties would execute a Services Agreement in lieu of monetary payment to WTRI. (Doc. No. 37-4, Exh. B.) On December 2, 2016, PMI informed WTRI it would exercise its right to reject the Alpha 5 software and retain ownership. (TAC ¶ 80.) On December 15, 2016, the parties executed a Services Agreement memorializing the parties' agreement to perform a pilot study of the software. (Doc. No. 37-5, Exh. C.) WTRI alleges PMI then failed to perform its obligations under the Services Agreement, which damaged WTRI's business relationships.

WTRI filed this action on August 20, 2018. On October 4, 2018, PMI moved to dismiss the Complaint for the first time. (Doc. No. 10.) WTRI responded by filing a First Amended Complaint. (Doc. No. 12.) On November 8, 2018, PMI moved to dismiss the FAC for lack of personal jurisdiction and failure to state a claim. (Doc. No. 14.) On

---

[1] The "Acceptance Criteria" are 76 "product description and specifications" mutually agreed upon by the parties and memorialized in Exhibit A to the Development Agreement. (Dev. Agree. § 5.1; Doc. No. 37-2, Exh. A at 22-39.)

March 18, 2019, the court declined to grant PMI's motion to dismiss the FAC on personal jurisdiction grounds, but granted the motion for failure to state a claim. (Doc. No. 24.) On April 2, 2019, WTRI filed a Second Amended Complaint ("SAC"). (Doc. No. 25.) On August 13, 2019, the court found that WTRI sufficiently pled claims for breach of contract for both the Development and Services Agreements, and breach of the implied covenant of good faith and fair dealing in the Development Agreement. (Doc. No. 32.) The court also found, however, that WTRI failed to sufficiently plead claims for breach of the implied covenant of good faith and fair dealing in the Services Agreement, fraudulent misrepresentation, and tortious interference with prospective business relations. (Id.) The court granted WTRI leave to amend, but cautioned that further unsuccessful attempts to amend the Complaint may demonstrate that the dismissed claims cannot be cured. (Id. at 18.)

## LEGAL STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the pleadings. To overcome such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Facts merely consistent with a defendant's liability are insufficient to survive a motion to dismiss because they establish only that the allegations are possible rather than plausible. Id. at 678-79. The court must accept as true the facts alleged in a well-pled complaint, but mere legal conclusions are not entitled to an assumption of truth. Id. The court must construe the pleading in the light most favorable to the non-moving party. Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995).

## DISCUSSION

In its TAC, WTRI asserts claims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing in both the Development and Services Agreements;

(3) fraudulent misrepresentation; and (4) tortious interference with prospective business relations. PMI moves to dismiss WTRI's claims for breach of the implied covenant in the Services Agreement, fraudulent misrepresentation, and tortious interference. In its opposition, WTRI withdraws its claim for breach of the implied covenant with respect to the Services Agreement. (Doc. No. 39 at 11 n.1.) Thus, the fraud and tortious interference claims are the only claims at issue.

**I.     Fraud**

PMI argues that WTRI's fourth attempt to sufficiently plead fraud fails because WTRI fails to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and fails to plead the required elements of fraud. (Doc. No. 38-1 at 18-23.) In its TAC, WTRI repeats its allegations that PMI misrepresented to WTRI that it would "continue to perform" under the Development and Services Agreements in good faith, and, after the execution of the Services Agreement, would "resume performance to move the software project forward." (TAC ¶¶ 198, 200.) WTRI also repeats its allegation that "[d]espite its representations, PMI failed to perform its contractual obligations[.]" (TAC ¶ 201.) In support of these allegations, WTRI again cites evidence that Mr. Bicak made the decisions= to kill the software project by redirecting resources and personnel elsewhere, and that PMI would never sell the software.[2] (TAC ¶¶ 202-04.) Finally, WTRI again refers to PMI's fraud as a misrepresentation, omission, inducement, and concealment. (TAC ¶¶ 197, 204-05.)

