# EXHIBIT 1

1 EXHIBIT 1

# SOFTWARE TECHNOLOGY DEVELOPMENT AND PURCHASE AGREEMENT

This SOFTWARE TECHNOLOGY DEVELOPMENT AND PURCHASE AGREEMENT (referenced herein as the "Agreement") dated as of the 8th day of September, 2015 ("Effective Date"), is by and between Workplace Technologies Research, Inc., ("Seller"), a Delaware corporation, with a principal address of 3333 Camino del Rio South, Suite 110, San Diego, CA 92108 and Project Management Institute, Inc. ("Purchaser"), a Pennsylvania corporation with a principal address of 14 Campus Boulevard, Newtown Square, PA 19083. Seller and Purchaser are each sometimes referred to in this Agreement as a "Party" and collectively as the "Parties".

WHEREAS, Seller has agreed that in collaboration with Purchaser it will develop and produce exclusively for Purchaser a new software product pursuant to this Agreement, meeting certain agreed upon specifications (referred to herein as the "Software") and derived from the Seller Software (as defined herein) which new product is described more specifically in Exhibit A hereto; and

WHEREAS, Purchaser desires to (i) acquire ownership of the Assigned Software (as defined below) including the intellectual property developed pursuant to this Agreement, as incorporated into the Software and (ii) receive a perpetual license to certain other Seller intellectual property in existence on the Effective Date as incorporated into the Software, i.e., the Seller Software (as defined below); and

WHEREAS, Seller desires to transfer and grant such rights referenced above to Purchaser, all subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties intending to be legally bound, hereby agree as follows:

1. Development of the Software

1.1 Development. Purchaser hereby retains Seller to perform those design and development services, and Seller hereby agrees to perform those design and development services related to the Software as are assigned to it pursuant to the Development Plan (as defined herein) set forth in summary outline form in Exhibit B. The Parties shall work together in a joint effort to accomplish the tasks and objectives set forth in the Development Plan. For the purposes of this Agreement, the "Software" shall comprise the Assigned Software and the Seller Software, but with respect to the Seller Software only to the extent the Seller Software is incorporated therein, and is necessary to use, or is integrated with the Assigned Software.

1.2 Development Plan. That written plan agreed to by the Parties setting forth (i) the design and development responsibilities of the Parties, (ii) the timelines therefor, (iii) the specifications for the Software, and such other pertinent matters as the Parties may agree, a summary outline of which is attached hereto as Exhibit B, shall be referred to herein as the Development Plan. As work under the Development Plan moves from stage to stage, Purchaser may evaluate the desirability of modifying remaining aspects of the Development Plan. Modifications to the Development Plan shall be effective only upon written agreement of the Parties. Any such agreed upon modification to the Development Plan shall include alterations to the timelines pertaining to the Parties' performance thereunder necessitated by such modification and any increase in payments that may be due from Purchaser to Seller for performance of its modified responsibilities, as well as any other modified term or condition pertaining to performance of the Development Plan.

1.3 Support and Maintenance. Any support and maintenance services, updates, error corrections, training, or other post-delivery services shall be contracted under and governed by a separate agreement between the Parties.

1.4 Purchaser Responsibilities. Purchaser agrees to perform all tasks assigned to Purchaser as set forth in the Development Plan or otherwise agreed to by the Parties, and to provide all

LP

assistance and cooperation to Seller in order to complete the development, testing and production, timely and efficiently, of the Software. Seller shall not be deemed in breach of this Agreement in the event Seller's failure to meet its responsibilities and time schedules is due proximately to Purchaser's actions or inactions related to its material responsibilities as set forth in this Agreement. In the event of any such failure or delay by Purchaser, all of Seller's time frames, milestones, and/or deadlines shall be extended as reasonably necessary for Seller to accommodate and account for such Purchaser delay or failure. Purchaser shall be responsible for making, at its own expense, any changes or additions to Purchaser's systems, software, and hardware that may be required to support operation of the Software. In addition, Purchaser is responsible for securing its own license or usage rights for an applicable virtual reality platform, if required, to host the Software, as such necessary third party rights are described in Exhibit A hereto. Except as otherwise agreed in writing, Purchaser shall be solely responsible for the conduct and cost of all commercialization activities related to the Software and preparation for its introduction to the market including, but not limited to, preparation of marketing materials and the conduct of training of a sales force and distribution agents.

1.5 Project Managers. Purchaser and Seller shall each assign a Project Manager for managing the development of the Software. The Project Managers shall be responsible for: (i) managing the day-to-day activities under this Agreement, (ii) serving as liaisons between the Parties, (iii) assigning and scheduling the appropriate personnel to perform the required services under this Agreement, and (iv) implementing, as authorized by the responsible Party, any and all amendments or other modifications to the Development Plan. Such authorization shall not include any right on the part of the Project Managers to change the terms and conditions of this Agreement. Each Project Manager shall receive direction from and be responsible for reporting to the Project Manager's employer only.

2. Intellectual Property Rights; Assignment & License

2.1 Transfer & Assignment. All materials, including, but not limited to, software, programs, source code and object code, comments to the source or object code, specifications, documents, abstracts, and summaries thereof intrinsic thereto and provided therewith, or which is available to be provided therewith, but only to the extent the foregoing are developed (or created) pursuant to this Agreement, whether by Seller alone, or jointly by Seller and Purchaser, including, without limitation, the items set forth on Exhibit A (collectively the "Assigned Software") and not including the Seller Software (as such term is defined below), shall be owned exclusively by Purchaser. Seller acknowledges that the Assigned Software shall be deemed "works made for hire" by Seller on behalf of Purchaser, and, therefore, shall be the exclusive property of Purchaser. To the extent the Assigned Software is not deemed "works made for hire" under applicable law, Seller hereby irrevocably assigns and transfers to Purchaser all right, title and interest in and to the Assigned Software, including, without limitation, all patent and copyright interests, and agrees to execute all documents reasonably requested by Purchaser for the purpose of applying for and obtaining domestic and foreign patent and copyright registrations.

2.2 Licensed Software. Notwithstanding any provision of this Agreement to the contrary, any pre-existing software, source code and object code, specifications, documents, routines, methodologies, processes, libraries, information, tools or technologies created, adapted, owned, licensed or used by Seller in its business generally prior to the date of this Agreement, including all associated intellectual property rights (collectively "Seller Software") shall be and remain the sole property of Seller, and Purchaser shall have no ownership interest in or claim to the Seller Software, except as necessary to exercise its rights in the Assigned Software or as otherwise assigned, licensed or permitted by Seller. Seller expressly grants to Purchaser a royalty-free, worldwide, perpetual, irrevocable,

LD

exclusive license within the Field of Use as set forth in Section 2.4, with full rights to transfer, sublicense, use, reproduce, distribute, adapt, modify, publicly perform, and publicly display the Seller Software, to the extent it is a necessary part of the Software or a required element of the Software's functionality, solely to the extent that the Seller Software is used in conjunction with the Software. All such licensed Seller Software is identified and described in detail in Exhibit C hereto. Seller reserves all other rights in the Seller Software.

2.3 Third Party Licenses. Purchaser shall be responsible for purchasing any applicable third party licenses ("Third Party Materials") that are necessary for Purchaser to support or host the Software (such as a virtual world hosting platform unless otherwise provided in the Development Plan). To the extent Purchaser requests that any Third Party Materials be incorporated into the Software, Seller and Purchaser shall mutually agree upon the use of such Third Party Materials, and Purchaser shall acquire, at its own expense, a license enabling Seller to utilize and incorporate such Third Party Materials into the Software. Purchaser further acknowledges that the Software may include Third Party Materials that are owned by third parties and are licensed to Seller, are sublicensable or assignable to Purchaser, and are subject to the terms of this Agreement and any license agreements or other such agreement between Seller and such third parties. Purchaser shall only access and utilize Third Party Materials in whole or in part in conjunction with its use of the Software, and not on a stand-alone basis. Seller and any third party providing such Third Party Materials in conjunction with this Agreement, if applicable, are independent parties. Seller shall have no liability for the performance, or failure to perform, of any such third party or Third Party Materials that Purchaser separately procures. Seller shall obtain the approval of Purchaser before incorporating any Third Party Materials into the Software. All Third Party Materials necessary for full operation and utilization of the Software are listed on Exhibit C. SELLER MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, WITH REGARD TO ANY THIRD PARTY MATERIALS. SELLER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON- INFRINGEMENT WITH REGARD TO THE THIRD PARTY MATERIALS.

2.4 Field of Use. The Parties acknowledge and agree that the Software is for Purchaser's exclusive use, in connection with and for purposes of accelerated learning and expertise development in the field of project, program and portfolio management (the "Field of Use"). Accordingly, Seller will not use the Software within such Field of Use, except as otherwise expressly permitted in writing by Purchaser, and Purchaser will not use the Seller Software outside of the Field of Use, except as otherwise expressly permitted in writing by Seller.

2.5 Consideration. Subject to the terms and conditions of this Agreement, Purchaser shall pay to Seller, as complete consideration for the development of the Software, and the grant(s) of rights in and to the Software, as set forth herein, up to a total of Four Million Dollars (US) ($4,000,000), to be paid as follows:

(a) an initial payment of One Million Dollars (US) ($1,000,000) ("First Payment") due and payable upon the execution of this Agreement, such First Payment to be used by Seller as the sole basis to seek matching funds from the National Science Foundation ("NSF") and to be non-refundable to Purchaser;

(b) once Seller delivers to Purchaser the fifth (version) Alpha Software, (i) if Purchaser accepts the fifth (version) Alpha Software, Purchaser shall make a "Second Payment" of One Million Dollars (US) ($1,000,000) or (ii) if Purchaser rejects the fifth (version) Alpha Software, then (aa) if Purchaser further elects to retain

ownership of the rejected version, Purchaser shall make a Second Payment totaling One Million Five Hundred Thousand Dollars (US) ($1,500,000) with One Million Dollars (US) ($1,000,000) of such Second Payment due upon the first sale or licensing of the Software by Purchaser and the remaining Five Hundred Thousand Dollars (US) ($500,000) of such Second Payment due on the one year anniversary date of such first sale or licensing and Purchaser shall owe no Third Payment or Final Payment (as set forth below) or (bb) if Purchaser elects not to retain ownership of the rejected version and terminates this Agreement as further set forth below, then Purchaser shall owe no Second Payment, Third Payment (as set forth below), or Final Payment (as set forth below));

(c) after acceptance of the fifth (version) Alpha Software and once Seller delivers to Purchaser the final production build ("Charlie") Software, (i) if Purchaser accepts the Charlie Software, then Purchaser shall make a "Third Payment" of One Million Dollars (US) ($1,000,000) or (ii) if Purchaser rejects the Charlie Software, then (aa) if Purchaser further elects to retain ownership of the rejected version, Purchaser shall make a Third Payment totaling One Million Five Hundred Thousand (US) ($1,500,000) with One Million Dollars (US) ($1,000,000) of such Third Payment due upon the first sale or licensing of the Software by Purchaser and the remaining Five Hundred Thousand Dollars (US) ($500,000) of such Third Payment due on the one year anniversary date of the first sale or licensing of the Software by Purchaser and Purchaser shall owe no Final Payment (as set forth below), or (bb) if Purchaser elects not to retain ownership of the rejected version and terminates this Agreement as set forth below, then Purchaser shall owe no Third Payment or Final Payment (as set forth below); and/or

(d) following Purchaser's acceptance of the Charlie Software, Purchaser shall make a "Final Payment" of One Million Dollars (US) ($1,000,000) ("Final Payment") due on the one year anniversary date following the date of Purchaser's acceptance of the Charlie Software.

3. Irrevocable Assignment. Subject to the terms and conditions of this Agreement, both the assignment and license grant to Purchaser of the Software is made without reservation of rights, except as is expressly set forth in this Agreement, and shall be irrevocable upon payment of the consideration due and owing in accordance with the foregoing payment obligations. Each Party shall be responsible for and shall pay all taxes, duties, and levies of any kind imposed by any governmental entity with respect to the transactions contemplated under this Agreement as applicable to such Party, including interest and penalties thereon. Except as otherwise agreed to by the Parties in writing, each Party shall be responsible for the payment of costs it has incurred and will incur according to law in connection with the execution and delivery of this Agreement and consummation of the transactions contemplated hereby.

4. Exclusive Payment for Purchase. The foregoing represents Purchaser's only payment obligations to Seller hereunder for the purchase of the Software and the grant of license rights thereto, to the extent applicable. Seller shall have no right to any further royalties, revenues, fees, or other payments in connection with, or as a result of, the sale, assignment, and license of the Software and/or Purchaser's utilization or exploitation thereof. Fees paid to Seller for services pursuant to any services or other agreements between the Parties are distinct and do not form part of the consideration for the transactions hereunder.

5. Acceptance Criteria.

5.1 General. The Software shall be developed in accordance with the product description and specifications to be mutually agreed to by the Parties ("Acceptance Criteria") as part of the Development Plan, which Acceptance Criteria are referenced in general scope in Exhibit A.

LD

Except for the payments due to Seller in accordance with Sections 2.5(b)(ii)(aa) or 2.5(c)(ii)(aa), Seller acknowledges and agrees that subsequent payments of the foregoing consideration shall be contingent upon whether or not the Software meets the applicable Acceptance Criteria. Further, development of the Charlie Software shall be contingent upon the fifth (version) Alpha Software meeting all applicable Acceptance Criteria following review, testing, and acceptance of the Alpha Software by Purchaser.

5.2 Review Cycles. Upon delivery of the Software (Alpha or Charlie) by Seller to Purchaser, Purchaser agrees to conduct immediately good faith testing of the Software (Alpha or Charlie) to determine that the Software meets the applicable Acceptance Criteria (for Alpha or Charlie). In the event that the Software (Alpha or Charlie) fails to meet the Acceptance Criteria, Purchaser may either reject the Software following such initial testing or choose in its sole discretion to provide to Seller a written list of items that must be corrected and the reason(s) why such items fail to comply with the Acceptance Criteria. In the event Purchaser provides such a written list, then at no additional charge to Purchaser, Seller shall provide a corrected version of the Software to Purchaser for further review and testing. The testing and evaluation process shall resume as set forth above for up to two review cycles following the initial testing by Purchaser for each version of the Software (Alpha and Charlie). Purchaser, however, may elect following any review cycle to reject the Software (Alpha or Charlie) and terminate this Agreement upon written notice to Seller that the Software fails to meet the Acceptance Criteria. Moreover, this Agreement may be terminated at Purchaser's election, if after Purchaser has completed at least two (2) review cycles as described in this Section, Purchaser determines that the Software does not meet the Acceptance Criteria.

5.3 Election to Retain Interest. In the event that Purchaser rejects either the fifth (version) Alpha Software or the Charlie Software in accordance with the foregoing review procedure, Purchaser shall be entitled, in its sole discretion, to elect (exercisable within thirty (30) days following Purchaser's written notice of rejection of the Software) to retain ownership of the rejected version of the Software. If Purchaser elects to retain ownership, Purchaser shall make the corresponding payment due in accordance with the payment provision above and this Agreement shall terminate following Purchaser's satisfaction of such payment obligation. If Purchaser elects not to retain ownership, Purchaser shall owe no further payment in accordance with the payment provision above and this Agreement shall terminate. In either case, termination shall be in accordance with the termination provisions below.

6. Further Assurances. Seller further agrees that Seller will reasonably, at Purchaser's sole cost and expense: (i) cooperate with Purchaser in the filing and prosecution of any and all patent, trademark, copyright or other intellectual property registrations or applications; (ii) execute, verify, acknowledge, and deliver all such further papers, including applications and instruments of transfer; and (iii) perform such other acts, as Purchaser lawfully may reasonably request, to facilitate Purchaser's right to obtain, perfect, protect, maintain, defend, or enforce any of the rights granted hereunder.

7. Exclusivity and Non-Competition. Seller agrees that it shall not develop, design, produce, license, assign or sell any product to any other purchaser, user, assignee, licensee or other transferee that duplicates or is substantially similar to the Software for use within the Field of Use, or that is otherwise intended for use in the Field of Use. Seller further agrees that it shall not use or sell the Software other than as is permitted under this Agreement or under separate written agreement.

8. Delivery. Seller agrees to deliver the Software and any applicable documentation and user guides to Purchaser in accordance with the delivery schedule set forth in Exhibit B.

LO

9. Term; Termination.

9.1 Term. This Agreement shall be effective as of the Effective Date and shall continue in effect until terminated as provided in this Agreement.

9.2 Termination for Failure to Timely Deliver Software. Purchaser shall have the right to terminate this Agreement if Seller fails to deliver the fifth (Alpha) version Software and any applicable documentation and user guides to Purchaser in accordance with this Agreement within two (2) years from the Effective Date, or such extended deadline date as the Parties may have agreed upon in writing.

9.3 Termination for Rejection. In accordance with the foregoing acceptance and election process, Purchaser shall have the right to terminate this Agreement upon rejection of the Software (Alpha or Charlie). This Agreement shall also terminate following final acceptance of the Software and fulfillment by both parties of their respective obligations set forth herein.

9.4 Termination for Cause. Without limitation of any other right of termination, this Agreement may be terminated earlier by either Party upon written notice to the other, if such other Party breaches any other material obligation provided hereunder and the breaching Party fails to cure such material breach within thirty (30) days of receipt of such written notice. Except as set forth above, neither Party shall have a right to terminate this Agreement absent an uncured breach of a material provision of this Agreement, as provided in this Section 9.4. The right to terminate this Agreement pursuant to this Section 9.4 shall not be exclusive and shall be in addition to any other remedies available to a Party in law or at equity.

9.5 Effect of Termination or Expiration; Survival. Upon termination or expiration of this Agreement for any reason, Purchaser will make payment for any amounts owed in accordance with Section 2.5 and, in particular, shall continue to be responsible for payments due in accordance with Sections 2.5(b)(ii)(aa) or 2.5(c)(ii)(aa). However, all remaining development obligations of Seller and all other remaining payment obligations of Purchaser that would have been due and owing after the date of termination under this Agreement shall be void, and Seller and Purchaser shall have no further development or payment commitment to the other Party whatsoever related to the Software under this Agreement. In addition, all of Purchaser's Confidential Information, software, materials, and data shall be returned promptly to Purchaser and Seller shall be prohibited from any retention or use of such Purchaser Confidential Information, software, materials or data. Further, subject to Purchaser's rights in the Software, Purchaser shall immediately cease use of and return all Seller Confidential Information. Upon termination of this Agreement by Seller for Purchaser's failure to make any payment to Seller in breach of this Agreement, any rights in the Software that were assigned or licensed to Purchaser, shall automatically expire and such assignment shall be null and void *ab initio*, ownership of the Software shall revert to or remain with Seller, as applicable. But, upon termination of this Agreement in accordance with Sections 5 and 9.3 or 9.4, Purchaser shall be entitled to any available rights in the Software as expressly set forth in this Agreement. In particular, upon termination of this Agreement for rejection of the Software (Alpha or Charlie) by Purchaser, Purchaser's election not to retain ownership, and reversion of ownership of the Software to Seller, Purchaser shall be entitled to all licensed rights to the Seller Software and shall also have a royalty-free, worldwide, perpetual, irrevocable, exclusive license to the Software (in the form rejected by Purchaser) within the Field of Use, with full rights to transfer, sublicense, use, reproduce, distribute, adapt, modify, publicly perform, and publicly display such version of the Software. Upon termination of this Agreement for rejection of the Software (Alpha or Charlie) by Purchaser and Purchaser's election to retain ownership, Purchaser shall be entitled to all licensed rights to the Seller Software, and such rejected version of

LO

the Software shall be treated as Assigned Software and subject to the assignment to Purchaser herein and all of Purchaser's rights therein. Any provision of this Agreement shall survive to the extent necessary to effectuate the Parties' clear intent, and shall not expire upon termination or expiration of this Agreement including, without limitation, Sections 2.5(b)(ii)(aa), 2.5(c)(ii)(aa), 12, 13, and 14, which shall survive the expiration or termination of this Agreement.

10. Representations and Warranties.

10.1 Mutual.

(a) Corporate Power. Each Party hereby represents and warrants that such Party is duly organized and validly existing under the laws of the state of its incorporation and has full corporate power and authority to enter into this Agreement and to carry out its provisions.

(b) Binding Agreement. Each Party represents and warrants that: (a) neither it nor any of its respective employees, directors, or officers are under any pre-existing obligation inconsistent with the provisions of this Agreement; (b) this Agreement is a legal and valid obligation binding upon it and enforceable with its terms; and (c) the execution, delivery, and performance of this Agreement by such Party does not conflict with any agreement, instrument or understanding, oral or written, to which it is a Party or by which it may be bound, nor violate any law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

10.2 Representations and Warranties of Seller. Seller represents and warrants to Purchaser the following:

(a) Intellectual Property. Seller is the creator, developer and lawful owner of the Assigned Software and the Seller Software or otherwise has all the necessary rights and title to perform its obligations under this Agreement, grant any rights to Purchaser as specified herein, free and clear of any claims, judgments, or third party interests and for the Assigned Software, any liens or encumbrances, and provide the services and the Software. Further, Seller represents and warrants that it is not involved in any current litigation or arbitration, received any other claim, and knows of no pending litigation, arbitration, other claim, or fact which may be the basis of any claim regarding any of the Seller Software, Assigned Software or other materials Seller has used or will use to develop or has incorporated or will incorporate into the Software.

(b) Warranty Period. For a period of one hundred eighty (180) days from the date of acceptance ("Warranty Period"), the Software will operate in substantial conformance with the specifications set forth in Exhibit A and, to the extent not inconsistent therewith, any documentation provided with the Software. All warranty claims of which Purchaser reasonably had notice not made in writing within such period shall be deemed waived. The foregoing warranty is solely for the benefit of Purchaser and Purchaser shall have no authority to extend such warranty to any third party.

(c) Quality of Services. Any Services shall be performed in a professional and workmanlike manner. The foregoing warranty is solely for the benefit of Purchaser, and Purchaser shall have no authority to extend such warranty to any third party.

(d) Modification of Software. Seller shall not be responsible for modifications of the Software made by Purchaser outside Seller's control or direction.

LD

(e) Disclaimer of Other Warranties. EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN, THE SOFTWARE AND ANY SERVICES AND SUPPORT PROVIDED HEREUNDER ARE OTHERWISE PROVIDED TO PURCHASER "AS IS," WITH ALL FAULTS, AND WITHOUT WARRANTY OF ANY KIND. SELLER EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY OF INFORMATION, QUIET ENJOYMENT, TITLE, AND NON-INFRINGEMENT. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY SELLER OR SELLER'S AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THE WARRANTIES PROVIDED IN SECTION 10.2 (REPRESENTATIONS AND WARRANTIES OF SELLER).

10.3 Representations and Warranties of Purchaser. Purchaser hereby represents and warrants to Seller that any elements, text, graphics, photos, designs, trademarks, or any other materials, content, or information ("Purchaser Content") furnished to Seller by or on behalf of Purchaser for inclusion into the Software are owned or licensed by Purchaser, and that Purchaser has all necessary rights and authority to grant to Seller the applicable rights for Seller's performance of its obligations herein, including use of such Purchaser Content and incorporating such Purchaser Content into the Software.

11. Limitation of Liability. EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT AND SUBJECT TO THE LIMITATION NOTED BELOW, NEITHER PARTY WILL BE LIABLE, IN THE AGGREGATE, WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY, OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY DIRECT, SPECIAL, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST REVENUES, PROFITS, OR DATA, COST OF PROCUREMENT OF SUBSTITUTE GOODS, TECHNOLOGY, OR SERVICES, OR ANY AMOUNTS IN EXCESS OF THE PAYMENTS TO BE MADE TO SELLER BY PURCHASER PURSUANT TO THIS AGREEMENT. THE PARTIES AGREE THAT THE LIMITATIONS IN THIS SECTION ARE A BARGAINED FOR EXCHANGE AND A MATERIAL CONDITION AND PREMISE OF THIS AGREEMENT. THIS LIMITATION OF LIABILITY CLAUSE SHALL NOT APPLY WHERE LIABILITY ARISES AS A DIRECT RESULT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY AGAINST WHOM A CLAIM OR ACTION FOR DAMAGES IS BROUGHT.

12. Indemnification. Each Party agrees to indemnify, defend, and hold harmless the other Party, its directors, officers, employees, agents and its successors and assigns ("Indemnitees") from and against any and all liability, claims, causes of action, and suits, together with resulting damages, and expenses, including reasonable attorneys' fees, (collectively "Losses") due to or in respect of third parties that any Indemnitee may incur arising out of (i) a breach by an indemnifying Party of any representation, warranty or obligation contained in this Agreement or (ii) a violation of law by the indemnifying Party or (iii) gross negligence or willful misconduct by the indemnifying Party or (iv) Losses of an Indemnitee resulting from a breach of an indemnifying Party's obligations of confidentiality as set forth in Section 13 (Confidentiality). Each Party will defend at its expense, with counsel reasonably acceptable to the Indemnitee, any action brought against such Indemnitee, which is covered by this indemnification provision, and will pay any costs, fees, and damages finally awarded against such Indemnitee in such action or to be paid in settlement of such claim; provided that, no indemnifying Party shall enter into any settlement that does not provide a complete and unconditional release of the Indemnitee or requires an admission of guilt or fault on the part of the Indemnitee without the express written consent of the Indemnitee. As a condition to receiving such indemnification, the Indemnitee shall promptly notify the indemnifying Party in writing of such claim, provided that the failure to notify or delay in notifying the indemnifying Party will not relieve it from liability which it may have to the indemnified Party except to the extent the indemnifying Party is prejudiced by such failure or delay. Each

LD

Indemnitee shall have the right, at its own expense, to participate in the defense of any such claim through counsel of its own choosing, and shall in any event cooperate reasonably with the indemnifying Party in defense of such claim. No Party shall be liable with respect to Losses to the extent the other Party has an obligation to indemnify the first Party pursuant to this Agreement.

13. Confidentiality.

13.1 Each Party (the "Disclosing Party") may, in connection with this Agreement, disclose to the other Party (the "Receiving Party") confidential information, including, without limitation, information relating to the Disclosing Party's business, computer software, algorithms, trade secrets, know-how, processes, techniques, ideas, improvements, inventions (whether or not patentable), customer lists, and other technical, business, financial, customer and product development plans, forecasts, strategies and information (collectively, "Confidential Information"). For the purposes of this Agreement, the terms and conditions of this Agreement, information related to the Seller Software and the Assigned Software (and, in particular, the related source code) as well as any information identified or marked as "confidential" or "proprietary" or that which the Receiving Party knows or reasonably should know is considered to be the confidential information of the Disclosing Party shall also be considered the Confidential Information. Confidential Information does not include information that: (a) is or becomes publicly available through no breach by the Receiving Party of this Agreement; (b) was previously known to the Receiving Party prior to the date of disclosure, as evidenced by contemporaneous created written records; (c) was acquired from a third party without any breach of any obligation of confidentiality; or (d) was independently developed by the Receiving Party hereto without reference to Confidential Information of the Disclosing Party. Each Party agrees not to use (other than for purposes contemplated by this Agreement), and will use commercially reasonable efforts to prevent the disclosure to third parties of, any of the disclosing Party's Confidential Information. The Receiving Party may make disclosures required by court order or law provided that the Receiving Party promptly informs the Disclosing Party in writing of the court order or other disclosure demand and provide a copy thereof to the Disclosing Party, uses diligent efforts and cooperates with the Disclosing Party to limit such disclosure and obtain confidential treatment or a protective order for such disclosure, has allowed the Disclosing Party to participate in the proceeding for same, and only discloses that Confidential Information necessary to comply with such court order or other disclosure demand. In addition, Seller shall be entitled to disclose the existence of this Agreement, and matters related to the development and commercialization of the Software to the NSF. Such disclosure shall be limited to information required to be disclosed pursuant to relevant NSF Guidelines related to grants providing matching funds for products to be developed for commercial use. In no event shall such limited disclosure result in this Agreement being placed in the public domain or subject to public disclosure.

13.2 Each Party acknowledges and agrees that due to the unique nature of the Disclosing Party's Confidential Information, there may be no adequate remedy at law for any breach of its obligations hereunder, that any such breach may allow the Receiving Party or third parties to unfairly compete with the Disclosing Party resulting in irreparable harm to the Disclosing Party and, therefore, that upon any such breach or threat thereof, the Disclosing Party shall be entitled to seek injunctive relief and other appropriate equitable relief in addition to whatever remedies it may have at law, and to be indemnified by the Receiving Party from any loss or harm (including, without limitation, attorneys' fees) in connection with any breach or enforcement of the Receiving Party's obligations hereunder or the unauthorized use or release of any Confidential Information. The Receiving Party will

LD

promptly notify the Disclosing Party in writing upon the occurrence of any such unauthorized release or other breach of which it is aware.

13.3 The obligations of confidentiality set forth in this Section 13 (Confidentiality) shall apply through the acceptance or rejection of the Software and for up to five (5) years thereafter, provided, however, any Confidential Information that constitutes a trade secret of a Party shall remain such Party's Confidential Information and shall be treated confidentially in accordance with the terms of this Section 13 (Confidentiality).

14. General.

14.1 Relationship of the Parties. Notwithstanding any provision hereof, for all purposes of this Agreement each Party shall be and act as an independent contractor and shall not bind nor attempt to bind the other in any manner.

14.2 Force Majeure. Either Party shall be excused from delays in performing or from failing to perform its obligations under this Agreement to the extent the delays or failures result from causes beyond the reasonable control of the Party, including, but not limited to: default of subcontractors or suppliers; failures or default of third party software, vendors, or products; acts of God or of public enemy; U.S. or foreign governmental actions; strikes; communications, network/Internet connection, or utility interruption or failure; fire; flood; epidemic; and freight embargoes.

14.3 Notices. All notices required under this Agreement shall be in writing and shall be by personal delivery, international courier with tracking capabilities or by certified or registered mail, return receipt requested, and shall be deemed given upon receipt of delivery. Notices and payments hereunder shall be sent to the addresses set forth at the beginning of this Agreement or such other address as either Party may specify in writing.

14.4 Waiver. The failure of a Party to require performance by another Party of any provision hereof shall not affect the full right to require such performance at any time thereafter; nor shall the waiver by either Party of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

14.5 Severability. If any provision of this Agreement is held to be illegal or unenforceable, such provision shall be limited or eliminated to the minimum extent necessary so that the remainder of this Agreement will continue in full force and effect and enforceable.

14.6 Controlling Law; Jurisdiction. This Agreement shall be interpreted and controlled by and construed and enforced according to the laws of the State of New York without regard to conflict of laws provisions thereof. Both Parties agree that process may be served in the manner provided herein for giving notices or otherwise as allowed by US federal law.

14.7 Disputes. Purchaser and Seller agree, prior to bringing any claim against the other Party, to make a good-faith effort to resolve any disagreement arising out of, or in connection with, this Agreement through negotiation. Should the Parties fail to resolve any such disagreement within thirty (30) days, either Party may then proceed to bring any claim or cause of action in accordance with the terms of Section 14.6. Notwithstanding the foregoing, this Section shall not preclude either Party from seeking temporary, provisional, injunctive or other equitable relief from any court where appropriate; to protect such rights as may be substantially or irrevocably lost or impaired in the absence of such relief without first resorting to informal dispute resolution.

14.8 Integration; Merger. This Agreement, together with all Exhibits hereto, constitutes the entire agreement between the Parties concerning the subject matter hereof. This Agreement replaces and fully supersedes any prior verbal or written understandings, communications, or representations between the Parties. This Agreement shall not be

LD

modified except by a subsequently dated written amendment signed by a duly authorized representative of each Party.

14.9 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement. This Agreement may be executed and delivered by electronic facsimile (including scanning) transmission with the same force and effect as if it were executed and delivered by the Parties simultaneously in the presence of one another, and signatures on a facsimile copy hereof shall be deemed authorized original signatures.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed by the signature of its duly authorized officer as of the date above first written.

**Workplace Technologies Research, Inc.**

**("Seller")**

By: [signature]
Lia DiBello, Ph.D
Chief Executive Officer & Director of Research

**Project Management Institute, Inc.**

**("Purchaser")**

By: [signature]
Mark A. Langley
President & Chief Executive Officer

By: [signature]
Joseph Cahill
Vice President, Finance & Administration

# EXHIBIT A

## PRODUCT DESCRIPTION

This Product Description is an addendum to the Software Technology Development and Purchase Agreement ("Agreement") between WTRI and PMI ("Parties") dated September 8, 2015, and is incorporated into the Agreement by reference.

The product is an immersive "accelerated learning" technology platform derived from existing technology developed by WTRI and further enhanced with project management specific content that WTRI and PMI will jointly develop (the "Software").

WTRI will utilize elements of its existing FutureView™ products, including its Event Generator and Metrics Engine and a version of the Cognitive Agility Assessment Tool to measure learning.

The Software will consist of an individual and team play version that is uniquely tailored for project management education, specifically for advancing the Technical, Leadership, and Strategic/Business Management skill levels of project managers along the Dreyfus model of expertise.

For both the team and the individual, accelerated learning will be measured by changes in cognitive agility and improved performance within the simulated environment.

## Product Concept and Design

**The World**

The simulated world consists of 4 companies that will include and accommodate at least 9 industry settings. Each industry will be comprised of 4 projects across the 4 Dreyfus levels. **See Figure 1, Company 1, with projects across 9 Industries and 4 Dreyfus Levels,** showing the configuration of one of the four companies.

LD



**Figure 1: Company 1 with Projects across 9 Industries and 4 Dreyfus Levels**

**The Rehearsal**

For both the individual play and the team play versions, project sessions based on the results of an initial assessment (the Cognitive Agility Assessment Tool) will be provided to both the individual and team, respectively. Individual and teams select a project and must complete 2 sessions. A rehearsal equals 2 complete sessions. Individual and team performance reporting will be provided at the end of the each session. Once the second session is complete, the learner receives a certificate of completion and is awarded professional development units if they are PMP's. The learner or team picks one project per purchase and there is no requirement or limit on purchases. In both the individual and the team version, learners work as project managers.

**The Companies**

Each company will have unique finances, histories, strategies, and marketplace context. PMI will collaborate with WTRI to define these companies.

**The Projects**

The projects—each within one of the 9 industries—will be simulations in which learners manage projects, respond to various challenges, and advance the success of the companies. Each project will include project assets such as but not limited to project history, a charter, and budget, schedule, risk register, and stakeholder information.

Each project will be designed to accommodate various levels of expertise from relative beginner to intuitive expert. **See Figure 2, Engineering Project, Levels L2 – L5.** The information, technologies and patterns of activity as created by WTRI's applicable technologies influence the learner's experience by presenting level-appropriate challenges.



**Figure 2. Utilities Project, Levels L2 – L5**

A person could rehearse every project for a single virtual company if additional rehearsals are purchased, taking on increasingly complex projects as they advance along the continuum of professional development.

**The Project Challenges**
Learners will be presented with level-appropriate challenges that require them to make a decision that impacts the project. Learner's actions and behaviors in response to these challenges will be captured and tracked by the underlying technologies, which—when measured against the learners' assessment and first session results—should demonstrate accelerated learning.

**The Initial Assessment (The Cognitive Agility Assessment Tool)**
The learner completes the Cognitive Agility Assessment which provides information about their experiences as a project manager. Leveraging WTRI's technologies, the system measures the learner's baseline level of competency within the PMI Talent Triangle. To ensure accurate placement, this assessment will be a "show me" and not a "tell me" type of assessment. The assessment will require the learner to examine scenarios and data and then recommend actions and/or predict future results. The resulting assessment baseline will be the point from which an individual's learning is measured throughout their experience within the simulated environments.

Within the individual version, an assessment places the learner at their level of work. The learner will be provided with a variety of projects from which to choose that would advance the learner along the continuum of professional development. **See Figure 3, Sample Individual Player Options Based on Assessment.**

LD



**Figure 3. Sample Individual Player Options Based on Assessment**

Within the team version, an aggregate of the team's assessment scores identify an appropriate level of play. Appropriate projects are then recommended for the team. Once a project is selected, the team enters the virtual world, and play begins. Once the team is in a project, the project cannot be changed. **See Figure 4, Aggregated Team Level Based on Individual Assessment.**

LD



**Figure 4. Aggregated Team Level Based on Individual Assessment**

**Onboarding**

The learner for both individual and team play is provided with orientation materials to prepare for the simulated experience. This material is similar to what one might receive upon accepting an assignment to a project. It will include project artifacts, resources, and tools needed to manage processes of the projects in these companies. It is estimated that review of the onboarding kit will take 2 hours and PDUs will be offered for this work. The learner will also receive instructions on how to function within the simulation.

**Time**

Each project rehearsal unfolds within the simulated environment over 2 8-hour periods. Each session is timed. The learner will only be able to spend 8 hours of work time within each of the sessions. Work that is not complete at the end of the 8 hours will affect the learner's score. The clock for these sessions is only running while the learner is in the simulation. If the learner takes a break, the clock stops. At any point in play, the learner can stop and resume exactly where they left off.

The learner attempts to achieve the project's objectives within the first session, representing the project's start and end. A complete rehearsal consists of two complete 8-hour sessions, so the learner will have two opportunities to achieve the project's objectives. This format is critical to accelerating the learning within simulations, which requires iterative decision-consequence-outcome experiences for the participant(s).

The compression of time within the simulated environment allows for more iterations of the decision-consequence-outcome experiences of real life, thereby accelerating learning.

LD

**Input and Feedback**
Within the team play, learners will receive input from other players as well as artificial intelligent (AI) bots and will receive immediate feedback on their decisions from the system throughout the rehearsal, so they will know how their decisions impact the project. Within individual play, learners will only interact with AI bots. The impacts of these decisions on the company's business objectives will be provided immediately, allowing for the learner to make adjustments as needed to best meet the objectives. Twelve hours after completion of the full first session, the learner will be provided a report showing the project outcomes relative to the objectives. The second session can begin after report is received. The second session must be started within a certain period of time (to be validated by testing). Following completion of the second session the rehearsal is complete. The learner and/or team will be provided a report showing their development along the identified continuum of expertise within each the three sides of the PMI Talent Triangle compared to the initial assessment.

**The Learner Experience**
A basic representation of the learner experience is depicted in **Figure 5. Flow**.

The learner will be able to choose from recommended rehearsals across the various companies, which are based on the results of an initial assessment if in the individual player mode. If in the team mode, all players will be required to take the assessment and the project level will be recommended based on the team's aggregate assessment score.

Learners will have the ability to start and stop as needed, working within projects until complete. In all cases, when a learner stops –intentionally or accidentally—the system will pause and resume at the point at which the learner stopped.

The learner or team must complete 2 consecutive sessions of the same project, known as a rehearsal, to receive credit for completion.

The system will enforce a minimum 24-hour break between completion of the first session and beginning of the second session to maximize the learning impact.

Twelve hours after the learner or team completes a rehearsal, the system will provide a comprehensive report of accelerated learning consisting of performance against their original assessment as well as project results.

If someone purchases more rehearsals, the system will keep a history of the individual's achievements from previous rehearsals completed and remember the learner's previously established level when accessing subsequent rehearsals. The system will not require an assessment once the individual has already completed an initial assessment.

Teams who immediately purchase new rehearsals will be automatically leveled based on past performance if the team consists of all the original members.

LD



**Figure 5. Flow**

**Emulating the Project Team**

Artificial intelligence (AI) bots will simulate project team members and/or stakeholders, etc. Individual learners' decisions over the course of the rehearsal will determine what the AI bots do and how the AI bots' actions affect elements of the project.

A company-level AI bot will be able to interact with individual players at a team level to influence players' access to resources and project information. This will eliminate the need for live facilitation of simulations. This AI bot will be programmed to work across all projects within the 4 companies.

**Data Collection and Feedback to the Learner**
Each simulated environment will include special dashboards that will provide insight on how effectively the learner is meeting the project's and company's objectives.

The Metrics Engine will capture data associated with learning.

Data collected by the Metrics Engine will be used to score "behavior" associated with project management capabilities.

The simulated environments will contain sensors built into the 3-D world to collect data. These sensors will measure learner's decisions regarding project and company goals.

PMI and WTRI will define the data collection goals of the Metrics Engine.

The Metrics Engine will export data that can be imported into any report format or reporting software.

PMI and WTRI will design the reports.

Final reports will address the requirements of PMI's Continuing Certification Requirements reporting structure which is aligned to PMI's Talent Triangle.

**Product Architecture**
The Software will be built as a virtual world and in such a manner that a common platform allows for integrating capabilities applicable to both individual and team play.

This Software will demonstrate accelerated learning and development of project management performance for individuals and teams within the simulated environment to the same degree as teams have performed within WTRI's other project management simulated environments, which in turn have demonstrated equivalent accelerated learning and development to the same degree as teams have performed within WTRI's live simulations.

This Software will use artificial intelligence to simulate project team members in the form of AI Bots. PMI will provide SMEs in order to extract knowledge needed to build the artificial intelligence.

Components of the Software are linked via an application program interface API—a set of routines, protocols, and tools for building software applications—which connects all the technologies which run and monitor the activities in the world to each other and to the world itself.

**Additional Features**
PMI's final product will also incorporate the following:

- product scalability to reach a high volume and global market;
- use of North American English in the simulation environment;
- incorporation of project management specific competencies, identified and validated through new and/or existing research by PMI and PM SMEs;
- administrator capabilities that allow PMI to seamlessly deliver the product to customers;
- secure storage of learner and team experience data that will allow PMI to extract, tabulate and evaluate individual and aggregate performance.

## WTRI Applicable Technologies

**Event Generator**
WTRI's Event Generator is a software application that creates "probable unfolding futures" at a high level, in extreme detail, or both. These futures unfold within the simulated environments, each consisting of:

1. A company, including artifacts of the company, the company's history, and the project-related characters represented as Artificial Intelligence (AI) bots
2. The company's projects and all project-related artifacts
3. Level-appropriate project challenges

Data is synchronized at all points within the simulated environment, throughout the learner's individual simulation experience.

There are two important features of the Event Generator with regard to project management:

1. The Event Generator will—based on the learner's or teams choice of the recommended simulated environments as described in the Product Concept Design section—accommodate the level of complexity for a given project. Complexity in this instance relates directly to human behavior, systems behavior, and ambiguity as defined by PMI's research on complexity.

2. Each time a new project session is run, the "future" and project challenges are unique in the details but the project goals remain the same. Research has shown this feature propels in depth learning vs. memorization or "gaming" the exercise.

**Metrics Engine**
WTRI's Metrics Engine is a kind of Event Generator in reverse. It uses the same goals as the Event Generator and captures and tracks individual behavior, decisions, and outcomes associated with the learner's progress. This allows learners and system administrators to see "where" the learners are along the continuum of professional development even before they have achieved a new level of expertise. PMI's intellectual property will be used to define the behaviors, decisions, and outcomes that need to be captured and tracked.

**Cognitive Agility Assessment Tool**
WTRI'S Cognitive Agility Assessment Tool is a knowledge elicitation instrument that will measure the individual's Dreyfus levels along each leg of the PMI Talent Triangle, as well as their cognitive agility. This allows for the product to present simulated environments appropriate for the individual's learning needs. It also serves as a baseline for reporting of the learner's progress.

**Virtual World**
All of these technologies will interface with a virtual world built by WTRI for PMI's use. WTRI will develop the virtual world and integrate WTRI's technologies with the virtual world. Additionally, PMI and WTRI will integrate the technologies with PMI's systems (TBD). Any developer's licenses that are needed to run the technology will be PMI's responsibility.

LD

**Integration of PMI's Intellectual Property and WTRI's Research**

Elements of PMI's intellectual property will be explicitly incorporated into the Software, to include (but not limited to) relevant areas of the *PMBOK® Guide*, PMI Talent Triangle, *Navigating Complexity: A Practice Guide*, PMP Role Delineation Study, Career Framework Knowledge Base, the PMP Exam Content Outline, and any other PMI materials or content.

The product will leverage WTRI's extensive research on accelerated learning through simulation in order to develop project management expertise and cognitive agility. The primary objective is to move practitioners along the continuum of project management expertise, with the ultimate goal being attainment of the highest level of expertise. WTRI will work with PMI to identify project management capabilities that will be tested and measured.

WTRI and PMI will coordinate in an ongoing fashion to update the model used to test and measure project management capabilities.

Projects will reflect or be relatable to the following industries:

1. Information Technology Solution Services
2. Computers/Software/Data Processing
3. Financial Services
4. Telecommunications
5. Business Management Services
6. Defense
7. Engineering
8. Aerospace
9. Utilities

**Acceptance Criteria**
In order for PMI to accept ownership of the Software, it must meet all requirements stated in the Acceptance Criteria below.

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 1 | The Software will develop individuals and teams in the area of project management, specifically advancing the Technical, Leadership, and Strategic/Business Management skills levels, using criteria from a matrix of skills mapped to the five Dreyfus/PMI levels to be developed by WTRI and PMI. | Software | Technical Components | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 2 | In the individual version, accelerated learning will be measured by changes in cognitive agility and improved performance within the simulated environment without live facilitation. At least 80% of the user's discreet measured technical, leadership, and business skills within the simulation will have increased by at least one Dreyfus/PMI level. | Software | Technical Components | Non-functional |
| 3 | WTRI will provide a detailed plan for testing and validation of the functionality and stability of the Software. | Technical Solution | Test & Validation | Non-functional |
| 4 | WTRI will provide for PMI approval a detailed plan for testing and validation that accelerated learning occurs via use of the Software, using a protocol acceptable for cognitive science research of this kind, which is acceptable to PMI. | Technical Solution | Test & Validation | Non-functional |
| 5 | Evidence of accelerated learning will be assessed by levels (i.e. quantitative data).<br><br>The Software must demonstrate equivalent accelerated learning and development of project management performance for individuals and teams within the simulated environment. The learning will be equal to that shown in WTRI's prior project management rehearsals, which were equal in learning impact to WTRI's other live simulated environments. (WTRI shall provide PMI with benchmarking data, including but not limited to pertinent facts and | Technical Solution | Software | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | data (e.g., publications in peer reviewed journals), about WTRI's past live simulation participant/team initial assessment and simulation performance scores, as well as pertinent facts and data about WTRI's evaluation and interpretation of each simulation's data, in order to allow PMI and WTRI to develop an effective standard to measure accelerated learning within a team or individual asynchronous and un-facilitated online simulation of project management. ) | | | |
| 6 | Each company runs dynamically in a simulated environment, responding to marketplace forces and enduring the consequences of its chosen strategy. | Technical Components | Virtual World | Functional |
| 7 | The Software must support companies, including artifacts of the company and the company's history based on PMI inputs, including responses, probability percentages, outcomes and scoring. | Technical Components | Virtual World | Functional |
| 8 | The Software must support project-related characters represented as Artificial Intelligence (AI) bots. | Technical Components | Virtual World | Functional |
| 9 | The Software must support the company's projects and all project-related artifacts and level-appropriate project challenges based on inputs provided by PMI SME's. | Technical Components | Core Functionality | Functional |
| 10 | Each project must have 4 versions developed that correspond to the upper 4 Dreyfus/PMI levels. WTRI will provide PMI with templates and feedback in order to deliver project assets that meet | Technical Components | Core Functionality | Non-functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | the Software's requirements for content | | | |
| 11 | In the individual version, at any point in play, the user must have the ability to stop and resume exactly where they left off. User must be able to start and stop to ensure a positive experience and minimize attrition. | Technical Solution | Software | Functional |
| 12 | In the individual version, the Software must be built so that the individual user's events will not continue while the user is not present (i.e., the user picks up exactly where they left off). | Technical Components | Core Functionality | Functional |
| 13 | Data must be synchronized at all points within the simulated environment, throughout the user's individual simulation experience. | Technical Components | Core Functionality | Functional |
| 14 | Each time a new project session is run, the "future" and project challenges are unique in the details but the project goals remain the same. | Technical Components | Core Functionality | Functional |
| 15 | The entire solution must be presented in North American English language. | Technical Solution | Software | Functional |
| 16 | The individual user or team must have the ability to pick one rehearsal per purchase with no limit on purchases. | Integrated Systems | Access Control | Functional |
| 17 | The Software must include an initial cognitive agility assessment to determine the user's capability profile (individual and team). | Technical Components | Core Functionality | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 18 | The Software will include a way to not require a cognitive agility assessment if the individual has already completed an initial cognitive agility assessment, unless it has been 6 months since the previous assessment was completed. | Technical Components | Core Functionality | Functional |
| 19 | The Software will allow teams who immediately purchase new rehearsals must be automatically leveled based on past performance if the team consists of all the original members with a 6 month limit. If any new members are present or the 6 month limit has passed, a new cognitive agility assessment must be taken. | Technical Components | Core Functionality | Functional |
| 20 | The Software will allow the use of the results of the user's first rehearsal to identify and recommend new rehearsals immediately after completion of the first rehearsal. | Technical Components | Core Functionality | Functional |
| 21 | A rehearsal equals completion of an initial assessment, onboarding, and a project which is completed twice (20 hours total). | Technical Solution | Software | Functional |
| 22 | The user must complete 2 consecutive sessions with a total of 16 hours of the same project. | Technical Solution | Software | Functional |
| 23 | The user must have the ability to select any project at their level, per purchase, taking on increasingly complex projects as they advance along the continuum of professional development. | Technical Components | Core Functionality | |

JD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 24 | The information, technologies and patterns of activity as created by WTRI's applicable technologies, must present level-appropriate challenges based on the Dreyfus/PMI capability levels. | Technical Solution | Software | Non-functional |
| 25 | The Metrics Engine must use PMI's intellectual property to define the behaviors, decisions, and outcomes that need to be captured and tracked. There must be an API to get data out without stopping the system. | Technical Components | Core Functionality | Functional |
| 26 | The Metrics Engine will capture data associated with learning while the Grader will score "behavior" associated with project management capabilities. | Technical Components | Core Functionality | Functional |
| 27 | There must be test scripts developed during Alpha to capture qualitative data surrounding functionality. This includes feedback on graphics, usability (i.e. was the help function adequate?), what region the user resides, how many times the user was disconnected from the system, the user identity if known and overall feedback on the software by testers. | Technical Solution | Test & Validation | Functional |
| 28 | The simulated environments must contain sensors built into the 3-D world to collect data to produce ongoing quantitative reports. At a minimum, the item analysis and system data must be provided in an Excel or a comma delimited report to support exporting data to any report format:<br><br>The responses user makes to prompts, how the user is behaving within the | Technical Components | Core Functionality | Non-functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | system, must tie data to scores set for behaviors, how long the user is in the system, how long it takes for the user to respond to a specific challenge, how often the user is in the system (daily, weekly, etc.), what projects are chosen/more popular than others, where the user is from based on IP address, initial cognitive agility assessment scores to research patterns against simulation behavior, all actions taken to analyze patterns, aggregated scores across regions to compare regional differences (i.e. is language an issue? are there patterns by region?), how often the user references help and how often the user references the on-boarding documentation. | | | |
| 29 | Quantitative analysis on accelerated learning during Alpha testing must be conducted and should include but not be limited to:<br><br>what elements of the project content seemed to hinder learning, what and how many times users accessed project specific content, how this access to project specific content related to the user's performance of specific tasks, how often the user chose to interact with the AI bots, how specific interactions with the AI bots supported or hindered performance; the user's pattern of use and its effect on accelerated learning; how often the user visited the practice room to learn or relearn how to work within the system. Evidence of accelerated | Technical Solution | Test & Validation | Non-functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | learning must be shown upon testing and review of the fifth Alpha version of the Software | | | |
| 30 | Each project rehearsal will unfold within the simulated environment over 2 8-hour periods. | Technical Solution | Software | Functional |
| 31 | Each session must be time boxed to no more than 8 hours. | Technical Solution | Software | Functional |
| 32 | The Software must end the session after the user completes no more than 8 hours of work time. Work that is not complete at the end of the 8 hours will affect the user's score. | Technical Solution | Software | Functional |
| 33 | The Software must have a countdown clock for the user to reference during the simulation. | Technical Components | Virtual World | Functional |
| 34 | Each company must have unique finances, histories, strategies, and marketplace content. | Technical Components | Virtual World | Non-functional |
| 35 | The simulated world must consist of 4 company settings and 9 industry settings with each project containing a minimum of 4 project-unique settings. Each of these settings may have up to 2 versions of the setting to depict changes to the setting as a result of presented challenges. | Technical Components | Virtual World | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 36 | Each industry must be comprised of a project across the 4 top Dreyfus levels as applicable to PMI's Career Framework Knowledge Base. | Technical Components | Virtual World | Functional |
| 37 | The projects—each within one of the 9 PMI-selected industries— must be simulations in which users manage projects, respond to various challenges, and advance the success of the companies. Each project must include the following assets not limited to:<br><br>• scope<br>• schedule<br>• budget<br>• resources<br>• stakeholder register<br>• business case<br>• risk register<br>• at least 5 challenges per level, at least 5 artificial intelligence robots (AI bots)<br>• at least 5 possible and credible user responses to each challenge per each of the 5 Dreyfus/PMI levels<br>• AI bot responses to each challenge<br>• AI bot responses to the user's chosen action or inaction to the challenge<br>• a scoring rubric based on the PMI/Dreyfus assessment mapping all user responses for each project<br>• at least 5 project specific virtual settings that are unique to the project<br>• up to 2 versions of each virtual setting per challenge, before and after a challenge has occurred. These virtual settings may experience physical changes based on the challenges experienced. For example, if a hurricane | Technical Components | Virtual World | Functional |

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | strikes, one or more of the virtual rooms may experience flooding and the graphics must represent this change. The changed room would not count as an additional project-specific virtual setting, but only as one version of the setting. If the challenge that occurs is a budget cut, no changes to the physical environment would be likely, and additional versions of a setting would not be needed. | | | |
| 38 | On-boarding must be accomplished in virtual world through a simulated manner, including a practice area for users to become acclimated to the virtual world prior to beginning the rehearsal (i.e. how to move the avatar, review dashboards, menus, in-world communication mechanism and how to interact with AI bots). | Technical Components | Virtual World | Functional |
| 39 | On-boarding documentation includes, but is not limited to project artifacts, tools and instructions on how to function within the world needed to manage processes of the projects in these companies. | Content | Onboarding Materials | Functional |
| 40 | The on-boarding documentation must be accessible in the virtual world or accessible from within the virtual world. | Technical Components | Virtual World | Functional |
| 41 | Project-related AI bots must be interactive, have a voice and represent project stakeholders and the project team with which the user must interact during execution of a project. | Technical Components | Virtual World | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 42 | The Software must support in-world communications mechanisms between team members (e.g. sending emails, texts, taking notes on a document, reports, etc.) to display/deliver global, company, or project-related information to the learner. NOTE: PMI will demo in-world communication mechanisms used by Online Learning during the design phase. | Technical Components | Virtual World | Functional |
| 43 | The Software must contain a game set-up interface for creating the patterns of unfolding futures that are presented to the learner via in-world events (i.e. the pattern generator). | Technical Components | User Interfaces | Functional |
| 44 | The user must receive instructions on how to function within the simulation as an avatar during on-boarding. | Technical Components | User Interfaces | Functional |
| 45 | The Software must utilize AI bots to simulate company business activities external to the project, such as manufacturing, order processing, R&D, etc. Individual users' decisions over the course of the simulation will determine what the AI bots do and how the AI bots' actions affect elements of the project. The AI bots may also be used to fill key project team roles that would be filled by real humans in the team simulation environment. | Technical Components | Virtual World | Functional |
| 46 | The solution must have a skin for the player (not user, the actual screen in which the simulation is seen) that is PMI branded. | Technical Solution | Software | Functional |

20

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 47 | The system must present a page for completing a mandatory user profile including at minimum but not limited to name and email address pulled from single sign-on. | Technical Components | User Interfaces | Functional |
| 48 | Data within the user profile must flow back to PMI.org via services. | Integrated Systems | myPMI Profile Integration | Functional |
| 49 | The Software will include the ability for users to build their own avatars. Avatars must provide users with a full spectrum of choices regarding race, gender, age, and disability. | Technical Components | User Interfaces | Functional |
| 50 | Each simulated environment must include special dashboards that will provide insight on how effectively the user is meeting the project's and company's objectives. | Technical Components | User Interfaces | Functional |
| 51 | The cognitive agility assessment will use scenario based questions that demonstrate learner skill (a "show me" model) and will not rely on a learner's own perception of skills (a "tell me" model) to determine learner level. | Technical Components | Core Functionality | Functional |
| 52 | Within the individual version, an assessment places the user at their level of work. The user must be provided with a variety of projects from which to choose that would advance the user along the continuum of professional development. | Technical Components | User Interfaces | Functional |
| 53 | In the team mode, all players must be required to take the cognitive agility assessment and the project level will be recommended based on the team's | Technical Components | Core Functionality | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | aggregate assessment score. | | | |
| 54 | The project is then selected by the team, the team enters the virtual world, and play begins. Once the team is in a project, the project cannot be changed. | Technical Components | Core Functionality | Functional |
| 55 | Once an individual is in a project, the project cannot be changed. | Technical Components | Core Functionality | Functional |
| 56 | The user will receive immediate feedback (less than a second) on their decisions throughout the rehearsal, after the decision results in a consequence. | Technical Components | User Interfaces | Functional |
| 57 | After completing session 1, the user must be provided with information including but not limited to thanking the user for completion, messaging regarding returning, instructions that the user will receive a report at the beginning of session 2 (debrief of session 1), message of encouragement explaining that everyone fails at first attempt, and ability to exit the rehearsal. The message should be available and accessible from in-world as soon as the clock runs out for the first session. Additionally, all reports should be downloadable and printable. | Technical Components | User Interfaces | Functional |
| 58 | Twelve hours after completion of the full first session, the user must be provided a report showing the project outcomes relative to the objectives. The report should be downloadable, printable, and legible in-world. | Technical Components | User Interfaces | Functional |
| 59 | The second session must be built to | Technical | Core | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | begin after report is received by the user but not sooner than 12 hours after session one. | Components | Functionality | |
| 60 | Once the rehearsal is complete, the user and/or team must be provided a report showing their development along the identified continuum of expertise within the PMI Talent Triangle compared to the initial cognitive agility assessment and address the requirements of PMI's Continuing Certification Requirements reporting structure. This report should be downloadable, and printable.<br><br>NOTE: Information must show initial cognitive agility assessment levels and demonstrated simulation levels of technical skill (all 10 knowledge areas), as well as leadership skills and business acumen. An explanation of the % of improvement needed to advance to a new level should be included, as well as the projects they are now qualified to attempt within the next six months should they wish to come back. | Technical Components | User Interfaces | Functional |
| 61 | There must be a countdown clock to warn/alert the user of how much time he has left to play within a session. Once the time has run out, the user cannot continue play until the next session is released or until a new project is purchased. | Technical Components | User Interfaces | Functional |
| 62 | There must be a sleep-cycle lock out countdown clock that prevents a learner from accessing the second | Technical Components | User Interfaces | Functional |

LP

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | session of a rehearsal before the 12 hour sleep-cycle lock out period is complete. | | | |
| 63 | The sleep-cycle lock out countdown clock will prevent the learner from accessing the session too early, but will not prevent a learner from accessing the session if they have taken a longer sleep-cycle lock out period than is recommended. | Technical Components | User Interfaces | Functional |
| 64 | The system must allow a customer care administrator to monitor and support a user's simulation. | Technical Components | User Interfaces | Functional |
| 65 | The system must allow for configuration changes of the Pattern Generator and any other elements of the Software to support enhancing the user's simulation experience including but not limited to functionality, graphics, activities, and all elements of individual projects. | Technical Components | User Interfaces | Functional |
| 66 | The system must allow for configuring a sleep-cycle lock out period if PMI needs to modify the sleep-cycle lock out period duration at a later date. | Technical Components | User Interfaces | Functional |
| 67 | After completing session 2, the user must be provided with a completion notice in-world that can be pulled within the user profile as well. This is the standard for all PMI professional development and the current report will be used as a template, which reflects the number of PDU's. | Technical Components | User Interfaces | Functional |
| 68 | The Software must be integrated with PMI systems. | Enterprise Architecture | Integrated Systems | Functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 69 | The Software must be built as a virtual world and in such a manner that a common platform allows for integrating capabilities applicable to both individual and team play. | Enterprise Architecture | Infrastructure as a Service | Non-functional |
| 70 | The Software must comply with PMI's security standards | Enterprise Architecture | Infrastructure as a Service | Non-functional |
| 71 | The cognitive agility assessment will be accessed via the web and the simulation will be accessed via the web when the virtual world platform has the ability to do so. | Enterprise Architecture | Infrastructure as a Service | Functional |
| 72 | The Software will have the ability to be upgraded. | Enterprise Architecture | Infrastructure as a Service | Functional |
| 73 | Any web components of the Software must follow PMI browser standards which require that websites and web applications support the following browsers and versions:<br><br>• The latest two versions of Chrome.<br>• The latest two versions of Firefox.<br>• Safari version 8 and above.<br>• Internet Explorer (IE) versions 11, 10, 9, and 8; Support of IE 8 is required for PMI.org and ProjectManagement.com. Websites and web applications used only by internal PMI staff are not required to support IE 8.<br>• The latest version of mobile Google Chrome.<br>• The latest version of mobile Safari.<br>• The latest version of the native Android mobile browser (if not replaced by mobile Chrome).<br>• Internet Connection: 56 KB Modem as | Enterprise Architecture | Infrastructure as a Service | Functional |

LP

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| | minimum, 128 KB recommended<br>• Memory: 256 MB minimum, 512 MB recommended<br>• Processor: Pentium II 300 minimum, Pentium III recommended<br>• Speakers: Multimedia speakers or headphones<br>• Responsive Design Standards require that all websites and web applications built by vendors for PMI must detect and support the screen resolutions of both desktop or laptop computers, smartphones, and tablets. Additionally, the performance of all websites and web applications must be optimized for use on computers, smartphones, and tablets. | | | |
| 74 | Any virtual world components of the Software must meet the following standards:<br>• Internet Connection: 1 MB/s minimum<br>• Memory: 4 GB minimum<br>• Processor: Core Two Duo minimum<br>• Speakers: Headset with microphone<br>• Operating System: Windows XP and above, MAC OSX 10.7 and above | Enterprise Architecture | Infrastructure as a Service | Functional |
| 75 | The Software must operate on mobile devices operating the native Android, Google Chrome and iOS platforms when the virtual world platform has the ability to do so. | Enterprise Architecture | Infrastructure as a Service | Functional |
| 76 | Software must be able to support 200K simultaneous users. | Enterprise Architecture | Infrastructure as a Service | Non-functional |

LD

| ID# | Solution Requirements | Categories | Sub-Categories | Type |
|---|---|---|---|---|
| 77 | The system will identify a user as new (never used the Software) or returning (a user that has purchased the Software whether or not they completed the cognitive agility assessment, a session or a rehearsal). | Integrated Systems | SSO Integration | Functional |
| 78 | For the individual version, the system will grant access to the Software based on user authentication. The criteria to access is purchase of the software and the user must be an active PMP. | Integrated Systems | Access Control | Functional |
| 79 | A test harness must be built to test the pattern generator and validate it is working correctly and conduct all back end tests. | Technical Solution | Test & Validation | Non-functional |

LD

**Exhibit B**

**Software Development Plan**

This Software Development Plan ("Development Plan") is an addendum to the Software Technology Development and Purchase Agreement ("Agreement") between WTRI and PMI ("Parties") dated September 8, 2015, and is incorporated into the Agreement by reference. This Development Plan describes the schedule for development of the Software and responsibilities of the Parties with respect to such development.

Reference Documents

The Development Plan refers to or incorporates the following elements and attachments:

| Document Name | Relationship to this Development Plan |
|---|---|
| Acceptance Criteria (Solution Requirements)<br>***Included in Exhibit A to Agreement*** | Identifies all requirements for acceptance of the Software |
| Technical Development Project Schedule<br>***Attachment 1 to Development Plan*** | Identifies all key development-related activities and represents their approximate durations in a graphical view |
| Technical Development Milestone Chart<br>***Attachment 2 to Development Plan*** | Identifies all key milestones for development of the Software. |
| Work Breakdown Structure and Dictionary<br>***Included in this Development Plan*** | Identifies all elements of development project scope to be delivered by the project team.<br><br>Defines each element of development project scope and assigns individual responsibility for the delivery of each element of scope |

Work Breakdown Structure

The project's work breakdown structure (WBS), WBS Dictionary and WBS Chart are set forth below. The WBS and WBS Dictionary are provided to help ensure that the Parties and all project team members have a comprehensive understanding of what activities the project team and each project team member will perform to deliver the completed Technical Solution, as defined below.

LD

**WBS Chart**

2

LD



**WBS Dictionary**

| WBS ID | Title | Person Responsible | Definition |
|---|---|---|---|
| 2 | Technical Solution | Team | Creation of all deliverables that are associated with the Accelerated Learning through Iterative Rehearsal of Simulated Projects Software |
| 2.1 | Project Management | Jesse Sardina | General project management of the design, development, test & validation, and operational readiness of the Software |
| 2.1.1 | Requirements | Kara Austin | Requirements definition, documentation, and management for the Technical Solution |
| 2.1.1.1 | Technical Components | Kara Austin | Management of requirements for the Software's technical components (Core Functionality, Virtual World, and User Interfaces) |
| 2.1.1.2 | Content | Kara Austin | Management of requirements for the Content (Capability Profiles, Project Assets, and On-Boarding Kits) |
| 2.1.1.3 | Enterprise Architecture | Kara Austin | Management of requirements for the Enterprise Architecture (Infrastructure as a Solution and Integrated Systems) |
| 2.1.1.4 | Operational Readiness | Kara Austin | Management of requirements for Operational Readiness (Refresh Plan and Legal / IP Compliance) |
| 2.1.2 | Designs | Chris Mancus | Development and verification of design documentation for the Technical Solution |
| 2.1.2.1 | Software | Lia DiBello | Development and verification of design documentation for the Software and the components of the Software |
| 2.1.2.2 | Enterprise Architecture | Jeffrey Kirkell | Development and verification of design documentation for the Enterprise Architecture |
| 2.1.3 | Review & Acceptance | Thom Rossi | Review and acceptance of the Technical Solution requirements, designs, and test & validation results |
| 2.1.3.1 | Requirements | Thom Rossi | Review and acceptance of the Technical Solution requirements |
| 2.1.3.2 | Designs | Chris Mancus / Jeffrey Kirkell | Review and acceptance of the Technical Solution designs |
| 2.1.3.3 | Test & Validation Results | Chris Mancus | Review and acceptance of the Technical Solution Test & Validation Results |
| 2.2 | Software | Betsy Redden | Development of the Software's components, its content, and the assembly of components and content into Software Builds |
| 2.2.1 | Technical Components | Lia DiBello | Development of the technical components of the Software |

| WBS ID | Title | Person Responsible | Definition |
|---|---|---|---|
| 2.2.1.1 | Core Functionality | Lia DiBello | This includes development of:<br>- The profiling instrument that will determine where an individual learner's capabilities are mapped to along the continuum of expertise within each leg of the PMI Talent Triangle<br>- The pattern generator that will create "unfolding futures" that will be presented to the individual learners via simulated environments<br>- The data collection tool that will capture and track an individual learners' actions and decisions within simulated environments |
| 2.2.1.2 | Virtual World | Lia DiBello | Development of the simulated environments (i.e. Companies, Governments, Artificial Intelligence bots, and all related artifacts) within which individual learners rehearse simulated projects |
| 2.2.1.3 | User Interfaces | Lia DiBello | Development of the menus, dashboards, and utilities that enable human-system interaction between the individual learners and the Software |
| 2.2.2 | Content | Karen Holloway | Development of the Project Management Content that will be incorporated into the Software |
| 2.2.2.1 | Capability Profiles | Karen Holloway | Development of the models to be used by the Software in determining an individual learner's capabilities along the continuum of expertise within each leg of the PMI Talent Triangle |
| 2.2.2.2 | Project Assets | Karen Holloway | Development of the stories within which individual learners are immersed, the project documentation used by individual learners to manage the simulated projects, and the impacts to simulated projects with which individual learners must deal in order to keep the projects on track and meet objectives |
| 2.2.2.3 | On-Boarding Materials | Lia DiBello | Development of all materials that inform the individual learners of the project's backstory, to include the goals and objectives for the projects |
| 2.2.2.4 | Context Sensitive Help | Lia DiBello | Development of Software-related help that is available to and accessible by learners from within the virtual world |
| 2.2.3 | Software Builds | Lia DiBello | Assembly of the Software's components and content into verifiable and testable Builds |
| 2.2.3.1 | Alpha Builds | Lia DiBello | Assembly of the Software's components and content into the first prototype |
| 2.2.3.2 | Beta Builds | Lia DiBello | Assembly of the Software's components and content into the second prototype |
| 2.2.3.3 | Charlie Builds | Lia DiBello | Assembly of the Software's components and content into the final Software |
| 2.3 | Enterprise Architecture | Thom Rossi | Implementation of Enterprise Architecture that enables development & deployment, hosting, ongoing monitoring & maintenance, and integration of the Software with PMI's systems |

LD

| WBS ID | Title | Person Responsible | Definition |
|---|---|---|---|
| 2.3.1 | Infrastructure as a Service | Thom Rossi | Implementation of the development environments and deployment processes by which the Software will be created, tested, and moved from lower-level development environments to PMI's production environment |
| 2.3.1.1 | System Hosting | Thom Rossi | Implementation of the infrastructure that allows for development and delivery of the Software |
| 2.3.1.4 | Email Capability | Thom Rossi | Implementation of the mechanism by which Software-initiated communications will be queued and transmitted |
| 2.3.1.5 | Monitoring & Support | Thom Rossi | Implementation of a monitoring capability to assess Technical Solution-health in-operations |
| 2.3.2 | Integrated Systems | PMI/WTRI | Integration of the Software with PMI's systems to enable purchase of and access to the Software as well as enabling PMI to capture, store, and utilize data collected via use of the Software |
| 2.3.2.1 | SSO Integration | PMI | Integration of the Software with PMI's Single Sign-On capability |
| 2.3.2.2 | Commerce Server Integration | Chris Mancus | Integration of the Software with PMI's Commerce solution |
| 2.3.2.3 | Data Integration | PMI/WTRI | Integration of the Software with PMI's data systems |
| 2.3.2.4 | CCRS Integration | PMI | Integration of the Software with PMI's CCRS Web Service for automated reporting of PDUs |
| 2.3.2.5 | MyPMI Profile Integration | Chris Mancus | Integration of the Software with PMI's MyPMI Profile service for automated exchange of individual learners' profile data |
| 2.3.2.6 | Access Control | Chris Mancus | Integration of the Software with a web service that evaluates whether a user should have access to the Software. |
| 2.3.2.7 | System Status Service | Chris Mancus | Development of a service that provides an indication of the Software's status to other systems |
| 2.3.2.8 | CRM Notification Service | Chris Mancus | Development of a service that informs CRM of any end-user communications initiated and transmitted by the Software |
| 2.3.2.9 | Asset Subscriber Service | Chris Mancus | Development of a service that retrieves assets for use in the virtual world |
| 2.4 | Test & Validation | Betsy Redden | Varying levels of test that will be conducted on the Software components, content, and builds as well as the Enterprise Architecture and Integrated Systems |
| 2.4.1 | Unit Tests | PMI/WTRI | Unit testing of technical components, builds, and EA implementations |
| 2.4.2 | System Tests | PMI/WTRI | Functional testing of technical components, builds, EA implementations, and releases |
| 2.4.3 | Field Tests | Lia DiBello | Field testing of builds and releases |
| 2.4.4 | Compatibility Tests | Thom Rossi | Testing the Technical Solution on various operating systems and browsers that PMI intends to support |
| 2.4.5 | Load Tests | Thom Rossi | Load performance testing of the Technical Solution |

LO

| WBS ID | Title | Person Responsible | Definition |
|---|---|---|---|
| 2.4.6 | Data Validation & Report Tests | Thom Rossi | Validation of the data post-integration with PMI's data warehouse and the QA of reports |
| 2.4.7 | Pilot Test | Betsy Redden | Pilot testing of the Final build |
| 2.5 | Operational Readiness | Victor Carter-Bey | Administrative deliverables to prepare the Technical Solution for operational release |
| 2.5.1 | Technical Solution Releases | Chris Mancus | Assembly of the Software with EA, thereby representing a production release |
| 2.5.1.1 | Solution Release 1 | Chris Mancus | Assembly of the Software with EA into the first release |
| 2.5.1.2 | Solution Release 2 | Chris Mancus | Assembly of the Software with EA into the second prototype |
| 2.5.1.3 | Solution Release 3 | Chris Mancus | Assembly of the Software with EA into the final Software |
| 2.5.2 | Refresh Plan | Thom Rossi | Development of a plan that addresses business and technical processes for refresh of the Software's core functionality and content |
| 2.5.2.1 | Core Functionality Refresh Plan | Lia DiBello | Technical processes for refresh (or upkeep) of the Software's technical components |
| 2.5.2.2 | Content Refresh Plan | Betsy Redden | Business and technical processes for refresh of the Software's project management content |
| 2.5.3 | Legal / IP Compliance | Victor Carter-Bey | Application for Trademark of the Software |
| 2.5.3.1 | Trademark | Marjorie Gordon | Obtaining a Trademark for the Software |

2. Technical Solution- Development Plan

The Technical Solution is comprised of individual components that fall within three distinct groups:

1. The "Technical Components" – defined as the core functionality, virtual world, and user interfaces of the Software, which are to be developed and delivered by WTRI.
2. The "Content" – defined as the project management content to be developed by PMI and WTRI and incorporated into the Software by WTRI.
3. The "Enterprise Architecture" – defined as the infrastructure to be implemented by PMI, and the integrations to be implemented by PMI and WTRI, such that the Software can be delivered to end-users.

Responsibility for development of the Technical Solution will be shared by PMI and WTRI. The table below identifies the development activities for which each Party is responsible. Each of those items is discussed in further detail below.

| Technical Solution Development Activities | WTRI | PMI |
|---|---|---|
| Project Management | | |
| Manage requirements for Technical Solution | | ☒ |
| Create designs for Software | ☒ | |
| Create designs for Enterprise Architecture | | ☒ |

LP

| | | |
|---|---|---|
| Review and accept all requirements, designs, and test results associated with the Technical Solution | | ⍰ |
| **Development** | | |
| Develop core functionality technical components which include the following:<br>⍰ Cognitive Agility Assessment web application<br>⍰ Assessment Reporting web application<br>⍰ Virtual world in the Unity platform<br>⍰ SmartFox extensions<br>o World Manager<br>o Pattern Generator<br>o Metrics Engine<br>o Scenario Grader<br>o Notification Module<br>⍰ Pattern Generator Admin UI<br>⍰ SmartFox Test Harness | ⍰ | |
| Develop project management content to be incorporated in Software | | ⍰ |
| Build out technical infrastructure to support Technical Solution<br>This includes implementing Amazon AWS portion of architecture | | ⍰ |
| Develop integration endpoints to meet requirements of Technical Solution<br>⍰ Updates to SSO service<br>⍰ Updates to Profile service<br>⍰ Updates to CCRS service<br>⍰ Updates to Marketplace<br>⍰ Develop Asset Subscriber<br>⍰ Develop ETL to pull assessment data into warehouse from AWS | | ⍰ |
| Develop Software to consume services created by PMI for integration | ⍰ | |
| **Deployment / Automation** | | |
| Develop delivery of core functionality | ⍰ | |
| Develop automation for deploying full technical solution to test environments and production | | ⍰ |
| Deliver core functionality Software to PMI | ⍰ | |
| Deploy core functionality Software to test and production environments | | ⍰ |
| **Test / Validation** | | |
| Conduct unit tests on core functionality Software prior to delivery of Software to PMI | ⍰ | |
| Conduct system testing of core functionality following deployment to test environment | ⍰ | |
| Conduct field testing of fully integrated solution with representatives of the end-user stakeholder group | | ⍰ |
| Conduct compatibility testing of core derivative | ⍰ | |
| Conduct load testing of full integrated solution | | ⍰ |
| Conduct data validation & report testing of full integrated solution | ⍰ | ⍰ |

The final Technical Solution will adhere to PMI's Technical Standards. PMI will support WTRI with aligning to those technical standards by assigning a System Architect and Lead Instructional Designer to act as liaisons between the PMI and WTRI technical teams.

2.1 Project Management Approach

PMI will manage delivery of the Technical Solution's requirements, designs, and test and validation

LD

outputs in accordance with PMI's policies and standards for project management. Requirements, designs, and test and validation outputs are version controlled and ushered through a review and acceptance process to obtain buy-in from all relevant stakeholders, as described below.

2.1.1 Requirements

The Business Analyst (BA) will perform requirements definition, documentation, and management for the Technical Solution. Once requirements are defined, the BA will conduct tracking and monitoring to ensure project quality, including use of a requirements traceability matrix, and regular communication of status to the core team and stakeholders. BA responsibilities are described in detail below.

2.1.1.1 Technical Components Requirements

The BA will perform management of requirements for the Software's technical components (Core Functionality, Virtual World, and User Interfaces). The BA will convert requirements into Epic and Task cards within JIRA, as well as posting them to a Wiki page for IT documentation.

The BA will be the primary contact for WTRI and will establish Sprint Planning, daily Scrums and Backlog Grooming meetings with his team and input of best practices from PM to ensure governance of those tasks.

2.1.1.2 Content Requirements

The BA and Project Manager (PM) will act in partnership to obtain status reports from the PMI business resources responsible for development of the project management content. The BA will coordinate between PMI and WTRI to ensure delivery of content, conduct reviews across teams and resolve open questions related to the requirements.

2.1.1.3 Enterprise Architecture Requirements

The BA will work closely with the PMI Enterprise Architecture team by conducting regular meetings to review any changes to requirements and the impacts of any such changes.

2.1.1.4 Operational Readiness Requirements

The BA will track status of builds and testing via daily scrum meetings and monitoring JIRA cards to ensure the Technical Solution is ready for launch. This effort does not include the transition of the Technical Solution to operations, rather this effort includes the readiness and ability to launch once development of the Technical Solution is complete.

2.1.2. Designs Approach

Designs will be created for both the Software and the Enterprise Architecture deliverables, which comprise the Technical Solution. WTRI will create the designs related to the Software, depicting its relationship to the overall Technical Solution. PMI will create the designs related to the Enterprise Architecture, depicting its relationship to the overall Technical Solution.

PMI will evaluate all design deliverables provided by WTRI. All design deliverables will be version controlled and made available as agreed. Evaluation criteria will be made available to all parties as they are established by the product team and project stakeholders. These evaluations will occur on an ongoing basis until after pilot testing is complete.

Changes to designs for the Technical Solution, following their evaluation, are to be managed by PMI to ensure stakeholder buy-in with any changes to designs prior to implementing solutions according to the designs.

LD

2.1.2.1 Software Design

WTRI will create and deliver to PMI all designs for the Software and its relationship to the Technical Solution, including but not limited to:

1. Entity Relationship Diagrams for all databases within the Technical Solution
2. Infrastructure Architecture Designs for multi-player versions of the Software
3. Application Architecture Design for the overall Software
4. Knowledge Elicitation Tool Designs
5. User Feedback & Reporting Designs
6. Project Assets Structure Designs for the Pattern Generator

These designs will be subject to PMI approval and WTRI will work with PMI to ensure the designs are acceptable. Designs will conform to the functional and non-functional requirements for the Technical Components and Content, as defined by the Solution Requirements below.

2.1.2.2 Enterprise Architecture Design

PMI will create and deliver all designs to WTRI that are related to the Enterprise Architecture and its relationship to the Technical Solution including, but not limited to:

1. System Architecture Designs
2. Interface Designs

Designs will conform to the functional and non-functional requirements for the Enterprise Architecture.

2.1.3 Review & Acceptance Approach

PMI will review and accept or decline all requirements, designs, and test and validation deliverables associated with the Technical Solution. Evaluation criteria will be made available to all parties as they are established by the product team and project stakeholders.

2.1.3.1 Requirements Review and Acceptance

The BA will coordinate with relevant stakeholders for the review and acceptance of all requirements of the Technical Solution. Requirements Management Plan checkpoints will be established to monitor and communicate status formally, as well as to obtain buy-in from stakeholders for verification and prioritization of the requirements.

Inputs into the project management plans associated with risks, resources and vendors from a technology perspective will be provided to the PM by the BA and core team.

2.1.3.2 Designs Review and Acceptance

The System Architect and PMI Lead Instructional Designer will coordinate with relevant stakeholders for the review and acceptance of all designs for the Technical Solution. Design review and acceptance checkpoints will be established to monitor and communicate status formally, as well as to obtain buy-in from stakeholders on the Technical Solution designs.

2.1.3.3 Test and Validation Review and Acceptance

PMI will provide WTRI with a packet outlining standard approach and expectations for vendor delivery – including system and performance test plans, automated deployments and test automation, architecture and design reviews, code and unit test reviews, and data validation.

WTRI will provide the artifacts, leveraging PMI resources where needed, which will be reviewed and accepted or declined by the PMI technical and instructional design team prior to any test activities being

LP

performed.

2.2 Software Development Approach

WTRI and PMI will develop two separate Software deliverables, one that enables use of the team-capability and one that enables use of the individual-capability. However, both deliverables will be developed in parallel and synchronized. The team version will not be restricted only to participants who are PMI members or PMPs. Therefore, it may be accessed with a different interface than the individual version, which will be restricted to PMI member and PMPs earning PDU's.

To be considered team play, a team cannot consist of less than 3 players playing in the system within the same rehearsal for the rehearsal's duration.

The Software is developed iteratively, over a series of seven (7) major builds, with the designations Alpha (1-5), Beta, and Charlie, as described in sections 2.2.3.1, 2.2.3.2, and 2.2.3.3, respectively.

Leading up to, and between each major build, WTRI will deliver to PMI a build of the Software, as-is. This will occur on a monthly basis to establish the deployment procedures and to ensure that configuration of an Enterprise Architecture enables automated deployment of the Software for operational use.

Technical Components

The Technical Components will be developed iteratively and in alignment to the major builds of the Software. WTRI will leverage existing technologies and subject-matter expertise for development and verification of the core functionality, virtual world, and user interfaces.

Content

The Content will be developed iteratively and in alignment to the major builds of the Software. PMI with WTRI's support will leverage Subject Matter Expert (SME) volunteers for the development and validation of the project management content.

An initial set of Content will be created in conjunction with, and incorporated into, the Alpha (1-5) builds of the Software. This will represent a sub-set of the final Content deliverable. PMI will leverage a small group of SME volunteers for this effort.

Once the model has been validated, PMI will conduct two meeting events to leverage a larger group of SMEs for the development and validation of the final set of Content deliverables. The final set of validated Content will be delivered to WTRI for incorporation into the Beta build.

Analysis of the testing conducted on the Beta build will identify changes needed to the Content, which will be revised and incorporated into the final major build, Charlie.

2.2.1 Technical Components Development

WTRI will develop all Technical Components of the Software, to include:

1. Core Functionality – Complete set of WTRI's underlying technologies required for the Software to accelerate learning;
2. Virtual World – The environment in which the user is immersed during rehearsal of the project;

LD

3. User Interfaces – The menus, dashboards, and utilities that enable user interaction with the Software.

WTRI will follow a Scrum-based process for development of all Technical Components of the Software, which involves the following activities:

1. WTRI will leverage JIRA for Scrum-based development
2. PMI will review Sprint plans to understand the functionality/capabilities expected to be developed during each Sprint
3. PMI will review code and other materials developed during each Sprint
4. PMI will review unit tests and the results of unit tests for each capability delivered via each Sprint
5. PMI will participate in Sprint reviews to evaluate the capabilities delivered via each Sprint

During development, those technologies will be customized to PMI's specifications. Test and validation of those technologies will be accomplished in accordance with section 2.4.

2.2.1.1 Core Functionality Development

WTRI will develop the core functionality, consisting of the core set of WTRI technologies required to create an accelerated learning Software. Unit testing will be performed on the core functionality during development, and the results will be provided to PMI for review and acceptance prior to delivery of each major build to PMI. These may result in new requirements and further changes in the design of the Software.

2.2.1.2 Virtual World Development

WTRI will leverage their existing fictional world to create the virtual world that contains PMI's simulated environments and project rehearsals. Design of the virtual world will continue to evolve throughout development of the project management content, as the content development efforts help define the projects and the companies within which the projects are executed.

During the early stages of development, the virtual world will contain only basic shapes depicting the objects within the virtual world. Once the projects and companies are fully defined by PMI, WTRI will create all final artwork to represent the objects within the virtual world.

Elements of the virtual world, which are to be developed by WTRI, include but are not limited to:

1. Emulation of the real-world economy
2. Avatars that can be modified by the learner to represent the learner within the virtual world
3. Company facilities / locations to simulate the environments within which projects are executed
4. In-world communications mechanisms (e.g. Emails, texts, reports, etc.) to display /deliver global, company-, or project-related information to the learner
5. Project-related AI bots to represent project stakeholders and the project team with which the learner must interact during execution of a project
6. Other project-related artifacts to ensure learners have a comprehensive set of tools that may be required during execution of the project
7. Game set-up interface for creating the patterns of unfolding futures that are presented to the learner via in-world events
8. Artwork and symbolic density to embed the schemas that are important to the participant

2.2.1.3 User Interfaces Development

LD

The User Interfaces that allow for Game Set-Up and User Feedback will be created by WTRI in accordance with PMI's specifications regarding the user experience within the Software. The User Interfaces that support users in executing the project rehearsals, such as dashboards and utilities, will be created by WTRI to align with project management content created with PMI's SME volunteers.

2.2.2 Content Development

PMI will leverage SME volunteers to create the project management content that will be incorporated into the Software.

To accomplish this, PMI, in collaboration with WTRI, will:

1. Recruit and onboard SMEs
2. Schedule and plan the Content Development Mega Meeting event
3. Create a workflow to support SME volunteers in creating PM content during the Mega Meeting
4. Create all materials required to conduct the Content Development Mega Meeting (slide decks, working session materials, etc.)
5. Recruit and train Instructional Design facilitators to help conduct the Content Development Mega Meeting sessions
6. Review content created during the Content Development Mega Meeting for completeness and quality
7. Schedule and plan the Content Validation Mega Meeting event
8. Create a workflow to support SME volunteers in validating PM content during the Mega Meeting
9. Create all materials required to conduct the Content Validation Mega Meeting (slide decks, working session materials, etc.)
10. Recruit and train Instructional Design facilitators to help conduct the Content Validation Mega Meeting sessions
11. Review outputs of the Content Validation Mega Meeting
12. Create and deliver the content package to WTRI for incorporation into the Software

Project management content will conform to PMI's specifications. Test and validation of the project management content will be accomplished in accordance with section 2.4.

2.2.2.1 Capability Profiles Development

Capability profiles are core elements of the Software as they enable the acceleration of learning via use of the Software. Those profiles are used to categorize learners based on the initial assessment performed by WTRI's Knowledge Elicitation Tool, thereby establishing a baseline for the learners against which their individual development is measured. Additionally, those profiles are used to develop an individual's capabilities along the continuum of expertise, as demonstrated within the simulated environments, by imposing level-appropriate patterns of unfolding futures on the learner.

Capability profiles, therefore, will be created by WTRI and PMI at the outset of the development phase and before the design and development of the Knowledge Elicitation Tool is finalized. Once created, those profiles will be reviewed and validated by PMP®-certified SME volunteers. Adjustments to the profiles will be made based on feedback received during that review, as well as feedback received via field testing.

2.2.2.2 Project Assets Development

The core functionality will incorporate project assets developed by PMI, WTRI, and PMP®-certified SME

LD

volunteers. The project assets create the context for the learners in the virtual world, allowing them to rehearse projects for the fictitious companies.

To ensure that all project asset requirements are clearly defined prior to engaging SMEs in development, WTRI and PMI will work together to create one full set of project assets. The processes and collaborative method that is refined during the development of those project assets will serve as a template for development of all other project assets.

Once the project asset requirements are clearly defined, PMI and WTRI will conduct a mega meeting for development of the project assets. Following conclusion of the mega meeting, PMI will continue to work with the SME volunteers on developing content that was not completed or requires revision.

Following an internal review of the content developed by the SME volunteers, PMI and WTRI will conduct a validation meeting to ensure all project assets are suitable. Once validated, PMI will package and deliver the project assets to WTRI for incorporation into the core functionality.

2.2.2.3 On-Boarding Materials Development

WTRI will develop on-boarding materials for the users, with inputs and assistance from PMI. Each project requires on-boarding materials to inform the user of the project's backstory, to include the goals and objectives for the project.

On-boarding materials may require the user to complete pre-work assignments before attempting the project rehearsal. Assignments may include completing artifacts related to the project or learning about the company for which the project will be executed. The depth and breadth of the pre-work assignments will be directly related to the level of capability for which the project has been designed.

PMI will leverage SME volunteers to validate the on-boarding kit content and the utility of the on-boarding materials toward meeting the project's objectives.

2.2.2.4 Context Sensitive Help

PMI and WTRI will create a topic outline for the context sensitive help, leveraging best practices for online help or user assistance within virtual worlds. The outline will be used to create a script, which will be incorporated into the Beta build of the Software.

2.2.3 Software Builds Approach

Each build of the Software will incorporate progressively evolving versions of the Technical Components and Content. Additionally, the Beta build of the Software will be integrated with PMI's systems. All elements of the Software will be refined and verified via the Charlie build.

Earlier builds will include full functionality and content, with the exception of integration, which will allow for system and field testing that will help the team determine if the underlying technologies, project management content, and models that support accelerated learning conform to PMI's specifications and meet the needs of the end users.

Design revisions and changes to the Software's Technical Components and Content with each subsequent build will leverage the results of system and field testing of the preceding build, which will refine the Software to meet PMI's specifications and the needs of the end users.

2.2.3.1 Alpha Build

The Alpha builds will be assembled by WTRI to produce a fully functional set of the Technical Components and the initial set of Content by Alpha 1. There will be no integrations in place within the

LD

Software upon delivery of the Alpha builds.

The Alpha builds will consist of five distinct deliverables, with designations Alpha 1, Alpha 2, Alpha 3, Alpha 4, and Alpha 5. Each release of an Alpha build will be tested by end-users via field testing, with the primary objective of validating the underlying capability profiles and model for measuring accelerated learning. WTRI will work with PMI to develop methods to measure and validate learning.

Each field test is expected to result in the identification of changes required to the underlying model within the Software, which will then be re-deployed and re-tested as the next Alpha build. If the model cannot be validated via this series of builds and field testing, the project team will identify options for resolution of the issue.

1.2.3.2 Beta Build

The Beta build will be assembled by WTRI with fully functional set of the Technical Components and a full set of Content. Integrations with PMI's systems will be in-place within the Software upon delivery of the Beta build. Beta testing may result in a decision to review the Content to ensure accelerated learning and an enjoyable user experience.

2.2.3.3 Charlie Build

The Charlie build will be assembled by WTRI with the final versions of Technical Components and Content. The Charlie build will be used in the Pilot launch and testing phase of the project.

2.3 Enterprise Architecture Development Approach

PMI will implement the infrastructure as a service to create the test/production environment. Following test and validation of the final Software, that environment will become the production environment for the Technical Solution.

PMI and WTRI will integrate the Software with PMI's systems in accordance with the deliverables of sections 2.1.1.3 and 2.1.2.2. Test and validation of the project management content will be accomplished in accordance with section 2.4.

2.3.1 Infrastructure as a Service Implementation

PMI will procure the infrastructure as a service solution. All services and infrastructure will be implemented on Amazon Web Services (AWS) with the Business Support tier. All services and infrastructure configurations will be automated using native AWS tools and Puppet, unless an alternate hosting provider or tool is specifically called out in this document or later determined to be more appropriate.

PMI will configure the components of the infrastructure as a service solution to ensure the Software functions as intended.

2.3.1.1 System Hosting Implementation

PMI will obtain services from AWS, or other provider, to enable delivery of the Software to end-users. That is anticipated to involve some or all of the following activities:

1. Identifying specifications for the AWS
2. Procuring SmartFox licenses
3. Determining how to automate deployment
4. Automating creation of the environment
5. Automating SmartFox and extension installs
6. Automating the Knowledge Assessment tool

7. Automating asset storage
8. Automating the reporting system
9. Automating the pattern generator admin UI
10. Automating database service
11. Automating database installations
12. Automating load balancing
13. Automating backups
14. Configuring network DNS
15. System security configuration

2.3.1.2 Email Capability Implementation Approach

PMI will configure the Amazon Simple Mail Service, including email capability.

2.3.1.3 Monitoring & Support Implementation Approach

PMI will configure Amazon Cloud Watch for monitoring and supporting of the Technical Solution. That is expected to involve the following activities:

1. Initial configuration of Cloud Watch
2. Determining data points that need to be monitored
3. Enhancing the Cloud Watch configuration
4. Refining scalability rules
5. Combining Cloud Watch with PMI's monitoring systems

2.3.2 Integrated Systems Development

PMI will develop any components necessary to allow for integration of the Software with PMI's systems (aka "services"). WTRI will assist PMI with the integration of the Software with PMI's systems in accordance with PMI's technical standards and guidelines for vendors.

2.3.2.1 SSO Integration Approach

WTRI will support PMI with enabling the Single Sign-On (SSO) capability via the Knowledge Elicitation Tool and the Unity platform upon which the virtual world is built. WTRI and PMI will implement the integration points within the Software to utilize PMI's SSO capability.

2.3.2.2 Commerce Server Integration

PMI will update PMI's Marketplace Web pages to conform to business rules for controlling customer access to the Software and will develop a Software check service that will determines whether a user has purchased access to the Software.

2.3.2.3 Data Warehouse Integration

For integration with PMI's Data Warehouse:

1. In concert with WTRI, PMI will conduct a "by's and measures" analysis of user activity on the WTRI application – both in terms of metrics already generated and not currently captured – with a view to determining areas of interest that should be incorporated into the data warehouse.

2. Based on the by's and measures requirements determined, PMI will construct one or more staging tables, which are to be populated by WTRI and tailored to align with PMI's specifications regarding use of the data.

3. WTRI and PMI will develop structures and processes, including but not limited to stored procedures, necessary to populate the staging tables on a nightly basis.

LD

    4. PMI will develop all structures and processes required for the Extract, Transform, Load (ETL) of data from the staging tables to PMI's data warehouse

For integration to support updating in-world assets, which are created by PMI, during operations:

1. PMI will build a service method that moves new assets to a pre-established drop point.
2. WTRI will automate the capture and update of all in-world assets from the drop point.

2.3.2.4 CCRS Integration

PMI will build services for WTRI to use in delivering Continuing Certification Requirements (CCR) data upon completion of a project rehearsal.

WTRI will implement the integration points within the Software to deliver CCR data to PMI interfaces.

2.3.2.5 myPMI Profile Integration

PMI will build services to retrieve and update profile data for use within the Software.

WTRI will implement the integration points within the Software to utilize and update the profile data.

2.3.2.6 Access Control Integration

PMI will build an access control service to determine if a user has purchased access to the Software and should be granted access based on the customer access rules established by the business.

WTRI will implement the integration points within the Software to grant or restrict access based on the returns from the access control service.

2.3.2.7 System Status Service Integration

PMI will build a System Status service to determine whether the system is functioning as intended.

WTRI will implement the integration points within the Software to utilize returns from the system status service

2.3.2.8 CRM Notification Service Integration

PMI will build a CRM Notification Service to update a user's CRM profile with emails and other communications delivered by the Technical Solution.

2.3.2.9 Asset Subscriber Service Integration

PMI will build an asset subscriber service that allows for in-world assets to be modified.

WTRI will implement the integration points within the Software to consume the assets and place them in- world for project rehearsals.

2.4 Test and Validation Approach

Testing will be utilized to analyze a Software item to detect the differences between existing and required conditions and to evaluate the features of the Software item. The Software Test Plan will act as the high-level test plan. Specific testing activities will have their own test plans.

Specific test plan components may include:

1. Purpose for level of test
2. Items to be tested
3. Features to be tested
4. Features not to be tested
5. Management and technical approach
6. Pass / Fail criteria

LD

7. Individual roles and responsibilities
8. Milestones
9. Schedules, and
10. Risk assumptions and constraints

2.4.1 Unit Testing

Unit testing will be performed on all versions of the Technical Solution and will verify that all requirements have been met. This includes testing and verification of Software functionality, systems integrations, and delivery and support mechanisms of the Software.

2.4.2 System Testing

Testing conducted in which Software elements, hardware elements, or both are combined and tested until the entire system has been integrated.

The purpose of system testing is to ensure that design objectives are met and ensures that the Software, as a complete entity, complies with the Solution requirements.

A component of the system testing will be test automation – providing an automated method to validate that the system, once deployed, passes a minimum standard of checks to confirm functionality. This test automation will also be leveraged for regression testing in future deployments and upgrades.

WTRI will conduct system testing for each build (all minor and major builds) within an operations-representative environment.

PMI staff will conduct system testing and will audit the system testing processes employed by WTRI. The audit process for system testing will include, but is not limited to:

1. Reviews of test plans
2. Reviews of test case results
3. Reviews of unit test results
4. Reviews of open defects and overall testing progress

2.4.3 Field Testing

Field testing will be performed on all but the final release of the Technical Solution. Field tests will be structured in similar fashion to the Pilot test. This test method is used to solicit feedback from project manager users as to the effectiveness and suitability of the Software.

2.4.4 Compatibility Testing

Compatibility testing will be performed on all releases of the Technical Solution. Compatibility testing will be used to verify that the Technical Solution will function as intended on all versions of software/hardware specified by PMI and WTRI.

2.4.5 Load Test

Testing will be done to ensure that that the Software performs to customer expectations, including evaluation of response time, availability, portability, and scalability.

PMI will create and review load/performance and scalability testing plans, and analyze the results of load testing. PMI will conduct load performance and scalability testing for the entire system. WTRI will review and give feedback.

LD

2.4.6 Data Validation and Report Testing

Data Validation:

1. WTRI will provide documentation of all data validation structures and processes currently in the system, including logging, checksum/row count validation, control-bounds threshold alerts etc.
2. In the absence of sufficient existing validation structures and processes in the system, WTRI will work with PMI to institute such structures and processes to meet existing standards.
3. In the absence of sufficient delivery mechanisms for alerts, error reports, etc., WRTI will work with PMI to develop them.

Data Warehouse Validation:

1. WTRI will work with PMI to ensure that the designated data warehouse (DWH) staging tables are updated within an agreed-upon 3 hour window daily. The data is intended for ETL to the PMI DWH on a daily basis.
2. WTRI will design the software to provide automated alerting to WTRI staff and PMI staff if the data does not reach the designated DWH staging tables in the agreed-upon timeframe, or if one or more tables is unavailable, or if there is an accuracy or other unexpected issue, such as a partial load.
3. An automated row count check of the designated DWH staging tables will be performed to ensure all appropriate rows from global databases have loaded.
4. WTRI will be responsible for designing the software to ensure the accuracy of data in the global databases. WTRI will also be responsible for remediating issues in the software for data delivery, availability and accuracy of data for the designated DWH staging tables.
5. WTRI will be responsible for communication to PMI Data Services staff of any proposed changes to ERD, and particularly of the aggregate database so that appropriate adjustments can be made to PMI DW ETL and any other downstream processes.

QA for reports provided by WTRI will verify:

1. Delivery of reports will be agreed-upon with PMI (such as email, remoting into a system to retrieve reports).
2. The format/layout of reports provided to PMI is agreed-upon with PMI.
3. Help text will be provided where appropriate and agreed-upon with PMI.
4. Data displayed on reports is reflected accurately from source data. The source code is checked that it pulls the correct data and that data is accurately displayed on the report.
5. Calculated values (subtotals by a unit such as reporting period, totals, averages, minimum, maximum) are computed correctly.
6. Any drill-downs in the report are functional and display accurate data.
7. Reports will be available at an agreed-upon SLA and the reports will render within an agreed-upon interval.
8. Report data will be exportable to Excel or other agreed-upon format.

2.4.7 Pilot Testing

Pilot testing will be performed on the final release of the Technical Solution and will validate the effectiveness and suitability of the Software to end-users. This will include testing and verification of the Software's ability to deliver the expected results.

This form of acceptance testing will be conducted to determine whether or not a system satisfies the acceptance criteria and to enable PMI to determine whether or not to accept the system.

Acceptance testing ensures that requirements' objectives are met and that all components are correctly

LD

included in the package.

PMI and WTRI will be actively involved in the pilot testing of the system, including business stakeholders, select end users and technical staff.

2.5 Operational Readiness

WTRI and PMI will prepare the Technical Solution for operational use by implementing an automated deployment mechanism for moving Software and Enterprise Architecture components from development into the test/production environments.

Preparing the Technical Solution for operational use will conform to the deliverables of section 2.1.1.4.

2.5.1 Technical Solution Release

Software builds (Alpha, Beta, Charlie) and Enterprise Architecture capabilities will be deployed via a series of seven (7) "Releases". Each Release of the Technical Solution is to be deployed to the test environment by PMI. Each build of the Software will be deployed to the test environment to allow for functional and field testing of the Software.

WTRI will automate deployment of the Software such that it moves from the WTRI development environment to the test environment in conjunction with a Release.

WTRI will implement automation of the Software deployment at the outset of the project, and prior to delivery of the first major build of the Software, Alpha 1.

2.5.1.1 Solution Release 1 (Alpha)

Release 1 will consist of five distinct deliverables, with the designations Release 1.1, Release 1.2, Release 1.3, Release 1.4, and Release 1.5. Each release will be tested by PMI and WTRI via system testing and by end-users via field testing, with the primary objective of validating the software's functionality and effectiveness as a learning accelerant, as described in section 2.2.3.1.

2.5.1.2 Solution Release 2 (Beta)

Release 2 is deployed by PMI and consists of the Beta build, along with all services required for integration of the Software with PMI's systems.

2.5.1.3 Solution Release 3 (Charlie)

Release 3 will be deployed by PMI and will consist of the Charlie build, inclusive of any updates to the Technical Components, Content, and services required for integration of the Software with PMI's systems.

2.5.2 Refresh Plan Development

PMI and WTRI will develop the refresh plan, which identifies the processes/procedures to be executed by staff within each organization for updating the Technical Components and Content within the Software once development is complete and the Technical Solution has been transitioned to operations.

2.5.2.1 Core Functionality Refresh Plan Development

WTRI will develop the Core Functionality refresh plan by identifying the processes/procedures to be executed by staff within each organization for updating the Technical Components of the Software.

2.5.2.2 Content Refresh Plan Development Approach

PMI will develop the Content refresh plan by identifying the business and technical processes/procedures to be executed by staff within each organization for updating the Content of the Software.

LD





Technical Development Plan
Exhibit B - Attachment 1

Exhibit B Attachment 1-Technical Solution Development Schedule
2015
2016
2017
Sep-15
Oct-15
Nov-15
Dec-15
Jan-16
Feb-16
Mar-16
Apr-16
May-16
Jun-16
Jul-16
Aug-16
Sep-16
Oct-16
Nov-16
Dec-16
Jan-17
Feb-17
Mar-17
Apr-17
May-17
Jun-17
Jul-17
Aug-17
Sep-17
Oct-17
Solution Requirements & Designs
Product Requirements & Designs
Enterprise Architecture Requirements & Designs
Baseline
Baseline
Manage Technical Solution Designs
Technical Components
Develop Technical Components
Alpha Version Components
5 Iterations to validate Dreyfus / Capability Profiles Model
Technical Components - Alpha 1
Beta Version Components
Charlie Version Components
Technical Components - Beta
Comp. - Charlie
Project Management Content
Develop Project Management Content
Alpha Version Content
Beta Version Content
Charlie Version Content
Project Management Content - Alpha Versions
Project Management Content - Beta
Content - Charlie
Product Builds
Alpha Builds
5 Iterations to validate the Dreyfus / Capability Profiles Model
Decision Point: Beta Content Dev
Beta Build
Charlie Build
Enterprise Architecture
Infrastructure
Integrations
Test & Validation
Unit Tests
System Tests
Field Tests
Compatibility Tests
Load Tests
Data Validation & Report Tests
Pilot Test
PILOT Test

LD

CONFIDENTIAL WTRI00009280

59 EXHIBIT 1

Technical Development Milestone Chart

Attachment 2 to Exhibit B

| Project Milestone | Complete Date | Qtr 3 2015 | Qtr 4 2015 | Qtr 1 2016 | Qtr 2 2016 | Qtr 3 2016 | Qtr 4 2016 | Qtr 1 2017 | Qtr 2 2017 | Qtr 3 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Technical Solution Development** | 7/20/17 | | | | | | | | | |
| ***Develop Technical Components*** | 7/20/17 | | | | | | | | | |
| Alpha Versions | 10/3/16 | | | | ◆ ◆ | ◆ ◆ | ◆ | | | |
| Beta Version | 5/9/17 | | | | | | | | ◆ | |
| Charlie Versions | 7/20/17 | | | | | | | | | ◆ |
| ***Develop Content*** | 7/20/17 | | | | | | | | | |
| Alpha Versions | 4/13/16 | | | | ◆ | | | | | |
| Beta Versions | 4/25/17 | | | | | | | | ◆ | |
| Charlie Versions | 7/20/17 | | | | | | | | | ◆ |
| ***Software Builds*** | 7/20/17 | | | | | | | | | |
| Alpha Builds (Alpha 1 thru Alpha 5) | 10/3/16 | | | | ◆ ◆ | ◆ ◆ | ◆ | | | |
| Beta Build | 5/9/17 | | | | | | | | ◆ | |
| Charlie Build | 7/20/17 | | | | | | | | | ◆ |
| ***Infrastructure*** | 7/20/17 | | | | | | | | | |
| System Hosting | 4/13/16 | | | | ◆ | | | | | |
| Email Capability | 5/9/17 | | | | | | | | ◆ | |
| Monitoring & Support | 7/20/17 | | | | | | | | | ◆ |
| ***Integrations*** | 5/9/17 | | | | | | | | | |
| SSO | 4/13/16 | | | | ◆ | | | | | |
| Commerce Server | 11/1/16 | | | | | | ◆ | | | |
| Data Warehouse | 4/5/17 | | | | | | | | ◆ | |
| CCRS | 5/9/17 | | | | | | | | ◆ | |
| myPM | 1/15/17 | | | | | | | ◆ | | |
| Access Control | 12/15/16 | | | | | | ◆ | | | |
| System Status | 2/15/17 | | | | | | | ◆ | | |
| CRM Notification | 10/15/16 | | | | | | ◆ | | | |
| Asset Subscriber | 10/15/16 | | | | | | ◆ | | | |
| ***Unit Testing*** | 7/20/17 | | | | | | | | | |
| Alpha Builds | 10/3/16 | | | | ◆ ◆ | ◆ ◆ | ◆ | | | |
| Beta Build | 5/9/17 | | | | | | | | ◆ | |
| Charlie Build | 7/20/17 | | | | | | | | | ◆ |
| ***Technical Solution Releases*** | 7/20/17 | | | | | | | | | |
| Release 1 (1.1 thru 1.5) | 10/3/16 | | | | ◆ ◆ | ◆ ◆ | ◆ | | | |
| Release 2 | 5/9/17 | | | | | | | | ◆ | |
| Release 3 | 7/20/17 | | | | | | | | | ◆ |
| ***System Testing*** | 7/27/17 | | | | | | | | | |
| Release 1 (1.1 thru 1.5) | 10/20/17 | | | | ◆ ◆ | ◆ ◆ | ◆ | | | |
| Release 2 | 5/15/17 | | | | | | | | ◆ | |
| Release 3 | 7/27/17 | | | | | | | | | ◆ |
| ***Field Testing*** | 5/29/17 | | | | | | | | | |
| Release 1 (1.1 thru 1.5) | 11/3/17 | | | | ◆ | ◆ ◆ ◆ | ◆ | | | |
| Release 2 | 6/16/17 | | | | | | | | ◆ | |
| ***Compatibility Testing*** | 6/26/17 | | | | | | | | | |
| Release 1 | 10/20/17 | | | | | | ◆ | | | |
| Release 2 | 5/15/17 | | | | | | | | ◆ | |
| ***Load Testing*** | 6/15/17 | | | | | | | | ◆ | |
| ***Data Validation & Report Testing*** | 6/15/17 | | | | | | | | ◆ | |
| ***Content Refresh Plan*** | 6/15/17 | | | | | | | | ◆ | |
| ***Legal / IP Compliance*** | 6/7/17 | | | | | | | | | |
| ***Pilot Testing*** | 6/21/17 | | | | | | | | | |

| Milestone Color Key | |
|---|---|
| Milestones aligned to Alpha Builds | ◆ |
| Milestones aligned to Beta Builds | ◆ |
| Milestones aligned to Charlie Builds | ◆ |
| Milestones not aligned to Software Builds | ◆ |

60

**Exhibit C**

Seller Software used in conjunction with the Software is identified below.

## 1. The Event Generator

WTRI's Event Generator is a software application that creates "probable unfolding futures" at a high level, in extreme detail, or both. These futures unfold within the simulated environments, each consisting of:

- A company, including artifacts of the company, the company's history, and the project-related characters represented as Artificial Intelligence (AI) bots
- The company's projects and all project-related artifacts
- Level-appropriate project challenges

Data is synchronized at all points within the simulated environment, throughout the learner's individual simulation experience.

There are two important features of the Event Generator with regard to project management:

- The Event Generator will—based on the learner's or teams choice of the recommended simulated environments as described in the Product Concept Design section—accommodate the level of complexity for a given project. Complexity in this instance relates directly to human behavior, systems behavior, and ambiguity as defined by PMI's research on complexity.

- Each time a new project session is run, the "future" and project challenges are unique in the details but the project goals remain the same. Research has shown this feature propels in depth learning vs. memorization or "gaming" the exercise.

## 2. The Metrics Engine

WTRI's Metrics Engine is a kind of Event Generator in reverse. It uses the same goals as the Event Generator and captures and tracks individual behavior, decisions, and outcomes associated with the learner's progress. This allows learners and system administrators to see "where" the learners are along the continuum of professional development even before they have achieved a new level of expertise. PMI's intellectual property will be used to define the behaviors, decisions, and outcomes that need to be captured and tracked.

LD

3. The "virtual world," in massive multi-player, single-player or group specific player form

WTRI has its own "FutureView" world technology which can reside on a server or can be hosted on a cloud service. It can operate in single player, multi-player or group form, and has an "auto-spawn" feature, permitting individual users or individual groups of users to experience their exercises in unique instantiations of a given environment. This platform will underlie the virtual worlds built by WTRI for PMI's use.

4. The API that connects The Event Generator and the Metris Engine to the "Virtual World".

WTRI has developed an API that links its Event Generator, Metrics Engine, Profiler and Modeler to virtual worlds in general, allowing the unfolding events and metrics to be controlled external to the virtual world, and hence, more easily modified.

5. The Profiler or cognitive agility assessment tool.

WTRI'S Cognitive Agility Assessment Tool is a knowledge elicitation instrument that will measure the individual's Dreyfus levels along each leg of the PMI Talent Triangle, as well as their cognitive agility. This allows for the product to present simulated environments appropriate for the individual's learning needs. It also serves as a baseline for reporting of the learner's progress.

6. The dynamic Strategic modeling technology

A financial modeling technology that applies the theory of constraints to the value proposition of a business, project or strategy. It helps decision makers visualize and calculate the top and bottom line financial impact of changes made at the strategic, tactical, and operational levels of a business. The difficulty of anticipating the links between changes in execution and a financial impact at the bottom or top line has accounted for many change initiative failures The models themselves add to our understanding of how the different levels and functions in an organization interact. Often, specific between-level or between-function impacts are known, but the model brings all the interactions together into one dynamic whole, exposing both hidden negative ripple effects and growth opportunities that would not be discovered otherwise. When attached to virtual worlds, the modeler can calculate the financial value of decisions, behavior and other activities in the simulated environment. When used to evaluate the activity of project managers or project teams, it can calculate business benefits and earned value of projects.

# EXHIBIT 2
# FILED UNDER SEAL

# EXHIBIT 3

68 EXHIBIT 3

First Amendment To Software Technology Development and Purchase Agreement

This is an amendment ("Amendment") to the Software Technology Development and Purchase Agreement dated September 8, 2015 ("Agreement"), by and between Workplace Technologies Research, Inc. ("Seller") and Project Management Institute, Inc. ("Purchaser") (each a "Party", collectively "Parties"). This Amendment is effective as of November 30, 2016 ("Effective Date").

Preamble

Whereas, the Parties have determined mutually that the Agreement terms should be changed to allow for a mutually beneficial, ongoing working arrangement between the Parties in the event that Purchaser exercises its right under the Agreement to reject the Software and retain ownership of the Software following delivery to Purchaser of the fifth (version) Alpha Software.

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties intending to be legally bound hereby agree to amend the Agreement as follows:

Paragraph 2.5 Consideration

Paragraph 2.5 (b) is hereby amended and restated in its entirety to read as follows:

(b) once Seller delivers to Purchaser the fifth (version) Alpha Software, (i) if Purchaser accepts the fifth (version) Alpha Software, Purchaser shall make a "Second Payment" of One Million Dollars (US) ($1,000,000) or (ii) if Purchaser rejects the fifth (version) Alpha Software, then (aa) if Purchaser further elects to retain ownership of the rejected version, Purchaser shall, within no more than thirty (30) days following such election to reject and retain the Software, and subject to good faith negotiations of the Parties, enter into a Service Agreement with Seller ("Service Agreement") in substantially the form attached as Exhibit 1 to this Amendment, and Purchaser shall owe no Second Payment, Third Payment (as set forth below), or Final Payment (as set forth below)or (bb) if Purchaser elects not to retain ownership of the rejected version and terminates this Agreement as further set forth below, then Purchaser shall owe no Second Payment, Third Payment (as set forth below), or Final Payment (as set forth below));

Paragraph 5.3 Election To Retain Interest

Paragraph 5.3 of the Agreement is hereby amended and restated in its entirety to read as follows:

5.3 Election to Retain Interest. In the event that Purchaser rejects either the fifth (version) Alpha Software or the Charlie Software in accordance with the foregoing review procedure, Purchaser shall be entitled, in its sole discretion, to elect (exercisable within thirty (30) days following Purchaser's written notice of rejection of the Software) to retain ownership of the rejected version of the Software. If Purchaser elects to retain ownership of the rejected Alpha Software, Purchaser and Seller will enter into the Service Agreement, as is provided in Paragraph 2.5(b)(ii)(aa), and Purchaser shall owe no further payments to Seller under this Agreement in respect of such retention of ownership. If Purchaser elects to retain ownership of the rejected Charlie Software, Purchaser shall make the applicable payment due in accordance with the payment provision set forth above in Paragraph 2.5, and this Agreement will terminate following Purchaser's satisfaction of such payment obligation. If Purchaser elects not to retain ownership, no further payment obligations shall accrue pursuant to Paragraph 2.5 above, and this Agreement shall terminate. In either case, the effects of termination shall be in accordance with the termination provisions below

All other terms and conditions of the Agreement will remain in effect. Capitalized terms not defined herein shall have meaning provided in the Agreement. This Amendment is not intended to change, expand or eliminate any of the Parties' remaining entitlements, obligations or duties under the Agreement, nor to create new entitlements, obligations or duties, except as expressly set forth herein. The Parties understand and agree that Purchaser has no obligation to enter into the Services Agreement with Seller as set forth above unless Purchaser exercises its option to reject and retain ownership of the fifth (version) Alpha Software, and that, in such event, Purchaser's obligation to make the Second Payment in conjunction with such rejection and retention of ownership in the fifth (version) Alpha Software is terminated, as set forth above.

IN WITNESS WHEREOF, each of the undersigned has caused this Amendment to the Agreement to be executed by its duly authorized officer as of the date above first written.

| Workplace Technologies Research, Inc. | Project Management Institute, Inc. |
|---|---|
| By: ______________________ | By: ______________________ |
| Lia DiBello, Ph.D | Brian A. Weiss |
| Chief Executive Officer & Director of Research | Vice-President, Practitioner Career Development |

4816-3813-8171.2

# EXHIBIT 4

71 EXHIBIT 4

Message

**From:** Victor Carter-Bey [/O=PMI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR CARTER-BEY]
**Sent:** 12/2/2016 11:12:56 AM
**To:** Lia DiBello @ WTRI.com [Lia@WTRI.com]
**Subject:** RE: PMI Alpha 5 Decision

Tick...tick...tick.... ☺

(yes, it does...)

Victor R. Carter-Bey, DM
Director, Certification
Project Management Institute
Phone: +1 610 356 4600 ext. 1112
E-mail: victor.carter-bey@pmi.org

---

**From:** Lia DiBello [mailto:Lia@WTRI.com]
**Sent:** Friday, December 02, 2016 11:10 AM
**To:** Victor Carter-Bey
**Cc:** Lia DiBello @ WTRI.com
**Subject:** RE: PMI Alpha 5 Decision

Thanks Victor. The clock starts now for the services agreement. I assume. Lia

---

**From:** Victor Carter-Bey [mailto:Victor.Carter-Bey@pmi.org]
**Sent:** Friday, December 2, 2016 8:02 AM
**To:** Lia DiBello <Lia@WTRI.com>
**Subject:** PMI Alpha 5 Decision

Dear Lia:

This confirms our recent evaluation of the PAL Software (fifth Alpha version) against Acceptance Criteria contained in the Development Agreement between PMI and WTRI, as highlighted and memorialized in the attached document.

This email is to inform you that PMI has elected to reject the fifth (version) Alpha Software and retain ownership of the rejected version, in accordance with the option to reject and retain interest set forth in paragraph 5 of the Development Agreement, as amended by the Amendment dated November 30, 2016 .

Thank you for all of the work and efforts of your team to date and we look forward to our continued partnership.

Best,

Victor

Victor R. Carter-Bey, DM
Director, Certification
Project Management Institute

14 Campus Boulevard
Newtown Square, PA 19073-3299 USA
Phone: +1 610 356 4600 ext. 1112
E-mail: victor.carter-bey@pmi.org

# EXHIBIT 5

74 EXHIBIT 5

# SERVICES AGREEMENT

This Services Agreement ("Services Agreement") is made and entered into as of December 15, 2016 by and between Project Management Institute, Inc., a Pennsylvania corporation with offices located at 14 Campus Boulevard, Newtown Square, PA 19073 ("PMI"), and Workplace Technologies Research Institute, Inc., a Delaware corporation with offices located at 3333 Camino del Rio South, Suite 110, San Diego, CA 92108 ("WTRI"). PMI and WTRI shall hereafter be referred to individually as a "Party" and collectively as the "Parties."

The terms and conditions of this Services Agreement apply to and govern all maintenance, development, promotions and other support services provided by WTRI to PMI ("Services"). This Services Agreement shall become effective (the "Effective Date") on the date that PMI notifies WTRI that it will reject and retain ownership of the fifth (version) Alpha Software received from WTRI, pursuant to the Software Development and Purchase Agreement, dated September 8, 2015, by and between the Parties, as amended ("Development Agreement").

In consideration of the mutual covenants and agreements provided below, the Parties agree as follows:

**1. DEFINITIONS**

1.1 "Avatar" means a virtual person through which an individual User acts within the Virtual World.

1.2 "CAAT" (Cognitive Agility Assessment Test), means the initial screening program used to determine the level of cognitive capability of a User in the Virtual World.

1.3 "Content" means all WTRI-created artifacts, scenarios, visual and auditory materials present in the Virtual World, the CAAT, virtual company websites, user guides, and performance reports.

1.4 "Enhancement" means a request to add new features to a technology product or service, or change features already working as designed.

1.5 "Error" means a verifiable programming error, logic error, or "bug" within the Software, or other defect in the Software that causes it to operate not in material conformity with its documentation. Under no circumstances shall a new feature request or requirement by PMI, nor a request to support a new type of hardware or application not previously supported by the Software, be considered an Error correction event.

1.6 "Severity Level 1" means an Error that prevents the Software from being used or materially affects the operations of the Software.

1.7 "Severity Level 2" means an Error that will impact the performance and use of the Software, but does not produce substantially degrade the performance of the Software or does not materially restrict PMI's use of the Software.

1.8 "Severity Level 3" means an Error that causes only a minor impact on the performance of the Software or PMI's use of the Software.

1.9 "Software" means the Software delivered by WTRI to PMI, pursuant to and as defined in the Development Agreement.

1.10 "User" means an individual acting within the Virtual World via an Avatar.

1.11 "Virtual World" means the virtual testing and learning environment generated by the Software.

1.12 "Workaround" means a change in the procedures followed or data supplied by PMI to avoid or minimize the impact of an Error without substantially impairing PMI's use of the Software.

**2. SERVICES**

2.1 Content Development: WTRI will perform the following Services with regard to Content development:

2.1.1. CAAT: WTRI will develop no fewer than one (1) cognitive agility assessment test (CAAT), in addition to the CAAT developed during the Alpha phase of the Software development process. The work will include development of all elements of the scenario in which the User will be required to interact and progress, and will include no less than

eighteen (18) questions, each with no fewer than five (5) possible resolutions, per scenario, to which the User will be required to respond.

2.1.2. Virtual Companies: WTRI will create no fewer than one (1) virtual company, in addition to the one (1) original company created during the Alpha phase of the Software development process, representing such industries as PMI may designate in writing, to be represented in the Virtual World where the in-world projects will be performed, including all informational materials and documents associated with each company and define all company environments to be used for in-world implementation by PMI.

2.1.3 Projects: Working in conjunction with PMI-selected subject matter experts ("SMEs"), WTRI will create one (1) software development project in addition to the original ERP implementation project created during the Alpha phase of the Software development process, with content that supports five (5) Dreyfus levels of complexity, as approved by PMI, to be undertaken by Users in the Virtual World. Deliverables for the project will include without limitation the following: (i) project summary; (ii) project overview; (iii) stakeholder list and biographies; (iv) all dialog scripts; (v) metrics for measuring project achievements; (vi) project activities (no fewer than ten (10) ); (vii) ten (10) core events designed at the appropriate level; (viii) forty-eight (48) challenges.

2.1.4 Resource Management: WTRI will identify and manage Content development resources, including without limitation student and other academic volunteers and consultants recruited by WTRI to produce Content and to coordinate with PMI-identified subject matter experts ("SMEs").

2.2 Product Testing, Experimentation and Research: WTRI will collaborate with PMI to design and develop a structured research program to conduct experimental testing of the Software that will involve no fewer than twelve (12) unique subject companies with no fewer than eighteen (18) individual testers per company. WTRI will design a "celebrity demo" in order to promote the research program and recruit the twelve (12) subject companies for the experiment, to be scheduled by the Parties. WTRI CEO, Lia DiBello ("Dr. DiBello") will meet personally with all twelve (12) companies to promote and explain the research program and the Software. Questions to be presented to the subject companies will include without limitation the following: (1) what organizations would benefit from use of the Software; (2) what do you consider to be the key value to organizations and individuals of using the Software; (3) which company representatives do you believe are most likely to purchase the Software (e.g., C-Suite, Human Resources, Project Management Office leaders, others); (4) how would you price the Software; (5) what is your product preference out of the various Software uses: facilitated team, multi-player, individual. WTRI will be responsible for all record-keeping and reporting regarding the conduct and results of the research. Promptly upon execution of this Services Agreement, the Parties will jointly develop agreed templates for written communications with subject companies, surveys and questionnaires to be distributed to subject companies, and reporting of results of experimental testing. The research program will be completed by the third quarter, 2017.

2.3 Product Licensing and Customer Feedback: Pursuant to the terms of a license agreement to be entered into by the Parties, in a form materially consistent with Exhibit "A" hereto, WTRI will be permitted to use the Software with its customers. WTRI will obtain written feedback from its customers relative to their experience using the Software, in accordance with customer survey forms to be developed by PMI.

2.4 Promotional Services. WTRI shall provide the following services related to promotion of the Software to PMI's customers and market:

2.4.1 Thought Leadership and Publications Content: WTRI CEO Lia DiBello ("Dr. DiBello") will develop for PMI exclusively a derivative of the research paper to be produced for the National Science Foundation ("NSF") related to the accelerated learning capabilities of Software and the underlying neuroscience, suitable for use in white papers, publications or other media distribution to PMI key stakeholders, including without limitation members, credential holders, organizations that utilize project management. Dr. DiBello will further develop for PMI exclusively no fewer than two (2) other articles suitable for publication by PMI, in general media on the subject of accelerated learning as applied to project management skills with reference to PMI's Talent Triangle. PMI will be entitled, within its sole discretion, to: (i) request adjustments to any written materials developed by WTRI under this Section; (ii) determine whether any or all of such materials will be published or otherwise distributed, and (iii) determine the venues, web sites, events, print or online publications where such materials will be published or otherwise distributed.

2.4.2 Personal Appearances and Presentations: Dr. DiBello will speak at no fewer than four (4) PMI events or other special engagements during the Term of this Services Agreement on specific topics to be agreed by the Parties related to accelerated learning in virtual world environments and its application to project, program and portfolio management expertise. Those events or engagements may include, without limitation, speaking before PMI's Global Executive Council, at PMI's Global Congress, and at PMI's PMO Symposium. Any and all such speaking engagements and presentations may be video or audio-taped by PMI in any form of media chosen by PMI, and such recordings will be owned entirely by PMI, and may be used by PMI, in whole or in part, for further promotions of the Software or other related uses, on PMI's web sites, at PMI virtual events or otherwise, within PMI's sole discretion.

2.4.3 Consultation with Marketing Representatives: Dr. DiBello will consult with representatives of PMI's Marketing Group, or their designees, on approaches to the marketing and sale of the Software, including language of collateral materials, approaches to special product introductory events, and the development of articles for placement in various media. Dr. DiBello's time in performing those Services shall not exceed sixty (60) hours in each year that this Services Agreement is in effect.

2.4.4 Assistance with Continued Research: Dr. DiBello will advise on approaches for continuing research and obtaining validation of successful acceleration of learning and expertise in real-world contexts as a result of using the Software.

2.4.5 Technology Demonstrations and Sales Calls: Dr. DiBello will participate in demonstrations of the Software upon reasonable request, including but not limited to participation in sales calls and meetings to recruit companies to participate in the research program set forth in Section 2.2. PMI may, at its sole option, video or audio tape Dr. DiBello's presentation at such demonstrations. Such recordings will be owned entirely by PMI and may be used by PMI for virtual demonstrations, trainings or such other uses as PMI may wish within its sole discretion.

The Parties will remain in regular communication via telephone and email through their designated contact persons, no less frequently than once per week during any time when WTRI is performing the above Services.

2.5 Technical Assistance Services. WTRI will provide technical assistance services and consultation ("Technical Support Services") with respect to the Software as set forth below. As applicable, Technical Support Services shall be performed in accordance with the Service Level Agreement ("SLA"), attached hereto as Exhibit "B".

2.5.1 Design Consultation: WTRI will assign appropriate resources to consult with PMI on issues related to the functional design of items within the Virtual World.

2.5.2 Enhancements: Upon request and in consultation with PMI, WTRI will develop enhancements to the Software as prototypes to be implemented by PMI. WTRI also will provide PMI with enhancements to the Seller Software, (as defined in the Software Technology Development and Purchase Agreement by and between the Parties dated September 8, 2015) that WTRI distributes to its other customers who are enrolled in a services or maintenance agreement with WTRI. If WTRI distributes any enhancement to the Seller Software as an option or new product for which it charges an additional fee, it will make such option or new product available to PMI on the same terms as it offers generally to other similarly situated customers.

2.5.3 Change Requests. WTRI will perform such additional enhancements, upgrades or adjustments as PMI may reasonably request in writing ("Change Request"), subject to the time restrictions set forth below. Upon receipt of a Change Request from PMI, WTRI shall consider the scope and requirements of the Change Request and advise PMI of the anticipated time required and impact of fulfillment of the Change Request. WTRI's Response to any such Change Request must be within 24 hours. Implementation of any change requested in a Change Request shall be within one (1) week of WTRI's receipt of the Change Request, unless another time for is agreed to by the Parties in writing.

2.5.4 Service Time Allotment. WTRI will allot to PMI a minimum of two hundred (200) hours for the one (1) year Term for the above consultation and technical support services. WTRI shall provide a monthly billing report for the 200 hours of technical services specifying the services performed and time incurred on an hourly basis. If PMI requests technical consultation or support services beyond the 200 hours of time allotted for the one (1) year Term, WTRI shall provide such services on an hourly basis at the rate of two hundred dollars ($200) per hour; provided,

however, WTRI, whether through Dr. DiBello or otherwise shall not be obligated to devote more than a total of four hundred (400) hours in excess of two hundred (200) without its express written consent.

2.5.5 Error Corrections. In accordance with the SLA, WTRI will use commercially reasonable efforts to correct problems or Errors, as determined by PMI and which are reported by PMI by issuing either: (i) "Correction Information," such as correction or corrected documentation; or (2) "Support Modifications," if the Error is reasonably determined by PMI to reside in the programming of the Software itself, or to relate to the implementation or access to the Software if the Software is provided on a remotely accessible basis. As used herein, a "Support Modification" to the Software means a revision or modification thereto which provides Error correction or which otherwise is intended to remedy the reported, verifiable, material non-conformity of the Software with its documentation. Error correction as used herein does not include the development of custom software or customization services.

2.5.6 PMI Contact. With respect to the technical assistance services herein, each PMI Contact will (i) be able to provide to WTRI reasonable descriptions of reported problems or Errors, together with reasonable and available supporting data and (ii) have the relevant technical knowledge necessary to assist WTRI in performing the Technical Support Services contemplated under this Services Agreement, including familiarity with the Software.

2.5.7 Remote Access. PMI acknowledges that WTRI's ability to perform certain Technical Support Services may be conditioned upon remote access to the Software and the portions of PMI's computer system to which the Software is connected, as reasonably requested by WTRI. All such access shall be pursuant to PMI's security protocols and processes.

**3. PMI RESPONSIBILITIES**

PMI and its personnel shall cooperate reasonably with WTRI with respect to providing responses to WTRI's requests for information, providing access to the Software, and providing access to all necessary information necessary for Error correction or other performance under this Services Agreement.

**4. FEES, EXPENSES, AND PAYMENT**

4.1 Fees. In consideration of the Services to be performed by WTRI, and the delivery of Services in accordance with the Services detail and schedule for performance attached hereto as Exhibit "C", PMI will pay WTRI an all-inclusive fee for all Services, of One Million One Hundred Thirty-Seven Thousand Six Hundred Twenty-Three Dollars and Zero Cents ($1,137,623.00) per one (1) year Term payable in three (3) payments as follows:

1. $568,811.50, due upon signing
2. $284, 405.75 on June 1 2017
3. $284, 405.75 on Dec 14 2017.

The foregoing all-inclusive fee does not include Services in excess of two hundred (200) hours as provided in Section 2.5.4. The first payment ("First Payment") of $568,811.50 shall be payable upon execution of this Services Agreement and receipt of WTRI's invoice, and each subsequent payment shall be made according to the schedule above, and pursuant to the invoicing requirements herein, provided that WTRI is in full compliance with all terms and conditions of this Services Agreement, including without limitation the schedule for Services delivery set forth in Exhibit "C", at the time payment is due. This Services Fee is separate from any fees that WTRI may earn from licensing of the Software to its customers in accordance with Section 2.3 above

4.2 Expenses. PMI will reimburse WTRI solely for special or unusual expenses incurred at PMI's request, and that are expressly approved by PMI in advance. WTRI will be responsible for its own ordinary and necessary business and travel expenses. WTRI not be responsible for delays caused in seeking and obtaining PMI's approval of expenses.

4.3 Payment. All amounts to be paid by PMI hereunder shall be due upon receipt of WTRI's invoice and payable within thirty (30) calendar days thereafter.

4.4 Taxes. PMI shall pay all applicable sales, use and excise taxes relating to, or under, this Agreement, exclusive of taxes based on or measured by WTRI's income, Software, or franchise status, unless PMI is exempt from the payment of such taxes and provides WTRI with sufficient evidence of such exemption.

4.5 Record-keeping. WTRI shall maintain complete and accurate accounting records, which, at a minimum, shall document WTRI's performance of technical support or additional services on a hourly basis and which generally shall be in a form in accordance with generally accepted accounting principles, to substantiate WTRI charges, fees, costs, and expenses hereunder, and WTRI shall retain such records for a period of two (2) years from the date of the termination of this Agreement. PMI shall have the right to inspect and audit the records kept by WTRI with respect to this Agreement. Any such inspection and audit shall be performed during WTRI's normal business hours and be preceded by at least ten (10) business days' prior written notice. Any audit conducted by PMI shall be at PMI's expense unless the results of an audit reasonably show an error in an invoiced amount that resulted in overpayment by PMI to WTRI, in which case WTRI shall refund PMI the amount of the overpayment and pay for the audit

**5. SOFTWARE OWNERSHIP**

Ownership of the Software is exclusively governed by the Development Agreement. Enhancements developed exclusively for the benefit of PMI shall be deemed to be Assigned Software as defined in the Development Agreement and owned by PMI.

**6. TERM AND TERMINATION**

6.1 Term. This Agreement will be effective from the Effective Date and shall remain in effect for one (1) year thereafter, unless earlier terminated as provided herein (the "Initial Term"). Following the Initial Term, this Agreement may be renewed upon the mutual agreement of the Parties for an additional one (1) year term (the "Renewal Term") at fees for the Services consistent with those of the Initial Term, and paid on the same quarterly basis during the Renewal Term. The Parties may mutually agree to different Services and payment terms for the Renewal Term, as appropriate, and this Agreement may be renewed upon mutual agreement of the Parties following the Renewal Term at fees for the applicable services to be negotiated by the Parties.

6.2 Termination. All Services hereunder may be terminated by either Party upon written notice to the other, if the other Party breaches any material obligation provided hereunder and the breaching Party fails to cure such breach within thirty (30) calendar days after receipt of the notice. Additionally, this Agreement shall also terminate if the Development Agreement is terminated under circumstances where PMI does not retain ownership of the Software. WTRI shall promptly notify PMI in writing in the event that the Services of Lia DiBello are no longer available to WTRI, and WTRI or PMI may terminate this Agreement upon such notice. In the case of termination of this Agreement because the Services of Lia DiBello are no longer available, where payment has been made for Services that will not be performed, PMI shall be entitled to a full refund of the payment made for services not performed.

**7. WARRANTIES**

7.1 Limited Warranties. WTRI represents that it has all rights necessary to enter into and perform under this Services Agreement and further warrants that the Services will be performed in a timely, workmanlike and professional manner by appropriately qualified personnel in accordance with all applicable laws and regulations. As the sole and exclusive remedy of PMI for breach of the foregoing warranty, WTRI shall, at its option, either re-perform the Services so that they do conform with the foregoing warranty or refund to PMI a prorated portion of the fees paid in connection with the applicable Services. The warranties provided in this Section are solely for the benefit of PMI and PMI will have no authority to extend such warranty to any third party.

7.2 DISCLAIMER OF WARRANTIES. EXCEPT AS OTHERWISE SET FORTH IN SECTION 7.1, THE SERVICES ARE PROVIDED WITHOUT ANY OTHER WARRANTIES OF ANY KIND. WTRI DISCLAIMS ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY OF INFORMATION, QUIET ENJOYMENT, TITLE, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY WTRI OR WTRI'S AUTHORIZED REPRESENTATIVES WILL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THIS WARRANTY. WTRI MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED WITH REGARD TO ANY THIRD PARTY CONTENT OR ANY SOFTWARE, EQUIPMENT, OR HARDWARE OBTAINED DIRECTLY BY PMI FROM THIRD PARTIES (COLLECTIVELY, THE "THIRD PARTY ITEMS"). PMI SHOULD CONSULT THE RESPECTIVE VENDORS/MANUFACTURERS OF THE THIRD PARTY ITEMS FOR WARRANTY AND PERFORMANCE INFORMATION. NOTHING IN THIS SUPPORT SERVICES AGREEMENT SHALL BE INTERPRETED AS A WARRANTY, EITHER

EXPRESS OR IMPLIED, BY WTRI THAT WOULD EXPAND IN ANY WAY A VENDOR/MANUFACTURER'S STANDARD END-USER WARRANTY.

**8. LIMITATION OF LIABILITY**

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY GENERAL, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES FOR LOSS OF BUSINESS, LOSS OF PROFITS, BUSINESS INTERRUPTION, OR LOSS OF DATA) ARISING OUT OF OR CONNECTED IN ANY WAY WITH THIS SUPPORT SERVICES AGREEMENT, OR ANY SERVICES RENDERED UNDER THIS AGREEMENT, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE TOTAL LIABILITY OF EITHER PARTY TO THE OTHER PARTY FOR ALL DAMAGES, LOSSES, AND CAUSES OF ACTION (WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE) SHALL NOT EXCEED THE TOTAL FEES PAID BY PMI HEREUNDER TO WTRI. THIS LIMITATION OF LIABILITY PROVISION SHALL NOT APPLY IN IN THE CASE OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY THE PARTY AGAINST WHOM LIABILITY IS CLAIMED.

**9. INDEMNIFICATION**

Indemnification. Each Party agrees to indemnify, defend, and hold harmless the other Party, its directors, officers, employees, agents and its successors and assigns ("Indemnitees") from and against any and all liability, claims, causes of action, and suits, together with resulting damages, and expenses, including reasonable attorneys' fees, (collectively "Losses") due to or in respect of third parties that any Indemnitee may incur arising out of (i) a breach by an indemnifying Party of any representation, warranty or obligation contained in this Agreement or (ii) a violation of law by the indemnifying Party or (iii) gross negligence or willful misconduct by the indemnifying Party or (iv) Losses of an Indemnitee resulting from a breach of an indemnifying Party's obligations of confidentiality as set forth in Section 10.3 (Confidentiality). Each Party will defend at its expense, with counsel reasonably acceptable to the Indemnitee, any action brought against such Indemnitee, which is covered by this indemnification provision, and will pay any costs, fees, and damages finally awarded against such Indemnitee in such action or to be paid in settlement of such claim; provided that, no indemnifying Party shall enter into any settlement that does not provide a complete and unconditional release of the Indemnitee or requires an admission of guilt or fault on the part of the Indemnitee without the express written consent of the Indemnitee. As a condition to receiving such indemnification, the Indemnitee shall promptly notify the indemnifying Party in writing of such claim, provided that the failure to notify or delay in notifying the indemnifying Party will not relieve it from liability which it may have to the indemnified Party except to the extent the indemnifying Party is prejudiced by such failure or delay. Each Indemnitee shall have the right, at its own expense, to participate in the defense of any such claim through counsel of its own choosing, and shall in any event cooperate reasonably with the indemnifying Party in defense of such claim. No Party shall be liable with respect to Losses to the extent the other Party has an obligation to indemnify the first Party pursuant to this Agreement.

**10. GENERAL**

10.1 Waiver, Amendment Or Modification. The waiver, amendment or modification of any provision of this Services Agreement or any right, power, or remedy hereunder shall not be effective unless made in writing and signed by the Party against whom enforcement of such waiver, amendment, or modification is sought. The terms of this Services Agreement shall not be amended or changed by the terms of any purchase order or acknowledgement even though WTRI may have accepted or signed such documents. No failure or delay by either Party in exercising any right, power, or remedy with respect to any of its rights hereunder shall operate as a waiver thereof.

10.2 Notice. All notices, demands, or consents given under this Services Agreement will be in writing and will be deemed given when delivered personally, or three (3) calendar days after deposit in the mail (certified or registered mail), or one (1) calendar day after being sent by overnight courier, to the receiving Party at the address set forth in this Services Agreement or at such other address given by either Party to the other in writing.

10.3 Confidentiality. Each Party (the "Disclosing Party") may, in connection with this Services Agreement, disclose to the other Party (the "Receiving Party") confidential information, including, without limitation, information relating to the Disclosing Party's business, computer software, algorithms, trade secrets, know-how, processes, techniques, ideas, improvements, inventions (whether or not patentable), customer lists, and other

technical, business, financial, customer and product development plans, forecasts, strategies and information (collectively, "Confidential Information"). For the purposes of this Services Agreement, the terms and conditions of this Services Agreement, information related to the Software (and, in particular, the related source code) as well as any information identified or marked as "confidential" or "proprietary" or that which the Receiving Party knows or reasonably should know is considered to be the confidential information of the Disclosing Party shall also be considered the Confidential Information of the Disclosing Party. Confidential Information does not include information that: (a) is or becomes publicly available through no breach by the Receiving Party of this Services Agreement; (b) was previously known to the Receiving Party prior to the date of disclosure, as evidenced by contemporaneous created written records; (c) was acquired from a third party without any breach of any obligation of confidentiality; or (d) was independently developed by the Receiving Party hereto without reference to Confidential Information of the Disclosing Party. Each Party agrees not to use (other than for purposes contemplated by this Services Agreement), and will use commercially reasonable efforts to prevent the disclosure to third parties of, any of the disclosing Party's Confidential Information. The Receiving Party may make disclosures required by court order or law provided that the Receiving Party promptly informs the Disclosing Party in writing of the court order or other disclosure demand and provide a copy thereof to the Disclosing Party, uses diligent efforts and cooperates with the Disclosing Party to limit such disclosure and obtain confidential treatment or a protective order for such disclosure, has allowed the Disclosing Party to participate in the proceeding for same, and only discloses that Confidential Information necessary to comply with such court order or other disclosure demand. Each Party acknowledges and agrees that due to the unique nature of the Disclosing Party's Confidential Information, there may be no adequate remedy at law for any breach of its obligations hereunder, that any such breach may allow the Receiving Party or third parties to unfairly compete with the Disclosing Party resulting in irreparable harm to the Disclosing Party and, therefore, that upon any such breach or threat thereof, the Disclosing Party shall be entitled to seek injunctive relief and other appropriate equitable relief in addition to whatever remedies it may have at law, and to be indemnified by the Receiving Party from any loss or harm (including, without limitation, attorneys' fees) in connection with any breach or enforcement of the Receiving Party's obligations hereunder or the unauthorized use or release of any Confidential Information. The Receiving Party will promptly notify the Disclosing Party in writing upon the occurrence of any such unauthorized release or other breach of which it is aware. The obligations of confidentiality set forth in this Section 10.3 (Confidentiality) shall apply for up to five (5) years after termination of this Services Agreement, provided, however, any Confidential Information that constitutes a trade secret of a Party shall remain such Party's Confidential Information and shall be treated confidentially in accordance with the terms of this Section 10.3.

10.4 Entire Agreement. This Services Agreement constitutes the entire agreement between the Parties in connection with the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties related to such subject matter, and there are no warranties, representations, or agreements between the Parties in connection with the subject matter hereof except as specifically set forth or referred to herein. In the event of any conflict with the Development Agreement, this Services Agreement shall control.

10.5 Assignment. PMI shall not assign this Services Agreement without the written consent of WTRI, which consent shall not be unreasonably withheld. WTRI shall not assign or delegate any obligation under this Services Agreement without the written consent of PMI.

10.6 Governing Law; Forum; Severability. The validity, construction and performance of this Services Agreement and the legal relations among the Parties to this Services Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding that body of law applicable to choice of law. If any provision of this Services Agreement or the application of any such provision shall be held by a tribunal of competent jurisdiction to be contrary to law, the remaining provisions of this Services Agreement shall continue in full force and effect.

10.7 INAPPLICABILITY OF UCITA. THE PARTIES AGREE THAT NO PROVISION OF THE UNIFORM COMPUTER INFORMATION TRANSACTIONS ACT (UCITA) IS INTENDED TO APPLY TO THE INTERPRETATIONS OF THIS SUPPORT SERVICES AGREEMENT, WHETHER OR NOT UCITA IS ENACTED IN THE STATE WHOSE LAW GOVERNS THIS

AGREEMENT AS SET FORTH IN SECTION 10.6 (GOVERNING LAW; FORUM; SEVERABILITY) OF THIS SUPPORT SERVICES AGREEMENT.

10.8 Relationship Of The Parties. WTRI is an independent contractor under this Services Agreement, and nothing herein shall be construed to create a partnership, joint venture, or agency relationship between the Parties hereto. PMI and WTRI shall have no authority to enter into agreements of any kind on behalf of the other, and neither Party shall have the power or authority to bind or obligate the other in any manner to any other third party.

10.9 Survival. The following sections shall survive expiration or termination of this Services Agreement: Definitions, Termination Intellectual Property Rights, Disclaimer of Warranties, (Limitation of Liability General, and any other provision reasonably contemplated as remaining in effect after expiration or termination of this Services Agreement.

10.10 Construction. The section headings in this Services Agreement are for convenience of reference only, will not be deemed to a part of this Services Agreement, and will not be referred to in connection with the construction or interpretation of this Services Agreement. Unless otherwise expressly stated, the words "herein," "hereof," and "hereunder" and other words of similar import refer to sections of this Services Agreement as a whole and not to any particular section, or subsection of this Services Agreement. The words "include" and "including" shall not be construed as terms of limitation and shall, in all instances, be interpreted as meaning "including, but not limited to."

10.11 Force Majeure. Neither Party will be liable for any failure or delay in performance under this Services Agreement which is due to any event beyond the reasonable control of such Party, including without limitation, fire, explosion, unavailability of utilities or raw materials, unavailability of components, labor difficulties, war, riot, act of God, export control regulation, laws, judgments, or government instructions.

10.12 Counterparts. This Services Agreement may be executed simultaneously in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute the same Services Agreement.

IN WITNESS WHEREOF, this Services Agreement has been duly executed by the undersigned as of the date first set forth above.

Project Management Institute, Inc.

By: ______________________
Mark A. Langley
President & Chief Executive Officer

By: ______________________
Joseph James Cahill
Vice President, Finance & Administration

Workplace Technologies Research Institute

By: ______________________
Lia DiBello
Chief Executive Officer & Director of Research

Exhibit "B"

SERVICE LEVEL AGREEMENT

This states the service level requirements and communication policies and procedures governing technical Services provided by WTRI to PMI under the Services Agreement dated ______________.

**Required Service Levels**

The following describes the service levels to which WTRI must adhere.

1.1 Severity Level Factors

When Services commence, or at product delivery, PMI and WTRI will create a contact list for use by staff for problem or Error notification. WTRI will use the Severity Level Factors Table (Figure 1) to assign and properly notify PMI of any problems or Errors it identifies. PMI and WTRI, or their designees, may jointly decide to adjust or reclassify the severity rating.

| Severity Level Factors: | Severity Levels: | | | |
|---|---|---|---|---|
| | 1. Critical | 2. High | 3. Medium | 4. Low |
| Impact on Users | • Application is down or very slow<br>• Network Failure<br>• Server Failure<br>• Security Failure | Major feature not working properly | Minor feature not working properly | • Typos on website<br>• Customized reporting<br>• Modified DB field for upload |
| Number of Users Affected | All or virtually all users | A majority of users | Less than a majority of users | Only a few users |
| Existence of Workaround | None exists | Workaround adds significant difficulty | Workaround adds some difficulty | Workaround adds no difficulty; is as good as normal process |

1.2 Response Time Targets

If a problem or Error occurs, and upon receipt of notice from PMI, WTRI must notify PMI within the target time frames indicated in the Response Times Targets table below. WTRI will respond to the Error reports within the timeframes indicated in the Severity Level Factors Table (Figure 1).

| Response Time Target | Severity Levels: | | | |
|---|---|---|---|---|
| | 1. Critical | 2. High | 3. Medium | 4. Low |
| Time to First Response | Within one hour | Within two hours | Within eight hours | Within eight hours |
| Time to Resolution | Four service hours | 12 service hours | Three service days | Three service days |

1.3 Technical Consultation Response Time

WTRI's technical consultation resources will be reasonably available for consultation with PMI representatives via phone, email or other electronic communication during regular business hours, 9AM to 5PM, US Pacific Time. During such times, calls or emails from PMI will be returned within no more than twenty-four (24) hours. PMI and WTRI may agree to make appointments for consultation outside of regular business hours upon no less than forty-eight (48) hours' request for such a consultation by PMI.

**Exhibit "C"**

**Services Detail and Delivery Schedule**

WTRI will deliver the Services identified below on the following schedule. Payment of fees as set forth in paragraph 4 of the Services Agreement will be contingent on WTRI's performance of Services materially on schedule.

A. Fee payments and related Services to be delivered

(1) First fee payment, invoice dated December, 2016 as pre-payment for services to be provided by and before second payment.

(2) Second fee payment, invoice dated June, 2017
Services completed and delivered:

- Pilot Design
- Product Development for both ERP and SW, individual and team for both
- Pilot Recruitment
- Facilitator Training
- Pilot Operations
- Promotional Activities

(3) Third fee payment, invoice dated December, 2017. Services completed and delivered:

- Pilot Operations – Final Analyses and recommendation for product road map
- Promotional Activities

**B. Activity Chart**

The chart below identifies specific outputs and deliverables of the Services, aligned with the time frame for delivery. Where there are activities for which PMI has primary responsibility that will integrate with activities of WTRI, those are included, with PMI identified as the responsible party.

Specific schedule for promotional activities will be agreed-to by PMI and WTRI within 6 months of executing the Services Agreement.

| Service type | Activity | Responsible Party | Outputs | Objectives | Timeframe |
|---|---|---|---|---|---|
| **Pilot Design** | Design pilot experiment | WTRI with PMI input | Documented pilot plan to include:<br><br>1.Requirements of organizations<br>2.Type of organizations<br>3.Tester profile<br>4. Buyer type<br>5. Research conditions<br>6. Interview guide<br><br>7. Analysis methodology | Designed pilot program will help establish:<br><br>1.Use of product<br>2.Value of product<br>3.Product type preference<br>4.Price point<br>5.Project preference | **November 2016– January 2017** |

| | | | | | |
|---|---|---|---|---|---|
| | | | 8. Survey design<br>9. Organization feedback reports | 6.Pain points addressed<br>7.Features | |

| | | | | | |
|---|---|---|---|---|---|
| **Pilot Recruitment (WTRI)** | Recruitment of pilot program organizations.<br><br>WTRI to recruit no fewer than 12 organization to participate in pilot program | WTRI | WTRI engagement of C suite level stakeholders that will sign their organization up to a pilot program | Secure at least 12 organizations to participate in pilot program at a C suite level buyer (or influencer) profile. | **January- March 2017** |

| | | | | | |
|---|---|---|---|---|---|
| **Pilot Recruitment** (PMI) | Recruitment of Pilot program organizations<br><br>A diverse range of organizations will be targeted across different buyer profiles in the PMO and HR function through 1-2-1 meetings or inclusion in the WTRI recruiting/solicitation demo event. | PMI, coordinating with WTRI | 1-2-1 meetings Inclusion in WTRI recruitment demo | Secured participation in pilot program to reflect diverse range of organizations and buyer profiles. | **January 2017 – March 2017** |
| **Training** | Training of Software product core team and identified facilitators | PMI and WTRI | Trained core team members and facilitators to conduct pilot experiments with organizations.<br><br>Facilitator training for core team for team experiments | Enabled group of core team members and identified facilitator from PMI to conduct successful pilot program with each organizations participating. | **January 2017 – March 2017** |
| **Pilot program operations** | Running of pilot program with 12 - 24 organizations.<br><br>Up front on-boarding of participants<br>Core team to stay engaged with organizational contacts (potential buyers) regarding user feedback, relationship driven aspects of the | PMI with support as required from WTRI | Operational pilot program | Successful implementation of pilot program.<br><br>Collection of useful feedback | **March 2017 – August 2017** |

| | | | | | |
|---|---|---|---|---|---|
| | business opportunity, etc.<br>Customer care and application support to be touch points on technical support and user experience<br>Collection of feedback from organizations | | | | |
| **Pilot operations** | Analysis and delivery of feedback to organizations | PMI / WTRI / Czarina Games | Organizational feedback results | Delivery of feedback reports to organizations to demonstrate value to organization. | **March 2017 – September 2017.** |
| **Product Development** | Development of new rehearsal. Software development project. Individual and multi-player products, with one new CAAT | PMI and WTRI | Finalized Software Development project (Individual product)<br><br>Finalized Software Development project (Multi-player product)<br><br>Finalized CAAT | Pilot ready Software Development project (Individual product)<br><br>Pilot ready Software Development project (Multi-player product)<br><br>Pilot ready CAAT | **October 2016 – June 2017** |
| **Promotions** | Consulting with marketing, assisting with research | WTRI / PMI | The parties will further define as needed. | Promote | **January – June 2017** |
| **Promotions** | Consulting with marketing, assisting with research Speaking engagements, presentations, thought leadership and publications | WTRI / PMI | The parties will further define as needed. | | **Ongoing through December 2017** |

## C. Services Detail

### (1) Pilot Experiments

The pilot program will test the hypothesis that the Software can address organizational pain points related to project management and project manager performance via the use of simulated rehearsals in a risk-free environment. Through the use of feedback loops aimed at utilizing such mechanisms as (pilot participant) evidence of accelerated learning, survey/assessment data, interviews, etc., PMI and WTRI will work together to provide evidence to organizations demonstrating how the Software effectively addresses key business needs, objectives and challenges.

**(a) Assumptions**

- Each experiment (total time) will run 3 - 4 weeks per organization with no more than 4 organizations running concurrently with a staggered schedule from March – August, 2017. This includes training, testing, feedback, focus groups, individual interviews and reports.
    - Use of the Software will be limited to a 2-week window during this timeframe, no more than 2 organizations at a time.
- Individual and Team Organizational Pilot: ERP & Software Development (staggered)
    - March to August, 2017
    - Staggered testing (Operationally providing each organization support; in order to do this we cannot have all organizations testing the Software at the same time)
        - ~2 organizations "live" at a time

**(b) Pilot Experiment Design and Summary:**

- WTRI with PMI input will design and develop the pilot. This will include:
    - Research questions and goals
    - Pilot requirements: testers, survey, interviews, analysis, reports, research conditions
    - Collection, standardization, and interpretation of evidence
    - Construction of feedback loops with organizations so as to demonstrate the value of the product
    - Identification and collation of purchase triggers
- Participation in the program is expected to span the C-Suite, HR function (PMI to recruit), PMO function (PMI to recruit)

  Participation is to be 24 organizations with 18 testers.
    - Target recruitment numbers are as follows:
        - ~12 Organizations recruited from C-Suite (WTRI to recruit)
        - ~6 Organizations recruited through HR function
        - ~6 Organizations recruited through PMO function
        - 18 testers per organization
            - 9 individual
            - 9 team based (3 teams of 3)
- PMI will offer participants 1 of 2 project rehearsals (To Be Determined based on timing of the Software Development Rehearsal Completion)
    - **ERP Project**
        - Individual
        - Team
    - **Software Development Project (Agile project focus)**
        - Individual
        - Team

**(c) Preparation for Pilot:**

Content Development and Management)

(October, 2016 – February 2017:

- Finalize and complete new company (WTRI)
- Conduct Virtual SME meeting (PMI)
    - Use 6 – 9 SMEs (that have already been vetted)
    - Develop content for Software Development project

- Review content (PMI & WTRI)
- Conduct Face to Face meeting (early 2017)
  - Set up and invite SMEs (PMI)
  - Facilitate meeting (PMI)
    - WTRI to attend, if appropriate (depends on timing and agreement)
  - Finalize content for Software Development project

**(d) Pilot Participant Recruitment:**

Recruitment of Organizational Client via C-Suite (WTRI; with monitoring and support from PMI) (November, 2016-February 2017)

- WTRI to use a concept known as "Celebrity demo"
  - Goal is to demo the product to senior leaders **selling** the idea of organization participation in the pilot program. Demos can be held virtually or face to face (celebrity is a name, no celebrity is included).
  - Networking is critical "value-add" to these demos for the senior leaders of organizations.
  - WTRI to create demo – executive problem from Proteum, in teams
  - PMI to include 1 member each from PMI Board of Directors, and Executive Management Group, if appropriate in each demo (February 2017)
  - Recruitment of organizational clients in HR and PMO function (PMI; with support from WTRI as appropriate):
  - Lia DiBello will participate in recruitment meetings, scheduled throughout pilot participant to explain the science, the evidence of accelerated learning, and the practical application within simulated rehearsals (PMI and WTRI to develop an agreed to script)

**(e) Pilot Operations and Client Support**

- Trained PMI identified facilitators to work individually with company contacts, provide feedback for the experiment and provide support.
  - Training to include facilitation method of team product, feedback gathering processes, reporting
  - Assumption: PAL Team managers will need to work very closely with all facilitators, technical team and organizations involved, to ensure the pilot / research goals are met and controlled.
  - The trained core team is needed to work closely with the organizations to provide the "control" for statistical validity of the research experiment (Pilot)
- Technical support will be provided by tier 2 support used today. (In the current Alpha testing any technical questions that come through customer care are escalated to Thom's team to address.) This ensures consistency in communications, support, and alignment with pilot requirements.
  - Because the product under test is minimally viable, the technical development team must support all configurations, across all participating organizations.



22 December 2016

Ms. Lia DiBello
Chief Executive Officer & Director of Research
Workplace Technologies Research, Inc.
3333 Camino del Rio South, Suite 110
San Diego, CA 92108

RE: Services Agreement and License Agreement

Ms. DiBello:

Enclosed please find two (2) Services Agreements and two (2) License Agreements signed by Mark Langley.

Kindly sign one set of the agreements where indicated and return them to Marjorie Gordon at the following address:

Project Management Institute, Inc.
14 Campus Boulevard
Newtown Square, Pennsylvania 19073

Should you have any questions, please feel free to contact us.

Warm regards,

Enclosures

14 Campus Blvd | Newtown Square, PA 19073-3299 USA | tel: +1 610 356 4600 | fax: +1 610 356 4647 | PMI.org

CONFIDENTIAL WTRI00009403

89 EXHIBIT 5

Exhibit "A"

LICENSE AGREEMENT

This LICENSE AGREEMENT ("License Agreement") dated December 15, 2016 (the "Effective Date"), is by and between Workplace Technologies Research, Inc. ("Licensee"), a Delaware corporation with a principal address of 3333 Camino del Rio South, Suite 110, San Diego, CA 92108, and Project Management Institute, Inc. ("Licensor"), a Pennsylvania corporation with a principal address at 14 Campus Boulevard, Newtown Square, PA 19073. Licensor and Licensee are referred to herein individually as a "Party" and together as the "Parties."

RECITALS:

Licensor has purchased from Licensee certain Software pursuant to a Software Development and Purchase Agreement dated September 8, 2015 (the "Purchase Agreement).
Licensor wishes to exploit the Software fully, and Licensee wishes to make the Software available to its customers ("Customers") for their use in connection with organizational team training and development programs offered by such Customers to persons employed by them in the field of project, program and portfolio management (" Project Management Corporate Programs"); and

Licensor agrees to grant, and Licensee agrees to obtain, a right to license copies of the Software (in executable code form) and a license to use such Software solely in connection with the Business as defined below, on the terms and conditions set forth herein.

THEREFORE, in consideration of the mutual covenants contained in this License Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties hereto agrees as follows:

1. <u>DEFINITIONS</u>

In addition to any other terms defined in this License Agreement, the following terms when used in this License Agreement shall have the meanings indicated:

1.1. <u>Affiliate</u> means, with respect to any referenced Person, any other Person, which directly or indirectly controls, is controlled by, or is under common control with such referenced Person, where "control" means ownership, directly or indirectly, of a majority in interest of the voting interests in such Person, or possession of the right to control management of such referenced Person.

1.2. <u>Business</u> means the distribution, marketing, and licensing of the Software to customers of Licensee for their use in Project Management Corporate Programs and use thereof by Licensee in the conduct or facilitation of Project Management Corporate Programs.

1.3. <u>Customer Personnel</u> means employees and contract personnel of Licensee Customers.

1.4. <u>Distribution Channels</u> means retail distribution channels in the Territory, including without limitation distribution directly to end-users, and sub-licenses to third party distributors.

1.5. <u>Improvements</u> means any developments of, improvements to, additions to modifications of, derivatives of, or alterations to the Software, including any inventions or works, or any associated rights thereto.

1.6. Licensor Customer means a Person as to whom Licensor seeks to enter or has entered into a license, sale or other agreement for the use of the Software.

1.7. Promotional Materials means any documents and materials including manuals and packaging of the Software, advertising, promotional, display and/or other such marketing materials of or concerning the Software furnished by Licensor to Licensee and which Licensee shall use in conjunction with the distribution of the Software and for promotional purposes only.

1.8. Person means a partnership, a joint venture, a firm, a company, a corporation, a government or any department or agency thereof, a trustee, a trust, an unincorporated organization or any other legal entity of whatever kind or nature.

1.9. Personnel means employees and contract personnel of Licensee

1.10. Project Management Corporate Programs means those programs, training, education, or development opportunities offered by customers of Licensee to Customer Personnel who are engaged in project, program or portfolio management.

1.11. Software means the Software as described in the Purchase Agreement.

1.12. Team means groups of Customer Personnel working together on projects, assignments, tasks or development opportunities.

1.13. Territory means on a worldwide basis.

**2. LICENSE**

2.1. License Grant. Licensor hereby grants to Licensee, and Licensee hereby accepts, a non-exclusive, non-transferrable right and license ("License"), on the terms and conditions set forth in this Agreement during the Term, to use internally and to further distribute, market, and sublicense, the Software and to reproduce and distribute the Promotional Materials through the Distribution Channels in the Territory in connection with the Business. Licensor further grants to Licensee the right use and distribute the Software in pre-market ready, non-final format, to conduct pilot tests of the Software and to offer a limited number of opportunities for Customers to use and provide feedback on the Software.

2.2 Restrictions. Except as necessary to service Customers in the ordinary course of Business or as may otherwise be contemplated by this License Agreement, Licensee may not (i) use, copy, store, reproduce, transmit, distribute, display, rent, lease, sell, modify, alter, license, sublicense, or commercially exploit the Software (or any part thereof) in any manner not permitted by this License Agreement; (ii) reverse engineer, decompile, disassemble, translate, or create any derivative work of the Software (or any part thereof); (iii) access, link to, or use any source code from the Software (or any part thereof); (iv) erase or remove any proprietary or intellectual property notice contained in or on the Software (or any part thereof); or (v) use or permit use of the Software (or any part thereof) for or by any Person or entity. In addition, Licensee shall not enter into any contractual relationship or other legally binding obligation with any third party or person, including without limitation any Licensor Customer, which shall have the purpose or effect of encumbering Licensor or the use of the Software, or any part thereof, or interfering with Licensor relationships or business arrangements with Licensor Customers.

2.3 Reservation of Rights. Licensor reserves all other rights, title, and interest not expressly granted herein.

2.4 Delivery of Software. Promptly after the Effective Date, Licensor will provide or make available to Licensee a copy or available tangible embodiment of any Software licensed under this License Agreement as reasonably requested by Licensee.

2.5 Licensee Commercial Effort. Licensee shall at all times use reasonable commercial endeavors to market the Software and stimulate and increase interest in the Software within the Territory for the purposes and uses described herein, subject to any limitations set forth in Section 2.2. In particular and without limiting the generality of the foregoing, Licensee shall at its own cost and expense: a) maintain adequate promotional and office facilities and a trained staff within the Territory b) submit for Licensor's prior written approval any marketing materials produced by Licensee, such approval not to be unreasonably withheld. Licensee shall ensure that all such commercial efforts are consistent with any Licensor marketing directives as communicated in writing by Licensor to Licensee.

2.6 Notice of Customer Engagements and Sub-Licenses. When Licensee enters into any Customer use or license agreements, sub-licenses or distributor agreements related to the Software, Licensee shall give notice to Licensor of any and all such Customer agreements, sub-licenses or distributor agreements, and shall provide to Licensor the name, address, principal contact person and summary of material terms of the agreement with and for the Customer, sub-licensee or distributor. Notice under this Section shall be provided within ten (10) business days prior to Licensee's entering into the Customer agreement, sub-license or distributor agreement, and Licensor reserves the right to deny Licensee permission to enter into any such agreement or sub-license. This Section 2.6 shall not be construed to require notice of the transfer of Software to end-users pursuant to a standard form of license or a "shrink-wrap" license between Licensor and any such end-user.

**3. PROPRIETARY RIGHTS**

3.1. Ownership of the Software. Licensee hereby acknowledges that Licensor is the owner of the Software as provided in the Purchase Agreement, including associated rights thereto and the goodwill and reputation symbolized thereby, and that nothing contained herein shall constitute an assignment of such rights or grant to Licensee of any right, title, or interest therein. Licensee shall have no right and shall not make any improvements to the Software pursuant to this Agreement. All goodwill and improved reputation generated by Licensee's use of the Software shall inure to the benefit of Licensor. Licensee shall also not register the Software in any forum or in any jurisdiction, and has no right to do so pursuant to this Agreement.

3.2. Copyright and Trade Mark Notices. The copyright and trade mark notices to be provided to Licensee by Licensor, must appear on all versions of the Software and any promotional material promoting the sale of the Products.

3.3 Protection of Rights. Licensee agrees to use commercially reasonable efforts to cooperate fully and in good faith with Licensor, its Affiliates, and others with which Licensor has a contractual relationship for the purpose of securing and preserving the rights of Licensor and its Affiliates rights in and to the Software by executing all documents and, at no cost to Licensee, taking all other acts reasonably necessary to record,

register, or otherwise acknowledge the existence of this License Agreement or the rights granted hereunder to the Software, and by providing such consents, cooperation, and other assistance as Licensor may reasonably request, at no cost to Licensee, to perfect, defend and protect Licensor's and its Affiliates' ownership interest in the Software. Specifically, in the event Licensor undertakes any prosecution or litigation relating to the Software, Licensee shall execute any and all documents, reasonably cooperate with Licensor at Licensor's cost, and otherwise do such other acts and things as, in the reasonable opinion of counsel for Licensor, may be necessary to carry out such prosecution or litigation.

3.4 Enforcement. In the event that Licensee becomes aware of any unauthorized use of the Software or dilution of any of its associated marks, Licensee shall promptly notify Licensor of such use or dilution, as the case may be. Licensor may take any action that it deems necessary to protect its rights, and Licensee shall assist Licensor, at Licensor's cost and expense, to the extent reasonably necessary in order to protect Licensor's rights in and to the Software.

4. CONFIDENTIALITY

4.1 Obligations of Confidentiality. Except as otherwise expressly provided for in this License Agreement, Licensee shall keep confidential any and all information, whether such information is furnished in oral, electronic, or written form, that is not generally available to the public as well as the terms, conditions and provisions set forth in this License Agreement (all such information shall be collectively referred to herein as the "Confidential Information"), and shall not disclose to any Person, directly or indirectly, any Confidential Information, provided, however, that the foregoing restrictions shall not apply to any information disclosed hereunder if Licensee can demonstrate that such Confidential Information (i) is or hereafter becomes generally available to the public other than by reason of any breach hereof; (ii) was already known to Licensor as shown by written records; or (iii) is disclosed to Licensor by a third party who has the right to disclose such information. For the avoidance of doubt, the Software shall at all times be the Confidential Information of Licensor.

4.2. Disclosure Required by Order. If required by order of any government authority, Licensee may disclose to such authority Confidential Information to the extent required by such order, provided that Licensee shall have first notified Licensor of such order and Licensee shall have used its reasonable best efforts to maintain the confidentiality of such Confidential Information.

4.3. Effort. Licensee shall deal with the Confidential Information so as to protect it from disclosure with a degree of care not less than that used by it in dealing with its own information intended to remain exclusively within its knowledge and shall take reasonable steps to minimize the risk of disclosure of Confidential Information.

4.4. Injunctive Relief. Licensee acknowledges and agrees that due to the unique nature of the Confidential Information, there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach may allow third parties to unfairly compete with Licensor resulting in irreparable harm to Licensor, and, therefore, that upon any such breach or any threat thereof, Licensor shall be entitled to obtain appropriate equitable relief in addition to whatever remedies it might have at law and to be indemnified by Licensee from any loss or harm, including, without limitation, lost profits and attorneys' fees, in connection with any breach or enforcement of Licensee's

obligations hereunder or the unauthorized use or release of any such Confidential Information.

5. **REPRESENTATIONS AND WARRANTIES; COVENANTS**

5.1. Representations and Warranties. Each Party covenants that it has the right to enter into this License Agreement and will continue to have throughout the Term the full right to perform its respective obligations hereunder.

5.2. No Other Representations. EXCEPT AS SPECIFICALLY PROVIDED IN THIS LICENSE AGREEMENT, NEITHER PARTY MAKES ANY OTHER REPRESENTATION, WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, UPON WHICH THE OTHER PARTY MAY RELY. NEITHER PARTY ASSUMES ANY LIABILITY OR OBLIGATION TO THE OTHER PARTY BY PROVIDING OR DENYING ANY WAIVER, APPROVAL, AGREEMENT OR SUGGESTION IN CONNECTION WITH THIS LICENSE AGREEMENT.

6. **TERM AND TERMINATION**

6.1. Term. Unless earlier terminated as provided herein, the term of this License Agreement (the "Term") shall commence on the Effective Date and shall continue for a period of two (2) years, subject to renewal on an annual basis with the mutual consent of the Parties.

6.2. Termination.

(a) Licensor or Licensee may terminate this License Agreement at any time and for any reason upon providing thirty (30) days' notice to the other Party.

(b) If one Party is in default of any obligation contained in this License Agreement, and the non-defaulting Party serves upon the defaulting Party notice in writing requiring the default to be remedied within thirty (30) days of the date of such notice, or such greater number of days as the non-defaulting Party may in its discretion allow, and the defaulting Party fails to comply with such notice, then the non-defaulting Party may immediately terminate this License Agreement by notice in writing to the defaulting Party.

6.3. Licensee's Obligations Upon Termination or Expiration of Agreement. Upon termination of this License Agreement, Licensee shall undertake the following:

(a) Immediately cease all use of the Software and the Confidential Information in Licensee's possession or under its control;

(b) Return to Licensor all documentation relating to or tangible embodiments of the Software and all products and materials bearing any portion of the Software in its possession or under its control received pursuant to this License Agreement;

(c) Return to Licensor all Licensor Confidential Information, and copies thereof received pursuant to this License Agreement, in Licensee's possession or under its control, and upon Licensor's request, have an executive from Licensee execute an affidavit attesting to the completion of the foregoing; and

(d) Upon Licensor's request, have an executive from Licensee execute an affidavit attesting to the completion of the foregoing.

6.4. Survival of Terms. Termination of this License Agreement for any reason shall not affect those obligations which, from the context hereof, are intended to survive termination of this License Agreement, including, without limitation, the provisions set forth in Sections 3, 4, 6.3, 6.4, 6.5, 6.6, 7, and 8 hereof.

6.5. Survival of Rights Properly Granted to Sub-Licensees. In the event this License Agreement expires or is terminated for any reason, all sublicenses properly granted by Licensee to any Person in accordance with this License Agreement prior to such expiration or termination shall remain in effect in accordance with the terms of each sublicense until the end of the then-current term of each such sublicense, subject to the payment of any fees or fulfillment of any other responsibilities under the sublicense by the sublicensee. Accordingly, with respect to such sublicense and upon expiration of this License Agreement or upon termination of this License Agreement pursuant to the terms of this License Agreement, the applicable provisions of this License Agreement shall survive with respect to and in order to make effective any such sublicenses properly granted under this License Agreement in accordance with their terms. However, Licensee shall have no right to renew or extend any sublicense and any right to grant new licenses shall cease upon termination or expiration of this License Agreement. Moreover, any right to extend or renew any sublicense shall be at the discretion of Licensor. Immediately upon any termination or expiration of this License Agreement, Licensee will provide Licensor with a report on and a description of all surviving sublicenses.

## 7. CONSIDERATION

7.1. Royalty. In consideration of the right to use and commercialize the Software under this License Agreement, Licensor agrees that the rights granted pursuant to this Agreement shall be royalty-free until January 31, 2019, and thereafter Licensee agrees to pay Licensor a royalty equal to ten percent (10%) of all payments received by Licensee for the use of the Software by sublicensees pursuant to this License Agreement, less any credits, refunds, taxes or deductions (the "Royalty").

7.2. Invoicing and Payments. The Royalty payments shall be made to Licensor at the address specified below, in "Notices" below on a calendar quarterly basis, specifically, on or before the last day of the month after quarter end during the Term of this Agreement.

7.3. Reporting and Audit. During the Term of this Agreement, Licensee shall provide to Licensor written quarterly reports at the address specified under "Notices" below, setting forth Licensee's monthly net payments for the Software in order for Licensor to verify the amount of the Royalty payment due to Licensor hereunder. Such reports shall be made concurrently with the quarterly Royalty payments payable to Licensor by Licensee. During the Term of this License Agreement, and no more than once during any given twelve (12) month period, upon reasonable notice and during regular business hours, Licensor or its agent(s) shall have the right to inspect all relevant books and records of Licensee solely in order to verify the amount of the Royalty owed to Licensor under this Agreement. If this License Agreement is terminated when outstanding reports and royalty payments are due and owing to Licensor, such reports and payments shall continue to be made on the foregoing schedule.

7.4. Customer Feedback. As additional consideration for the License, Licensee shall provide to Licensor written feedback from Licensee Customers on their experience using the Software, using customer survey and interview templates provided by PMI. Provision of such feedback shall be made a condition of use of the Software by Licensee Customers. Such Licensee Customer feedback shall be solicited from all Licensee Customers within no more than ten (10) business days following their use of the Software.

## 8. MISCELLANEOUS

8.1. Relationship. In the performance of this License Agreement, the Parties are engaged in independent business, and this License Agreement shall not be deemed to

(a) make either Party a partner, joint venturer, agent or other representative of the other Party, or (b) grant either Party any right of authority to assume or create any obligation in the name or on behalf of the other Party or to accept legal summons or legal process for the other Party. The relationship of the Parties under this License Agreement shall solely be that of licensor and licensee.

8.2. Notices. Notices, statements and other communications to be given under the terms of this License Agreement shall be in writing and delivered (i) by hand against receipt, (ii) by certified or registered mail, postage prepaid, return receipt requested, if applicable, or (iii) by reputable overnight courier service with package tracking capability, addressed to the Parties as follows:

| To Licensor: | To Licensee: |
|---|---|
| Project Management Institute | Workplace Technologies Research, Inc. |
| 14 Campus Boulevard | 3333 Camino del Rio South, Suite 110 |
| Newtown Square, PA 19083 | San Diego, CA 92108 |
| Attn: Brian Weiss | Attn: Lia DiBello |
| Email: brian.weiss@pmi.org | Email: Lia@wtri.com |

or at such other address as is from time to time designated in writing by the Party receiving the notice. Any such notice that is delivered by mail or reputable overnight courier service in accordance herewith shall be deemed received when delivery is received or refused, as the case may be. Additionally, notices may be given by electronic mail with electronic or telephonic confirmation of receipt, provided that an original copy of such transmission shall be delivered to the addressee by reputable overnight courier service by no later than the second business day following such transmission. Electronic mail shall be deemed delivered (A) on the date of such transmission if sent during the receiving Party's normal business hours or (B) on the next succeeding day on which the receiving Party is normally open for business if not sent during the receiving Party's normal business hours.

8.3. Waiver. The failure or delay of any Party to insist upon strict performance of any of the terms or provisions of this License Agreement, or to exercise any option, right, or remedy contained in this License Agreement, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by any Party of any term or provision of this License Agreement shall be deemed to have been made unless expressed in writing and signed by such Party.

8.4. Partial Invalidity. If any portion of any term or provision of this License Agreement, or the application thereof to any Party or circumstance shall be invalid or unenforceable, at any time or to any extent, the remainder of this License Agreement, or the application of such term or provision to Parties or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this License Agreement shall be valid and enforced to the fullest extent permitted by law.

8.5. Further Assurances. From time to time after the execution of this License Agreement, each Party will execute and deliver such other instruments of conveyance, assignment, transfer and delivery and take such other action as the other Party may reasonably request in order to consummate the transactions contemplated hereby.

8.6. Governing Law; Submission to Jurisdiction. This License Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth

of Pennsylvania applicable to parties residing in the Commonwealth of Pennsylvania, without regard to applicable principles of conflicts of law. Each of the Parties irrevocably consents to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania or, if such court does not have jurisdiction, any Pennsylvania state court located in or with jurisdiction in Delaware County, in connection with any matter based upon or arising out of this License Agreement or the transactions contemplated hereby and agrees that process may be served upon it in any manner authorized by the laws of the Commonwealth of Pennsylvania for such Persons and waives and covenants not to assert or plead any objection which it might otherwise have to such jurisdiction and such process.

8.7. Entire Agreement. This License Agreement, constitutes the entire agreement between the Parties hereto on the subject matter hereof and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements, and understandings, whether oral or written or express or implied, with respect to the subject matter hereof. This License Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective Affiliates, representatives, successors and permitted assigns, in accordance with the terms hereof. Any amendment, change or modification to this License Agreement shall be void unless in writing and signed by all Parties hereto.

8.8. Assignability. Licensee may not assign this License Agreement without the prior written consent of Licensor.

8.9. Counterparts. This License Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument. Such executed counterparts may be delivered by facsimile or electronic mail which, upon transmission to the other party, shall have the same force and effect as delivery of the original signed counterpart.

8.10. Interpretation. Headings of articles and sections are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular articles or sections to which they refer.

**IN WITNESS WHEREOF,** the Parties have caused this License Agreement to be executed and delivered as of the day and year first above written.

| **LICENSEE:** | **LICENSOR:** |
|---|---|
| **WORKPLACE TECHNOLOGIES RESEARCH, INC.** | **PROJECT MANAGEMENT INSTITUTE, INC.** |
| By: [signature] | By: [signature] |
| Lia DiBello | Mark A. Langley |
| President & Director of Research | President & Chief Executive Officer |

# EXHIBIT 6

98 EXHIBIT 6

Exhibit "A"

LICENSE AGREEMENT

This LICENSE AGREEMENT ("License Agreement") dated December 15, 2016 (the "Effective Date"), is by and between Workplace Technologies Research, Inc. ("Licensee"), a Delaware corporation with a principal address of 3333 Camino del Rio South, Suite 110, San Diego, CA 92108, and Project Management Institute, Inc. ("Licensor"), a Pennsylvania corporation with a principal address at 14 Campus Boulevard, Newtown Square, PA 19073. Licensor and Licensee are referred to herein individually as a "Party" and together as the "Parties."

**RECITALS:**

Licensor has purchased from Licensee certain Software pursuant to a Software Development and Purchase Agreement dated September 8, 2015 (the "Purchase Agreement).
Licensor wishes to exploit the Software fully, and Licensee wishes to make the Software available to its customers ("Customers") for their use in connection with organizational team training and development programs offered by such Customers to persons employed by them in the field of project, program and portfolio management (" Project Management Corporate Programs"); and

Licensor agrees to grant, and Licensee agrees to obtain, a right to license copies of the Software (in executable code form) and a license to use such Software solely in connection with the Business as defined below, on the terms and conditions set forth herein.

THEREFORE, in consideration of the mutual covenants contained in this License Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties hereto agrees as follows:

1. DEFINITIONS

In addition to any other terms defined in this License Agreement, the following terms when used in this License Agreement shall have the meanings indicated:

1.1. Affiliate means, with respect to any referenced Person, any other Person, which directly or indirectly controls, is controlled by, or is under common control with such referenced Person, where "control" means ownership, directly or indirectly, of a majority in interest of the voting interests in such Person, or possession of the right to control management of such referenced Person.

1.2. Business means the distribution, marketing, and licensing of the Software to customers of Licensee for their use in Project Management Corporate Programs and use thereof by Licensee in the conduct or facilitation of Project Management Corporate Programs.

1.3. Customer Personnel means employees and contract personnel of Licensee Customers.

1.4. Distribution Channels means retail distribution channels in the Territory, including without limitation distribution directly to end-users, and sub-licenses to third party distributors.

1.5. Improvements means any developments of, improvements to, additions to modifications of, derivatives of, or alterations to the Software, including any inventions or works, or any associated rights thereto.

1.6. Licensor Customer means a Person as to whom Licensor seeks to enter or has entered into a license, sale or other agreement for the use of the Software.

1.7. Promotional Materials means any documents and materials including manuals and packaging of the Software, advertising, promotional, display and/or other such marketing materials of or concerning the Software furnished by Licensor to Licensee and which Licensee shall use in conjunction with the distribution of the Software and for promotional purposes only.

1.8. Person means a partnership, a joint venture, a firm, a company, a corporation, a government or any department or agency thereof, a trustee, a trust, an unincorporated organization or any other legal entity of whatever kind or nature.

1.9. Personnel means employees and contract personnel of Licensee

1.10. Project Management Corporate Programs means those programs, training, education, or development opportunities offered by customers of Licensee to Customer Personnel who are engaged in project, program or portfolio management.

1.11. Software means the Software as described in the Purchase Agreement.

1.12. Team means groups of Customer Personnel working together on projects, assignments, tasks or development opportunities.

1.13. Territory means on a worldwide basis.

**2. LICENSE**

2.1. License Grant. Licensor hereby grants to Licensee, and Licensee hereby accepts, a non-exclusive, non-transferrable right and license ("License"), on the terms and conditions set forth in this Agreement during the Term, to use internally and to further distribute, market, and sublicense, the Software and to reproduce and distribute the Promotional Materials through the Distribution Channels in the Territory in connection with the Business. Licensor further grants to Licensee the right use and distribute the Software in pre-market ready, non-final format, to conduct pilot tests of the Software and to offer a limited number of opportunities for Customers to use and provide feedback on the Software.

2.2 Restrictions. Except as necessary to service Customers in the ordinary course of Business or as may otherwise be contemplated by this License Agreement, Licensee may not (i) use, copy, store, reproduce, transmit, distribute, display, rent, lease, sell, modify, alter, license, sublicense, or commercially exploit the Software (or any part thereof) in any manner not permitted by this License Agreement; (ii) reverse engineer, decompile, disassemble, translate, or create any derivative work of the Software (or any part thereof); (iii) access, link to, or use any source code from the Software (or any part thereof); (iv) erase or remove any proprietary or intellectual property notice contained in or on the Software (or any part thereof); or (v) use or permit use of the Software (or any part thereof) for or by any Person or entity. In addition, Licensee shall not enter into any contractual relationship or other legally binding obligation with any third party or person, including without limitation any Licensor Customer, which shall have the purpose or effect of encumbering Licensor or the use of the Software, or any part thereof, or interfering with Licensor relationships or business arrangements with Licensor Customers.

2.3 Reservation of Rights. Licensor reserves all other rights, title, and interest not expressly granted herein.

2.4 Delivery of Software. Promptly after the Effective Date, Licensor will provide or make available to Licensee a copy or available tangible embodiment of any Software licensed under this License Agreement as reasonably requested by Licensee.

2.5 Licensee Commercial Effort. Licensee shall at all times use reasonable commercial endeavors to market the Software and stimulate and increase interest in the Software within the Territory for the purposes and uses described herein, subject to any limitations set forth in Section 2.2. In particular and without limiting the generality of the foregoing, Licensee shall at its own cost and expense: a) maintain adequate promotional and office facilities and a trained staff within the Territory b) submit for Licensor's prior written approval any marketing materials produced by Licensee, such approval not to be unreasonably withheld. Licensee shall ensure that all such commercial efforts are consistent with any Licensor marketing directives as communicated in writing by Licensor to Licensee.

2.6 Notice of Customer Engagements and Sub-Licenses. When Licensee enters into any Customer use or license agreements, sub-licenses or distributor agreements related to the Software, Licensee shall give notice to Licensor of any and all such Customer agreements, sub-licenses or distributor agreements, and shall provide to Licensor the name, address, principal contact person and summary of material terms of the agreement with and for the Customer, sub-licensee or distributor. Notice under this Section shall be provided within ten (10) business days prior to Licensee's entering into the Customer agreement, sub-license or distributor agreement, and Licensor reserves the right to deny Licensee permission to enter into any such agreement or sub-license. This Section 2.6 shall not be construed to require notice of the transfer of Software to end-users pursuant to a standard form of license or a "shrink-wrap" license between Licensor and any such end-user.

3. **PROPRIETARY RIGHTS**

3.1. Ownership of the Software. Licensee hereby acknowledges that Licensor is the owner of the Software as provided in the Purchase Agreement, including associated rights thereto and the goodwill and reputation symbolized thereby, and that nothing contained herein shall constitute an assignment of such rights or grant to Licensee of any right, title, or interest therein. Licensee shall have no right and shall not make any Improvements to the Software pursuant to this Agreement. All goodwill and improved reputation generated by Licensee's use of the Software shall inure to the benefit of Licensor. Licensee shall also not register the Software in any forum or in any jurisdiction, and has no right to do so pursuant to this Agreement.

3.2. Copyright and Trade Mark Notices. The copyright and trade mark notices to be provided to Licensee by Licensor, must appear on all versions of the Software and any promotional material promoting the sale of the Products.

3.3 Protection of Rights. Licensee agrees to use commercially reasonable efforts to cooperate fully and in good faith with Licensor, its Affiliates, and others with which Licensor has a contractual relationship for the purpose of securing and preserving the rights of Licensor and its Affiliates rights in and to the Software by executing all documents and, at no cost to Licensee, taking all other acts reasonably necessary to record,

register, or otherwise acknowledge the existence of this License Agreement or the rights granted hereunder to the Software, and by providing such consents, cooperation, and other assistance as Licensor may reasonably request, at no cost to Licensee, to perfect, defend and protect Licensor's and its Affiliates' ownership interest in the Software. Specifically, in the event Licensor undertakes any prosecution or litigation relating to the Software, Licensee shall execute any and all documents, reasonably cooperate with Licensor at Licensor's cost, and otherwise do such other acts and things as, in the reasonable opinion of counsel for Licensor, may be necessary to carry out such prosecution or litigation.

3.4 Enforcement. In the event that Licensee becomes aware of any unauthorized use of the Software or dilution of any of its associated marks, Licensee shall promptly notify Licensor of such use or dilution, as the case may be. Licensor may take any action that it deems necessary to protect its rights, and Licensee shall assist Licensor, at Licensor's cost and expense, to the extent reasonably necessary in order to protect Licensor's rights in and to the Software.

4. CONFIDENTIALITY

4.1 Obligations of Confidentiality. Except as otherwise expressly provided for in this License Agreement, Licensee shall keep confidential any and all information, whether such information is furnished in oral, electronic, or written form, that is not generally available to the public as well as the terms, conditions and provisions set forth in this License Agreement (all such information shall be collectively referred to herein as the "Confidential Information"), and shall not disclose to any Person, directly or indirectly, any Confidential Information, provided, however, that the foregoing restrictions shall not apply to any information disclosed hereunder if Licensee can demonstrate that such Confidential Information (i) is or hereafter becomes generally available to the public other than by reason of any breach hereof; (ii) was already known to Licensor as shown by written records; or (iii) is disclosed to Licensor by a third party who has the right to disclose such information. For the avoidance of doubt, the Software shall at all times be the Confidential Information of Licensor.

4.2. Disclosure Required by Order. If required by order of any government authority, Licensee may disclose to such authority Confidential Information to the extent required by such order, provided that Licensee shall have first notified Licensor of such order and Licensee shall have used its reasonable best efforts to maintain the confidentiality of such Confidential Information.

4.3. Effort. Licensee shall deal with the Confidential Information so as to protect it from disclosure with a degree of care not less than that used by it in dealing with its own information intended to remain exclusively within its knowledge and shall take reasonable steps to minimize the risk of disclosure of Confidential Information.

4.4. Injunctive Relief. Licensee acknowledges and agrees that due to the unique nature of the Confidential Information, there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach may allow third parties to unfairly compete with Licensor resulting in irreparable harm to Licensor, and, therefore, that upon any such breach or any threat thereof, Licensor shall be entitled to obtain appropriate equitable relief in addition to whatever remedies it might have at law and to be indemnified by Licensee from any loss or harm, including, without limitation, lost profits and attorneys' fees, in connection with any breach or enforcement of Licensee's

obligations hereunder or the unauthorized use or release of any such Confidential Information.

5. **REPRESENTATIONS AND WARRANTIES; COVENANTS**

5.1. Representations and Warranties. Each Party covenants that it has the right to enter into this License Agreement and will continue to have throughout the Term the full right to perform its respective obligations hereunder.

5.2. No Other Representations. EXCEPT AS SPECIFICALLY PROVIDED IN THIS LICENSE AGREEMENT, NEITHER PARTY MAKES ANY OTHER REPRESENTATION, WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, UPON WHICH THE OTHER PARTY MAY RELY. NEITHER PARTY ASSUMES ANY LIABILITY OR OBLIGATION TO THE OTHER PARTY BY PROVIDING OR DENYING ANY WAIVER, APPROVAL, AGREEMENT OR SUGGESTION IN CONNECTION WITH THIS LICENSE AGREEMENT.

6. **TERM AND TERMINATION**

6.1. Term. Unless earlier terminated as provided herein, the term of this License Agreement (the "Term") shall commence on the Effective Date and shall continue for a period of two (2) years, subject to renewal on an annual basis with the mutual consent of the Parties.

6.2. Termination.

(a) Licensor or Licensee may terminate this License Agreement at any time and for any reason upon providing thirty (30) days' notice to the other Party.

(b) If one Party is in default of any obligation contained in this License Agreement, and the non-defaulting Party serves upon the defaulting Party notice in writing requiring the default to be remedied within thirty (30) days of the date of such notice, or such greater number of days as the non-defaulting Party may in its discretion allow, and the defaulting Party fails to comply with such notice, then the non-defaulting Party may immediately terminate this License Agreement by notice in writing to the defaulting Party.

6.3. Licensee's Obligations Upon Termination or Expiration of Agreement. Upon termination of this License Agreement, Licensee shall undertake the following:

(a) Immediately cease all use of the Software and the Confidential Information in Licensee's possession or under its control;

(b) Return to Licensor all documentation relating to or tangible embodiments of the Software and all products and materials bearing any portion of the Software in its possession or under its control received pursuant to this License Agreement;

(c) Return to Licensor all Licensor Confidential Information, and copies thereof received pursuant to this License Agreement, in Licensee's possession or under its control, and upon Licensor's request, have an executive from Licensee execute an affidavit attesting to the completion of the foregoing; and

(d) Upon Licensor's request, have an executive from Licensee execute an affidavit attesting to the completion of the foregoing.

6.4. Survival of Terms. Termination of this License Agreement for any reason shall not affect those obligations which, from the context hereof, are intended to survive termination of this License Agreement, including, without limitation, the provisions set forth in Sections 3, 4, 6.3, 6.4, 6.5, 6.6, 7, and 8 hereof.

6.5. Survival of Rights Properly Granted to Sub-Licensees. In the event this License Agreement expires or is terminated for any reason, all sublicenses properly granted by Licensee to any Person in accordance with this License Agreement prior to such expiration or termination shall remain in effect in accordance with the terms of each sublicense until the end of the then-current term of each such sublicense, subject to the payment of any fees or fulfillment of any other responsibilities under the sublicense by the sublicensee. Accordingly, with respect to such sublicense and upon expiration of this License Agreement or upon termination of this License Agreement pursuant to the terms of this License Agreement, the applicable provisions of this License Agreement shall survive with respect to and in order to make effective any such sublicenses properly granted under this License Agreement in accordance with their terms. However, Licensee shall have no right to renew or extend any sublicense and any right to grant new licenses shall cease upon termination or expiration of this License Agreement. Moreover, any right to extend or renew any sublicense shall be at the discretion of Licensor. Immediately upon any termination or expiration of this License Agreement, Licensee will provide Licensor with a report on and a description of all surviving sublicenses.

7. CONSIDERATION

7.1. Royalty. In consideration of the right to use and commercialize the Software under this License Agreement, Licensor agrees that the rights granted pursuant to this Agreement shall be royalty-free until January 31, 2019, and thereafter Licensee agrees to pay Licensor a royalty equal to ten percent (10%) of all payments received by Licensee for the use of the Software by sublicensees pursuant to this License Agreement, less any credits, refunds, taxes or deductions (the "Royalty").

7.2. Invoicing and Payments. The Royalty payments shall be made to Licensor at the address specified below, in "Notices" below on a calendar quarterly basis, specifically, on or before the last day of the month after quarter end during the Term of this Agreement.

7.3. Reporting and Audit. During the Term of this Agreement, Licensee shall provide to Licensor written quarterly reports at the address specified under "Notices" below, setting forth Licensee's monthly net payments for the Software in order for Licensor to verify the amount of the Royalty payment due to Licensor hereunder. Such reports shall be made concurrently with the quarterly Royalty payments payable to Licensor by Licensee. During the Term of this License Agreement, and no more than once during any given twelve (12) month period, upon reasonable notice and during regular business hours, Licensor or its agent(s) shall have the right to inspect all relevant books and records of Licensee solely in order to verify the amount of the Royalty owed to Licensor under this Agreement. If this License Agreement is terminated when outstanding reports and royalty payments are due and owing to Licensor, such reports and payments shall continue to be made on the foregoing schedule.

7.4. Customer Feedback. As additional consideration for the License, Licensee shall provide to Licensor written feedback from Licensee Customers on their experience using the Software, using customer survey and interview templates provided by PMI. Provision of such feedback shall be made a condition of use of the Software by Licensee Customers. Such Licensee Customer feedback shall be solicited from all Licensee Customers within no more than ten (10) business days following their use of the Software.

8. MISCELLANEOUS

8.1. Relationship. In the performance of this License Agreement, the Parties are engaged in independent business, and this License Agreement shall not be deemed to

(a) make either Party a partner, joint venturer, agent or other representative of the other Party, or (b) grant either Party any right of authority to assume or create any obligation in the name or on behalf of the other Party or to accept legal summons or legal process for the other Party. The relationship of the Parties under this License Agreement shall solely be that of licensor and licensee.

8.2. Notices. Notices, statements and other communications to be given under the terms of this License Agreement shall be in writing and delivered (i) by hand against receipt, (ii) by certified or registered mail, postage prepaid, return receipt requested, if applicable, or (iii) by reputable overnight courier service with package tracking capability, addressed to the Parties as follows:

| To Licensor: | To Licensee: |
|---|---|
| Project Management Institute | Workplace Technologies Research, Inc. |
| 14 Campus Boulevard | 3333 Camino del Rio South, Suite 110 |
| Newtown Square, PA 19083 | San Diego, CA 92108 |
| Attn: Brian Weiss | Attn: Lia DiBello |
| Email: brian.weiss@pmi.org | Email: Lia@wtri.com |

or at such other address as is from time to time designated in writing by the Party receiving the notice. Any such notice that is delivered by mail or reputable overnight courier service in accordance herewith shall be deemed received when delivery is received or refused, as the case may be. Additionally, notices may be given by electronic mail with electronic or telephonic confirmation of receipt, provided that an original copy of such transmission shall be delivered to the addressee by reputable overnight courier service by no later than the second business day following such transmission. Electronic mail shall be deemed delivered (A) on the date of such transmission if sent during the receiving Party's normal business hours or (B) on the next succeeding day on which the receiving Party is normally open for business if not sent during the receiving Party's normal business hours.

8.3. Waiver. The failure or delay of any Party to insist upon strict performance of any of the terms or provisions of this License Agreement, or to exercise any option, right, or remedy contained in this License Agreement, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by any Party of any term or provision of this License Agreement shall be deemed to have been made unless expressed in writing and signed by such Party.

8.4. Partial Invalidity. If any portion of any term or provision of this License Agreement, or the application thereof to any Party or circumstance shall be invalid or unenforceable, at any time or to any extent, the remainder of this License Agreement, or the application of such term or provision to Parties or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this License Agreement shall be valid and enforced to the fullest extent permitted by law.

8.5. Further Assurances. From time to time after the execution of this License Agreement, each Party will execute and deliver such other instruments of conveyance, assignment, transfer and delivery and take such other action as the other Party may reasonably request in order to consummate the transactions contemplated hereby.

8.6. Governing Law; Submission to Jurisdiction. This License Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth

of Pennsylvania applicable to parties residing in the Commonwealth of Pennsylvania, without regard to applicable principles of conflicts of law. Each of the Parties irrevocably consents to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania or, if such court does not have jurisdiction, any Pennsylvania state court located in or with jurisdiction in Delaware County, in connection with any matter based upon or arising out of this License Agreement or the transactions contemplated hereby and agrees that process may be served upon it in any manner authorized by the laws of the Commonwealth of Pennsylvania for such Persons and waives and covenants not to assert or plead any objection which it might otherwise have to such jurisdiction and such process.

8.7. Entire Agreement. This License Agreement, constitutes the entire agreement between the Parties hereto on the subject matter hereof and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements, and understandings, whether oral or written or express or implied, with respect to the subject matter hereof. This License Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective Affiliates, representatives, successors and permitted assigns, in accordance with the terms hereof. Any amendment, change or modification to this License Agreement shall be void unless in writing and signed by all Parties hereto.

8.8. Assignability. Licensee may not assign this License Agreement without the prior written consent of Licensor.

8.9. Counterparts. This License Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument. Such executed counterparts may be delivered by facsimile or electronic mail which, upon transmission to the other party, shall have the same force and effect as delivery of the original signed counterpart.

8.10. Interpretation. Headings of articles and sections are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular articles or sections to which they refer.

**IN WITNESS WHEREOF,** the Parties have caused this License Agreement to be executed and delivered as of the day and year first above written.

**LICENSEE:**

**WORKPLACE TECHNOLOGIES RESEARCH, INC.**

By: Lia DiBello

Lia DiBello
President & Director of Research

**LICENSOR:**

**PROJECT MANAGEMENT INSTITUTE, INC.**

By: Mark A. Langley

Mark A. Langley
President & Chief Executive Officer

# EXHIBIT 7
# FILED UNDER SEAL

# EXHIBIT 8

# FILED UNDER SEAL

# EXHIBIT 9

# FILED UNDER SEAL

# EXHIBIT 10

# FILED UNDER SEAL

# EXHIBIT 11

200 EXHIBIT 11

**In the Matter Of:**

WORKPLACE TECHNOLOGIES V. PROJECT MANAGEMENT

18-CV-1927-JM-MSB

**STERLING CHAMBERLAIN**

*September 25, 2020*

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

WORKPLACE TECHNOLOGIES RESEARCH, INC.,

Plaintiff,

vs.

PROJECT MANAGEMENT INSTITUTE, INC.,

Defendant.

Case No. 18-CV-1927-JM-MSB

PROJECT MANAGEMENT INSTITUTE, INC.,

Counterclaimant,

vs.

WORKPLACE TECHNOLOGIES RESEARCH, INC.; and DOES 1-15 inclusive,

Counterdefendants.

VIDEOTAPED REMOTE PROCEEDING

DEPOSITION OF: STERLING CHAMBERLAIN
TAKEN BY : ERIC J. BAKEWELL, ESQUIRE
Commencing : 9:47 A.M. - 6:39 P.M.
Location : San Diego, California 92130
Day, Date : Friday, September 25, 2020
Reported by : JOLYNE K. ROBERTS, CSR NO. 10823
Pursuant to : Notice
Original to : CODE



APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF AND COUNTERDEFENDANT:

EVERSHEDS SUTHERLAND (US) LLP
12255 El Camino Real
Suite 100
San Diego, California 92130
858/252-6502
BY: SCOTT A. PENNER, ESQUIRE
scottpenner@eversheds-sutherland.com

FOR THE DEFENDANT & COUNTERCLAIMANT:

VENABLE LLP
2049 Century Park East
Suite 2300
Los Angeles, California 90067
310/229-9900
BY: ERIC J. BAKEWELL, ESQUIRE
ejbakewell@venable.com

ALSO PRESENT:

TOM ROWLES, VIDEOGRAPHER



the Phase IIB project. I was not at that meeting. 12:30:46
Q Did -- was WTRI, were they seeking a -- another letter or something from PMI at that point for the Phase IIB work? 12:30:51 12:31:02 12:31:06
A We were seeking a -- a investment of funds from PMI that would be matched 50 cents on the dollar by National Science Foundation. That is what Phase IIB is, for the development of actual product. 12:31:07 12:31:18 12:31:25 12:31:29
Q Was there an amount requested from PMI? 12:31:33
A I believe we asked for $1 million. 12:31:38
Q Did PMI provide that? 12:31:41
A They did. 12:31:44
Q And they provided the letter for NSF, right, for the Phase IIB? 12:31:45 12:31:49
A That -- they provided their agreement. I'm not sure it was just a letter. I -- I don't know exactly what documents they had to produce. We also had to provide the deposit receipts showing that PMI had actually given us the funds. 12:31:52 12:31:56 12:31:59 12:32:03 12:32:09
Q And on that, was there anything that PMI failed to provide for the Phase IIB grant? At least, again, from your knowledge or understanding. 12:32:12 12:32:21 12:32:31
A Not from my knowledge. 12:32:32
Q Okay. So were there other corporate sponsors of Phase IIB? 12:32:34 12:32:40



this Development Agreement.

Q BY MR. BAKEWELL: Was there anything else that WTRI needed to do with respect to -- to its portion or its contribution?

MR. PENNER: Objection. Outside the scope.

You can answer, if you know.

THE WITNESS: The virtual world product that PMI wanted required that WTRI work with PMI to develop a script to develop an actual environment; what was in it; what did it look like; what interactions did avatars have with each other and with the nonplayer characters; what was the text that was fed back and forth; what data was captured; what questions were asked; and how that was scored. All of that needed to be done.

Q BY MR. BAKEWELL: And the things that you identified in that last answer, were those obligations of PMI to develop?

A The obligation of PMI was to provide to us their subject matter experts so that they could give us the requirements; what -- what challenges should be given to the users; what would be a expert response as opposed to a novice response to those challenges. All of that information had to be gathered from PMI in order to have the virtual world perform the function that they wanted to perform.

Q And I understand, and I appreciate that. The part I'm not understanding, the part I'm trying to ask you about is it sounded to me from your prior testimony -- once again, it is what it is; I don't want to quote it.

But it sounded to me from your prior testimony like there was still some work that needed to be done to what you had identified as the WTRI contribution. And what I'm trying to figure out is whose responsibility was it to do that work, that further work? Was it PMI's, or was it WTRI's?

A It was WTRI's responsibility to do the work that WTRI had to do. It was PMI's responsibility to provide us with the data that was needed in order to do that work.

It was also PMI's responsibility to take the product that we were developing with the content in it and provide it on a user platform that could accommodate 200,000 simultaneous users.

Q The software that was being developed here, did that come out of --

THE REPORTER: I'm sorry, did that come out of?

Q BY MR. BAKEWELL: Did that go by the name of Alpha?

THE REPORTER: Thank you.

14:42:25 14:42:28 14:42:31 14:42:39 14:42:42 14:42:43 14:42:46 14:42:51 14:42:55 14:43:00 14:43:07 14:43:09 14:43:13 14:43:18 14:43:22 14:43:25 14:43:32 14:43:36 14:43:41 14:43:53 14:43:56 14:44:03 14:44:05 14:44:06



that PMI did? 18:30:22

A I would have to refresh my memory. I am not the expert on doing the market study. 18:30:23 18:30:27

Q Who would be the expert? 18:30:29

A Dr. Lehmann. 18:30:30

Q Do you know if there was a market study done in 2017? 18:30:32 18:30:37

A I do not. 18:30:37

MR. PENNER: Mr. Rowles, what do you have in terms of time left on the record? 18:30:38 18:30:40

MR. BAKEWELL: He's got like 6 hours and 55 minutes, but Mr. Rowles, you can confirm that. 18:30:42 18:30:45

THE VIDEOGRAPHER: One moment, please. 18:30:49

MR. PENNER: You can keep going while he's looking it up, calculating. 18:30:51 18:30:53

MR. BAKEWELL: It's okay. It's fine. 18:30:55

Q BY MR. BAKEWELL: Do you have any -- any awareness of PMI trying to sabotage the project with WTRI? 18:30:57 18:31:04 18:31:11

A No, I do not. 18:31:12

THE VIDEOGRAPHER: 413 minutes on the record. 18:31:22

MR. BAKEWELL: I'm sorry, I can't hear you, Mr. Rowles. What was that? 18:31:28 18:31:28

THE VIDEOGRAPHER: 413 minutes on the record. 6.8 hours. 18:31:29 18:31:35



CERTIFICATE OF

CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter of the State of California does hereby certify:

That the foregoing proceeding was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof;

That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date: October 6, 2020

JOLYNE K. ROBERTS,
CSR NO. 10823

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)



DEPOSITION ERRATA SHEET

WITNESS NAME: Mr. Sterling Chamberlain

DATE OF DEPOSITION: September 25, 2020

| PAGE | LINE | CHANGE |
|---|---|---|
| 4 | 23 | Replace "Workplace -" with "Workplace Technologies Research Inc" [Transcription Error] |
| 33 | 18 | Replace "paper bay stands" with "paper bus histories" [Transcription Error] |
| 41 | 5 | Replace "Brown Mountain Mining - Brown" with "Round Mountain Mining - Round" [Transcription Error] |
| 56 | 23 | Replace "I -" with "he" [Transcription Error] |
| 56 | 24 | Replace "as" with "was" [Transcription Error] |
| 64 | 20 | Replace "solicitation" with "elicitation" [Transcription Error] |
| 75 | 12 | Replace "PanGIA" with "Pangea" [Transcription Error] |
| 140 | 7 | Replace "CDP" with "CVP" [Transcription Error] |
| 142 | 19 | Replace "Brad Wardell" with "Brad Laudell" [Transcription Error] |
| 145 | 1 | Replace "Brad Wardell" with "Brad Laudell" [Transcription Error] |
| 169 | 22 | Replace "evert" with "event" [Transcription Error] |
| 208 | 20 | Replace "Promium" with "Proteum" [Transcription Error] |
| 208 | 25 | Replace "Promium" with "Proteum" [Transcription Error] |
| 209 | 2 | Replace "Promium" with "Proteum" [Transcription Error] |
| 226 | 15 | Replace "Nola" with "Lola" [Transcription Error] |
| 235 | 1 | Replace "up" with "off" [Transcription Error] |
| 236 | 20 | Replace "skill" with "scale" [Transcription Error] |

SIGNATURE: [signature] DATE: Oct. 26, 2020

45316080.1

DEPOSITION ERRATA SHEET

WITNESS NAME: Mr. Sterling Chamberlain

DATE OF DEPOSITION: September 25, 2020

| PAGE | LINE | CHANGE |
|---|---|---|
| 236 | 24 | Replace "skill" with "scale" [Transcription Error] |

SIGNATURE: [signature] DATE: Oct. 26, 2020

# EXHIBIT 12
# FILED UNDER SEAL

# EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

237

EXHIBIT 14



Planet Depos
We Make It Happen™

HIGHLY CONFIDENTIAL SOURCE CODE PURSUANT TO PROTECTIVE ORDER

# Transcript of Chris Mancus, Corporate Representative

**Date:** March 11, 2021
**Case:** Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| WORKPLACE TECHNOLOGIES | : | Case No. |
| RESEARCH, INC., | : | 3:18-cv-01927-JM-MSB |
| Plaintiff, | : | HIGHLY CONFIDENTIAL |
| v. | : | ATTORNEYS' EYES ONLY |
| PROJECT MANAGEMENT INSTITUTE, | : | VIDEOTAPED |
| INC., | : | DEPOSITION OF |
| Defendant. | : | PROJECT MANAGEMENT |
| | : | INSTITUTE, INC., BY |
| PROJECT MANAGEMENT INSTITUTE, | : | AND THROUGH THEIR |
| INC., | : | CORPORATE |
| Counterclaimant, | : | REPRESENTATIVE CHRIS |
| v. | : | MANCUS |
| WORKPLACE TECHNOLOGIES | : | CONDUCTED VIRTUALLY |
| RESEARCH, INC.; and DOES 1-15 | : | Thursday, |
| inclusive, | : | March 11, 2021 |
| Counterdefendants. | : | 6:12 a.m. PST |

- - - - - - - - - - - - - - - - - - -x

Job No.: 357683

Pages: 1 - 166

Reported By: Charlotte Lacey, RPR, CSR No. 14224

EXHIBIT 14

Highly Confidential Source Code
Transcript of Chris Mancus, Corporate Representative
Conducted on March 11, 2021 2

VIDEOTAPED DEPOSITION OF PROJECT MANAGEMENT INSTITUTE, INC., BY AND THROUGH THEIR CORPORATE REPRESENTATIVE CHRIS MANCUS, CONDUCTED VIRTUALLY.

Pursuant to notice, before Charlotte Lacey, Certified Shorthand Reporter in and for the State of California.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

240 EXHIBIT 14

Highly Confidential Source Code
Transcript of Chris Mancus, Corporate Representative
Conducted on March 11, 2021 3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF WORKPLACE TECHNOLOGIES RESEARCH, INC.:

SCOTT A. PENNER, ESQUIRE
EVERSHEDS SUTHERLAND (US) LLP
12255 El Camino Real, Suite 100
San Diego, California 92130
(858) 252-2510

ON BEHALF OF DEFENDANT PROJECT MANAGEMENT INSTITUTE, INC.:

ERIC J. BAKEWELL, ESQUIRE
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, California 90067
(310) 229-9900

ALSO PRESENT:

Drew Halton, Videographer
Jordan Collins, AV Technician

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
241 EXHIBIT 14

A Yes. 06:41:35

Q Okay. What is Subversion? 06:41:35

A It's a source code repository tool. 06:41:37

Q And have you often heard those referred to as SV, as in Victor, N, as in Nancy, repositories? 06:41:40 06:41:44

A Yes. 06:41:49

Q So if I refer to an SVN repository, you'll understand I'm referring to Subversion? 06:41:49 06:41:55

A Yes. 06:41:57

Q Was the source code for the PAL project stored in an SVN repository? 06:41:57 06:42:01

A Yes. 06:42:03

Q Who maintained the SVN repository for the PAL project? 06:42:04 06:42:09

A I do not specifically recall who maintained it. 06:42:09 06:42:11

Q Let me ask it in a different way. As opposed to a person, which company was responsible for hosting the SVN repository? 06:42:12 06:42:14 06:42:19

A PMI. 06:42:21

Q So the source of truth, if you will, was always in PMI's possession; is that correct? 06:42:22 06:42:26

A Correct. 06:42:28

MR. BAKEWELL: Objection; vague, argumentative. 06:42:28 06:42:30

Amazon.

Q Okay. And you don't remember who that was?

A His name shows up in the code check-ins. I don't --

Q The metadata that you have access to, correct?

A Correct.

Q If you look at the WBS section on page 5 there, which you're looking at on the screen, ending in Bates number 265, do you see section 2.4.5 is assigned to Mr. Rossi to do load testing?

A Yes.

Q Do you know -- again, did Mr. Rossi write any code for the project?

A No.

Q Do you know if anyone at PMI or Neudesic wrote code to do load testing?

A I -- from memory, I believe that -- I believe it was a combination of WTRI and Neudesic started to work on a load test harness.

Q Can you open on the source code computer. In the endorsed directory, you'll see 38.pdf.

A Okay.

Q Can you open that up?

A I have it.

(Deposition Exhibit 8 was marked for

Q Is that all right? Okay. 09:16:20

MR. PENNER: Okay. In Exhibit 7, if we can turn to page 15 of the Exhibit B, so the development agreement, which ends in Bates number 275. 09:16:23 09:16:26 09:16:33

Do you see section 2.3.2.3 there that references data warehouse integration? 09:16:53 09:16:57

A Yes. 09:17:00

MR. PENNER: Okay. And if you can turn to the next page, and there's a bullet point 4 there. 09:17:01 09:17:02

Q It says "PMI will develop." Do you see that? 09:17:08

A Yes. 09:17:12

Q Okay. So this is a PMI task under the development agreement, correct? 09:17:13 09:17:16

A Correct. 09:17:18

Q Can you show me were on the source code the code is for this point? 09:17:18 09:17:22

A I don't think we were at the -- at that stage of the project to have that built. 09:17:32 09:17:34

Q Okay. So there was not even back-end code yet for 2.3.2.3, correct? 09:17:35 09:17:39

A Correct. 09:17:42

Q In section -- the next paragraph there's -- it says "for integration." Do you see that? 09:17:44 09:17:53

A I'm sorry. Which section? 09:17:55

Q Sorry. The -- it's the same section, just the 09:17:57

next paragraph. It says, "For integration to" --

A Yes.

Q Do you see that?

A Yes, I see it.

Q And then there's a number 1 and a number 2 there?

A Yes.

Q And, on number 1, it says, "PMI will build a service method that moves new assets to a preestablished drop point." Do you see that?

A Yes.

Q Did PMI write source code for that?

A I don't recall.

Q Do you know where that source code would -- can be found on the source code computer?

A No, not specifically, no.

Q Do you know if it was ever created?

A I don't know.

Q Okay. On page 16 of Exhibit B to the development agreement, which ends in Bates number 276, which is on the screen. You'll see under section 2.3.2.4 it mentions CCRS integration?

A Yes.

Q And then in the text, it says, "PMI will build." Do you see that?

A Yes.
Q So that's a PMI obligation; is that right?
A That is correct.
Q Can you show me where, on the source code computer, the code is for that?
A Again, this is one of those ones where we weren't at that -- at that part of the lifecycle of the project to do that.
Q Okay. There wasn't even back-end code that you had written yet, correct?
A Correct.
Q Okay. On page 16 of exhibit B to the development agreement, ending in Bates number 276. Under section 2.3.2.5, you'll see it's saying "My PMI Profile Integration." Do you see that?
A Yes.
Q And it says "PMI will build services to retrieve and update profile data for use within the software." Do you see that?
A Yeah. Yes.
Q So this is, again, a PMI obligation, correct?
A Correct.
MR. BAKEWELL: Objection; form, foundation, calls for a legal conclusion.
A Correct.

09:19:02 09:19:03 09:19:06 09:19:06 09:19:09 09:19:11 09:19:14 09:19:19 09:19:20 09:19:23 09:19:25 09:19:26 09:19:27 09:19:30 09:19:36 09:19:37 09:19:37 09:19:41 09:19:46 09:19:46 09:19:46 09:19:49 09:19:49 09:19:51 09:19:55

Q It says -- oh. Sorry. Where on the source code is the code for that? 09:20:04 09:20:07
A I know it's here. I'm looking for it. 09:21:59
Okay. If you look at pal.common. 09:23:26
Q Pal.common. Yes. 09:23:34
A And then if you go under the security folder. 09:23:38
Q Okay. 09:23:41
A You will see a file, a CS file, called "Profile Service." 09:23:42 09:23:47
Q Okay. One second. 09:23:47
And is that the code that implements 2.3.2.5? 09:24:04
A That would be the back-end code I was referring to, yes. 09:24:12 09:24:14
Q Okay. One second here. 09:24:15
On page 16 of exhibit -- sorry. 09:24:45
Were there any other files that relate to section 2.3.2.5? 09:24:48 09:24:51
A No. Oh. I'm sorry. You asked the source files that would pertain to that? 09:24:54 09:25:00
Q Correct. 09:25:02
A Well, there's the interface file as well, the associated iProfileService interface in the -- 09:25:03 09:25:07
Q Sorry. But this is the code that actually implements the actual -- 09:25:07 09:25:09
A Correct. 09:25:11

Q Fair enough. Thank you for clarifying.
How do you know that that file performs the functions to -- set forth in 2.3.2.5?
A I believe we have test cases -- integration tests that actually run those, to prove out the connections do work from there to the back-end.
Q Sorry. I just meant is this from your personal knowledge, or is this something that you learned from someone in preparation for your deposition?
A No, something I learned.
Q Who did you learn it from?
A I -- I learned it.
Q As part of your preparation over the last two weeks?
A Yes. Correct.
Q Okay. In section 2.3.2.6 of -- sorry. Let me try that again.
On page 16 of Exhibit B to the development agreement, which ends in Bates number 276, you'll see that it says "Access control integration" under 2.3.2.6.
A Yes.
Q And, again, it says "PMI will build an access control service to determine if a user has purchased access to the software and should be granted access based on the customer access rules established by the

business." Do you see that? 09:26:24
A Yes. 09:26:25
Q That's a PMI obligation under the agreement, correct? 09:26:26 09:26:29
MR. BAKEWELL: Objection -- 09:26:29
A Correct. 09:26:29
MR. BAKEWELL: -- form, foundation, calls for a legal conclusion. 09:26:30 09:26:31
Q Sorry. Can you go ahead and answer. 09:26:33
A Correct. 09:26:34
Q Where's the source code that implements section 2.3.2.6? 09:26:42 09:26:44
A Again, that's access control for product, which we weren't there yet. 09:26:47 09:26:49
Q So there's no even back-end source code for that, correct? 09:26:50 09:26:57
A Correct. 09:26:58
Q So do you see where it then says "WTRI will implement the integration points within the software to grant or restrict access based on the returns from the access control service? 09:27:03 09:27:08 09:27:08 09:27:11
A Yes. 09:27:13
Q So if you didn't build the back-end connections, it would have been hard for WTRI to build the software connections, correct? 09:27:13 09:27:19 09:27:22

MR. BAKEWELL: Objection; form, foundation, calls for a legal conclusion.
A Correct.
Q On page 16 of Exhibit B to the development agreement, which ends in Bates 276, you'll see, under section 2.3.2.7, it says "System status service integration." Do you see that?
A Yes.
Q And it says "PMI will build a system status service to determine whether the system is functioning as intended." Do you see that?
A Yes.
Q That's a PMI obligation, correct?
MR. BAKEWELL: Objection; form, foundation, calls for a legal conclusion.
A Correct.
Q Where is the source code on the source code computer for that?
A There isn't any. It wasn't built yet. We weren't there in the project.
Q So not even any back-end code, correct?
A Correct.
Q On page 16 of Exhibit B to the development agreement, which ends in Bates number 276, you'll see section 2.3.2.8, it says, "labeled CRM notification

09:27:24 09:27:26 09:27:27 09:27:30 09:27:33 09:27:38 09:27:43 09:27:44 09:27:44 09:27:50 09:27:54 09:27:55 09:27:55 09:28:00 09:28:02 09:28:02 09:28:02 09:28:04 09:28:06 09:28:10 09:28:11 09:28:14 09:28:16 09:28:19 09:28:23

service integration." Do you see that?
A Yes.
Q It says "PMI will build a CRM notification service to update a user's CRM profile with e-mails and other communications delivered by the technical solution." Do you see that?
A Yes.
Q That was a PMI obligation?
MR. BAKEWELL: Objection; form, foundation, calls for a legal conclusion.
A Correct.
Q Where is the source code for that on the source code computer?
A Same applies here. We weren't in the project further -- along enough to actually get this wired up.
Q Okay. So you hadn't even built any back-end code for it yet, correct?
A Correct.
Q On page 16 of Exhibit B to the development agreement that ends in Bates number 276, you'll see, under section 2.3.2.9, it says "asset subscriber service integration." Do you see that?
A Yes.
Q And again it says "PMI will build an asset subscriber service that allows for in-world assets to be

09:28:32
09:28:34
09:28:34
09:28:38
09:28:44
09:28:47
09:28:48
09:28:48
09:28:50
09:28:51
09:28:52
09:28:53
09:28:56
09:28:57
09:29:00
09:29:03
09:29:07
09:29:09
09:29:11
09:29:15
09:29:18
09:29:29
09:29:30
09:29:30
09:29:34

modified." Do you see that?
A Yes.
Q That was a PMI obligation, correct?
A Correct.
MR. BAKEWELL: Objection; form, foundation, calls for a legal conclusion.
A Correct.
Q Where is the source code on the source code computer for that?
A Same applies here. We weren't there in the project to do this yet.
Q Okay. So I'm just going to summarize. There is no source code on the source code computer for section 2.3.2.3; is that correct? Sorry.
There's no source code on the source code computer for PMI's obligations for sections 2.3.2.3, correct?
MR. BAKEWELL: Objection; form, foundation, calls for a legal conclusion.
THE WITNESS: Could you scroll up again? I don't -- I don't see that on the screen.
A 2.3.2.3?
Q Correct.
A Correct. We weren't there in the project yet.
Q So let me try that again 'cause there's a --

09:29:38 09:29:38 09:29:38 09:29:42 09:29:42 09:29:43 09:29:43 09:29:44 09:29:46 09:29:47 09:29:50 09:29:51 09:30:07 09:30:10 09:30:17 09:30:19 09:30:27 09:30:27 09:30:29 09:30:30 09:30:32 09:30:35 09:30:38 09:30:38 09:30:40

calls for a legal conclusion.

A Correct. We weren't there in the project yet. 09:31:43

Q And there's no source code on the source code computer for PMI's obligations under section 2.3.2.8; is that correct?

MR. BAKEWELL: Objection. Objection; form, foundation, calls for a legal conclusion.

A Correct. We weren't there on the project yet.

Q And there is no source code on the source code computer for PMI's obligations under section 2.3.2.9; is that correct?

MR. BAKEWELL: Objection; form, foundation, calls for a legal conclusion.

A Correct. We weren't there on the project yet.

Q For each of those answers you said "we weren't there in the project yet." Was there something that said you weren't supposed to start that work yet?

MR. BAKEWELL: Objection; form, foundation.

A There is -- I believe there is -- there was that -- I don't know which spreadsheet it was, but it actually talks about some of these being in a later version, like a Beta or Charlie.

Q Does that mean that you don't even begin development of those things until you reach that phase?

MR. BAKEWELL: Objection; form, foundation.

CERTIFICATE OF SHORTHAND REPORTER

I, Charlotte Lacey, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto subscribed my hand this 23rd of March, 2021.

__________________________________

Charlotte Lacey, RPR, CSR #14224

No. 357683

Re: Deposition of **Chris Mancus, Corporate Representative**
Date: 3/11/2021
Case: Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 8 | 5 | "Alan" should be "Allen" |
| 31 | 20 | Change "caught" to "cut" |
| 98 | 19 | "No JS" should be "Node.js" |
| 100 | 12 | Change "pal.dv.cognitive" to "pal.db.cognitive" |
| 100 | 14 | Change "pal.dv.portal" to "pal.db.portal" |
| 115 | 25 | Change "CAT" to "CAAT" |
| 120 | 17 | Change "CAT to "CAAT" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4/22/2021
(Date)

Christopher A Mancus
(Signature)

EXHIBIT 14

No. 357683

Re: Deposition of **Chris Mancus, Corporate Representative**
Date: 3/11/2021
Case: Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Chris Mancus, Corporate Representative, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

4/22/2021 Christopher A Mancus

(Date) (Signature)

# EXHIBIT 15

257

EXHIBIT 15



pd
Planet Depos
We Make It Happen™

# Transcript of Jesse Sardina, Corporate Designee

**Date:** October 2, 2020

**Case:** Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

------------------------------x

WORKPLACE TECHNOLOGIES :
RESEARCH, INC., :
Plaintiff, : Case No.:
vs. : 3:18-CV-01927-JM-MSB
PROJECT MANAGEMENT INSTITUTE, :
INC., :
Defendant. :

------------------------------x

AND RELATED COUNTER-CLAIM :

------------------------------x

Videotaped Deposition of

PROJECT MANAGEMENT INSTITUTE, INC.

by and through its Corporate Designee

JESSE SARDINA

(Conducted Virtually)

Friday, October 2, 2020

7:31 a.m. PST

Job No.: 325133

Reported by: BRENDA MATZOV, CSR NO. 9243

Transcript of Jesse Sardina, Corporate Designee
Conducted on October 2, 2020 2

Videotaped/videoconference deposition of JESSE SARDINA, taken remotely/virtually in the above-entitled cause pending in the United States District Court, Southern District of California, before BRENDA MATZOV, CSR NO. 9243, and simultaneously in the participants' remote locations, on Friday, the 2nd day of October, 2020, at 7:31 a.m. PST.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
260 EXHIBIT 15

APPEARANCES:

FOR PLAINTIFF and COUNTER-DEFENDANT WORKPLACE TECHNOLOGIES RESEARCH, INC.:

EVERSHEDS SUTHERLAND (US), LLP
By: NICOLA A. PISANO, ESQ.
12255 El Camino Real
Suite 100
San Diego, California 92130
(858) 252-6502
nicolapisano@eversheds-sutherland.com

FOR DEFENDANT and COUNTER-CLAIMANT PROJECT MANAGEMENT INSTITUTE, INC.:

VENABLE, LLP
By: ERIC J. BAKEWELL, ESQ.
2049 Century Park East
Suite 2300
Los Angeles, California 90067
(310) 229-9900
ejbakewell@venable.com

ALSO PRESENT:

CHESTER WONG, Videographer
LEYHBERT SHARP, A/V Technician

A. In my experience on this project in particular, the -- the measures were above and beyond what PMI would apply for confidential information. It was made clear to all -- all PMI personnel involved in the project that the information that was produced as a result of the -- the content elicitation process, the content development process was not to be discussed outside of those within the project, even with other PMI employees.

This was done to protect PMI's process, the -- the outputs of that content elicitation process, and as well to protect the science that WTRI brought to the project in the -- the acceleration of expertise relative to the Dreyfus model.

So anyone who was working on the project was informed at the outset they were not to discuss the details of the project with anybody even within PMI. Exceptions were their supervisor, to the extent that they needed to know what the individual's working on. But any details beyond that should be referred to Victor Carter-Bey as our lead for this effort.

Q. So was there some sort of memo to or

08:08:46 08:08:48 08:08:52 08:08:57 08:09:02 08:09:05 08:09:08 08:09:13 08:09:16 08:09:18 08:09:22 08:09:25 08:09:28 08:09:32 08:09:35 08:09:39 08:09:40 08:09:44 08:09:47 08:09:49 08:09:54 08:09:57 08:10:00 08:10:04 08:10:10

from Carter-Bey that defined the extra level of security to be applied to the information in the WTRI-PMI work?

A. A memo? No. There was -- if I recall correctly -- I'd have to review the materials -- at the -- at the kickoff sessions or the on-boarding sessions with individuals participating in the project, there was content in the communications about the need to maintain confidentiality of what we were working on.

Q. So how did these -- this -- these restrictions go above and beyond what PMI normally does?

A. Those are typically not restrictions that are put in place for any project that we're working on. That's how it goes above and beyond, in my opinion.

Q. Okay. And -- and can you just clarify for me again what those additional restrictions were?

A. The actual formalization of the -- the need to maintain confidentiality for the -- for the particulars of the project. There were also -- also steps taken with third parties to ensure that employees of those third-party vendors

08:10:13 08:10:19 08:10:25 08:10:28 08:10:33 08:10:35 08:10:39 08:10:42 08:10:44 08:10:48 08:10:50 08:10:54 08:10:57 08:10:58 08:10:59 08:11:03 08:11:09 08:11:10 08:11:11 08:11:13 08:11:14 08:11:15 08:11:19 08:11:24 08:11:28

thumb drives.

Q. Mr. Sardina, are you familiar with a term -- with the term "SME," S-M-E?

A. Yes.

Q. What's a SME?

A. A SME is a subject matter expert.

Q. Does PMI ever hire third-party SMEs?

A. Not that I'm aware of. Our -- our SMEs are -- our SMEs are typically volunteers. I think in 100 percent of the cases our SMEs, especially those involved in creating content that we will then re-purpose for products, are volunteers. Volunteers are -- are recruited through our volunteer relationship management system, also known as VRMS.

Any volunteer with PMI must agree to maintain confidential the information that is produced during their engagement with PMI or any -- actually, anything that is done with PMI in their volunteer capacity.

Q. Okay. So there's no -- I'm sorry.

A. To my knowledge, that -- that agreement to maintain confidentiality is recorded within VRMS, as part of their application for the -- for the volunteer opportunity.

08:21:34 08:21:42 08:21:43 08:21:47 08:21:49 08:21:50 08:21:53 08:22:04 08:22:07 08:22:09 08:22:16 08:22:19 08:22:22 08:22:24 08:22:27 08:22:29 08:22:39 08:22:41 08:22:44 08:22:48 08:22:52 08:22:54 08:22:56 08:23:02 08:23:04

Q. Okay. So there's no separate NDA. Instead there's a provision in the -- in the application.
Is that your position?
A. I believe it actually is an NDA that is part of the -- that application process.
Q. Did PMI request any third-party SMEs to participate in the PMI-WTRI development work?
A. Third-party SMEs -- can I ask for a distinction between third-party SMEs and volunteer SMEs?
Q. I -- okay. I'm -- by "third party," I mean somebody that's not actually a -- a PMI employee. So maybe it's the same thing.
A. Okay. Well, I would consider the -- the vendors that we brought into the project, I would consider them third-party SMEs. They were subject matter experts in various disciplines or fields that PMI did not have in-house. There were volunteer SMEs as well, which were involved in creating the content as part of the development effort.
Q. So --
A. That's --
Q. So did PMI recruit volunteers to

08:23:06 08:23:09 08:23:14 08:23:15 08:23:16 08:23:18 08:23:26 08:23:33 08:23:53 08:23:57 08:24:01 08:24:02 08:24:06 08:24:09 08:24:11 08:24:13 08:24:16 08:24:19 08:24:22 08:24:25 08:24:26 08:24:32 08:24:33 08:24:33 08:24:33

this product or this technical solution is what it was termed.

In order to deliver this technical solution, there is project management that needs to take place. There are software that needs to be developed. There's an enterprise architecture that needs to be in place. Test and validation activities need to occur. And then operational readiness needs to be, well, ensured. We need to ensure the -- the -- the org -- organization is ready to accept this in operational capacity. And then we decompose -- we continue that de -- decomposition process until it doesn't make sense to decompose any further.

(Court reporter clarification.)

BY MR. PISANO:

Q. So we have page -- Bates number page 9262 on the -- on the screen. This is not so much an org chart, like with people's names, as it is a clarification of the development or -- or the -- or the -- the responsibilities for components of this project.

Is -- is that fair?

A. No. I would say this is an illustration of the work that needs to take place in order

to deliver this product. In order to deliver the technical -- technical solution, this is the work that needs to be performed.

Q. Okay.

A. Under the auspices of -- in the context of project management, we have to manage requirements. We have to manage designs. We have to govern the review and the acceptance process.

In the context of software creation, we have to build these technical components that consist of core functionality, a virtual world, and user interfaces. So this is a decomposition of the work, not the product itself, and -- and not responsibilities.

The WBS dictionary on the next page takes it a step further to say this box 2.1 means this and the person responsible for ensuring that that takes place, not for performing all of the work under that, but for ensuring it takes place, that responsibility is assigned to so-and-so.

Q. Okay. Good. So -- so if we go to the -- the next page -- and I'm going to ask you to flip back. Hopefully this thing is not sideways now. Of course it is.

responsibility to CVP? 11:55:31

MR. BAKEWELL: Object -- sorry. 11:55:34
Objection. Form. Foundation. Beyond the 11:55:34
scope. And mischaracterizes his testimony 11:55:44
as well. 11:55:49

THE WITNESS: So what PMI did after 11:55:53
we turned over development, I wouldn't say 11:55:55
we ever -- it wasn't like a -- a hand -- 11:56:00

BY MR. PISANO: 11:56:04

Q. Let -- let me retract that -- let 11:56:04
me -- let me -- let me -- just strike that. 11:56:07
Let me -- let me try again. 11:56:08

What did -- what work did PMI do on 11:56:10
the Agile software after it retained CVP to do 11:56:13
the coding? 11:56:20

A. So C -- sorry. PMI was still very 11:56:25
much involved in establishing the -- the 11:56:28
enterprise architecture to enable delivery 11:56:31
of the software to our stakeholders, to our 11:56:35
community, still creating content, managing 11:56:39
the overall delivery of the -- the project to 11:56:41
PMI, operations readiness in the form of -- in 11:56:45
this case, during the services agreement, that 11:56:50
took the form of the pilot operations, essentially 11:56:53
getting things in place so that we could realize 11:56:56

Q. So with respect to -- well, so here in exhibit -- or Section 2.1.4, it says: 11:58:29 11:58:45

"WTRI will identify and manage content development resources." 11:58:46 11:58:52

Do you have an understanding what that is referring to? 11:58:53 11:58:58

A. Yeah. That WTRI was going to also bring in content development SMEs. 11:59:02 11:59:06

Q. Did -- did PMI also bring in SM -- SMEs as part of its work under Exhibit 12? 11:59:13 11:59:18

A. Yes. 11:59:20

Q. And the SMEs, they did the same sorts of things that -- oh, strike that. 11:59:22 11:59:25

The -- what -- what did the SM -- SMEs that PMI recruited, what -- what was their purpose as part of Exhibit 12? 11:59:26 11:59:31 11:59:35

A. It was focused primarily on the rehearsal content itself. If I -- if I remember correctly, the -- the reference to the resources that WTRI was bringing was focused on work that they had actually taken on with Texas Woman's College University -- I think that's the name of the academic institution -- to define and design the dashboard within the virtual world that participants -- either individual or team 11:59:38 11:59:42 11:59:43 11:59:46 11:59:50 11:59:55 11:59:57 12:00:03 12:00:08

participants would review or would have access to review during the rehearsal to give them an indication of how things were progressing.

Q. So let's look at exhibit -- I'm sorry -- Exhibit 12, Section 2.4. Do you see that? It's labeled:

"Promotional Services."

A. Yes.

Q. Okay. So are you familiar with the promotional services that WTRI was required to provide under Exhibit 12?

MR. BAKEWELL: Objection. Form. Foundation. Calls for a legal conclusion. Beyond the scope.

THE WITNESS: I'm familiar with the -- the services that were expected.

BY MR. PISANO:

Q. Okay. Did PMI have any obligations with respect to those promotional services?

MR. BAKEWELL: Objection. Form. Foundation.

THE WITNESS: PMI would have had to make available the opportunity for those promotional activities to take place. Such as in two four -- 2.4.2, it calls out PMI's

12:00:12 12:00:15 12:00:18 12:00:37 12:00:39 12:00:47 12:00:49 12:00:51 12:00:51 12:01:02 12:01:05 12:01:08 12:01:08 12:01:08 12:01:14 12:01:15 12:01:17 12:01:17 12:01:22 12:01:30 12:01:30 12:01:33 12:01:34 12:01:38 12:01:41

Global Congress as an example. That is a -- an event hosted by PMI. So that would have been an obligation of PMI to host that event. 12:01:46 12:01:49 12:01:52

BY MR. PISANO: 12:01:56

Q. Was there someone at PMI who was responsible for, for example, fulfilling that role of identifying opportunities for WTRI to participate in conferences? 12:01:56 12:02:00 12:02:05 12:02:10

A. Yes. And -- and even to consult with WTRI, there was an individual on the project team responsible for that. 12:02:15 12:02:17 12:02:21

Q. Who was that? 12:02:22

A. Her name was Lisa -- Lisa MacGregor. That is M-a-c-G-r-e-g-o-r. 12:02:24 12:02:26

Q. Do you know whether Ms. MacGregor contacted Ms. DiBello about preparing and submitting research papers as listed in 2.4.1? 12:02:37 12:02:39 12:02:45 12:02:48

MR. BAKEWELL: Objection. Form. Foundation. 12:02:50 12:02:50

THE WITNESS: With -- specifically for research papers, I don't know. I do know that Lisa had made attempts to set a time with Lia for consultation on marketing activities but that those attempts were -- were not fruitful. 12:02:54 12:02:55 12:03:00 12:03:05 12:03:10

BY MR. PISANO:

Q. Did you ever get an explanation from WTRI why those attempts at setting up marketing -- marketing activities were not successful?

MR. BAKEWELL: Objection. Form. Foundation. Beyond the scope.

THE WITNESS: I -- I personally did not receive any explanation from -- from WTRI.

BY MR. PISANO:

Q. Was there someone at PMI who's responsible for -- well, let me back up.

Section 2.4.1 says:

"WTRI CEO, Lia DiBello ('Dr. DiBello') will develop for PMI exclusively a derivative of the research paper to be produced for the National Science Foundation."

Do you see that?

A. I do.

Q. Do you know whether she ever did so?

A. I don't know if she produced a -- I don't know if she produced the report for the National Science Foundation. I do not recall ever seeing a derivative of that research paper for PMI.

Q. In Section 2.4.2, Dr. DiBello was

12:03:13 12:03:13 12:03:25 12:03:27 12:03:31 12:03:31 12:03:34 12:03:36 12:03:39 12:03:45 12:03:48 12:03:51 12:03:55 12:04:00 12:04:04 12:04:08 12:04:08 12:04:09 12:04:11 12:04:15 12:04:18 12:04:20 12:04:24 12:04:27 12:04:29

revolve around the misrepresentation with respect to the ability to code the software? 14:45:51 14:45:56

Is that fair? Or were there other aspects? 14:46:01 14:46:03

A. I'd say that's -- that's fair. 14:46:06

Q. So with respect to the 2016 services agreement, was there a misrepresentation of WTRI's ability to do coding? Because they weren't responsible for coding under the 2016 services agreement. 14:46:09 14:46:12 14:46:19 14:46:23 14:46:26

A. Yeah. For the 20 -- 14:46:27

MR. BAKEWELL: Objection. Form. Calls for a legal conclusion. May call for discussions with -- with counsel. 14:46:29 14:46:30 14:46:35

You can answer. 14:46:36

THE WITNESS: I -- I can't -- I can't answer that, for the 2016 services agreement, what would have been a breach of implied covenant of good faith and fair dealing, other than the fact that Lia was -- my understanding is Lia was non-responsive to requests from our marketing representative for consultation. 14:46:37 14:46:41 14:46:43 14:46:46 14:46:50 14:46:57 14:47:02

BY MR. PISANO: 14:47:03

Q. Okay. Let's move on to Topic No. 36, which is: 14:47:03 14:47:06

CERTIFICATE OF REPORTER

I, BRENDA MATZOV, CSR NO. 9243, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was remotely duly sworn by me to testify the truth, the whole truth, and nothing but the truth;

That the foregoing deposition was taken remotely/virtually before me, at which time the aforesaid proceedings were stenographically recorded by me and thereafter transcribed by me;

That the foregoing transcript, as typed, is a true record of the said proceedings;

And I further certify that I am not interested in the action.

Dated this 20th day of October, 2020.

Brenda Matzov
_______________________________
BRENDA MATZOV, CSR NO. 9243

No. 325133

Re: Deposition of **Jesse Sardina, Corporate Designee**
Date: 10/2/2020
Case: Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 249 | 24 | Change "tactical" to "technical" |
| 253 | 15 | Change "Craig" to "Greg" |
| 147 | 20 | Change "Lehman" to "Lehmann" |
| 197 | 7 | Change "Lehman" to "Lehmann" |
| 252 | 16 | Change "Lehman" to "Lehmann" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

11/20/20
(Date)

(Signature)

EXHIBIT 15

No. 325133

Re: Deposition of **Jesse Sardina, Corporate Designee**
Date: 10/2/2020
Case: Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Jesse Sardina, Corporate Designee, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

11/20/20 (Date)

(Signature)

# EXHIBIT 16

277 EXHIBIT 16



pd
Planet Depos
We Make It Happen™

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Transcript of Richard Fincher

**Date:** April 30, 2021
**Case:** Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

________________

| | |
|---|---|
| WORKPLACE TECHNOLOGIES RESEARCH, INC.<br><br>Plaintiff,<br><br>vs.<br><br>PROJECT MANAGEMENT INSTITUTE, INC.<br><br>Defendant. | Case No. 18-CV-1927 JM-MSB |
| PROJECT MANAGEMENT INSTITUTE, INC.<br><br>Counterclaimaint,<br><br>vs.<br><br>WORKPLACE TECHNOLOGIES RESEARCH, INC.; and DOES 1-15, inclusive,<br><br>Counterdefendants. | HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY |

REPORTER'S TRANSCRIPT

REMOTE VIDEOTAPED DEPOSITION OF

RICHARD FINCHER

FRIDAY, APRIL 30, 2021

8:33 a.m. Pacific Standard Time

Reported by: Burgundy B. Ryan, CSR, RPR

Certificate No. 11373

EXHIBIT 16

A P P E A R A N C E S

FOR THE PLAINTIFF:

EVERSHEDS SUTHERLAND LLP
By: SCOTT A. PENNER, Esq.
12255 El Camino Real
San Diego, California 92130-2071
858.252.6458

FOR THE DEFENDANT:

VENABLE LLP
By: NICOLE N. KING, Esq.
2049 Century Park East, Suite 2300
Los Angeles, California 90067
310.229.0427

ALSO PRESENT:

MYLENE SANTIANO, IT Technician
Planet Depos

CHESTER WONG, Videographer
Planet Depos

Exhibit C on top of page nine. 10:05:12

Do you see that? 10:05:14

A Yes, I do. 10:05:15

Q And now on page nine, you state, in that first full paragraph, "These documents are product design documents and" product (sic) "management documents, not contractual documents." 10:05:16 10:05:20 10:05:24 10:05:26

Do you see that? 10:05:29

A Yes, I do. 10:05:30

Q So, again, I want to clarify that it's your opinion that the three exhibits that are attached to the development agreement are not contract documents; is that correct? 10:05:31 10:05:33 10:05:36 10:05:40

A I'm not making a legal interpretation here. So I'm saying that I would not view them, in my experience, as a part of the contractual documents. They were advisory in nature. 10:05:41 10:05:43 10:05:47 10:05:52

Q And do you intend to tell the jury that they were advisory in nature? 10:05:55 10:05:57

A Yes, I would. 10:05:59

Q I just want to make sure we are all talking about the same thing. So if we can put up what is marked as tab B and mark that as Exhibit 3? 10:06:11 10:06:13 10:06:17

And while that is being put into the chat and marked for your display, I will do my read-on for 10:06:20 10:06:21

CERTIFICATE OF STENOGRAPHIC REPORTER

I, BURGUNDY B. RYAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition,

RICHARD FINCHER,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

DATED: Monday, May 3, 2021.

____________________________________

Burgundy B. Ryan, CSR No. 11373, RPR

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 18 | 15 | “basis” not *“bases”* |
| 18 | 17 | “basis” not *“bases”* |
| 21 | 15 | “basis” not *“bases”* |
| 21 | 22 | “basis” not *“bases”* |
| 28 | 17,18 | “Summary of Case Relative Experience: “not *"This is a summary of case relevant (sic) experience."* |
| 54 | 24 | “basis” not *“bases”* |
| 60 | 4 | “in December” not “mid-November” |
| 60 | 7 | “Early December” not “Mid-November” |
| 60 | 8 | “after” not “before” |
| 61 | 12 | “no” not “Approximately, yes” |
| 69 | 6 | “project management” not “*product (sic) management”* |
| 102 | 16 | “basis” not *“bases”* |
| 131 | 10 | “technical debt” not *“technical depth”* |
| 131 | 20 | “technical debt” not *“technical depth”* |
| 131 | 14,15 | “technical debt” not *“technical depth”* |
| 132 | 7 | “technical debt” not *“technical depth”* |
| 132 | 13 | “technical debt” not *“technical depth”* |
| 132 | 15 | “technical debt” not *“technical depth”* |
| 136 | 20 | “Dr. DiBello” not *“Dr. de Villa”* |
| 136 | 23 | “Dr. DiBello” not *“Dr. de Villa”* |
| 147 | 18 | “Dr. DiBello” not *“Dr. de Villa”* |
| 148 | 6 | “basis” not *“bases”* |
| 150 | 5 | “basis” not *“bases”* |
| 166 | 17 | “PMBOK” not *“pinblock”* |
| 169 | 12 | “PAL Project Phases” not *"Powell project phases."* |
| 169 | 20,21 | “Exhibit B Attachment 1 – Technical Solution Development Schedule” not *"Exhibit B, Attachment 1-technical solution development schedule”* |
| 195 | 5 | “Re-platforming” not *“Replatforming”* |
| 195 | 7 | “Re-platforming” not *“Replatforming”* |
| 195 | 25 | “page” not “*paragraph (sic)”* |
| 209 | 15 | “The” not *“Your”* |
| 214 | 6 | “leading” not *“grading”* |
| 237 | 1 | “difficult” not *“direct”* |
| 242 | 24 | “or” not *“her”* |

| 244 | 17 | "Theoretically" not *"Infinitely"* |
|---|---|---|
| 253 | 15 | "person-weeks" not *"persons"* |
| 254 | 5 | "Dr. DiBello" not *"Dr. de Villa"* |
| 254 | 15 | "Dr. DiBello" not *"Dr. de Villa"* |
| 254 | 24 | "Dr. DiBello" not *"Dr. de Villa"* |
| 257 | 9 | "in an encompassing view" not *"over-compassing (sic) your view"* |
| 346 | 11 | "so basically, no" not "but basically, yes" |
| 348 | 25 | "executable software" not "EXE file" |

No. 367485

Re: Deposition of **Richard Fincher**
Date: 4/30/2021
Case: Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Richard Fincher, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_June 03, 2021_____ __Richard Fincher________________

(Date) (Signature)

Richard Fincher

Digitally signed by Richard Fincher
Date: 2021.06.03 12:50:55 -05'00'

# EXHIBIT 17

286 EXHIBIT 17



pd
Planet Depos
We Make It Happen™

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

# Transcript of Betsy Redden, Corporate Designee

**Date:** September 29, 2020

**Case:** Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

\- - - - - - - - - - - - - - x

WORKPLACE TECHNOLOGIES :
RESEARCH, INC., :
Plaintiff, :
v. : Civil Action No.
PROJECT MANAGEMENT : 3:18-cv-01927-JM-MSB
INSTITUTE, INC., :
Defendant. :

\- - - - - - - - - - - - - - x

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Remote Videotaped Deposition of
PROJECT MANAGEMENT INSTITUTE, INC.,
by and through its corporate designee,
BETSY REDDEN
Tuesday, September 29, 2020
10:33 a.m. Eastern

Job No.: 323095
Pages: 1 - 160
Reporter: DEBRA BOLLMAN FARFAN, RMR CRR CRC
CA CSR NO. 11648

Confidential
Transcript of Betsy Redden, Corporate Designee
Conducted on September 29, 2020 2

Videoconference Deposition of BETSY REDDEN, held remotely:

Witness Location:

Philadelphia, Pennsylvania

Pursuant to notice, before Debra Bollman Farfan, Registered Merit Reporter, Certified Realtime Reporter, CRC, and Certified Shorthand Reporter No. 11648, in and for the State of California.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

289 EXHIBIT 17

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF WORKPLACE TECHNOLOGIES RESEARCH, INC.:

JUSTIN GRAY, Esquire
EVERSHEDS SUTHERLAND, LLP
12255 El Camino Real
San Diego, California 92130
1-858-252-2834

ON BEHALF OF THE DEFENDANT PROJECT MANAGEMENT INSTITUTE, INC. and THE WITNESS, BETSY REDDEN:

NICOLE KING, Esquire
VENABLE, LLP
Suite 2300
2049 Century Park East
Los Angeles, California 90067
+1 310.229.0427

ALSO PRESENT:

JUAN F. MAMBOYO, VIDEO TECH

A. No. PAL was just the name of the project. 10:57:01 10:57:07

Q. Did PMI recruit participants for the Alpha pilot program? 10:57:11 10:57:14

A. Yes. 10:57:16

Q. Who at PMI was involved in recruiting participants for the Alpha pilot program? 10:57:18 10:57:22

A. We had a -- a number of people on our team that worked on recruitment. We leveraged our recruitment processes and standardized standardization with our certification team. 10:57:24 10:57:37 10:57:44 10:57:51

So Dawn Harris was one of the folks on the certification team who had a knowledge of how to -- how to recruit, and how to ensure that we had all the right documentations, as well as the people we recruited met the criteria that was set. As well as -- Karen Holloway was involved as well. There was a team of folks that came in and out. 10:57:55 10:58:00 10:58:03 10:58:07 10:58:13 10:58:18 10:58:25 10:58:29

Q. Did you personally work on recruitment for the Alpha pilot program? 10:58:33 10:58:36

A. I managed the team. I didn't do the recruiting. 10:58:38 10:58:43

Q. You mentioned needing the right documentation. What were you referring to 10:58:44 10:58:49

there?

A. There was specific criteria that we would -- would put together for volunteers or volunteers that we were looking for, depending on the different type of role that we needed. So if it was for the Alpha pilot, I can't remember exactly what that criteria is.

But I do know, generally, we would ask if they were a PMP, certified or not. We would ask if they had certain limitations. We would ask if they had done other volunteer activities that might conflict with being a volunteer and things like that. If they'd be willing to sign a confidentiality agreement, NDA.

Q. Did PMI's recruitment efforts for the Alpha pilot program, were they all done internally at PMI, or did PMI have any third parties that also assisted in the process?

A. I believe it was all done internally.

Q. When, approximately, did recruitment efforts for the Alpha pilot program begin?

A. Oh, I -- I can't -- I'd be guessing. I can't remember, I'm sorry.

Q. The recruitment efforts for the Alpha pilot program, were those made to

organizations, or to people in particular, or both?

A. My rec- -- I recall it was originally to individuals, and then I believe we did both. But I'm -- I don't remember the order or the -- in what -- when we started one.

Q. How did PMI select individuals to reach out to to potentially recruit for the Alpha pilot program?

A. For specific groups that we needed actual subject matter experts for that pilot program, which would be working very closely with the instructional designers and providing and validating project management content, we had a much more rigorous -- or not much more, but we just had a different type of recruitment where there would be an interview process, I believe.

We would reach out to our volunteer programs and services area in our -- in PMI, and ask if they had experts that may be interested in working in this type of -- on this type of project, and if they were willing to put in the time commitment. So that was something that was -- was asked throughout the

volunteer programs and services area.

The other recruitment we may have done a call for volunteers through our website, and volunteer looking for -- we have a volunteer area on our website, and we would vet folks through that.

Q. You mentioned subject matter experts. What kind of subject matter experts was PMI looking for?

A. We were looking for subject matter experts in project management, with all different types of background. From the Agile background to -- and some early in their career, some later in their career. So anything that was project management related, we were looking for experts in that -- that area.

Q. So to basically get a wide variety of people to participate in the pilot?

A. Correct. As well as to ensure that we were looking for or standardizing everything across the project management industry.

Q. I believe you mentioned having to meet certain criteria. What type of criteria needed to be met in order for someone to participate

in the Alpha pilot program? 11:03:35

A. I can just give you what I remember. I do not -- I would -- there are -- I don't know what exactly it is today. But I believe we had PMP certified, and we may have said we want to have a certain number of folks who were PMPs, and maybe not PMPs, to ensure that we had some validation, but had some criteria work experience and could reference that. And we would sometimes ask for references, I believe.

So there were certain criteria about that, looking at folks' resumes and things to see if they have the experience in project management.

Q. Approximately how many participants in total were recruited for the Alpha pilot program?

A. The Alpha pilot program overall, I believe, very high estimate would be two to three hundred.

Q. I think you had mentioned that there were at least certain organizations that PMI had reached out to as part of this recruitment process. How did PMI select those organizations to reach out to for the

11:03:41 11:03:45 11:03:48 11:03:52 11:03:56 11:03:59 11:04:03 11:04:08 11:04:12 11:04:14 11:04:17 11:04:20 11:04:22 11:04:23 11:04:29 11:04:31 11:04:32 11:04:39 11:04:44 11:04:45 11:04:58 11:05:01 11:05:04 11:05:07

recruitment?

A. The organizational side was a separate recruitment process than the Alpha pilot program. I did not lead that, per se. We actually ended up hiring someone who took on the organizational side, because that was a big pilot program that worked with Lia.

Q. Who was that that PMI hired to do that?

A. Justin Fahy.

Q. And who does Justin Fahy work for or who did he work for at the time?

A. He reported to Victor. He no longer works at PMI. He was hired specifically for this project. And -- but we were colleagues, and before he came on, you know, I -- you know, we worked together to ensure that, you know, we were a team. We were all going to be successful.

Q. Besides having some individuals with PMP certification, and others that didn't have a PMP certification, were there any other types of criteria that PMI used to recruit participants for the Alpha pilot program?

A. They -- they did. But I can't recall at this time all the different criteria.

11:05:09 11:05:10 11:05:16 11:05:20 11:05:24 11:05:28 11:05:33 11:05:36 11:05:40 11:05:42 11:05:47 11:05:49 11:05:52 11:05:54 11:05:59 11:06:04 11:06:06 11:06:08 11:06:09 11:06:24 11:06:27 11:06:29 11:06:32 11:06:34 11:06:41

Q. Did, for example, PMI look for individuals from particular, for lack of a better word, fields, working in different areas, things like that?

A. Yes. We did -- we did look for a variety of industry representation in the different pilots, so that we could get a real subsection of all industries, as many as we could.

Q. Do you think that PMI was successful in that regard?

MS. KING: Objection. Calls for speculation.

THE WITNESS: Yes.

BY MR. GRAY:

Q. I'm sorry, was your answer to that question "yes," Ms. Redden?

A. Yeah.

Q. Did PMI as part of these recruitment efforts, look for individuals from any particular age ranges?

A. We did capture age, and we did try to have a variety representing. So we asked for age groups. We asked for industry, yes.

Q. Did PMI, as part of these recruitment

11:06:46 11:06:53 11:06:56 11:07:01 11:07:02 11:07:07 11:07:13 11:07:23 11:07:25 11:07:25 11:07:27 11:07:28 11:07:30 11:07:30 11:07:31 11:07:32 11:07:34 11:07:36 11:07:38 11:07:48 11:07:50 11:07:52 11:08:02 11:08:06 11:08:09

efforts, look for individuals from varied ethnic backgrounds?

A. We looked across the globe, since we are a global organization, and we're developing a product for global use. So we also looked across -- it was open to anyone if they met the criteria, obviously.

Q. And by "meeting the criteria" you're referring to PMP certifications and things like that?

A. Project management experience, yes. They had to -- they had to speak English because this was an English -- everything was done in English.

Q. As part of these recruitment efforts, did PMI look for individuals from any certain educational backgrounds? For example, having a bachelor's degree or having an advanced degree or anything like that?

A. I don't recall if that was a criteria.

Q. You mentioned that participants needed to speak English. Was that -- that was one of the criteria for the recruitment efforts?

A. Yes.

Q. Were any of the participants --

11:08:13 11:08:18 11:08:19 11:08:26 11:08:29 11:08:36 11:08:42 11:08:46 11:08:49 11:08:52 11:08:52 11:08:56 11:08:59 11:09:03 11:09:08 11:09:10 11:09:12 11:09:15 11:09:17 11:09:18 11:09:25 11:09:32 11:09:36 11:09:38 11:09:39

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, Debra Bollman Farfan, C.S.R. No. 11648, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth; That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

I further certify that I am not interested in the event of the action. Witness my hand this 5th day of October, 2020.

___________________________.

Debra Bollman Farfan, CA CSR No. 11648

RMR, CRR, CRC

No. 323095

Re: Deposition of **Betsy Redden, Corporate Designee**
Date: 9/29/2020
Case: Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 7 | 12 | Change "Project" to "Product" |
| 16 | 11 | Change "refreshed" to "refresh" |
| 35 | 16 | Change "Wilhol" to "Wilwol" |
| 46 | 13 | Change "property" to "product" |
| 85 | 21 | Change "Wilhol" to "Wilwol" |
| 98 | 17 | Delete ",but Cameron is" |
| 112 | 4 | Change "committee" to "team" |
| 125 | 20 | Change "don't want to say" to "don't know what was said" |
| 144 | 6 | Delete "I think it was Julia, but" |
| 149 | 3 | Change "patent" to "product" |
| 153 | 9 | Change "vehicles" to "virtual" |
| 84 | 24 | Delete "tool" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

11/12/2020
(Date)

Betsy Redden
(Signature)

EXHIBIT 17

No. 323095

Re: Deposition of **Betsy Redden, Corporate Designee**
Date: 9/29/2020
Case: Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Betsy Redden, Corporate Designee, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

11/12/2020 Betsy Redden

(Date) (Signature)

# EXHIBIT 18

# FILED UNDER SEAL

# EXHIBIT 19

# FILED UNDER SEAL

# EXHIBIT 20
# FILED UNDER SEAL

# EXHIBIT 21

# FILED UNDER SEAL

# EXHIBIT 22

346 EXHIBIT 22

# WORKPLACE TECHNOLOGIES RESEARCH, INC.

# v.

# PROJECT MANAGEMENT INSTITUTE, INC.

Expert Witness Report

Richard Fincher

Prepared for Venable LLC

December 11, 2020

CONFIDENTIAL

**Compensation:**

- $695 per hour for consulting, research, reports, deposition, and trial testimony.

**Resume/CV:**

- See Exhibit 005.

# Executive Summary

This is an expert report in the matter of Workplace Technologies Research, Inc. V. Project Management Institute, Inc., United States District Court Southern District of California Case No. 3:18-CV-01927-JM-MSB.

My opinions expressed in this report are formed from documents contained in the attached exhibits, from depositions conducted by PMI and WTRI, from reviewing documents provided by the parties in discovery, and from my training and experience.

Additional information may be provided after this report is issued; therefore I reserve the right to update my analysis and opinions and to issue a revised report.

## Summary of Opinions

My opinions are as follows:

1. PMI (Project Management Institute) approached the PAL (PMI's Advanced Learning) product development work using professional project management methodologies and processes.
2. PMI and WTRI (Workplace Technologies Research Inc.) executed a *Software Technology Development and Purchase Agreement*, (Exhibit 012). The exhibits attached to the Agreement contain project development and software design documents that are advisory and would not be understood as binding contract terms or obligations by people or entities entering any agreement related to the project management industry.
3. The agreement, (Exhibit 019), by PMI and WTRI to combine the Alpha 4 and Alpha 5 phases and advance the Alpha 3b was correct and necessary.

**7. WTRI did not create software code and product at an acceptable level of quality when developing the PAL product.**

Neudesic provided an overview of WTRI's development of the PAL system, (Exhibit 007), stating that WTRI's quality of code development was "terrible," "terribly inefficient," did not meet PMI quality standards, that "*everything that's built so far has to be refactored*[27] *from the ground up"* and that WTRI was "incapable" of refactoring the code base. Neudesic estimated between $450,000 and $650,000 to correct the "technical debt" [28] that WTRI had created.

In February 2016, Neudesic published the *Project PAL Code Remediation Plan* document, (Exhibit 008). Neudesic reviewed the code developed for compliance with *PMI's Technical Standards for Vendors*, *PMI Coding Standards*, and Neudesic's code review standards, (Exhibit 008 page 10). The purpose of this remediation plan was to document known quality concerns about the current implementation of the solution based on Alpha phase requirements. My analysis of the remediation plan data shows a minimum estimated 2,170 work hours, (55 work weeks), needed to bring the system to a minimally acceptable level.

Richard Fincher December 11, 2020

[27] *In computer programming and software design,* ***code refactoring*** *is the process of restructuring existing computer code—changing the factoring—without changing its external behavior. Refactoring is intended to improve the design, structure, and/or implementation of the software (its non-functional attributes), while preserving its functionality. Potential advantages of refactoring may include improved code readability and reduced complexity; these can improve the source code's maintainability and create a simpler, cleaner, or more expressive internal architecture or object model to improve extensibility*. Wikipedia entry Code refactoring

[28] Technical debt is a concept in software development that reflects the implied cost of additional rework caused by choosing an easy (limited) solution now instead of using a better approach that would take longer. Technical debt can be removed through code refactoring, the process of restructuring existing computer code without changing its external behavior, or by discarding the existing code and starting new code development.

# EXHIBIT 23

# FILED UNDER SEAL

# EXHIBIT 24

357 EXHIBIT 24

# Workplace Technologies Research, Inc.

**v.**

# Project Management Institute, Inc.

Expert Rebuttal Report of Carlyn Irwin

Carlyn Irwin
Senior Advisor
Cornerstone Research

April 7, 2021

CONFIDENTIAL

PMI's conduct and knowledge, as espoused in WTRI's complaint. In light of this Court's ruling denying WTRI's motion to add new claims against PMI for Fraudulent Misrepresentation and Fraudulent Inducement in the proposed Fourth Amended Complaint, such conclusions are not relevant to damages. Even assuming, for the sake of argument, that WTRI's claims of fraud against PMI had not been dismissed, Mr. LaMotta has not conducted a proper fraud examination in connection with this matter and his analysis of purported fraud committed by PMI falls short of relevant standards.

31. In summary, as I discuss in greater detail below, Mr. LaMotta relies on a flawed theory of damages and has not established a reasonable basis to rely on the information that underlies his calculations of damages. Even if Mr. LaMotta's estimates of damages were valid and had a reasonable basis—which they are not and do not have, respectively—it must be recognized that should PMI prevail on its counterclaims, any lost profits from the hypothetical "but for" commercialization of the software technology at issue would accrue to PMI rather than WTRI.

## VIII. The Damages Estimates Proposed by Mr. LaMotta Do Not Pertain to Specific Causes of Action Pled by WTRI

32. As noted above in Section II.C, any calculation of damages should be specific to each cause of action pled by a plaintiff (claimant). As I understand, WTRI's only remaining claims in this matter are its (i) claims for breach of contract relating to the Development Agreement and the Services Agreement, and (ii) claims for breach of implied covenant of good faith and fair dealing relating to only the Development Agreement.[23]

33. With respect to the LaMotta Report, it is notable that Mr. LaMotta makes no attempt to provide estimates of damages specific to each of WTRI's individual claims. Rather, Mr. LaMotta only offers the broad generalization that "PMI's actions and breach of contract" resulted in harm to WTRI.[24] Accordingly, Mr. LaMotta offers no methodology by which a trier of fact could determine damages if PMI is found to be only partially liable. For example, if PMI is found to be liable for only breach of implied covenant of good faith and fair dealing relating to

[23] Opening Report, ¶ 14. As further noted above, I understand that on December 3, 2020 WTRI filed a proposed Fourth Amended Complaint seeking to add new claims against PMI for Fraudulent Misrepresentation and Fraudulent Inducement. On January 25, 2021, the Court ruled to deny WTRI's motion to add these fraud claims against PMI.

[24] LaMotta Report, ¶¶ 9–10. Mr. LaMotta concludes that WTRI suffered economic damages "that total [*sic*] least $20.1 million."

the Development Agreement (and no other cause of action), a trier of fact cannot discern from the LaMotta Report the appropriate amount of damages WTRI would be entitled to. Similarly, if PMI were found to be liable for breach of contract relating to only the Development Agreement (but not the Services Agreement), a trier of fact again cannot discern the amount of damages, based on the LaMotta Report.

34. I note also that the LaMotta Report presents six components of WTRI's purported damages, which, when added together, sum to $20,090,952.[25] However, adding these components of purported damages, is, at best, misleading. If certain components of damages would only exist under a particular cause of action, *but not under another*, then the different components cannot be added together. As one prominent example, if PMI were only found liable for breach of implied covenant of good faith and fair dealing—which relates *only* to the Development Agreement—all damages relating to the Services Agreement would be rendered moot. Therefore, the sum "total" of Mr. LaMotta's damages would be less than $20,090,952. As I also discuss below in Section X.F, Mr. LaMotta's proposed damages would lead to double-counting or adding together duplicative damages arising from the same source (which further renders unreliable the cumulative total damages figure of $20,090,952).

35. As described above, this Court has denied WTRI's motion seeking to add, in WTRI's proposed Fourth Amended Complaint, new claims against PMI for Fraudulent Misrepresentation and Fraudulent Inducement.[26] To the extent that certain components of Mr. LaMotta's damages result only from PMI's alleged fraudulent misrepresentation and/or fraudulent inducement, any such damages would also be moot. Of course, Mr. LaMotta fails to specify which component(s) of damages result(s) specifically from the allegations of fraud.

## IX. Mr. LaMotta Fails to Explain How Any of WTRI's Purported Damages Were Caused by Any Specific Alleged Breach by PMI

36. In its Third Amended Complaint, WTRI alleges that "PMI has refused to perform and continues to refuse to perform its obligations under the Development Agreement and Development Plan [attached as Exhibit B to the Development Agreement]."[27] The specific

[25] LaMotta Report, ¶ 10 and Attachment 3.0.
[26] Order on Motion for Leave to File Fourth Amended Complaint, January 25, 2021, p. 4.
[27] TAC, ¶ 166.

the Development Agreement (and no other cause of action), a trier of fact cannot discern from the LaMotta Report the appropriate amount of damages WTRI would be entitled to. Similarly, if PMI were found to be liable for breach of contract relating to only the Development Agreement (but not the Services Agreement), a trier of fact again cannot discern the amount of damages, based on the LaMotta Report.

34. I note also that the LaMotta Report presents six components of WTRI's purported damages, which, when added together, sum to $20,090,952.[25] However, adding these components of purported damages, is, at best, misleading. If certain components of damages would only exist under a particular cause of action, *but not under another*, then the different components cannot be added together. As one prominent example, if PMI were only found liable for breach of implied covenant of good faith and fair dealing—which relates *only* to the Development Agreement—all damages relating to the Services Agreement would be rendered moot. Therefore, the sum "total" of Mr. LaMotta's damages would be less than $20,090,952. As I also discuss below in Section X.F, Mr. LaMotta's proposed damages would lead to double-counting or adding together duplicative damages arising from the same source (which further renders unreliable the cumulative total damages figure of $20,090,952).

35. As described above, this Court has denied WTRI's motion seeking to add, in WTRI's proposed Fourth Amended Complaint, new claims against PMI for Fraudulent Misrepresentation and Fraudulent Inducement.[26] To the extent that certain components of Mr. LaMotta's damages result only from PMI's alleged fraudulent misrepresentation and/or fraudulent inducement, any such damages would also be moot. Of course, Mr. LaMotta fails to specify which component(s) of damages result(s) specifically from the allegations of fraud.

## IX. Mr. LaMotta Fails to Explain How Any of WTRI's Purported Damages Were Caused by Any Specific Alleged Breach by PMI

36. In its Third Amended Complaint, WTRI alleges that "PMI has refused to perform and continues to refuse to perform its obligations under the Development Agreement and Development Plan [attached as Exhibit B to the Development Agreement]."[27] The specific

[25] LaMotta Report, ¶ 10 and Attachment 3.0.
[26] Order on Motion for Leave to File Fourth Amended Complaint, January 25, 2021, p. 4.
[27] TAC, ¶ 166.

obligations enumerated in the Third Amended Complaint include 35 sub-sections of the Development Plan pertaining to, among others, project management, enterprise architecture, operational readiness, review and acceptance, requirements, test and validation results, software, content, capability profiles, project assets, system hosting, various testing (e.g., unit, system, compatibility, load, and pilot testing), data and profile integration, access control, development of services (e.g., systems status, customer relationship management, and asset subscriber services), technical solution releases, refresh plans (i.e., plans that address the processes for refresh of the software's core functionality and content), legal/intellectual property compliance, and obtaining a trademark.[28] WTRI further alleges that "PMI breached Section 1.1 of the Development Agreement requiring that the parties 'work together in a joint effort to accomplish the tasks and objectives set forth in the Development Plan.'"[29]

37. With respect to the Services Agreement, WTRI alleges that "PMI breached the Services Agreement…by failing to perform its obligations under the Services Agreement itself, as well as Exhibit C attached to the Services Agreement."[30] Specifically, WTRI claims that PMI did not meet its obligations to complete a functional Agile product, failed to recruit any organizations to participate in the pilot program, and failed to collect feedback from participants.[31]

38. While WTRI asserts that PMI breached its contract by allegedly refusing or failing to perform all of the obligations described above, Mr. LaMotta provides no explanation of how any of the purported damages he calculates result from (i.e., were caused by) any of PMI's specific alleged breaches. That is, he does not consider or explain how any of PMI's alleged failures, either individually or collectively, caused the failure of the entire PAL project—irrespective of PMI's discretion to stop funding the project at any point in time. Instead, he only notes in his report that his "assignment in connection with this litigation is to assume liability and to analyze and opine as to the appropriate amount of damages…."[32] However, this statement provides no

[28] TAC, ¶ 167.
[29] TAC, ¶ 168.
[30] TAC, ¶ 171.
[31] TAC, ¶¶ 173–5.
[32] LaMotta Report, ¶ 4. As Mr. LaMotta further notes: "I also understand that the 2015 Development Agreement and the 2016 Services Agreement contain language regarding limitation of liability. I understand that WTRI contends in the operative Complaint that PMI's wrongful conduct falls outside those limitations and rises to the level of gross negligence or willful misconduct. Consistent with my required assumption of liability, I have been asked to assume that PMI will be found liable for damages and to quantify the amount of those damages based in part, among other things, PMI's wrongful conduct excepting limitations of liability under the contractual agreements between the parties."

detail of what Mr. LaMotta is assuming liability for and how such liability would result in the types of damages he calculates. There is no discussion in the LaMotta Report about how, but for any of PMI's alleged failures, the PAL project would have been completed and the software technology would have been commercialized. Given the absence of any discussion or analysis of a causal link between any of PMI's alleged failures and WTRI's inability to complete any tasks, a trier of fact cannot determine from the LaMotta Report what amount of WTRI's purported "damages" results from any specific alleged breach.

## X. Criticisms of and Corrections to Mr. LaMotta's Flawed Calculations of WTRI's Purported Damages

39. The fundamental flaws in the LaMotta Report described above critically undermine any calculations of damages purported by Mr. LaMotta. Nevertheless, I analyzed the calculations and, as discussed in detail below, discovered many methodological errors and baseless or speculative assumptions relied upon by Mr. LaMotta for each of the six components of WTRI's purported damages. I also make corrections to the calculations in an attempt to remediate Mr. LaMotta's errors (to the extent they can be remediated).

### A. Time-Based Milestone Payments Owed by PMI under the Development Agreement

40. As his first component of WTRI's purported damages, Mr. LaMotta claims that when "PMI elected to reject Alpha 5 and retain ownership of the software" technology at issue, this would have triggered a total of $1.5 million in payments from PMI to WTRI (pursuant to PMI's payment obligations under the Development Agreement).[33] In support of his assumption, Mr. LaMotta shows a flow chart indicating that if PMI rejected Alpha 5 and retained ownership, it would be obligated to pay WTRI $1 million upon first sale of the software, and $500,000 the following year.[34]

41. There are several critical problems with Mr. LaMotta's assumptions and premise for these damages. First, Mr. LaMotta improbably assumes that in the "but for" world—a

[33] LaMotta Report, ¶ 74.
[34] LaMotta Report, ¶¶ 73–74.

hypothetical scenario in which PMI never allegedly breached the Development Agreement—the software technology at issue would have been completed and commercialized with absolute, 100% certainty.  Given the challenges of developing a novel technology and successfully bringing it to market, there would have been at least some probability that the software could not be commercialized, even in the absence of any alleged breach of contract or implied covenant. Indeed, I understand that there are several contested issues that impact the reasonableness of claiming this form of damages.  For example, whether the software technology at issue could have been completed is a contested issue in this matter and other experts have opined on challenges and problems with bringing the technology to market.[35]  To any extent that the probability of successful commercialization is less than 100% in the "but for" world, Mr. LaMotta overstates WTRI's purported damages.[36]

42.     As noted above, a pervasive problem throughout the LaMotta Report is that Mr. LaMotta ignores or disregards incremental expenses avoided by WTRI by virtue of ceasing work on the PAL project.  Consider that, with respect to his first component of WTRI's damages, Mr. LaMotta simply assumes that the $1.5 million payment to WTRI represents or equates to "lost profits."  Yet, even assuming that WTRI hypothetically received $1.5 million in additional payments from PMI, WTRI would have incurred at least some amount of additional expenses (e.g., compensation for staff, payments to third-party vendors and contractors, expenses for facilities and equipment) after receiving the payments in order to bring the software technology at issue to commercialization and to support ongoing sales.  Indeed, WTRI's own contemporaneous forecasts—relied upon by Mr. LaMotta in his report—indicate that WTRI projected to incur tens of millions of dollars in ongoing expenses related to sales of the software technology.[37]  Given that the software technology was not commercialized, WTRI, in the actual world, avoided these incremental expenses.  Therefore, assuming that the hypothetical $1.5 million in additional payments from PMI represents "profits" lost by WTRI is flawed and unsupported.

---

[35] I understand that other experts have opined that there were marketability and commercialization problems with the software technology at issue and that the technology could have cannibalized sales of PMI's other products or services.

[36] For example, if, in the "but for" world absent any alleged breach by PMI, the software technology would have been commercialized with only an 80% probability, the expected value of the incremental payments (i.e., Mr. LaMotta's damages) would be $1.2 million [$1.5 million * 80%].

[37] LaMotta Report, footnotes 125–127 citing Weiss Deposition Exhibit 21 (PMI00070370).

hypothetical scenario in which PMI never allegedly breached the Development Agreement—the software technology at issue would have been completed and commercialized with absolute, 100% certainty. Given the challenges of developing a novel technology and successfully bringing it to market, there would have been at least some probability that the software could not be commercialized, even in the absence of any alleged breach of contract or implied covenant. Indeed, I understand that there are several contested issues that impact the reasonableness of claiming this form of damages. For example, whether the software technology at issue could have been completed is a contested issue in this matter and other experts have opined on challenges and problems with bringing the technology to market.[35] To any extent that the probability of successful commercialization is less than 100% in the "but for" world, Mr. LaMotta overstates WTRI's purported damages.[36]

42.      As noted above, a pervasive problem throughout the LaMotta Report is that Mr. LaMotta ignores or disregards incremental expenses avoided by WTRI by virtue of ceasing work on the PAL project. Consider that, with respect to his first component of WTRI's damages, Mr. LaMotta simply assumes that the $1.5 million payment to WTRI represents or equates to "lost profits." Yet, even assuming that WTRI hypothetically received $1.5 million in additional payments from PMI, WTRI would have incurred at least some amount of additional expenses (e.g., compensation for staff, payments to third-party vendors and contractors, expenses for facilities and equipment) after receiving the payments in order to bring the software technology at issue to commercialization and to support ongoing sales. Indeed, WTRI's own contemporaneous forecasts—relied upon by Mr. LaMotta in his report—indicate that WTRI projected to incur tens of millions of dollars in ongoing expenses related to sales of the software technology.[37] Given that the software technology was not commercialized, WTRI, in the actual world, avoided these incremental expenses. Therefore, assuming that the hypothetical $1.5 million in additional payments from PMI represents "profits" lost by WTRI is flawed and unsupported.

---

[35] I understand that other experts have opined that there were marketability and commercialization problems with the software technology at issue and that the technology could have cannibalized sales of PMI's other products or services.

[36] For example, if, in the "but for" world absent any alleged breach by PMI, the software technology would have been commercialized with only an 80% probability, the expected value of the incremental payments (i.e., Mr. LaMotta's damages) would be $1.2 million [$1.5 million * 80%].

[37] LaMotta Report, footnotes 125–127 citing Weiss Deposition Exhibit 21 (PMI00070370).

### 1. Corrections to Mr. LaMotta's Damages

43. Assuming, for the sake of argument, that WTRI is entitled to these damages, at a minimum, expenses must be deducted to account for the reasons articulated above. According to WTRI00052056—an offering memorandum of WTRI disclosing the company's historical financial performance—WTRI's profit margin was 30.5% in 2015 (i.e., the year in which the Development Agreement was executed and PMI made its initial $1 million payment to WTRI).[38] This figure indicates that for every $1.00 WTRI receives—including from payments made by PMI—it makes a "profit" of $0.305 (and incurs costs of $0.695). Assuming WTRI would hypothetically receive payments from PMI of $1 million upon commercialization and $500,000 in one year thereafter, the value of each "but for" milestone payments (applying a 30.5% margin) would be $305,000 upon commercialization [$1 million * 30.5%] and $152,500 [$500,000 * 30.5%] one year thereafter. In total, the value of these two "but for" payments collectively is **$457,500** [$305,000 + $152,500].

44. Of course, as explained above, this amount is still overstated as it assumes the software technology at issue would have been completed and commercialized with 100% certainty. That is, WTRI could theoretically be entitled to $457,500 in damages for time-based milestone payments only under the most generous assumption that completion and commercialization of the software was inevitable—an assumption that is not supported by the record and, as I understand, contested by PMI and its experts in this matter. Given that I have no reasonable basis to determine what the appropriate probability would be, I do not make further corrections to Mr. LaMotta's purported damages here. However, should the trier of fact determine that the probability is less than 100% or that PMI had discretion to cease further investment into the technology, damages will be less than $457,500 or even zero. To the extent that any of the various factors that prevented completion and commercialization of the software are found to be relevant, then damages would be zero. Therefore, WTRI's damages for this component range from $0 to, at most, $457,500.

---

[38] WTRI00052056–99 at 64.

**B.     Additional Out-of-Pocket Costs Incurred by WTRI to Perform Tasks Purportedly Assigned to PMI under the Development Agreement and Services Agreement**

45.     Mr. LaMotta claims that:

> WTRI incurred a variety of costs in connection with the performance of work that was originally assigned to PMI.  These costs included software licensing costs, computer services and developer costs, and salary of WTRI employees that were diverted from their WTRI work to instead perform tasks specifically assigned to PMI.[39]

46.     For his second component of WTRI's purported damages, Mr. LaMotta assumes that WTRI should be entitled to recoup these costs, which he claims amount to approximately $775,000.[40]

47.     As a foundational issue undermining this category of purported damages, Mr. LaMotta fails to explain how WTRI could or would have avoided these expenses in the "but for" world, absent any alleged breach of contract by PMI—and therefore why these would constitute "damages."  Mr. LaMotta only cites to the testimony of Dr. DiBello who stated that "there were many things on the requirements list that they didn't seem to have the money to pay for.  And to keep the project on track I paid for those things."[41]  Yet this testimony fails to explain why it was PMI's obligation to pay for these expenses (i.e., any evidence in the Development Agreement or Services Agreement that PMI, rather than WTRI, was obligated to pay for these specific expenses), whether these expenses were even necessary "to keep the project on track," or whether WTRI could have economically benefitted (or will benefit) from incurring such purported expenses,[42] among other shortcomings.

48.     In addition, Mr. LaMotta fails to provide an adequate basis for these expenses purportedly incurred by WTRI.  Specifically, to support the dollar amounts of expenses, Mr. LaMotta relies on a WTRI-produced spreadsheet, WTRI00448783, summarized in Attachment

---

[39] LaMotta Report, ¶ 75.
[40] LaMotta Report, ¶ 75 and Attachment 5.0.
[41] DiBello Deposition, September 28, 2020, at 52:14–21.
[42] For example, as noted in my Opening Report ¶ 52 and below in Section X.G, WTRI has already commercialized its "MAXX Virtual World Rehearsal" for "agile" decision making—a product, which Ms. Holloway asserts, uses PMI's trade secrets.

### B. Additional Out-of-Pocket Costs Incurred by WTRI to Perform Tasks Purportedly Assigned to PMI under the Development Agreement and Services Agreement

45. Mr. LaMotta claims that:

> WTRI incurred a variety of costs in connection with the performance of work that was originally assigned to PMI. These costs included software licensing costs, computer services and developer costs, and salary of WTRI employees that were diverted from their WTRI work to instead perform tasks specifically assigned to PMI.[39]

46. For his second component of WTRI's purported damages, Mr. LaMotta assumes that WTRI should be entitled to recoup these costs, which he claims amount to approximately $775,000.[40]

47. As a foundational issue undermining this category of purported damages, Mr. LaMotta fails to explain how WTRI could or would have avoided these expenses in the "but for" world, absent any alleged breach of contract by PMI—and therefore why these would constitute "damages." Mr. LaMotta only cites to the testimony of Dr. DiBello who stated that "there were many things on the requirements list that they didn't seem to have the money to pay for. And to keep the project on track I paid for those things."[41] Yet this testimony fails to explain why it was PMI's obligation to pay for these expenses (i.e., any evidence in the Development Agreement or Services Agreement that PMI, rather than WTRI, was obligated to pay for these specific expenses), whether these expenses were even necessary "to keep the project on track," or whether WTRI could have economically benefitted (or will benefit) from incurring such purported expenses,[42] among other shortcomings.

48. In addition, Mr. LaMotta fails to provide an adequate basis for these expenses purportedly incurred by WTRI. Specifically, to support the dollar amounts of expenses, Mr. LaMotta relies on a WTRI-produced spreadsheet, WTRI00448783, summarized in Attachment

---

[39] LaMotta Report, ¶ 75.

[40] LaMotta Report, ¶ 75 and Attachment 5.0.

[41] DiBello Deposition, September 28, 2020, at 52:14–21.

[42] For example, as noted in my Opening Report ¶ 52 and below in Section X.G, WTRI has already commercialized its "MAXX Virtual World Rehearsal" for "agile" decision making—a product, which Ms. Holloway asserts, uses PMI's trade secrets.

5.0 to his report.[43]  While this spreadsheet lists expenses related to software licensing and computer services, it provides no details that can be used to discern why these expenses were necessary "to keep the project on track," or even that the expenses were incurred specifically in connection with the PAL project.[44]  Mr. LaMotta cites to no contemporaneous invoices or a database that could corroborate the dollar amounts of expenses incurred and whether the amounts were indeed paid in full.[45]

49.     More importantly, according to WTRI00448783, the overwhelming majority of WTRI's purported out-of-pocket costs arose from "salar[ies] of WTRI employees that were diverted from their WTRI work to instead perform tasks specifically assigned to PMI."[46]  Of the approximately $775,000 in claimed damages, more than $576,000 (i.e., almost 75%) was for "Officer Salary," "Staff Salary," and "Payroll Taxes" of WTRI employees.  Mr. LaMotta cites to no underlying documents, databases, or other evidence that could corroborate either (i) the amount of time spent by these employees, or (ii) the monetary value of this purported time spent.  Mr. LaMotta also cites no evidence that the time of these WTRI employees was specifically designated toward "perform[ing] tasks specifically assigned to PMI."[47]  In the absence of any corroborative documents or explanation, claiming these amounts of employee-related expenses as part of WTRI's purported damages, as Mr. LaMotta does, is speculative.  The lack of supporting documentation with respect to both expenses and WTRI employees' time not only challenges whether or not Mr. LaMotta has a reasonable basis to rely on these data, but also brings into question his objectivity as required by the AICPA's professional standards.[48]

---

[43] LaMotta Report, Attachment 5.0.
[44] WTRI00448783.
[45] In my Opening Report, I analyzed PMI's damages arising from expenses incurred by PMI to co-develop the software technology at issue.  In contrast to Mr. LaMotta's analysis (pertaining to expenses incurred by *WTRI* to co-develop the software), To establish a reasonable basis to rely on this information, I reviewed underlying invoices and other supporting documents of PMI's expenses, which were recorded in a spreadsheet (PMI00586948) queried directly from PMI's tracking systems and that the fields were populated with internally consistent data.  Based on my conversations with PMI employees Ioana Sfetcu, Josh Embree, and Michael Markman, these expenses were recorded in PMI's general ledger (i.e., the company's central bookkeeping repository) and, subsequently reflected in PMI's audited financial statements.  I also confirmed my understanding of the fields of data (e.g., employee / vendor name, quantity, and unit cost) and how PMI's employee time was tracked specifically for work on the PAL project.  *See* Opening Report, ¶¶ 35–36.
[46] LaMotta Report, ¶ 75.
[47] LaMotta Report, ¶ 75.
[48] "AICPA Code of Professional Conduct," December 15, 2014, at 0.300.500:  Objectivity "is a distinguishing feature of the [CPA] profession.  The principle of objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest."

50. Even assuming, for the sake of argument, that Mr. LaMotta had a sufficient basis for the dollar amounts of these out-of-pocket expenses, to any extent that WTRI would have incurred the expenses in the "but for" world—assuming PMI did not allegedly breach the contract—Mr. LaMotta has overstated this category of WTRI's purported damages. Similarly, to any extent that WTRI has been able to use the services and work listed in WTRI00448783 (and summarized in Attachment 5.0 of the LaMotta Report) toward development of WTRI's "MAXX Virtual World Rehearsal" product—which Dr. DiBello testified has garnered "big demand" and been commercialized to generate revenues[49]—Mr. LaMotta's estimate of damages would be overstated.[50]

#### 1. Corrections to Mr. LaMotta's Damages

51. Given that Mr. LaMotta fails to establish why it was PMI's obligation to pay for these expenses and whether these expenses were even necessary "to keep the project on track," claiming any lost profits arising from such purported out-of-pocket costs is speculative. Pending further documentation that could substantiate these claims of purported costs, WTRI's damages are **zero** for this component.

### C. Loss of Grants from the NSF

52. Relying on testimony from Dr. DiBello, Mr. LaMotta claims that:

> despite its prior history of more than a decade of success in securing NSF grants, WTRI has been unable to obtain funding from the NSF subsequent to the fallout of WTRI's relationship with PMI and its failure to deliver a software product in connection with the grants received.[51]

53. Again citing Dr. DiBello's deposition testimony, Mr. LaMotta further notes that WTRI had "historically received an average of approximately $750,000 per year in grants from the NSF," but that "WTRI began to receive push back from the NSF at the beginning of 2017 due to

---

[49] DiBello Deposition, October 6, 2020, at 357:8–359:24.
[50] WTRI's "MAXX Virtual World Rehearsal" product— which Ms. Holloway asserts uses PMI's trade secrets—is discussed further in Section X.G below.
[51] LaMotta Report, ¶ 80.

the relationship with PMI."[52] Specifically since 2018, the NSF declined at least three of WTRI's grant proposals, which would have totaled $1,050,000 in additional grant money.[53] This $1,050,000 amount comprises Mr. LaMotta's third component of WTRI's damages.

54. As an initial matter, Mr. LaMotta's adopted claims of WTRI's history of grants awarded by the NSF is directly refuted by NSF data. For example, Mr. LaMotta again cites to Dr. DiBello in claiming that WTRI had a long history of receiving grants from the NSF (receiving between 14 and 18 grants from the NSF between 1999 and 2013) and that "all of WTRI's prior projects with the NSF had been successful."[54] Yet as shown in **Exhibit 1**, publicly available data from the NSF indicate that WTRI received only eight grants between 2000 and 2013, and in fact received no grants at all in seven (i.e., half) of those years (including four consecutive years between 2008 and 2011). The average amount awarded per year was also approximately $225,000—or less than one-third of the $750,000 "average" amount claimed by Dr. DiBello. That Mr. LaMotta did not conduct any independent investigation of Dr. DiBello's representations—for example, by searching the public NSF database of grant awards[55]—demonstrates how he has failed to exercise due professional care and professional skepticism in this matter.

55. Regarding the theory of damages or economic harm, Mr. LaMotta fails to explain why or how an inability to obtain grant money results in "damages" or "lost profits" to WTRI. Grants represent federal financial assistance provided by the government to fund particular ideas or projects.[56] Such federal financial assistance does not equate to "profits" for a company, which are typically generated from sales of a particular product(s) or service(s).

56. Relatedly, even assuming that WTRI would have received these grants in the "but for" world (absent any alleged wrongful conduct by PMI), Mr. LaMotta again ignores or disregards incremental expenses WTRI was able to avoid in the actual world. That is, as a condition of hypothetically receiving these grants, WTRI would have been expected to further develop its

[52] LaMotta Report, ¶ 81.
[53] LaMotta Report, ¶ 81.
[54] LaMotta Report, ¶ 79.
[55] "Awards Simple Search," National Science Foundation, https://www.nsf.gov/awardsearch/, accessed March 20, 2021.
[56] "Grants 101," Grants.gov, https://www.grants.gov/learn-grants/grants-101.html, accessed March 20, 2021.

ideas or projects, thereby incurring additional expenses. These expenses would have been avoided if WTRI ceased work on the projects in the absence of NSF grant money.

57.    Moreover, as explained in my Opening Report and above in Section V, to claim damages for WTRI, Mr. LaMotta must explain "the logic that connects the defendant's alleged wrongful conduct and the plaintiff's damages."[57] With respect to WTRI's purported loss of grants from the NSF, Mr. LaMotta fails to demonstrate how WTRI's inability to obtain three grants from the NSF since 2018 is specifically due to (i.e., was caused by) PMI's alleged wrongful conduct. Instead, in his report, Mr. LaMotta only points to one project in which the NSF rejected WTRI's proposal purportedly due to a "failure to scale" and "Dr. DiBello attempted to explain to the NSF that the inability to scale (or sell at all) the product was due to PMI's wrongful conduct at issue in this lawsuit."[58] Mr. LaMotta's characterization of Dr. DiBello's "attempt[] to explain" why WTRI was unable to scale does not substantiate his assertion that "the correspondence between the NSF and WTRI indicates that the NSF's unusual rejection of WTRI's grant requests is attributable to PMI's failures under the contracts at issue in this case."[59] Indeed, if WTRI had such a long history of receiving grants from the NSF and "all of WTRI's prior projects with the NSF had been successful,"[60] it must be questioned how or why a single unfinished project (i.e., the PAL project at issue) would alone cause the NSF to reject all subsequent WTRI proposals. Yet, this logical disconnect is not evaluated or discussed in the LaMotta Report.

58.    Many variables—unrelated to PMI's alleged wrongful conduct—may explain why the NSF rejected WTRI's proposals since 2018, including but not limited to:  the quality of WTRI's proposals, the quality of competing or other grant proposals by other parties submitted to the NSF, the focus or subject matter of WTRI's proposals, the size and scope of the project, and the stage at which the proposed WTRI project had been developed. Some of these variables, such as competing grant proposals, arise from external circumstances not within WTRI's control. Mr. LaMotta fails to mention, much less analyze or account for, any of these considerations—this oversight in and of itself invalidates any claim for loss of grants from the NSF as "damages." To any extent that WTRI's inability to obtain the grants could be explained, even partially, by any

---

[57] Litigation Services Handbook, Ch. 4, p. 3.
[58] LaMotta Report, ¶ 82.
[59] LaMotta Report, ¶¶ 82–83.
[60] LaMotta Report, ¶ 79.

other factor or circumstance *other than* PMI's alleged wrongful conduct, Mr. LaMotta's purported damages (assuming there are any) are overstated.

59. In addition to these foundational issues, Mr. LaMotta's calculation of this component of damages is inconsistent with the very sources he relies upon. Namely, based on his interview with Dr. DiBello, Mr. LaMotta claims that "WTRI has historically been awarded approximately 70 to 80 percent of the grants it has applied for with the NSF."[61] Assuming this statistic is correct—which has not been corroborated by any documentary evidence cited in the LaMotta Report—it proves that, even absent any alleged wrongful conduct by PMI, WTRI does not invariably obtain a grant with the NSF every time it applies (i.e., successfully convert 100% of applications into awarded grants). By failing to account for at least some possibility ("70 to 80 percent")[62] that WTRI would not have been awarded *every* grant it applied for in the "but for" world, Mr. LaMotta overstates WTRI's purported damages (assuming there are any).

### 1. Corrections to Mr. LaMotta's Damages

60. Mr. LaMotta fails to consider or analyze any factors or circumstances of WTRI's grant proposals since 2018 (e.g., quality of WTRI's proposals, the quality of competing or other grant proposals, the focus or subject matter of WTRI's proposals) that may explain why the NSF rejected the proposals. Even accepting the questionable premise that WTRI's reported inability to obtain grants was entirely attributable to only PMI's alleged wrongful conduct (and no other factor or circumstance), the $1,050,000 "damages" figure assumed by Mr. LaMotta is overstated. Among other issues, this amount must further (i) deduct costs WTRI would have incurred upon receiving the grants, and (ii) be reduced to account for the possibility that WTRI would not have obtained the grants in the "but for" world. According to the WTRI00052056 document Mr. LaMotta cites—which provides WTRI's historical financial performance during 2013, 2014, and 2015—the average profit margin WTRI historically earned was approximately 24%.[63] Applying a 24% margin to the purported $1,050,000 in lost grants yields $252,000 [$1,050,000 * 24%]. If

[61] LaMotta Report, ¶ 80 citing to "Interview of Dr. DiBello."
[62] LaMotta Report, ¶ 80 citing to "Interview of Dr. DiBello."
[63] WTRI00052056–99 at 64. Profit as measured by WTRI's reported Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA").

other factor or circumstance *other than* PMI's alleged wrongful conduct, Mr. LaMotta's purported damages (assuming there are any) are overstated.

59. In addition to these foundational issues, Mr. LaMotta's calculation of this component of damages is inconsistent with the very sources he relies upon. Namely, based on his interview with Dr. DiBello, Mr. LaMotta claims that "WTRI has historically been awarded approximately 70 to 80 percent of the grants it has applied for with the NSF."[61] Assuming this statistic is correct—which has not been corroborated by any documentary evidence cited in the LaMotta Report—it proves that, even absent any alleged wrongful conduct by PMI, WTRI does not invariably obtain a grant with the NSF every time it applies (i.e., successfully convert 100% of applications into awarded grants). By failing to account for at least some possibility ("70 to 80 percent")[62] that WTRI would not have been awarded *every* grant it applied for in the "but for" world, Mr. LaMotta overstates WTRI's purported damages (assuming there are any).

### 1. Corrections to Mr. LaMotta's Damages

60. Mr. LaMotta fails to consider or analyze any factors or circumstances of WTRI's grant proposals since 2018 (e.g., quality of WTRI's proposals, the quality of competing or other grant proposals, the focus or subject matter of WTRI's proposals) that may explain why the NSF rejected the proposals. Even accepting the questionable premise that WTRI's reported inability to obtain grants was entirely attributable to only PMI's alleged wrongful conduct (and no other factor or circumstance), the $1,050,000 "damages" figure assumed by Mr. LaMotta is overstated. Among other issues, this amount must further (i) deduct costs WTRI would have incurred upon receiving the grants, and (ii) be reduced to account for the possibility that WTRI would not have obtained the grants in the "but for" world. According to the WTRI00052056 document Mr. LaMotta cites—which provides WTRI's historical financial performance during 2013, 2014, and 2015—the average profit margin WTRI historically earned was approximately 24%.[63] Applying a 24% margin to the purported $1,050,000 in lost grants yields $252,000 [$1,050,000 * 24%]. If

[61] LaMotta Report, ¶ 80 citing to "Interview of Dr. DiBello."
[62] LaMotta Report, ¶ 80 citing to "Interview of Dr. DiBello."
[63] WTRI00052056–99 at 64. Profit as measured by WTRI's reported Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA").

applying an 80% probability of grant approval (based on unsubstantiated representations of Dr. DiBello), the amount of corrected damages is further reduced to $201,600 [$252,000 * 80%].

61. However, as discussed above, federal financial assistance provided by the government to fund particular ideas or projects and not the economic equivalent of "lost revenue" that would result in "lost profits." Therefore, WTRI's damages are **zero** for this component.

**D. Unpaid Reimbursements Related to UCLA Brain Engagement Study**

62. Citing Dr. DiBello's deposition testimony and his interview of Dr. DiBello, Mr. LaMotta claims that "as part of the 2016 Services Agreement WTRI and PMI agreed that WTRI would conduct a brain engagement study with a scientist from UCLA.… Dr. DiBello testified that WTRI performed the study but that PMI failed to pay the agreed upon" amount of $120,000.[64] This $120,000 amount comprises Mr. LaMotta's fourth component of WTRI's damages.

63. According to Dr. DiBello's deposition testimony, this $120,000 amount "was additional money in the budget" for the Services Agreement related to "things that came up, additional tasks."[65] Based on my review of the LaMotta Report, Mr. LaMotta provides no justification for why this "additional money in the budget" spent on a brain engagement study results in damages to WTRI. Mr. LaMotta provides no explanation of how this amount could have been avoided in the "but for" world in which PMI had not engaged in its alleged wrongful conduct—that is, how WTRI could have avoided this cost if, hypothetically, it was able to successfully complete and commercialize the software technology at issue.

64. Moreover, the only bases for both (i) the amount ($120,000) and (ii) the notion that PMI agreed to pay for the study are representations of Dr. DiBello. Mr. LaMotta cites to no documentary evidence (e.g., invoices, receipts, bank statements) to substantiate that WTRI indeed incurred $120,000 in additional costs solely due to PMI's alleged wrongful conduct.[66] I note also that, according to Mr. LaMotta, this component of WTRI's purported damages only

---

[64] LaMotta Report, ¶ 84.
[65] DiBello Deposition, September 28, 2020, at 226:8–227:10.
[66] As discussed above and in my Opening Report, Mr. LaMotta must demonstrate that an amount of hypothetical profits lost is calculable with reasonable certainty and that it was solely PMI's alleged wrongful conduct—and no other fact or circumstance—that caused WTRI to lose such profits. Opening Report, ¶ 65.

applying an 80% probability of grant approval (based on unsubstantiated representations of Dr. DiBello), the amount of corrected damages is further reduced to $201,600 [$252,000 * 80%].

61.     However, as discussed above, federal financial assistance provided by the government to fund particular ideas or projects and not the economic equivalent of "lost revenue" that would result in "lost profits."  Therefore, WTRI's damages are **zero** for this component.

### D.     Unpaid Reimbursements Related to UCLA Brain Engagement Study

62.     Citing Dr. DiBello's deposition testimony and his interview of Dr. DiBello, Mr. LaMotta claims that "as part of the 2016 Services Agreement WTRI and PMI agreed that WTRI would conduct a brain engagement study with a scientist from UCLA….   Dr. DiBello testified that WTRI performed the study but that PMI failed to pay the agreed upon" amount of $120,000.[64] This $120,000 amount comprises Mr. LaMotta's fourth component of WTRI's damages.

63.     According to Dr. DiBello's deposition testimony, this $120,000 amount "was additional money in the budget" for the Services Agreement related to "things that came up, additional tasks."[65]  Based on my review of the LaMotta Report, Mr. LaMotta provides no justification for why this "additional money in the budget" spent on a brain engagement study results in damages to WTRI.  Mr. LaMotta provides no explanation of how this amount could have been avoided in the "but for" world in which PMI had not engaged in its alleged wrongful conduct—that is, how WTRI could have avoided this cost if, hypothetically, it was able to successfully complete and commercialize the software technology at issue.

64.     Moreover, the only bases for both (i) the amount ($120,000) and (ii) the notion that PMI agreed to pay for the study are representations of Dr. DiBello.  Mr. LaMotta cites to no documentary evidence (e.g., invoices, receipts, bank statements) to substantiate that WTRI indeed incurred $120,000 in additional costs solely due to PMI's alleged wrongful conduct.[66]  I note also that, according to Mr. LaMotta, this component of WTRI's purported damages only

---

[64] LaMotta Report, ¶ 84.
[65] DiBello Deposition, September 28, 2020, at 226:8–227:10.
[66] As discussed above and in my Opening Report, Mr. LaMotta must demonstrate that an amount of hypothetical profits lost is calculable with reasonable certainty and that it was solely PMI's alleged wrongful conduct—and no other fact or circumstance—that caused WTRI to lose such profits.  Opening Report, ¶ 65.

arises in connection with the *Services Agreement*[67] and would therefore evidently be moot under WTRI's claim for breach of implied covenant of good faith and fair dealing: As noted above in Section II.A, the Court in this matter found that "WTRI failed to sufficiently plead claims for breach of the implied covenant of good faith and fair dealing *in the Services Agreement*."[68]

#### 1. Corrections to Mr. LaMotta's Damages

65. Pending further documentation that could substantiate the purpose and amount of these purported costs, WTRI's damages are **zero** for this component.

### E. Lost Profits on "But For" Corporate Licenses for Hypothetical Product

66. The fifth—and by far, largest—component of WTRI's purported damages in the LaMotta Report pertains to WTRI's alleged lost profits from "but for" corporate licensors of the Proteum and/or Icebochz software products. Specifically, Mr. LaMotta claims that "WTRI intended to monetize the final Proteum and/or Icebochz products by licensing the software to corporations on an annual basis."[69] Without citing any support, Mr. LaMotta concludes that "PMI failed to execute on its required tasks and interfered with WTRI's ability to complete the products by cutting WTRI out of the development process."[70] He therefore assumes WTRI is entitled to lost profits arising from PMI's alleged wrongful conduct. He further opines that "both parties *understood* the significant risk WTRI faced by bringing its existing base of corporate customer contacts into the pilot" and that "PMI was *aware* that WTRI was putting its credibility and its long-term customer relationships at risk…."[71]

67. Based on representations from Dr. DiBello, Mr. LaMotta adopts the assumption that WTRI "had 24 customers that were planning to pay between $250,000 and $500,000 a piece for engagements of selling Proteum or Icebochz or both per year."[72] He also claims "that it was reasonably foreseeable at the time of the contracts that a failure to complete the products would

---

[67] LaMotta Report, ¶ 84: "I understand that as part of the 2016 Services Agreement WTRI and PMI agreed that WTRI would conduct a brain engagement study with a scientist from UCLA."
[68] Order Granting Motion to Dismiss, p. 3 (emphasis added).
[69] LaMotta Report, ¶ 89.
[70] LaMotta Report, ¶ 98.
[71] LaMotta Report, ¶ 98 (emphasis added).
[72] LaMotta Report, ¶ 92 citing to DiBello Deposition, September 28, 2020, at 88:14–89:9, 254:4–10.

- The loss is the direct and natural consequence of the breach;

- It is reasonably probable that the profits would have been earned except for the breach; and

- The amount of loss can be shown with reasonable certainty.

71.     I agree with Mr. LaMotta on all of the above points.  However, contrary to this very predicate he claims to rely upon in asserting damages, Mr. LaMotta's calculation of WTRI's purported lost profits fails in all of these regards.  In particular, Mr. LaMotta's damages amount was not determined with reasonable certainty, but instead derived from speculative and highly variable assumptions that are contradicted by the evidence cited in the LaMotta Report.

72.     Consider that, in first estimating WTRI's lost revenue, Mr. LaMotta's "analyses indicate that PMI's wrongful conduct resulted in WTRI losing licensing revenues of between $7.7 million and $45.8 million."[80]  This remarkably vast range—in which the high end of estimated "lost revenues" is approximately *six times* the amount of the low end—immediately casts doubt on whether "the amount of loss can be shown with reasonable certainty."

73.     As shown in **Exhibit 2**, the range of these purported lost profits was driven by three parameters supplied to Mr. LaMotta by WTRI:  (i) number of customers in year one (12 to 24); (ii) annual customer growth rate (between -25% and 25%); and (iii) annual revenue per customer ($250,000 to $500,000).  Based on these highly variable possible outcomes, WTRI's "lost revenue" could be as low as $0.7 million or as high as $36.6 million (i.e., more than 50 times higher than the low range) in a *single given year*.[81]  To determine a specific lost revenue figure, Mr. LaMotta evidently utilized a Monte Carlo simulation in which he simulated various scenarios or "paths" of possible total revenues WTRI purportedly lost.[82]  He claims that after running 10,000 simulations, the mean (i.e., average) result was $19.6 million, which he uses as

---

[80] LaMotta Report, ¶ 102.

[81] *See* **Exhibit 2**.  For example, based on Mr. LaMotta's parameters, WTRI could begin Year 1 (i.e., the year in which the software technology was hypothetically launched) with 12 customers.  If the number of customers declines by 25% each year, by Year 6, WTRI would have fewer than 3 customers—if each customer paid $250,000, WTRI would earn revenues of $0.7 million in Year 6.  Conversely, WTRI could begin Year 1 with 24 customers.  If the number of customers grows by 25% for each of the next five years, by Year 6, WTRI would have approximately 73 customers—if each customer paid $500,000, WTRI would earn revenues of $36.6 million in Year 6.

[82] For example, as shown in Attachment 4.1 to the LaMotta Report, in the "base case" simulation, WTRI is assumed to have 18 customers each year for six years, each paying $300,000 per year.  Other simulations or "paths" may have different numbers of customers or payment amounts per customer.

the basis for calculating WTRI's purported damages.[83] In my opinion, merely taking an average of an immense range of possible damages does not demonstrate that an amount of loss can be determined with reasonable certainty.

74. As purported corroboration of the assumptions or parameters supplied by WTRI, Mr. LaMotta claims that "Dr. DiBello's sales targets for corporate customers described above are consistent with…various valuations of the subject products performed by both PMI and WTRI."[84] For example, Mr. LaMotta cites to Exhibit 21 to the Deposition of Brian Weiss (PMI00070370)—a document in which WTRI and PMI each created forecasts of revenues and costs of the software technology at issue for a period of six years.[85]

75. Notwithstanding Mr. LaMotta's claim, the figures in this document (PMI00070370) do not comport with sales targets provided by Dr. DiBello. Moreover, this document is most striking in how it highlights the considerable *uncertainty* of attempting to project revenues and profits of a novel product with no precedent to assess past sales or customer demand. Consider that, as shown in **Figure 1** below, WTRI projected to generate revenues of $74.6 million across the first six years after product launch; by contrast, PMI projected to generate revenues of just $10.2 million (i.e., less than 1/7th of WTRI's estimate) for the same product during the same period. In Year 6 alone, WTRI projected revenues of $34.7 million—a figure nearly *14 times* that of PMI's projection ($2.5 million).[86]

**Figure 1 (excerpt from PMI00070370)**:

**Equivalent Sales Revenue Corporate**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| WTRI | Corporate Product Estimates | $ 1,200,000 | $ 2,808,000 | $ 5,840,640 | $ 11,136,154 | $ 18,951,709 | $ 34,674,608 |
| PMI | Corporate Product Estimates | $ 626,400 | $ 1,409,400 | $ 1,566,000 | $ 1,879,200 | $ 2,192,400 | $ 2,505,600 |
| **Sales Variance (Decrease)** | | **$ (573,600)** | **$ (1,398,600)** | **$ (4,274,640)** | **$ (9,256,954)** | **$ (16,759,309)** | **$ (32,169,008)** |

76. Similarly vast discrepancies in PMI versus WTRI forecasts are observed with respect to projected costs (*see* **Figure 2**). For example, WTRI expected to incur a total of $28.5 million in

[83] LaMotta Report, ¶ 104.
[84] LaMotta Report, ¶ 95.
[85] *See*, for example, LaMotta Report, Footnotes 125–127 citing Weiss Deposition Exhibit 21 (PMI00070370).
[86] This assumes the software technology would still be relevant and have a market at that time. Mr. LaMotta provides no explanation of why six years is the appropriate forecast horizon.

"but for" profits with reasonable certainty—which he has failed to do here—such lost profits would be awarded to PMI should PMI prevail on its counterclaims.

Executed on April 7, 2021.

Carlyn Irwin

**Exhibit 1**

## National Science Foundation (NSF) Grants Awarded to Workplace Technologies Research, Inc. (WTRI)[1]

2000–2013

| Year of Award Start Date[2] | Amount Awarded to Date[3] |
|---|---|
| 2000 | $99,998 |
| 2001 | $679,647 |
| 2002 | $0 |
| 2003 | $0 |
| 2004 | $0 |
| 2005 | $200,000 |
| 2006 | $1,038,388 |
| 2007 | $782,000 |
| 2008 | $0 |
| 2009 | $0 |
| 2010 | $0 |
| 2011 | $0 |
| 2012 | $180,000 |
| 2013 | $179,999 |
| **Average Amount Awarded Per Year** | $225,717 |

Source: https://www.nsf.gov/awardsearch/

Note:
[1] Includes the 8 NSF grants awarded to WTRI that are listed on the NSF website, which have an earliest 'Start Date' of January 1st, 2000. Excludes awards that Dr. Lia DiBello obtained on behalf of parties other than WTRI (e.g., CUNY Graduate School University Center).
[2] Year as indicated by the award's 'Start Date.'
[3] The total 'Awarded Amount to Date' for awards with a 'Start Date' in the given year.

CONFIDENTIAL

# EXHIBIT 25

382 EXHIBIT 25



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
Case No. 3:18-cv-01927-JM-MSB

| WORKPLACE TECHNOLOGIES RESEARCH, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PROJECT MANAGEMENT INSTITUTE, INC.,<br><br>Defendant. | EXPERT REPORT OF<br>Mickey A. Ferri, Ph.D. |
|---|---|

Mickey Ferri

Mickey A. Ferri, Ph.D.
December 11, 2020



## c. Summary of Opinions

9. Based on my education, experience, expertise, and my analysis of the evidence on the marketplace for the PAL product idea,[2] potential customers, customer needs, business model, economic value, and PMI and WTRI's commercialization approach, I conclude the following:[3]

a. Demand. There is little evidence of customer demand for the PAL product idea, and I am not aware of evidence that would validate demand such as customer purchases, preorders, or an established willingness to pay for PAL. See Section 5.a.

b. Market. PAL faced substantial market challenges, including a lack of focus, crowded markets with low-cost alternatives, and a small market opportunity. See Section 5.b.

c. Marketability. PAL had limited marketability to customers for multiple reasons, discussed in more detail below. See Section 5.c.

d. Commercialization approach. PMI pursued a thoughtful, strategic, and evidence-based commercialization approach in consultation with third-party experts. PMI evaluated multiple markets and made an informed and evidence-based "no-go" decision on PAL. In contrast, I am not aware of evidence suggesting WTRI performed a detailed or evidence-based commercialization approach. In addition, PMI and WTRI appeared to disagree on financial projections and target market focus. See Section 5.d.

e. Costs. There were substantial costs associated with PAL, including at least $10 million in costs incurred by PMI as of December 2017, an NSF grant of approximately $1.25 million, costs incurred by WTRI which WTRI appears to believe were meaningful and material, and additional uncertain costs as of 2017 projected to be at least $1 million to $4.6 million. See Section 5.e.

f. Economic value. The economic value of the PAL product idea was uncertain and not validated by customer demand or purchases. Multiple analyses indicated PAL likely had a small or even negative multi-year theoretical net present value. See Section 5.f.

---

[2] Throughout this report, I refer to PMI's Advanced Learning product as "PAL" or "the PAL product idea," because I am not aware of evidence of a particular PAL product being sold or commercialized.

[3] Throughout this report, I analyze the available and relevant evidence relating to PAL on each topic area. The evidence generally emerged between 2015 (when PMI and WTRI entered into the Development Agreement discussed below) and 2018 (when the Development Agreement and Services Agreement were terminated). In forming my conclusions, I evaluate each piece of evidence, considering its basis, underlying evidence, timing, relevance, reliability, and informative value.



g. Business rationale. While the PAL product idea may have been worth exploring in 2015, the decision to discontinue pursuing it in 2018 was a rational and reasonable business decision. See Section 5.g.

10. Based on my analysis of the evidence in this case, I conclude that PMI devoted substantial resources to conduct various market and financial analyses for PAL and made a good faith effort to thoroughly evaluate the market opportunity for PAL, including at least the following: (1) distributing Requests for Proposal ("RfPs") to 10+ consulting partners, (2) receiving six proposals from consulting partners, (3) considering analysis by PricewaterhouseCoopers, (4) considering analysis by Eric Boromisa, and (5) conducting its own internal analysis. These proposals and analyses included multiple components, including: (1) analysis of multiple market segments, (2) financial analysis, (3) interviews with potential customers, (4) analysis of customer needs and value proposition, and more. The various market analyses indicated that the market was not worth pursuing for PMI, which is consistent with my conclusions in this report. In contrast, WTRI's claims of demand, market, marketability, and economic value are not supported by evidence and analysis sufficient to continue investing in the PAL product idea.[4] Based on the market analyses conducted and factors analyzed in this report, I conclude that PMI's decision to discontinue pursuing the PAL product idea was evidence-based and economically reasonable.

## 2. Background

### a. Parties

11. Project Management Institute, Inc. ("PMI") is a not-for-profit professional membership organization for professionals working in project management.[5] PMI offers resources to enhance careers and improve the organizational success of over 2.9 million professionals.[6] PMI provides certification programs, academic and market research programs, chapters, training and education events, and other volunteer and professional development opportunities related to

[4] Here and throughout this report, the term "sufficient" is used in an economic and business context, considering the factors and evidence analyzed herein. Generally speaking, "sufficient" in this context relates to an amount that would be enough or adequate to reasonably believe the PAL product idea could yield a positive return on investment and/or that there would be enough to reasonably support the business decision to continue pursuing the PAL product idea.

[5] See: *e.g.*, PMI, "Learn About PMI," https://www.pmi.org/about/learn-about-pmi (accessed 11/9/2020).

[6] See: *e.g.*, PMI, "Learn About PMI," https://www.pmi.org/about/learn-about-pmi (accessed 11/9/2020).



h. WTRI Vice President and CTO (2020), when asked to define the target market, testified to his understanding that "the client for that end product would be people who do project management… It could be a certain type of company that does project management, or it could be a division of a company that does project management for their company."[248]

i. Czarina Games CEO (2020) testified that the "intended market for the PAL software, to my understanding, was reflective or representative of PMI's complete outreach, which is a voluminous amount, although I couldn't put a specific number on to it, of those who are becoming PMP certified or who have already attained their PMP Certification and would need to continue to have credits every year as part of a typical credential or certification process to maintain that PMP Certification."[249]

64. (2) Crowded markets with multiple competitors and low-cost alternatives. Evidence in this case indicates that for several different potential markets considered, there was substantial competition, including: multiple competitors and peers listed; a crowded market with low-cost alternatives; many players offering PAL-like products in the Project, Program, and Portfolio Management ("PPPM") space; and a variety of players targeting advanced learning offerings outside of PPPM. This evidence includes yet is not limited to:

a. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) lists direct competitors (not exhaustive) for PAL as a "Corporate/org L&D tool (excl. academic institutions)," including (1) Sandbox, (2) STS, and (3) Shark World.[250] The presentation identifies substitutes as (1) on-the-job training / mentoring and (2) classroom learning / e-learning.[251]

b. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) lists competitors for "PAL as L&D tool targeted specifically at academic providers / institutions" as (1) STS (REP), (2) doublemasters (REP), and (3) Prendo.[252] It further lists its "Peers" as (1)

248 Sterling Chamberlain, Dep. Tr., 9/25/2020, at 95:3-10.
See also: Sterling Chamberlain, Dep. Tr., 9/25/2020, at 133:14-19. ("There -- well, there were two classes of target users. One was the project management professionals that belonged to PMI's PMP network; the other was project managers who may be working for a company or in a group that may not also -- that they -- those users may not be project management professionals in the PMI system.")

249 Alicia Sanchez, Dep. Tr., 9/30/2020, at 90:1-10.

250 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -884-885.

251 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -885.

252 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -909.

CONFIDENTIAL



Bloomberg Aptitude Test, (2) personality / psychometric tests, and (3) classroom simulation tools (*e.g.*, StratX Solutions).[253]

c. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) evaluates PAL as a candidate screening tool for PM related recruiting and lists its "competitive set" as (1) internal screening processes / tools, (2) other recruiting firms, and (3) other "PAL-like simulation tools (e.g., AXELOS) and assessment tests."[254] The presentation further indicates that a "variety of screening techniques are currently used to screen candidates across the recruiting lifecycle,"[255] including automated prescreening, resume review, phone interview, reference checking, aptitude assessment, and traditional interviews.[256]

d. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) explains that, with respect to PAL as an academic L&D tool, "[t]here are well established approaches to teaching project management, both technical (e.g., textbook) and real world emulation (e.g., case studies/workshops, projects)."[257] The presentation further indicates that "[i]n the education space, there are several types of programs that include Project Management courses," including MBA programs, elective / program requirements, and PM-specific degrees and majors,[258] and that "Project Management simulation software is one approach, among many, used to teach Project Management."[259]

e. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) indicates that "[t]here are many players that have simulation based PM L&D tools in the market – PAL is not the first to the market, even though its science/technology behind it is differentiated."[260]

f. PAL Business Team "PAL 2017 Business Case for Pilot" (Dec. 2016) discusses findings from PwC Strategy&'s assessment and explains that "[c]lassroom and traditional e-learning are the dominant external Learning and Development products/services currently being utilized in the market."[261]

---

253 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -909.

254 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -918.

255 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -919.

256 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -920.

257 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -910.

258 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -911.

259 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -912.

260 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -886.

261 PAL Business Team, PAL 2017 Business Case for Pilot (Weiss Exhibit 14), 12/8/2016, PMI00009597, at -606.



g. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) indicates that "[t]here are many players offering PAL-like products in the PPPM space" and lists eight competitors.[262] Further, the cost per learner is indicated to be $45 at the low end to $150 to $600 at the high end.[263] The presentation further emphasizes that "[a]dditionally there are also a wide variety of players targeting advanced learning offerings outside of PPPM" and lists six simulation and gamification providers.[264]

h. Boromisa "PAL Commercialization Project – Executive Summary" (Nov. 2017) indicates that "there are quite a few existing products in the market that either emulate or co-opt the features implemented on PAL, (for instance, a free agile simulation in Minecraft, several social skill simulations using video recorded actors, a similar product developed by NASA that failed to commercialize). In short, differentiation in the training market will be extremely difficult given that there are several very similar products that deliver a combination of better, cheaper or faster outcomes than PAL."[265]

i. Boromisa "PMI PAL Commercialization Go/No Go Recommendation" (Nov. 2017) describes a "Crowded Market With Low Cost Alternatives" as a challenge related to the PAL product.[266] The presentation further indicates that "[s]everal responsive simulations exist that use video-taped meetings and responses from paid actors to convey body language and tone – at a significantly cheaper cost to produce than 3D virtual environments."[267] The presentation provides "[c]rowded simulation market, with inexpensive options" as one of four rationales to support a "No-Go" recommendation for PAL in the B2B market.[268]

j. WTRI CEO (2020) described the strategy to pursue competitive markets: "Well, we knew that PMI wanted to penetrate markets that they didn't have already. Markets that are dominated by their competitor, PRINCE2, so we were focusing on Australia and the UK."[269]

---

262 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -888.

263 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -888.

264 PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -889.

265 Brian Weiss, Dep. Tr., 9/30/2020, Exhibit 18, PMI00180159, at -161.

266 PMI, "PMI PAL Commercialization Go/No Go Recommendation," 11/27/2017, PMI00000141, at -147.

267 PMI, "PMI PAL Commercialization Go/No Go Recommendation," 11/27/2017, PMI00000141, at -147.

268 PMI, "PMI PAL Commercialization Go/No Go Recommendation," 11/27/2017, PMI00000141, at -151.

269 Lia DiBello, Dep. Tr., 9/28/2020, at 21:3-6.



based on an actual number of customers for an existing PMI product, and the discussion on cannibalization (see Section 5.g) indicates there is reason to believe that customers in the market for PMI certifications may be in the theoretical market for a potential product based on the PAL product idea.

68. The market size and revenue opportunity figures discussed throughout this section ranging from $360,000 to $1 million are especially small in the context of (1) PMI's total revenue, which was over $180 million in 2014 and increased to over $330 million in 2019 (see Attachment B-1) and (2) the costs associated with PAL (see Section 5.e). After evaluating the evidence in this case, I conclude that while there are a large number of project managers and PMI customers in existence, there is no evidence suggesting that more than a small number of potential customers (if any) would be willing to pay a high enough price for the PAL product idea to support more than a small market opportunity.

## c. Marketability

69. **Overview**. Marketability includes areas such as marketing strategy, product features, product benefits, product-market fit (*i.e.*, whether the product addresses customer needs and/or offers a value proposition for particular customer segments at a reasonable price), customer adoption rates, window of opportunity to enter the market.

70. **Summary of Opinions**. After evaluating the evidence in this case, I conclude that that the PAL product idea had limited marketability for multiple reasons. First, as discussed above in Section 5.a, there is a lack of customer purchases, lack of demand, and lack of value proposition. Second, as discussed in Section 5.b, there was a small market opportunity. Third, additional marketability analysis conducted for the PAL product idea concluded that PAL, scenario-based tools, and the use of gamification for training are (1) not well understood for developing Project Managers ("PMs"), (2) not considered useful relative to other tools, (3) not as likely to be deployed as other tools, and (4) PAL is not the right format to address the need for business and leadership skills. This analysis includes yet is not limited to:

a. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) explains that "[s]cenario based tools and the use of gamification for training are not yet well understood for developing PMs."[279] The presentation indicates that "Scenario-based / Simulation

[279] PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -869.



theoretical net present value of $94,546 based on a six-year value.[403] For the reasons discussed above, this is not specific to PAL and it is a theoretical analysis that is not reliable, relevant, or informative of the economic value of PAL. Nonetheless, this value is small compared to anticipated overall investment and consistent with later estimates of PAL's theoretical net present value.

### g. Business Rationale

97. **Overview**. Business rationale includes areas such as potential return on investment, risk analysis, financial planning, use of resources, management rationale, staff rationale, fit with organization culture, fit with organization values, impact on existing customers, impact on existing products and services, exit strategy (*e.g.*, resale value), economic climate, and more.

98. **Summary of Opinions**. Regardless of whether the PAL product idea was worth exploring in 2015, the decision to discontinue pursuing it was a rational and reasonable business decision based on the evidence and my analysis presented herein, as well as based on the information available at the time. The decision to discontinue pursuing the PAL product idea made economic and business sense for multiple reasons, including yet not limited to: (1) the lack of demand, market, marketability, and uncertain economic value for PAL discussed above and throughout this report, (2) while the investment that already occurred was a sunk cost, third-party analysis indicated substantial additional investment would have been required to bring the PAL product idea to market, (3) new product failures are common, so even if PAL were launched as a product, there may have been a reasonably high probability of failure, (4) even if the PAL product idea succeeded as a product, it would risk cannibalizing PMI's existing PMP business, (5) WTRI and PMI appeared to have different views on target customers, projections, and market opportunity, as well as challenges working together, indicating that it may not have been productive for the two parties to work together, (6) PMI's strength, growth, and focus in its core strategic markets indicated PMI would have had other more productive uses of resources than continuing to invest in PAL, (7) documents produced in this case and publicly available state that WTRI has experience in a variety of industries and has been successful, indicating it is reasonable that WTRI would

403 PMI, Project Makeup Updated Calc - Ind w Excel - PO Prices schedule $5M.xlsx, Tab "notes," PMI00572536. A Relativity search indicated "2/17/2015" as the "Primary date" for this document. An NPV of $94,546 is consistent with the values in Tab "Summary P&L," because the value of Operating Profit in year 1 is negative $1,946,027 and by year 6 it is only $5,041,866. Because the later years are discounted by a discount rate in NPV calculations, the earlier years with large negative numbers weigh in more than later years.



have had other more productive uses of resources than continuing to invest in PAL, and (8) the opportunity cost of investing more into PAL would have reduced resources available for other areas of PMI and WTRI.

99. (1) Lack of demand, market, marketability, and uncertain economic value. As discussed above, the evidence in this case showed there was a lack of demand for PAL (Section 5.a), a small potential market for PAL (Section 5.b), a lack of marketability for PAL (Section 5.c), and an uncertain economic value for PAL (Section 5.f). Due to this evidence based on interviews feedback, and surveys with potential customers, it made rational business sense to discontinue pursuing the PAL product idea.

100. (2) Substantial additional costs. Economically, when evaluating the decision on whether or not to continue pursuing PAL, all costs to date should be considered "sunk costs," meaning the costs had already occurred and it would have been appropriate to not factor them in to future decision-making.[404] Even after considering past costs as sunk, the evidence as of November 2017 indicated that multiple versions of the PAL product idea were being considered and that substantial additional investment would have been required to bring a version of the PAL product idea to market. See Sections 5.d and 5.e. Further evidence of additional costs that may have been incurred in different scenarios includes yet is not limited to:

a. PwC Strategy& "PAL Deep Dive Assessments" (Sept. 2016) indicates that with respect to PAL as an academic L&D tool that "generating sufficient revenue in this space would require PMI to...[i]nvest in a sales force to go after a set of buyers where PMI has no existing presence/relationships."[405] The presentation subsequently concludes "we recommend PMI not prioritize this opportunity in the short to mid-term."[406]

b. Boromisa "PAL Commercialization Project – Executive Summary" (Nov. 2017) emphasizes that "PMI would have to invest significant additional resources to build capabilities in marketing, sales and distribution, more than was initially projected in the PAL project plan. This should not be done outside of the broader transformation

[404] While it is economically appropriate to not consider past sunk costs in a net present value analysis or analysis of future decision-making, it is economically appropriate to consider the sunk costs in return on investment ("ROI") calculations considering the project as a whole. Further, past costs may be indicative of future costs, so it may be reasonable to consider past costs when evaluating potential future costs.

[405] PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -910.

[406] PwC Strategy&, "Org Markets Assessment & GTM," 9/13/2016, PMI00050810, at -910.

# EXHIBIT 26
# FILED UNDER SEAL

# EXHIBIT 27

# FILED UNDER SEAL

# EXHIBIT 28

402 EXHIBIT 28

# Games & Simulation Support

## Statement of Work (SOW)

**Submitted By**

Alicia Sanchez
Czarina Games ("Consultant")
2333 Fairview Ter
Alexandria, VA 22303
240-377-1675
E-mail: czarinagames@gmail.com

**Submitted to:**

Project Management Institute ("PMI")
14 Campus Blvd
Newtown Square, PA 19073

**January 5, 2016**

# Verification and Planning of Content Development Processes

All services identified within this SOW are provided in support of PMI's Advanced Learning (PAL) Project, under project code 14ORG1711.

Consultant shall advise PMI on knowledge elicitation strategies for developing rehearsal-based simulation content.

Deliverables shall include findings and recommendations for PMI's knowledge elicitation and content development process.

## Services and Pricing

| Services/Task | Hours NTE | Rate/ Unit | Costs |
|---|---|---|---|
| **Task 1: Data Collection Process** | | | **$10,500.00** |
| Subtask 1.1: Review all of the current data collected and analyze the current data collection strategy to provide mentoring, input, guidance and recommendations on the current strategy to ensure that the process is complete, repeatable, and to make it is standardized and scalable. | 60 | $175 | $10,500.00 |
| **Task 2: Verification of In-World Manifestation of Challenges / Impacts / Learner Options** | | | **$1,750.00** |
| Subtask 2.1: Review and provide guidance and recommendations regarding WTRI's implementation of challenges / impacts / options in the simulation. This will include how the data collected are translated into behaviors, situations, and outcomes that are operationalized or manifested in the virtual world. | 10 | $175 | $1,750.00 |
| **Task 3: Performance of Content** | | | **$1,750.00** |
| Subtask 3.1: Provide guidance, inputs and recommendations on establishing procedures and policies within the initial data collection processes and extending to future iteration of Alphas and Betas on determinations of how the content is performing within the Virtual World. Any deficiencies found will be addressed via recommendations of modifications to the data collection process. | 10 | $175 | $1,750.00 |

| Services/Task | Hours NTE | Rate/ Unit | Costs |
|---|---|---|---|
| **Total of All Services** | 80 | $175 | **$14,000.00** |

## Timeline

Consultant shall begin work immediately upon execution of this SOW. Work shall continue through completion of the services / tasks identified above. All work is estimated to be complete within four (4) weeks of the date of this SOW.

**Consultant**

Alicia D. Sanchez

CEO, Czarina Games

Date: Jan 5, 2016

**Project Management Institute**

Victor Carter-Bey

Director, Certifications

Date:

# EXHIBIT 29

407

EXHIBIT 29


10 September 2015

Dear National Science Foundation SBIR Program Representatives:

On behalf of the Project Management Institute (PMI), I am writing in support of WTRI's proposal for an NSF Phase IIB award for the Learning Project Management Skills Through "Experience" and Realistic Rehearsal in 3D Virtual Environments.

In January 2014, PMI provided a letter of support for the Phase II award. We are encouraged by NSF's continued support of this product and the promising results from the NSF supported research. PMI has signed a software development and purchase agreement with WTRI in order to include this capability in the PMI portfolio of products, and has invested an initial $1Million.

According to PMI's research, effective execution of organizational strategy and talent management are two critical issues facing today's organizations. Our *Pulse of the Profession* research has found that organizations that do not utilize effective project management waste $109 million for every $1 billion invested due to poor project performance. That risk is further increased if organizations do not invest in the talent they need to achieve the business benefits from their strategic projects. As reported by the *Project Management Talent Gap Report*, produced by the Anderson Economic Group for PMI, 1.57 million new project management jobs will be created globally each year through 2020. Along with this significant job growth will be a momentous expansion in the economic footprint of the profession, which is slated to grow by US$6.61 trillion. As the United States strives to remain competitive in this changing world, the stakes are incredibly high to ensure that U.S. companies succeed with their most strategic projects.

PMI believes that the proposed WTRI product can help develop the critical talent needed to work on complex and volatile projects. We are excited about offering this product to our members and encourage the NSF to continue supporting WTRI's work in this area.

Sincerely,

Brian A. Weiss, M.B.A.
Vice President, Practitioner Markets

14 Campus Blvd | Newtown Square, PA 19073-3299 USA | tel: +1 610 356 4600 | fax: +1 610 356 4647 | PMI.org

Redacted

**From:** Brian Weiss
**Sent:** Thursday, September 10, 2015 12:00 PM
**To:** Lia DiBello <Lia@WTRI.com>
**Cc:** Marjorie Gordon <Marjorie.Gordon@pmi.org>; Victor Carter-Bey <Victor.Carter-Bey@pmi.org>
**Subject:** NSF/Contract/Payment

Lia:

As discussed earlier today, we have executed the contract with WTRI and will overnight to you a copy. Please let us know if it doesn't arrive.

We have also initiated the process to transfer the initial $1M to your bank. Again (as I'm sure you will!!), please let us know of any issues.

Attached, as agreed, is a letter to support your NSF funding. Please let me know if this is sufficient or if you need it altered in any way. Victor and I will await the potential dates to go to Washington and meet with the people from NSF. We will figure out which one of us can go (based on availability) when we know the dates.

I toast a glass of champagne with you virtually today and hope we can find a date to do it in-person before too long. It has been great working with you and your team to date even though we both know the real work starts now!

Looking forward to a great partnership into the future with WTRI!!

All the Best,
Brian

Brian A. Weiss, MBA
Vice President, Practitioner Markets
Project Management Institute
14 Campus Boulevard
Newtown Square, PA 19073-3299 USA
Phone: +1 610 356 4600 ext. 1249
Fax: +1 610 355-1685
E-mail: brian.weiss@pmi.org
www.PMI.org
www.ProjectManagement.com
www.ProjectsAtWork.com

# EXHIBIT 30

# FILED UNDER SEAL

# EXHIBIT 31

419

EXHIBIT 32



Planet Depos
We Make It Happen™

# Transcript of Timothy Marshall, Corporate Designee

**Date:** October 21, 2020
**Case:** Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

15:42:49

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

WORKPLACE TECHNOLOGIES RESEARCH, INC.,

Plaintiff,

vs. Case No. 3:18-CV-01927-JM-MSB

Hon. Jeffrey T. Miller

PROJECT MANAGEMENT INSTITUTE, INC.,

Defendants.

_______________________________

PROJECT MANAGEMENT INSTITUTE, INC.,

Counter-Claimant,

vs.

WORKPLACE TECHNOLOGIES RESEARCH, INC.; and DOES 1-15 inclusive,

Counter-Defendants.

________________________________

EXHIBIT 32

Transcript of Timothy Marshall, Corporate Designee
Conducted on October 21, 2020 2

VIDEOTAPED DEPOSITION OF

TIMOTHY MARSHALL

via videoconference

Wednesday, October 21, 2020

4:09 p.m. EST

Job No.: 328939

Pages: 1 - 164

Stenographically Reported By:

Alison C. Webster, CSR-6266, RPR, RMR, CRR, RDR

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

422 EXHIBIT 32

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF AND COUNTER-DEFENDANTS

REGIS C. WORLEY, JR., ESQUIRE
SCOTT PENNER, ESQUIRE
Eversheds Sutherland
12255 El Camino Real
San Diego, California 92130
858.252.6458
regisworley@eversheds-sutherland.com
scottpenner@eversheds-sutherland.com

ON BEHALF OF THE DEFENDANT AND COUNTER-CLAIMANT

ERIC J. BAKEWELL, ESQUIRE
Venable LLP
2049 Century Park East
Suite 2300
Los Angeles, California 90067
310.229.9900
ejbakewell@venable.com

ALSO PRESENT:
Aubrey Antovich, Esq.
Bridgette Rast, Planet Depos host
Lucien Newell, video technician

A. The only sense I had was that there was rising tension between the two companies, but I don't know anything specific. The email that you brought up before was -- would be a good example of something that likely was going to be a point of contention. 20:11:37 20:11:41 20:11:44 20:11:47 20:11:49

Q. The coding email? 20:12:02

A. Yeah, the one that talked about the -- you know, the -- the dinner being canceled and going into a hard discussion the next day. You know, that sort of stuff. 20:12:02 20:12:02 20:12:02 20:12:03

Q. Did Neudesic have any reason to think that PMI wanted the project to fail? 20:12:03 20:12:16

A. Well, I can't comment on PMI's state of mind, or anything, but we had no reason to believe that they would want something they're paying for to fail. 20:12:18 20:12:23 20:12:25

Q. Did Neudesic have any reason to believe that PMI tried to sabotage the project? 20:12:37 20:12:37

A. No, we have no reason to believe that. 20:12:38

Q. Were any of the -- well, are you aware of any of the individuals from PMI that were working on the project getting reassigned away from the project? 20:12:40 20:13:17 20:13:21

A. I'm not aware of them being reassigned. But what I -- I do know is that, you know, the people that we interacted with did turn over somewhat while -- over the course of the project, so, you know, some people 20:13:26 20:13:31 20:13:34 20:13:37

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
)
SS)
COUNTY OF OAKLAND )

I, ALISON WEBSTER, certify that the deposition of TIMOTHY MARSHALL was taken before me via videoconference on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

Alison C. Webster
______________________________________________
ALISON C. WEBSTER, CSR-6266, RPR, RMR, CRR, RDR
Notary Public,
Oakland County, Michigan.

My Commission expires: May 1, 2023

# EXHIBIT 32
# FILED UNDER SEAL

# EXHIBIT 33

# FILED UNDER SEAL

# EXHIBIT 34

456 EXHIBIT 34

Eric J. Bakewell (SBN 241529)
EJBakewell@Venable.com
Matthew J. Busch (SBN 307396)
MJBusch@Venable.com
**VENABLE LLP**
2049 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone: (310) 229-9900
Facsimile: (310) 229-9901

*Attorneys for Defendant and Counterclaimant*
Project Management Institute, Inc.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

WORKPLACE TECHNOLOGIES RESEARCH, INC.,

Plaintiff,

v.

PROJECT MANAGEMENT INSTITUTE, INC.,

Defendant.

---

PROJECT MANAGEMENT INSTITUTE, INC.,

Counterclaimant,

v.

WORKPLACE TECHNOLOGIES RESEARCH, INC.; and DOES 1-15 inclusive,

Counterdefendants.

Case No. 18-CV-1927-JM-MSB

Hon. Jeffrey T. Miller
Courtroom No. 5D

**PROJECT MANAGEMENT INSTITUTE, INC.'S FIRST SUPPLEMENTAL RESPONSES TO WORKPLACE TECHNOLOGIES RESEARCH, INC.'S INTERROGATORIES, SET ONE (NOS. 1-10)**

Action Filed: August 20, 2018
Trial Date: July 26, 2021

PROPOUNDING PARTY: WORKPLACE TECHNOLOGIES RESEARCH, INC.

RESPONDING PARTY: PROJECT MANAGEMENT INSTITUTE, INC.

SET NUMBER: ONE

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant and Counterclaimant Project Management Institute, Inc. ("PMI") hereby responds to Plaintiff and Counterdefendant Workplace Technologies Research, Inc.'s ("WTRI") Interrogatories (Nos. 1-10) as follows:

**GENERAL OBJECTIONS**

1. PMI is presently pursuing its investigation of the facts and law relating to WTRI's Interrogatories. PMI's objections and responses are based on the knowledge, information, and belief of PMI at this time, as well as the documents in PMI's possession, custody, or control. Therefore, these objections and responses are given without prejudice to PMI's right to produce evidence of subsequently discovered facts or to add, modify, or otherwise change or amend the objections and responses or to rely on additional evidence at trial or in connection with any pretrial proceedings. PMI expressly reserves the right to amend or supplement these objections and responses.

2. PMI objects to the Interrogatories to the extent that the Interrogatories are compound and/or contain impermissible subparts.

3. PMI objects to each and every instruction, definition, and interrogatory to the extent that they seek information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. PMI objects to each and every instruction, definition, and interrogatory to the extent that they are vague and ambiguous; overly broad; unduly burdensome; oppressive; and/or seek information that is not within PMI's possession, custody, or control.

5. PMI objects to each and every instruction, definition, and interrogatory to the extent that they seek documents protected from disclosure by the attorney-client privilege, work product doctrine, third-party privacy rights, and/or any other available privilege or immunity. Any inadvertent production of privileged documents or things shall not constitute a waiver of: (a) any such

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

privilege or immunity; (b) any grounds for objection to discovery with respect to such information or document; or (c) PMI's right to demand the return of inadvertently disclosed materials or to object to the use of any such information or document during any subsequent proceeding in this action or elsewhere.

6. PMI objects to each and every instruction, definition, and interrogatory to the extent that they attempt to impose any burdens inconsistent with or in addition to the obligations under the Federal Rules of Civil Procedure, Federal Evidence Code, the Local Rules of the Southern District of California, this Court's local rules, or any other applicable law.

7. PMI objects to each and every instruction, definition, and interrogatory to the extent that they are duplicative, cumulative, and/or seek information that may be obtained from other sources or through other means of discovery that are more convenient, more efficient, more practical, less burdensome, or less expensive.

8. PMI objects to each and every instruction, definition, and interrogatory to the extent that they are speculative, lack foundation, or improperly assume the existence of hypothetical facts that are incorrect or unknown to PMI.

9. PMI objects to each and every instruction, definition, and interrogatory to the extent that they call for a legal conclusion. Any response by PMI should not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in WTRI's instructions, definitions, or interrogatories.

10. PMI objects to each and every instruction, definition, and interrogatory to the extent they require PMI to prepare or make compilations, abstracts, audits, or summaries of or from PMI documents and the burden or expense of preparing or making those would be substantially the same for WTRI.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

11. PMI objects to the definition of the terms "YOU," "YOUR," and "YOURS" to the extent that those definitions seek documents and information beyond PMI's possession, custody, and control.

12. PMI objects to the definition of the terms "IDENTIFY" and "IDENTIFYING" to the extent that those definitions create compound interrogatories or impermissible subparts.

13. PMI objects to Instruction No. 1 to the extent that it seeks documents and information beyond PMI's possession, custody, and control.

14. PMI objects to Instruction No. 3 to the extent that it calls for privileged information and information created after the start of the litigation.

15. PMI objects to Instruction Nos. 4 and 8 to the extent that they attempt to impose a burden above and beyond the requirements of the Federal Rules of Civil Procedure.

16. PMI objects to Instruction No. 6 to the extent that it requires a detailed identification of records by Bates number in response to every interrogatory.

17. By responding to the Interrogatories, PMI does not waive any objection that may be applicable to: (a) PMI's use of any document produced; or (b) the admissibility, authenticity, relevance, or materiality of any such documents to any issue in this case.

18. The following responses constitute PMI's best information and belief at this time, based upon reasonable inquiry and the facts presently available and, except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that PMI has answered or objected to any interrogatory or part thereof should not be taken as an admission that PMI accepts or admits the existence of any facts set forth or assumed by such interrogatories, or that such answer or objection constitutes admissible evidence. The fact that PMI has responded to part or all of any interrogatory is not intended and shall not be

construed to be a waiver by PMI of all or any part of any objection to any interrogatory.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

Describe in detail the PMI Trade Secrets with reasonable particularity pursuant to Cal. Code Civ. P. § 2019.210.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

PMI incorporates by reference its General Objections. PMI objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other applicable privileges. PMI objects to this Interrogatory on the ground that it calls for premature expert opinion. PMI also objects to this Interrogatory to the extent it calls for a legal conclusion. PMI further objects to the Interrogatory to the extent that it seeks confidential and sensitive financial and business information. PMI further objects to this Interrogatory to the extent it is cumulative and duplicative of other Interrogatories served by WTRI. PMI further objects to this Interrogatory to the extent it imposes an obligation beyond the Federal Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, PMI responds as follows: PMI's proprietary flow activity templates and corresponding spreadsheet designs are story-writing tools used by programmers of gamified virtual environments to model increasingly complex and varied scenarios in virtual learning games (the "Flows"). The Flows enable virtual learning game users to advance their expertise in a given game (which models a real-life project) in record time. PMI's Flows are a marked improvement over previous scenario-based decision-making game designs as they provide a gamer in a virtual world vast numbers of decision-making outcomes that were not possible under pre-existing scenario-based learning models. Previous models did not allow for sufficient complexity to be scalable in a virtual world.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

The flow charts and spreadsheets that comprise PMI's Flows work in tandem. This new approach to simulation development in educational systems allows subject matter experts who develop the in-game project management education lessons ("SMEs") and developers to work rapidly to produce entirely new experiences for users within minutes instead of days or weeks. Individual spreadsheet cells contain the underlying learning scenario that a project management learner utilizing a virtual world can choose (*e.g.*, schedule team meeting) that correspond to a particular flow. The spreadsheets also facilitate prompt scoring of in-game interactions and measure proficiency advancement for each choice the user makes.

The flow/spreadsheet tandem also enables a specific flow to be repurposed across multiple scenario choices leading to the development of increased options for game users. This is a significant advancement over previous methods that forced designers of project management simulations to create flows that only allow for a discrete set of choices within an activity. The unique combination of PMI's flow and spreadsheet system allows SME's to quickly populate PMI's spreadsheet with new scenarios including the user's varied choices of action and non-user characters' responses to user choices. The combination of flows and spreadsheets also allow developers to quickly create "activity logic" (possible outcomes based on a user's in-game decisions) populated with SME-created spreadsheet content without the developer changing the logic. This results in almost instantaneous creation of new scenarios.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

Additionally, PMI identifies the following documents as part of its response pursuant to Federal Rule of Civil Procedure 33(d): PMI00000898 – PMI00000974.

Dated: August 10, 2020 VENABLE LLP

By: /s/ Eric J. Bakewell
Eric J. Bakewell
Matthew J. Busch

Attorneys for Defendant and Counterclaimant
Project Management Institute, Inc.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

**PROOF OF SERVICE**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

*Workplace Technologies Research, Inc., v. Project Management Institute, Inc.,*
USDC-Southern District, Case No. 2:18-cv-1927-JM-MSB

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Venable LLP, 2049 Century Park East, Suite 2300, Los Angeles, California 90067.

On August 10, 2020, I served a copy ☑ / original ☐ of the foregoing document(s) described as **PROJECT MANAGEMENT INSTITUTE, INC.'S FIRST SUPPLEMENTAL RESPONSES TO WORKPLACE TECHNOLOGIES RESEARCH, INC.'S INTERROGATORIES, SET ONE (NOS. 1-10)** on the interested parties in this action addressed as follows:

Jose L Patino
Scott A. Penner
Regis Worley
Justin Gray
Eversheds Sutherland (US) LLP
12255 El Camino Real, Suite 100
San Diego, CA 92130
Phone: (858) 252-6502
Email: JosePatino@eversheds-sutherland.com;
ScottPenner@eversheds-sutherland.com;
RegisWorley@eversheds-sutherland.com
JustinGray@eversheds-sutherland.com
wtri-pmi@eversheds-sutherland.com

**BY ELECTRONIC SERVICE:** I transmitted the above-stated document(s) and a copy of this declaration from my computer (electronic notification address hlmcmeans@venable.com) located Venable LLP, 2049 Century Park East, Suite 2300, Los Angeles, CA 90067 to the interested parties in this action whose names and e-mail addresses are listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. Service by e-mail or electronic transmission was based on a court order or an agreement of the parties to accept service.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under of the laws of the United States of America and the state of California that the foregoing is true and correct.

Executed on **August 10, 2020** at Los Angeles, California.

Hannah McMeans [signature]

Hannah McMeans

# EXHIBIT 35

# FILED UNDER SEAL

# EXHIBIT 36

# FILED UNDER SEAL

# EXHIBIT 37

481

EXHIBIT 37

Register
Log In

# Learn About PMI

## We're the leading not-for-profit professional membership association for the project management profession

Our professional resources and research deliver value for more than 2.9 million professionals working in nearly every country in the world to enhance their careers, improve organizational success and further mature the profession.

Our worldwide advocacy for project management is reinforced by our globally recognized standards, certification program, extensive academic and market research programs, chapters, and our volunteer and professional development opportunities.

## Certifications

We offer eight certifications that recognize knowledge and competency, including the Project Management Professional (PMP)® certification – renowned as the global gold standard. Salaries and career opportunities for PMPs show that employers recognize the value delivered by trained practitioners.

Learn more about Certifications

## Global Standards

Our standards for project, program and portfolio management are the most widely recognized ones in the profession and are a model for project management in business and government. They are developed by thousands of PMI volunteers with experience in every type of project and provide a common language for project management around the world.

Learn more about our Global Standards

## Chapters and Community

Much of our activity takes place in chapters located in over 80 countries. Chapters are open to PMI members and led by volunteers. Participate to enjoy events, meet new peers, network and share your knowledge and experience.

Discover our Chapters

ProjectManagement.com is PMI's knowledge portal, where all project managers can create and explore content and participate in a diverse, vibrant, global community.

Check out ProjectManagement.com

## Training and Education

From our live and virtual events to our e-learning courses and face-to-face seminars, we offer a wide range of professional development opportunities.

Search our training options

Experience our Events

You can also turn to our Authorized Training Partners for project management training and continuing development. For academic education, the PMI Global Accreditation Center for Project Management Education Programs (GAC) has recognized nearly 100-degree programs in institutions worldwide.

Search for Authorized Training Partners

Find out about GAC accredited academic programs

## Thought Leadership

Pulse of the Profession®, our annual research of trends in project management, plus in-depth reports on emerging topics, form the core of our widely recognized thought leadership platform, which advocates better business results through improved project outcomes. We also present a comprehensive Thought Leadership series each year, focused on a topic of strategic importance, with insights and perspectives for leaders at all levels.

Explore our Thought Leadership

## Academic Research

Our research program is the most extensive in the field and advances the science, practice and profession of project management. We expand the project management body of knowledge through research projects, symposiums and surveys, and we share information through publications and working sessions.

Register Log In

Learn more about our Academic Programs & Research

Project
Management
Institute.

© 2021 Project Management Institute, Inc. | 14 Campus Blvd, Newtown Square, PA 19073-3299 USA

Search
What are you looking for?

# EXHIBIT 38

484 EXHIBIT 38

WTRI's mission has been research to improve human thinking while at the same time providing benefits to organizations. We have a number of services and products developed from our research.

We are primarily Cognitive Scientists, neuroscientists, computer scientists and economists who do research to find ways to *help people adapt to* an increasingly complex world. Our products are the outcome of that work.

We have an interesting history. We started as university scientists trying to understand the role of cognition – expert thinking in specific – and the forces that affect businesses; what makes businesses successful and what causes their demise? We worked with economists to help us define models of success, and with cognitive scientists to design activities that develop the underlying business capabilities in an accelerated fashion. Most of our early work in this area was funded by NASA and the National Science Foundation and has a strong scientific history.

The products we are best known for are the Strategic Rehearsal and the Cognitive Agility Assessment tool. Thousands of people have gone through our rehearsals and taken advantage of our assessments. These services and products are powered by enabling technologies that are being constantly refined by our experience, our research and advances in technology.

Please take a moment to read about each one of these amazing innovations here on our website!

The FutureView™ Suite consists of four interconnected components:

1. The dynamic Strategic Modeler
2. The Patterned Event Generator
3. The Cognitive Agility Assessment
4. The FutureView Virtual World

The Risk is Virtual But the
Outcomes are Real
CONTACT US
[HTTPS://WTRI.COM/CONTACT-
US/]



WTRI [https://wtri.com/]
+1 619-232-8054 [tel:6192328054]
info@wtri.com [mailto:info@wtri.com]
3333 Camino Del Rio South, Suite 320 San Diego, CA 92108
Copyright © 2021 WTRInc. All rights reserved.

# EXHIBIT 39

# FILED UNDER SEAL

# EXHIBIT 40
# FILED UNDER SEAL

# EXHIBIT 41

# FILED UNDER SEAL