WTRI provides some additional specificity, however, as to the conduct WTRI alleges was fraudulent. The TAC alleges that, prior to signing the Services Agreement, PMI misrepresented that WTRI would be "involved," and a "joint participant," and would be "allowed to participate" in the development of the Agile product. (TAC ¶ 197.) WTRI also states that at the time these assurances were made, PMI had already been in discussions

---

[2] The TAC adds, however, that Mr. Bicak made the decision prior to signing the Services Agreement on December 15, 2016. (TAC ¶ 202.)

with another company, CVP, to handle the development, even though CVP warned PMI that without WTRI, the project would not succeed. (Id.) WTRI claims Mr. Bicak and his team made the misrepresentations between June and August of 2016. (Doc. No. 39 at 13 (citing TAC ¶¶ 93-97).) Accordingly, WTRI cures some of the deficiencies in the SAC previously identified by the court, i.e. that WTRI failed to identify when the fraudulent statements were made, who made the statements, and what was said. (See Doc. No. 32 at 15.) The TAC also cures the deficiency that the SAC failed to allege PMI's intent not to perform its contractual duties arose before the relevant contract was executed. (See id.)

WTRI fails, however, to cure all the deficiencies the court previously identified in the SAC. The TAC still contains mixed references to PMI's alleged misrepresentations, concealment, and inducement. WTRI still fails to sufficiently plead that PMI had a duty to disclose the information it allegedly concealed. Finally, and most importantly, WTRI again fails to sufficiently plead PMI's intent to defraud. The parties do not dispute that intent to defraud is a required element of fraud. (Doc. Nos. 38-1 at 18, 36 at 16.) WTRI argues that it specifically pled an intent to defraud by pleading that PMI intended to "abscond" with the material created by WTRI. (Doc. No. 39 at 16 (citing TAC ¶¶ 99, 198).) WTRI does not allege, however, that PMI fraudulently came into possession of these materials or absconded with them in a manner inconsistent with the contract. To the contrary, WTRI alleges only that PMI intended for the project to fail so that it could, under the contract, keep the materials and develop its own project after WTRI was "dismissed." (TAC ¶ 198.) WTRI admits that PMI had the option, in the Development Agreement, to decline to continue supporting WTRI and retain the rights to the materials. (TAC ¶ 99.) Furthermore, as pointed out by PMI, the TAC also does not detail how WTRI was prevented from being "involved" or a "joint participant," or was not "allowed to participate" in the development of the product. (Doc. No. 40 at 7.) WTRI also does not explain why this prevention was inconsistent with the contract or why these terms, if essential to the bargain, were not explicitly included in the contract. Based on the TAC, it was PMI's decision to exercise an option in the contract that prevented WTRI from being

involved. (TAC ¶ 99.) Without greater detail than is provided here, PMI's decision to exercise an option in a contract does not show plausible fraud or that PMI's alleged statements were more than mere puffery.

WTRI also argues that an intent to defraud can be shown by pleading a "plausible fraudulent scheme." (Doc. No. 39 at 17 (citing Electric Prop. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th Cir. 2014).) The "scheme" alleged by WTRI is, however, simply that PMI entered into a contract, leading up to which PMI allegedly made promises that it did not intend to keep that ultimately led to PMI's possession, under the contract, of the "main deliverable" WTRI was contracted to produce for PMI. (TAC ¶ 99.) WTRI cites no authority supporting that such conduct plausibly constitutes an intent to defraud or a "plausible fraudulent scheme." Promises that are part of a contract, regardless of the promisor's sincerity, are enforceable through a breach of contract claim. Based on the foregoing, WTRI fails to plausibly plead fraud as an independent claim from its claims of breach of contract and breach of the implied covenant of good faith and fair dealing in the Development Agreement.

## II. Tortious Interference with Prospective Business Relations

PMI argues that WTRI's fourth attempt to plead tortious interference fails because it insufficiently pleads independently wrongful conduct or that WTRI would have entered into new business relationships but for PMI's conduct. (Doc. No. 38-1 at 23-28.) In its SAC, WTRI alleged PMI knew WTRI enlisted 21 companies, including six specific companies, to participate in a pilot program. (SAC ¶ 183.) WTRI alleged that PMI "severely damaged WTRI's professional reputation and business relations" with at least six specific companies, as well as the National Science Foundation (NSF), by "intentionally reneging on its obligations" under the Development and Services Agreements, and because of PMI's "intentional misrepresentations and omissions to WTRI" and "attempted concealment of its wrongdoing." (SAC ¶ 184.) WTRI also claimed PMI "intentionally misrepresented to WTRI its intent to perform" under the Development and Services Agreements and "intentionally sabotaged" the Development Agreement by

"uploading false 'bug' reports. . . . to impede WTRI's progress on development of the software." (SAC ¶¶ 188, 193.) As a result of this "wrongdoing," WTRI alleged: (1) six companies "stopped working and collaborating" with WTRI; (2) it became "harder" to obtain funding from the NSF and the NSF declined two of WTRI's proposals, which was "highly unusual;" (3) WTRI made "false promises to its C-suite customers;" (4) WTRI incurred loss of "good will and damage" to WTRI's "business relations" with the NSF; (5) WTRI incurred "monetary and reputational damages regarding the fallout of its business relationships" with the six companies participating in the pilot program; and (6) McKinsey & Company ended its business relations with WTRI. (SAC ¶¶ 185-88, 194-95.)

In its TAC, WTRI now alleges that, prior to signing the Services Agreement, Dr. DiBello of WTRI informed Ms. Redden, Mr. Carter-Bey, and Mr. Weiss of PMI, that WTRI intended to recruit C-suite executives from at least five companies. (TAC ¶ 212.) WTRI also alleges that Dr. DiBello informed PMI that it could "not screw up the test" because doing so would irreparably harm the relationships that WTRI had painstakingly created based on years of trust. (Id.) PMI allegedly reassured Dr. DiBello that PMI was approaching the Services Agreement in the "utmost good faith" and that the relationships would be "well taken care of." (TAC ¶ 215.) WTRI alleges that: (1) prior to signing the Services Agreement, PMI had "no intention of developing a successful working test product;" (2) PMI intended to "cut WTRI out of the process entirely in an effort to cause the test to fail such that PMI could declare the project a failure, not have to pay WTRI, and then retain the technology for itself such that PMI could later launch its own product without WTRI;" (3) PMI "failed to disclose that it had already made alternate arrangements to proceed with the Agile product without WTRI;" and (4) CVP warned PMI that, without WTRI, the project would be a failure. (TAC ¶¶ 214-16.) In its TAC, WTRI also repeats its allegations regarding damage to its business relations. (TAC ¶¶ 218-222.)

The additions to WTRI's Complaint merely provide some specifics to support its allegation that PMI had knowledge of WTRI's various business relations or its desired business relations. While knowledge of a business relationship is an element of tortious

interference, Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (2003), WTRI does not sufficiently show independently wrongful conduct. The court has already found that WTRI's allegation of fraud and intentional misrepresentation do not show independently wrongful conduct. (Doc. No. 32 at 13-15.) The court also already found that WTRI did not allege a tortious breach of the implied covenant of good faith and fair dealing. (Id. at 9 n.6.) Without some duty to disclose, WTRI's additional allegation that PMI failed to disclose that it had already made "alternative arrangements" to proceed without WTRI, (TAC ¶ 215), adds little, if anything, to its previous claim that PMI failed to disclose that it "some time ago" decided to "kill" the project, (SAC ¶¶ 189-91). Furthermore, WTRI does not allege that PMI intended to interfere with WTRI's business relationships. Instead, WTRI alleges that PMI intended to "cut out" WTRI so it could avoid paying WTRI, and that PMI acted with "reckless disregard" for WTRI's business relationships. (TAC ¶¶ 214, 217.) Finally, as the court previously found, WTRI's allegations simply do not plausibly show that, but for PMI's conduct, it would have entered into a business relationship, would have likely gained an economic advantage, or would have received NSF funding. The fact that PMI was allegedly warned the project would fail if WTRI was "cut-out" goes more to PMI's knowledge than its intent. WTRI cites no authority that knowledge of potential disruption to business relations satisfies the intent element in a tortious interference claim. Accordingly, WTRI fails to plead a plausible claim for tortious interference with prospective business relations.

## CONCLUSION

The court previously cautioned WTRI that further unsuccessful attempts to amend the Complaint may demonstrate that the dismissed claims cannot be cured by amendment. (Doc. No. 32 at 18.) In its TAC, Plaintiff again unsuccessfully attempts to plead fraud and tortious interference. (See Doc. Nos. 24, 32.) Therefore, and for the forgoing reasons, PMI's motion to dismiss WTRI's claims in the TAC for: (1) breach of the implied covenant of good faith and fair dealing in the Services Agreement; (2) fraud; and (3) tortious interference with prospective business relations, is **GRANTED WITHOUT LEAVE TO**

8

**AMEND**.  After discovery commences, however, WTRI is free to request leave to amend its Complaint, as consistent with the Federal Rules of Civil Procedure and Local Rules, based on evidence obtained through discovery.

IT IS SO ORDERED.

DATED: January 22, 2020

_____
JEFFREY T. MILLER
United States District Judge