1
2
3
4
5
6
7      UNITED STATES DISTRICT COURT
8      SOUTHERN DISTRICT OF CALIFORNIA
9

| | |
|---|---|
| WORKPLACE TECHNOLOGIES RESEARCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> PROJECT MANAGEMENT INSTITUTE, INC., <br><br> Defendant. | Case No.:  18cv1927 JM (MSB) <br><br> **ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| PROJECT MANAGEMENT INSTITUTE, INC., <br><br> Counter-Claimant, <br><br> v. <br><br> WORKPLACE TECHNOLOGIES RESEARCH, INC., <br><br> Counter-Defendant. | |

Presently before the court are Plaintiff/Counter-Defendant Workplace Technologies Research, Inc. ("WTRI")'s Motion for Summary Judgment (Doc. No. 188) and Defendant/Counter-Claimant Project Management Institute, Inc. ("PMI")'s Motion for Summary Judgment, or in the alternative, Partial Summary Judgment (Doc. No. 190). Pursuant to Local Rule 7.1(d)(1), the court finds the matters presented appropriate for

resolution without oral argument.   Having considered the Parties' arguments, the evidence, and the law, the court rules as follows.

## BACKGROUND

### I.   Factual Background

This action arises out of an unsuccessful endeavor between WTRI and PMI to jointly develop educational project management software.[1]

#### A.   Development Agreement

On September 8, 2015, WTRI and PMI executed a "Software Technology Development and Purchase Agreement" setting forth the Parties' agreement to develop an "immersive, 'accelerated learning' technology platform." (Doc. No. 158-9, Ex. 1 ("Development Agreement")).  The platform was to be "derived from existing technology developed by WTRI" that would be "further enhanced with project management specific content" the Parties would jointly develop.  Development Agreement, Ex. A.

The Development Agreement proposed the development of five initial "Alpha" versions of software—"Alpha 1" through "Alpha 5"—followed by a "Charlie" version production build.  *Id.* at §§ 2.5; 5.  A Software Development Plan was attached as Exhibit B to the Development Agreement.  *Id.*, Ex. B.   The plan described the "schedule" and "responsibilities" of the WTRI and PMI teams.  *Id.*

The project was to be "developed in accordance with the product description and specifications to be mutually agreed to by the Parties" known as "Acceptance Criteria." *Id.* at § 5.1.  The "Acceptance Criteria" were laid out as seventy-nine requirements set forth in Exhibit A of the Development Agreement.   *Id.*, Ex. A at 10-27.   Under the Development Agreement, each "Alpha" and "Charlie" version of software was subject to review and testing upon delivery to determine whether the software met the "applicable Acceptance Criteria[.]"  *Id.* at § 5.2.

---

[1] The software was codenamed, at various stages of its development, the PAL project and/or Proteum.

The Development Agreement provided that WTRI would develop the project with PMI's collaboration in exchange for payment of up to $4,000,000. *Id.* at §§ 1.1; 2.5. PMI was to make an initial non-refundable payment of $1,000,000 to be used by WTRI to seek matching funds from the National Science Foundation ("NSF"). *Id.* at § 2.5(a). If PMI chose to accept the "Alpha 5" version of the software, PMI would make a second payment to WTRI totaling $1,000,000. *Id.* at § 2.5(b). WTRI would then develop the "Charlie" version production build. *Id.* at § 2.5(c). If PMI accepted the "Charlie" version delivered by WTRI, PMI would make a third $1,000,000 payment upon delivery and a final $1,000,000 payment a year after the date of acceptance. *Id.* at §§ 2.5(c) and (d).

The Development Agreement provided terms by which PMI could choose to reject the "Alpha 5" or "Charlie" versions of the software project if these versions failed to meet "applicable Acceptable Criteria." *Id.* at § 2.5. Even if rejected, PMI could still elect to retain ownership of these versions. *Id.* at §§ 2.5(b) and (c). If PMI elected to do so, it would be obligated to make various monetary payments to WTRI. *Id.* If PMI elected not to retain ownership, it would no longer be obligated to make any further payments to WTRI. *Id.*

## B. First Amendment to Development Agreement

On November 29, 2016, PMI and WTRI signed an agreement to accelerate the acceptance testing schedule for the "Alpha 5" version of the software to be completed by December 1, 2016. (Doc. Nos. 190-3 at 2). Subsequently, on November 30, 2016, the Parties executed a First Amendment to the Development Agreement. (Doc. No. 158-9, Ex. 3 ("First Amendment")). The First Amendment provided that if PMI elected to reject and retain the "Alpha 5" version of the software, the Parties would enter into a Services Agreement within thirty days in lieu of monetary payment to WTRI. First Amendment at § 5.3.

///

///

3

### C.     Election to Retain Alpha 5 Software and Services Agreement

On December 2, 2016, Victor Carter-Bey, the Director of Certification for PMI, e-mailed Lia DiBello, the Chief Executive Officer and Director of Research for WTRI, to confirm PMI had evaluated the "Alpha 5" software and was electing to reject and retain ownership of this version. (Doc. No. 158-9, Ex. 4).

On December 15, 2016, the Parties signed a Services Agreement memorializing the Parties' agreement to perform a pilot study. (Doc. No. 158-9, Ex. 5 ("Services Agreement")). The Services Agreement was to become effective "on the date that PMI notifies WTRI that it will reject and retain ownership of the fifth (version) Alpha Software received from WTRI[.]" Services Agreement at 1. Pursuant to the Services Agreement, WTRI would "collaborate with PMI to design and develop a structured research program to conduct experimental testing" of the software. *Id.* at § 2.2. The Services Agreement included an "Activity Chart"—attached as Exhibit C. *Id.*, Ex. C. The chart "identifie[d] specific outputs and deliverables" and denoted whether PMI, WTRI, or both were responsible for these tasks. *Id.*, Ex. C at Section B—"Activity Chart."

### D.     Termination

On June 18, 2018, WTRI's counsel sent a "Notice of Termination" to Mark Langley, PMI's President and CEO, purporting to: (1) terminate the Development Agreement for cause pursuant to Section 9.4; (2) declare the Services Agreement void; and (3) terminate the Services Agreement pursuant to Section 6.2 "[o]ut of an abundance of caution." (Doc. No. 190-21 at 10, 11-12).

On August 16, 2018, Joseph Cahill, PMI's Senior Vice President of Finance and Administration responded: (1) setting forth PMI's understanding the Development Agreement had already been terminated when PMI rejected and retained ownership of the "Alpha 5" software; and (2) acknowledging the termination of the Services Agreement. (Doc. No. 190-22 at 2-3). WTRI filed the instant lawsuit shortly thereafter.

///

## II.   Procedural Background

On August 20, 2018, WTRI filed its initial Complaint in this action.  (Doc. No. 1). On October 25, 2018, WTRI filed a First Amended Complaint asserting causes of action for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraudulent misrepresentation; and (4) tortious interference with prospective business relations.  (Doc. No. 12).   The court subsequently granted PMI's motion to dismiss WTRI's First Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 24 at 15-25).

On April 2, 2019, WTRI filed a Second Amended Complaint asserting the same four causes of action.  (Doc. No. 25).  On August 13, 2019, the court granted in-part and denied-in-part PMI's Motion to Dismiss WTRI's Second Amended Complaint.   (Doc. No. 32).  Specifically, the court denied PMI's motion as to WTRI's breach of contract claim and claim for breach of the implied covenant of good faith and fair dealing with respect to the Development Agreement.  *Id.* at 18.  The court granted PMI's motion as to WTRI's claim for breach of the implied covenant of good faith and fair dealing with respect to the Services Agreement and WTRI's fraudulent misrepresentation and tortious interference claims.  *Id.*

On August 27, 2019, WTRI filed a Third Amended Complaint asserting the same four causes of action.  (Doc. No. 37).[2]  On January 22, 2020, the court granted PMI's motion to dismiss WTRI's fraud and tortious interference claims without leave to amend. (Doc. No. 42 at 4, 8).  The court subsequently denied WTRI's motion for leave to file a Fourth Amended Complaint.  (Doc. No. 111).

On February 19, 2020, PMI filed its Answer and Counterclaims against WTRI for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) federal and state statutory trade secrets misappropriation.  (Doc. Nos. 46 and 47).

---

[2] WTRI subsequently withdrew its claim for breach of implied covenant with respect to the Services Agreement.  (Doc. No. 39 at 11, n. 1).

18cv1927 JM(MSB)

On May 24, 2021, WTRI filed a motion for summary judgment (Doc. No. 126) and its *Daubert* motions (Doc. No. 128).  PMI timely filed three *Daubert* motions (Doc. No. 132, 134, 136) and a motion for summary judgment (Doc. No. 135).  On May 25, 2021, PMI belatedly filed: (1) a separate motion for partial summary judgment on its counterclaims (Doc. No. 139); (2) the declaration of Eric J. Bakewell in support of its summary judgment motions with accompanying exhibits; (Doc. No. 145); and (3) a fourth *Daubert* motion (Doc. Nos. 137, 146).

On June 9, 2021, the court struck PMI's multiple motions for summary judgment and related supporting documents and directed PMI to file a single, consolidated summary judgment motion.  (Doc. No. 154).  On June 16, 2021, PMI refiled a single, consolidated motion for summary judgment.  (Doc. No. 158).[3]

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*

Material facts are those that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *See id*.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id.* at 254.  The question is "whether a jury could reasonably find *either* that the [moving party] proved his case by the quality and quantity of evidence required by the

---

[3] Pursuant to the court's order on the Parties' Motions to Seal (Doc No. 165), the original versions of the Parties' Motions (Doc. Nos. 126 and 158) were refiled as Doc. Nos. 188 and 190.

governing law *or* that he did not." *Id.* (emphasis in original). "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor." *Id.* at 255.

The moving party bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading," *Liberty Lobby*, 477 U.S. at 248, and affidavits or declarations supporting his opposition "must be made on personal knowledge," Fed. R. Civ. P. 56(c)(4). The opposing party need not show the issue will be resolved conclusively in its favor. *See Liberty Lobby*, 477 U.S. at 248-49. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial. *See id.*

## ANALYSIS

## I.   Evidentiary Objections

Both WTRI and PMI have asserted numerous evidentiary objections to declarations and documents submitted by the other side. (ECF Nos. 182-2; 185-7, 201-4; 207-3). "In motions for summary judgment with numerous objections, it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *Doe v. Starbucks, Inc.*, No. SACV 08-0582 AG CWX, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).

To the extent that any objected-to-evidence is relevant and relied on by the court herein, the court overrules any asserted objections to that evidence. First, with respect to the Parties' objections as to authenticity, as both Parties have noted, the 2010 amendments to Federal Rule of Civil Procedure 56 "eliminate[d] the unequivocal requirement that evidence submitted at summary judgment must be authenticated[.]" *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016). Instead, Rule 56 "mandates only that the *substance* of the proffered evidence would be admissible at trial."

*Sweet People Apparel, Inc. v. Phx. Fibers, Inc.*, 748 F. App'x 123, 125 (9th Cir. 2019); *see also James Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 2:21-CV-02504, 2021 WL 4296208, at *5 (C.D. Cal. Sept. 10, 2021) ("Since the 2010 amendments to Rule 56 of the Federal Rules of Civil Procedure, evidence need not be admissible in the *form* presented to a court on summary judgment. Rather, it is the *content* of the evidence that must be admissible.") (emphasis in original); *Hartranft v. Encore Cap. Grp., Inc.*, No. 3:18CV01187 BEN (RBB), 2021 WL 2473951, at *11 (S.D. Cal. June 16, 2021) ("The Court will consider the substance of evidence that would be admissible at trial even if the form of the evidence is improper so long as that same evidence may be admissible in another form."). The court is not convinced the relied upon evidence could not be presented in a form admissible at trial.

Second, with respect to the Parties' objections as to relevance, lack of foundation or personal knowledge, and hearsay, such objections are "duplicative of the summary judgment standard itself." *San Diego Unified Port Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 3:15CV1401 BEN (MDD), 2018 WL 4680005, at *6 (S.D. Cal. Sept. 28, 2018). "Instead of *objecting*, parties should simply *argue* that the facts are not material. Similarly, statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *see Sandoval v. Cty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("[P]arties briefing summary judgment motions would be better served to 'simply *argue*' the import of the facts reflected in the evidence rather than expending time and resources compiling laundry lists of relevance objections.") (emphasis in original).

Finally, the court overrules WTRI's objections to various PMI declarations on the basis they were electronically signed. Under Section 2.f of this District's Electronic Case Filing Administrative Policies and Procedures, "[i]f the original document requires the signature of a non-registered signatory, the filing party must scan and electronically file

the original document."  Office of the Clerk, United States District Court for the Southern District of California, Electronic Case Filing Administrative Policies and Procedures Manual, §2(f) (March 31, 2021).   A declaration of a non-attorney bearing only an electronic signature does not comport with this rule.  *See Kohler v. Chelsea San Diego Fin., LLC*, No. 09CV2780 JAH (BLM), 2010 WL 8754384, at *4 (S.D. Cal. Dec. 9, 2010) (type-written signature does not comport with CM/ECF Administrative Policies and Procedures); *Johnson v. Ford Motor Co.*, No. 17-CV-11412, 2019 WL 78893, at *7 (E.D. Mich. Jan. 2, 2019)  (interpreting similar rule).

Nevertheless, the court declines to strike these declarations as inadmissible based on their non-compliance with this District's CM/ECF policies.  *See Eddie Silva v. Domino's Pizza*, No. SACV182145JVSJDEX, 2020 WL 5894578, at *3 (C.D. Cal. Aug. 1, 2020) (declining to deem declarations with DocuSign signatures as inadmissible given "extraordinary circumstances of the pandemic.").  To the extent these declarations contain information about which the declarants have personal knowledge and are competent to testify, and could be presented in an admissible form, they will be considered.

## II.   Breach of Contract Claims

PMI requests that the court enter summary judgment in its favor on WTRI's breach of contract claims and PMI's counterclaim WTRI breached the Services Agreement. (Doc. No. 190 at 11-21, 30-32).  WTRI, in turn, requests that the court enter summary judgment in its favor on PMI's claims that WTRI breached the Development Agreement and Services Agreement.  (Doc. No. 188 at 25-29).  The court addresses each of these points below.

### A.   Applicable Law

The court first considers what law—California or New York—applies to the Parties' breach of contract claims.  The court already considered this issue in its Order on PMI's Motion to Dismiss WTRI's First Amended Complaint.  (Doc. No. 24 at 16-18).  In that Order, the court applied California's choice-of-law rules and found that while the

Development Agreement and Services Agreement contained choice-of-law provisions stating the contracts should be governed under New York law, the Parties had not identified any facts allowing the court to conclude New York had a substantial relationship to either of the Parties or the transaction at issue. *Id.* at 16-17. The court, therefore, declined to enforce the New York choice-of-law provision. *Id.* at 17.

In their current Motions for Summary Judgment, the Parties have not pointed to anything that would call the court's prior Order into question. Neither Party has taken an explicit position on which law applies. Absent a contrary position, the court renews its finding and again declines to enforce the New York choice-of-law provision.

**B.    Legal Standard**

Under California law, a breach of contract claim includes four elements: "(1) the [existence of a] contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

**C.    The Development Agreement**

**1.    PMI's Alleged Breach of the Development Agreement**

WTRI alleges PMI breached Section 1.1 of the Development Agreement and thirty-five provisions of the attached Software Development Plan (Doc. Nos. 37 at ¶¶ 167-68).

Section 1.1 of the Development Agreement states in relevant part:

> Purchaser hereby retains Seller to perform those design and development services, and Seller hereby agrees to perform those design and development services related to the Software as are assigned to it pursuant to the Development Plan (as defined herein) set forth in summary outline form in Exhibit B. The Parties shall work together in a joint effort to accomplish the tasks and objectives set forth in the Development Plan.

Development Agreement at § 1.1.

10

18cv1927 JM(MSB)

Specifically, WTRI alleges PMI failed to "work together" with WTRI in a "joint effort to accomplish the tasks and objectives set forth in the Software Development Plan" by: (1) failing to make necessary investments to ensure the project was sufficiently staffed; (2) terminating or reassigning key staff members as product development approached crucial milestones; (3) returning management of the "Proteum" version of the software to WTRI, making it effectively impossible for PMI to carry out its own obligations; (4) killing the project and redirecting resources without informing WTRI; (5) entering false bug reports to impede WTRI's progress; and (6) refusing to grant WTRI access to PMI software in order for WTRI to timely complete its obligations. (Doc. No. 37 at ¶ 168). WTRI also identifies thirty-five sections of the Software Development Plan containing obligations PMI purportedly failed to perform. *Id.* at ¶ 167.

In its Motion for Summary Judgment, PMI argues: (1) the undisputed facts show it fulfilled its obligations under the Development Agreement; and (2) the Software Development Plan was not a part of the Parties' contract and did not bind the Parties. (Doc. No. 190 at 11-16). PMI further argues it exercised its contractual right to terminate the Development Agreement by rejecting the "Alpha 5" version of the software on December 2, 2016, which terminated all (or almost all) its remaining obligations under the Development Agreement. *Id.* at 16-19.

      **a.    Whether the Software Development Plan Was Incorporated Into The Development Agreement**

The Parties dispute whether the Software Development Plan constituted a part of the Parties' Development Agreement. Under California law, "[a] secondary document becomes part of a contract as though recited verbatim when it is incorporated into the contract by reference provided that the terms of the incorporated document are readily available to the other party." *King v. Larsen Realty, Inc.*, 121 Cal. App. 3d 349, 357 (1981); *Bell v. Rio Grande Oil Co.*, 23 Cal. App. 2d 436, 440 (1937) ("A written agreement may, by reference expressly made thereto, incorporate other written

11

agreements; and in the event such incorporation is made, the original agreement and those referred to must be considered and construed as one.").

The "fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.  Such intent is to be inferred, if possible, solely from the written provisions of the contract."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 39-40 (1995) (internal citations omitted).   Application of these principles yields a straightforward resolution of this question.  Indeed, PMI's argument the Software Development Plan was not a part of the Parties' contract contradicts the express terms of both the Development Agreement and Software Development Plan.

Notably, the first page of the Software Development Plan explicitly states:

> This Software Development Plan ("Development Plan") is an addendum to the Software Technology Development and Purchase Agreement ("Agreement") between WTRI and PMI ("Parties") dated September 8, 2015, *and is incorporated into the Agreement by Reference*.

Development Agreement, Ex. B at 1 (emphasis added).

As the California Court of Appeal has held:

> The phrase "incorporation by reference" is almost universally understood, both by lawyers and nonlawyers, to mean the inclusion, within a body of a document, of text which, although physically separate from the document, becomes as much a *part* of the document as if it had been typed in directly. To "incorporate," after all, literally means to put *into a body*.

*Republic Bank v. Marine Nat. Bank*, 45 Cal. App. 4th 919, 922 (1996).

The very use of the term "addendum"—which is defined in Black's Law Dictionary as "[s]omething to be added, usu[ally] to a document; esp[ecially], a supplement to a . . . contract, or other document to alter its contents or give more information" ("Addendum", Black's Law Dictionary (11th ed. 2019))—evinces an intent that the Software Development Plan be addended *to something*—in this case, the Parties' Development Agreement.

As WTRI also correctly notes, in PMI's Answer to WTRI's Third Amended Complaint, PMI "admits that the Development Agreement incorporated the Development Plan." (Doc. No. 57 at ¶ 29). The court sees no reason to discount that admission now. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.").

Given the above, the court is hard pressed to determine how PMI could credibly argue the Software Development Plan was not made a part of the Development Agreement. In apparent answer to this question, PMI contends the Software Development Plan represented a "work plan" that set forth deliverables and not "contractual obligations set in stone." (Doc. No. 190 at 15-16). PMI's argument the Software Development Plan simply outlined non-binding "descriptions of tasks or components to be delivered by the parties" is contradicted by the plain terms of the Development Agreement.[4]

The Development Agreement expressly identifies the Software Development Plan as the: "written plan agreed to by the Parties setting forth (i) *the design and development*

---

[4] PMI's citation to *Oberg v. Los Angeles*, 132 Cal. App. 2d 151 (Doc. No. 190 at 15) for the proposition that "work plans" are subsidiary to a principal contract is inapposite here. In *Oberg*, a dispute between the parties arose as to whether plaintiffs were required to install membrane waterproofing over concrete joints pursuant to a "work plan." *Oberg*, 132 Cal. App. 2d at 158. The principal contract contained a provision that expressly outlined which documents constituted a part of the contract and which were not. *Id.* at 157. The "work plan" at issue was not expressly mentioned, but was referenced in other documents. *Id.*

In contrast, in this case, the Software Development Plan is expressly incorporated by reference into the Development Agreement. Regardless, in *Oberg*, the court found plaintiffs *were* bound to install membrane waterproofing as outlined in the "work plan." *Id.* at 161. Specifically, the court found that "*[c]onstruing the documents as one*, it appears to be manifest that membrane waterproofing was included in the executed contract." *Id.*

*responsibilities of the Parties*, (ii) the timelines therefor, (iii) the specifications for the Software, and such other pertinent matters as the Parties may agree[.]"  Development Agreement at  § 1.2 (emphasis added).  Similarly, the Software Development Plan states it "describes the schedule for development of the Software *and responsibilities of the* Parties with respect to such development."  *Id.*, Ex. B at 1 (emphasis added).

Under Section 1.4 of the Development Agreement, PMI contractually agreed to "perform all tasks assigned to [PMI] as set forth in the Development Plan or otherwise agreed to by the Parties, and to provide all assistance and cooperation to [WTRI] to complete the development, testing and production, timely and efficiently, of the Software." *Id.* at  § 1.4.  Although it is true the Software Development Plan was not "set in stone," the Development Agreement explicitly provided: "[m]odifications to the Development Plan shall be effective only upon written agreement of the Parties."  *Id.* at § 1.2.

Given this language, the court finds it difficult to determine how these provisions could mean anything other than what they state: that WTRI and PMI agreed to perform the tasks respectively assigned to them in the Software Development Plan subject to written modification.  While PMI points to the expert report of Richard Fincher, its designated expert in the project management industry, the problem with this extrinsic evidence is that "it does not explain the contract language, it contradicts it.  Under the parol evidence rule, extrinsic evidence is not admissible to contradict express terms in a written contract[.]"  *Wagner v. Columbia Pictures Indus., Inc.*, 146 Cal. App. 4th 586, 592 (2007) (quotations omitted); *see also Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979) ("[E]xtrinsic evidence cannot be received for the purpose of varying the terms of the contract.").

PMI's citations to the deposition testimony of Dr. DiBello and Jesse Sardina, a Project Manager at PMI, are unavailing.  First, the court does not read Dr. DiBello's testimony that the Software Development Plan represented a "good list for getting everything done" (Doc. No. 182-5 at 192:9-10), as somehow establishing she believed it

14

did not create binding obligations.  Taken in context, Dr. DiBello was testifying as to whether the individuals PMI assigned to these tasks "could actually do them" and opined that if someone left the company, PMI "would probably replace them with someone else." *Id.* at 192:5-19.  Indeed, DiBello also agreed the Software Development Plan set forth "PMI's obligations on the one hand" and "WTRI's obligations" on the other. *Id.* at 188:13-15.  Similarly, the court also does not read Mr. Sardina's testimony the Software Development Plan set forth "the work that needs to be performed" to deliver the "technical solution" contemplated by the Parties as somehow establishing Mr. Sardina's belief the Software Development Plan was non-binding.  (Doc. No. 161-5, Ex. 15 at 125:24-126:3).

The court "will not strain to create ambiguity where none exists.  If contractual language is clear and explicit, it governs." *See U.S. Bank Nat'l Ass'n v. Yashouafar*, 232 Cal. App. 4th 639, 646 (2014) (quotations omitted).  In this case, PMI's resistance to the incorporation of the Software Development Plan into the Development Agreement strains logic, common sense, and basic contractual principles.

### b.   When the Development Agreement Terminated

The court next considers PMI's arguments any remaining obligations it had under the Development Agreement ceased on December 2, 2016, when PMI elected to reject and retain the "Alpha 5" version software.  (Doc. No. 190 at 17-18).

The court first looks at the plain language of the First Amendment to the Development Agreement. *See  Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the contract should be considered first.").  In this case, the First Amendment did not expressly provide that PMI's obligations under the Development Agreement would automatically cease upon PMI's election to reject and retain the "Alpha 5" version software.  Instead, the First Amendment states that if PMI elected to retain ownership of the "rejected Alpha Software," then PMI and WTRI would enter into a Services Agreement.  First Amendment at § 5.3.

15

In contrast, the First Amendment explicitly sets forth two circumstances where the Development Agreement terminates: (1) if PMI chose to retain ownership of the rejected "Charlie" version software and made the applicable payment, the Development Agreement would "terminate following [PMI]'s satisfaction of such payment obligation"; and (2) if PMI chose not to retain ownership of either the rejected "Alpha 5" and "Charlie" versions, "no further payment obligations shall accrue" and "[the Development] Agreement shall terminate." *Id.*

The court next looks to the Services Agreement.  Under California law, "[t]he crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement.  The instrument itself may help to resolve that issue."  *Grey v. Am. Mgmt. Servs.*, 204 Cal. App. 4th 803, 807 (2012).  "The existence of an integration clause is a key factor in divining that intent." *Id.*

Section 10.4 of the Services Agreement states:

> This Services Agreement constitutes the entire agreement between the Parties *in connection with the subject matter hereof* and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties related to such subject matter, and there are no warranties, representations, or agreements between the Parties in connection with the subject matter hereof except as specifically set forth or referred to herein.  *In the event of any conflict with the Development Agreement, this Services Agreement shall control.*

Services Agreement at § 10.4 (emphasis added).

As set forth above, Section 10.4 specifically provides the Services Agreement constitutes the Parties' entire agreement only "*in connection with the subject matter hereof*[.]"  *Id.*  This language is key.  The subject matter of the Services Agreement governed WTRI's performance of certain specific tasks relating to the software project, including: (1) content development; (2) product testing, experimentation and research;

16

(3) product licensing and customer feedback; (4) promotional services; and (5) technical assistance services.  Services Agreement at § 2.  In contrast, the subject matter of the Development Agreement more broadly governed the development of the software project itself.  *See* Development Agreement.

There is no language in Section 10.2 that can be interpreted to mean the "subject matter" of the Services Agreement "was to waive, extinguish, excuse, or release any right or obligation of either party" arising from the Development Agreement.  *Oxford Preparatory Acad. v. Edlighten Learning Sols.*, 34 Cal. App. 5th 605, 611 (2019).  Instead, it is clear the Services Agreement and Development Agreement cover overlapping, but also different, subject matter, and that in the event of any conflict, the Services Agreement controls.  Services Agreement at § 10.4.

For the above stated reasons, the court is not persuaded by PMI's argument that *all* of its remaining obligations owed under the Development Agreement automatically terminated upon the effective date of the Services Agreement.

### c.   Whether PMI Breached the Development Agreement

Finally, the court addresses whether PMI breached the Development Agreement.  "Ordinarily, whether a party has performed as required under a contract is a question of fact for a jury, not a judge, to decide."  *Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221 EMC, 2009 WL 1082067, at *5 (N.D. Cal. Apr. 22, 2009) (collecting cases); *see also Ash v. N. Am. Title Co.*, 223 Cal. App. 4th 1258, 1268 (2014) ("[D]eterminations of whether there was a breach of contract . . . are questions of fact."); *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1161 (E.D. Cal. 2009) ("Generally, whether a party has performed as required by a contract, or breached it, is a question of fact.").

Here, the court finds there are multiple triable issues of fact as to whether PMI complied with its obligation to "work together" with WTRI "to accomplish the tasks and objectives set forth in the [Software Development Plan]" as required in Section 1.1 of the Development Agreement.  These issues make summary judgment inappropriate.  *See Biocheck China, Ltd. v. Hollis-Eden Pharms., Inc.*, No. 09-CV-1130-H (WVG), 2011

17

WL 13356127, at *2–3 (S.D. Cal. Apr. 7, 2011) (summary judgment inappropriate where multiple triable issues of fact existed as to whether a party performed under the contract).

Indeed, the Parties disagree, and have submitted conflicting evidence, on nearly every fact concerning their joint development, including: (1) whether PMI sufficiently staffed the project; (2) whether PMI terminated or reassigned key staff members as the project approached crucial milestones; (3) whether PMI put forward adequate resources to complete the project; (4) whether PMI submitted appropriate work orders; (5) whether PMI deliberately blocked WTRI from completing multiple Acceptance Criteria; and (6) whether PMI fulfilled certain, specific obligations assigned to it under the Software Development Plan. (*See* Doc. No. 181-3 at ¶¶ 29-30, 32, 35, 37, 39, 41-50).

As an example, PMI contends there is no genuine dispute it sufficiently staffed the project. (Doc. No. 190 at 13). In support, PMI cites to Dr. DiBello's testimony that PMI had "too many people" on the project—not too few. *Id.* Dr. DiBello's testimony, however, is taken out of context. Dr. DiBello, in fact, testified PMI was not *properly* staffing the project by providing a disruptively large number of staff doing unnecessary work:

> Q.  Well, did PMI put in a -- or staff, a lot of people to its work with WTRI.
>
> A.  They had too many people in the project. If you -- they -- we did 80 percent, if you look at the work order system, five of our people did 80 percent of the work to their 45. And, you know, so there were people doing a lot of work that was not necessary or work that was a distraction in order to justify their role on the project. It was a disruption. We needed 40 less people on the PMI project, on the PMI side.

(Doc. No. 182-5 at 49:12-21).

As another example, PMI contends there is no genuine dispute PMI's team members were appropriately submitting work orders to address extant issues. Again, PMI cites to Dr. DiBello's testimony in support  (Doc. No. 190 at 13), but again, this

testimony is taken out of context.  Dr. DiBello, in fact, testified PMI would file "work orders" for "ridiculous" tasks that the team should "not be doing in the early stages of an Alpha build" such as changing the color or placement of a heads-up display or fixing the gap in a sidewalk in a virtual environment.  (Doc. No. 190-9 at 382:4-19).[5]

In its Reply, PMI argues "none of WTRI's 'evidence' amounts to showing anything more than 'honest mistake, bad judgment or negligence' on PMI's part."  (Doc. No. 207 at 6).  But this is irrelevant.  California law does not require a breach of contract to be intentional.  *See Linden Partners v. Wilshire Linden Assocs.*, 62 Cal. App. 4th 508, 531-32 (1998) ("[A]ny nonperformance of a duty under a contract when performance is due is a breach. This includes defective performance as well as an absence of performance; *defective performance can be inadvertent as well as intentional*[.]") (emphasis added).

Without getting excessively further into the weeds of the Parties' conflicting arguments and evidence, it is manifestly clear there are numerous contested factual issues regarding whether PMI fulfilled its obligations under the Development Agreement.

## 2.    WTRI's Alleged Breach of the Development Agreement

PMI alleges WTRI breached the Development Agreement by advertising accelerated learning tools for project management professionals in violation of the "Field of Use" provision set forth in Section 2.4 of the Development Agreement.  (Doc. No. 47 at ¶ 51).[6]  Specifically, PMI alleges WTRI violated the "Field of Use" provision by promoting "virtual world simulations for use by project management professionals," including through WTRI's "MAXX Virtual World Rehearsal" ("MAXX") product.  *Id.*

---

[5] Dr. DiBello also testified she reported this issue to individuals at PMI whom she believed "tried to fix it," but it is unclear whether these actions stopped.  (Doc. No. 190-9 at 383:10-12).

[6] PMI also alleges WTRI breached the Development Agreement by misappropriating PMI's trade secrets without permission in violation of Section 13 of the Development Agreement.  (Doc. No. 47 at ¶ 51).

19

In its Motion for Summary Judgment, WTRI contends PMI has not met its burden of showing WTRI's MAXX product fell within the Development Agreement's "Field of Use" provision.  (Doc. No. 188 at 23-25).

Section 2.4 of the Development Agreement states:

> The Parties acknowledge and agree that the Software is for Purchaser's exclusive use, in connection with and for purposes of accelerated learning and expertise development *in the field of project, program and portfolio management* (the "Field of Use.").  Accordingly, Seller will not use the Software within such Field of Use, except as otherwise expressly permitted in writing by Purchaser, and Purchaser will not use the Seller Software outside of the Field of Use, except as otherwise expressly permitted in writing by Seller.

Development Agreement at § 2.4 (emphasis added).[7]

WTRI contends it is undisputed that WTRI's MAXX product is a simulation in *product* management and not *project* management.  (Doc. No. 188 at 24-25).  In support, WTRI submits the expert report of Dr. Mahesh Raisinghani, who opined product and project management are separate disciplines, with among other things, different certification requirements.  (Doc. No. 188-18 at ¶¶ 62-73).  Dr. Raisinghani further opined the MAXX product does not violate the "Field of Use" restriction because it "teaches agile leadership through the lens of the *product management* field."  *Id.* at ¶ 151.

Here, the court finds PMI has submitted sufficient evidence to raise a triable issue of fact as to whether WTRI's MAXX product falls within Section 2.4's "Field of Use"

---

[7] The Development Agreement's "Exclusivity Clause" further provides WTRI agrees:

> [I]t shall not develop, design, produce, license, assign or sell any product to any other purchaser, user, assignee, licensee or other transferee that duplicates or is substantially similar to the Software for use within the Field of Use, or that is otherwise intended for use in the Field of Use.

Development Agreement at § 7.

provision.  Notably, PMI submitted the report of its expert, Dr. Ricardo Valerdi, who opined the WTRI MAXX product lies within the "project management" domain.  (*See* Doc. No. 188-1 at ¶¶ 59 (discussing how users of the WTRI MAXX "perform specific *project management* tasks" involving "budget, scope, and timeline; stakeholder management; communication; and decision making"); 61 ("[t]he challenges that player[s] encounter in the Maxx product sit squarely in the *project management* domain") (emphasis added).

WTRI contends Dr. Valerdi's report is inadequate because Dr. Valerdi failed to address the proper scope of the "Field of Use" provision.  (Doc. No. 201 at 8).  The court is unconvinced.  Centrally, WTRI has not adequately explained (or cited legal authority) as to why PMI was *required* to submit expert testimony on the scope of this provision to create a triable issue of fact.  Indeed, under California law, "[e]xpert opinion on contract interpretation is usually inadmissible."  *Schaffter v. Creative Capital Leasing Grp., LLC*, 166 Cal. App. 4th 745, 760 (2008).

For these reasons, the court finds there are contested issues of fact as to whether WTRI's MAXX product falls within the "Field of Use" provision set forth in Section 2.4 of the Development Agreement.[8]

### D.   The Services Agreement

In this case, WTRI alleges PMI breached the Services Agreement by: (1) failing to complete a functional Agile product; (2) failing to recruit any pilot program organizations to perform in the pilot program; and (3) failing to collect user feedback from participants, pursuant to the Activity Chart attached as Exhibit C to the Services Agreement.  (Doc. No. 37 at ¶¶ 173-175).

---

[8] The court does not yet find it necessary to reach the question as to whether testimony from PMI's "virtual simulations expert," Clark Aldrich, is admissible—which the court notes is the subject of WTRI's co-pending *Daubert* motion.  (Doc. No. 128-1 at 10-14).

In its Motion for Summary Judgment, PMI argues the undisputed facts show it fulfilled its contractual obligations under the Services Agreement.  (Doc. No. 190 at 19-20).  PMI further argues that the License Agreement, Service Level Agreement, and Services Detail and Delivery Schedule, attached as Exhibits A, B, and C to the Services Agreement respectively, are separate from the Services Agreement, and any alleged breaches of these agreements would not constitute a breach of the Services Agreement.  *Id.* at 20-21.

In addition, PMI argues it is entitled to summary judgment on its counterclaim WTRI breached the Services Agreement, because the undisputed facts show WTRI did not fulfill its obligations under the Services Agreement.  *Id.* at 30-32.  Specifically, PMI alleges WTRI failed to: (1) develop a derivative of the research paper to be presented for grant approval to the NSF; (2) develop two other articles suitable for publication on the subject of accelerated learning; (3) speak on topics related to accelerated learning; (4) consult with PMI marketing representatives; and (5) assist PMI with "continuing research."  *Id.* at 31.

### 1. Whether the License Agreement, Service Level Agreement, and Services Detail and Delivery Schedule Were Incorporated into the Services Agreement

The court first addresses whether the License Agreement, Service Level Agreement, and Services Detail and Delivery Schedule were incorporated into the Services Agreement.  PMI argues these exhibits were "understood to be aspirational plans and schedules of tasks" and not "contractual" obligations.  (Doc. No. 190 at 21).

Under California law, "[t]he general rule is that the terms of an extrinsic document may be incorporated by reference in a contract so long as (1) the reference is clear and unequivocal, (2) the reference is called to the attention of the other party and he consents thereto, and (3) the terms of the incorporated document are known or easily available to the contracting parties."  *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 713 (2009).

Under this general rule, the Services Agreement clearly and unequivocally references the License Agreement, Service Level Agreement, and Services Detail and Delivery Schedule. Section 2.3 of the Services Agreement provides "WTRI will be permitted to use" the software product "[p]ursuant to the terms of a license agreement to be entered into by the Parties, in a form materially consistent with 'Exhibit A[.]'" Services Agreement at § 2.3. Section 2.5 provides that "WTRI will provide technical assistance services and consultation . . . in accordance with the Service Level Agreement" attached as Exhibit B. *Id.* at § 2.5. Finally, Section 4.1 provides PMI will pay WTRI fees based on whether WTRI "is in full compliance with all terms and conditions of this Service Agreement, including without limitation the schedule for Services delivery set forth in Exhibit 'C'." *Id.* at § 4.1.

The express references to each exhibit in the Services Agreement clearly evince the Parties' intent to incorporate these exhibits as part of the agreement. *See Tacori Enterprises v. Nerces Fine Jewelry*, No. CV122753DSFVBKX, 2013 WL 12113229, at *4 (C.D. Cal. Sept. 20, 2013) (finding clear and unequivocal reference to copyright registrations and other exhibit were "conclusive indicators" the parties meant to incorporate the exhibit into the agreement.)

There is no genuine dispute the License Agreement, Service Level Agreement, and Services Detail and Delivery Schedule were available to PMI. There is also nothing in the Services Agreement suggesting these exhibits were intended to be "aspirational," as PMI argues. The issue with PMI's extrinsic evidence to the contrary, again, is it suggests an interpretation of the Parties' contract that is antithetical to the contract's actual language. "[P]arol evidence is admissible only to prove a meaning to which the language is 'reasonably susceptible', not to flatly contradict the express terms of the agreement." *Winet v. Price*, 4 Cal. App. 4th 1159, 1167 (1992) (quotations omitted).

## 2. Whether WTRI Breached the Services Agreement

As the court already noted above, whether a party has performed as required under a contract is generally a question of fact, and here, the court finds there are multiple

23

triable issues of fact with respect to whether WTRI breached its obligations under the Services Agreement.

As one illustrative example, PMI contends it is undisputed Dr. DiBello failed to speak at a minimum of four PMI engagements.  (Doc. No. 190 at 31).  WTRI, however, submits conflicting evidence from Dr. DiBello that PMI "never scheduled" her engagements despite her both "remind[ing] them" and identifying specific events for which she would be suitable.  (Doc. No. 161-4, Ex. 8 at 220:22-25; 221:24-222:2).  WTRI argues by failing to do so, PMI breached its duty to "cooperate reasonably with WTRI with respect to providing responses to WTRI's requests for information . . . and providing access to all necessary information" for "performance" as required under Section 3 of the Services Agreement.  (Doc. No. 182-1 at ¶ 101; Services Agreement at 4).  This conflict is further complicated by the testimony of Mr. Sardina that someone at PMI *had* been assigned to consult with Dr. DiBello on marketing activities, but attempts to setup times had not been "fruitful."  (Doc. No. 158-9, Ex. 15 at 181:5-11; 21-25).  In short, there is an unresolved factual dispute as to the Parties' respective conduct in attempting to schedule Dr. DiBello's speaking engagements.

As another example, PMI contends it is undisputed WTRI failed to "develop for PMI exclusively a derivative of the research paper to be produced for the National Science Foundation . . . related to the accelerated learning capabilities of Software and the underlying neuroscience" as required under Section 2.4.1 of the Services Agreement.  (Doc. Nos. 190 at 31; 182-1 at ¶ 196; Services Agreement at § 2.4.1).  PMI cites to Dr. DiBello's testimony in support of this "undisputed" fact.  (Doc. No. 182-1 at ¶ 196).

Dr. DiBello's testimony, however, indicates she provided PMI with a paper right before the Services Agreement became effective.  (Doc. No. 161-4, Ex. 8 at 218:11-16).  Dr. DiBello testified she then told PMI she needed their input as to how to rewrite this paper:

> Q.    Okay.  So your understanding was that your obligation to
>         produce this research - - a derivative of the research

24

paper, it had already been done prior to execution of the Services Agreement?  Is that accurate?

A.      No.   My -- my understanding of that was that they needed to tell me -- you know , they needed to give me an idea of where they were going to publish it and any changes that they wanted to have made in that paper, which was written for the general public, but they may want to make some changes to it for their readership. I needed their help with that, and I told them that.  But it was pretty comprehensive, and it was already ready for release.  But it could have been rewritten a number of different ways for a number of their different publications.

*Id.* at 281:17-219:6.

Again, there is an unresolved factual dispute as to whether WTRI breached its obligations to develop a derivative research paper or whether PMI's conduct prevented WTRI from doing so.  These examples are merely illustrative.  Given the sheer number of the Parties' factual disagreements with respect to the Services Agreement, the court does not find it necessary to exhaustively outline all of the Parties' disagreements marshaled up to this point.

## II.      Breach of the Implied Covenant of Good Faith and Fair Dealing

WTRI alleges PMI breached the covenant of good faith and fair dealing implied under the Development Agreement by: (1) "knowingly and willfully misrepresenting its intent to perform its obligations under the Development Agreement and Development Plan"; (2) "sabotaging WTRI's ability to perform under the pilot study as agreed to in the Services Agreement"; and (3) "interfering with WTRI's efforts to finalize development of the software under the Development Agreement."  (Doc. No. 37 at ¶ 181).

PMI argues it is entitled to summary judgment on WTRI's claim for breach of the covenant of good faith and fair dealing because: (1) WTRI cannot establish an implied covenant applies in this case; and (2) WTRI cannot establish PMI acted in bad faith. (Doc. No. 190 at 21-24).  The court addresses each argument below.

### A.   Applicable Law

For the same reasons stated in Section II.A above, the court will apply California law in analyzing WTRI's claims for breach of the covenant of good faith and fair dealing.

### B.   Legal Standard

California law implies a covenant of good faith and fair dealing into every contract. *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 371 (1992). "In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031-32 (1992) (quoting *Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136, 1153 (1990)) (emphasis in original).

"In California, the factual elements necessary to establish a breach of the covenant of good faith and fair dealing are: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).

### C.   Analysis

#### 1.   Whether an Implied Covenant Applies

The court first addresses PMI's argument an implied covenant does not apply in this case because PMI complied with the express terms of the Development Agreement. (Doc. No. 190 at 23).   Under California law, "[t]he implied covenant will not apply where no express terms exist on which to hinge an implied duty, and where there has been compliance with the contract's express terms." *Abbit v. ING United States Annuity & Life Ins. Co.*, 999 F. Supp. 2d 1189, 1198 (S.D. Cal. 2014) (quoting *Berger v. Home Depot U.S.A., Inc.*, 476 F. Supp. 2d 1174, 1177 (C.D. Cal. 2007)).   Here, however, there

are multiple triable issues as to whether PMI breached the Development Agreement. Summary judgment on these grounds is, therefore, not warranted.[9]

### 2.    Whether PMI Acted Objectively Unreasonably or in Bad Faith

"The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.'" *Hicks v. E. T. Legg & Assocs.*, 89 Cal. App. 4th 496, 509 (2001) (quotations omitted).  The court is not persuaded this is a case where only one inference can be drawn.

Here, the crux of PMI's argument is that WTRI possesses no evidence PMI deliberately "sabotaged" the software project or acted in "bad faith." (Doc. Nos. 161 at 23-24; 207 at 9).  Specifically, PMI argues WTRI "admits" it has no evidence of PMI's "motivations" beyond speculation.  (Doc. No. 207 at 9).

PMI's argument is legally unsupported.  For WTRI to prevail, it is not necessary for WTRI to have direct evidence of PMI's motivations.  The implied covenant of good faith and fair dealing "has both a subjective and objective aspect[.]" *Carma Developers*, 2 Cal. 4th at 372.  "A party violates the covenant if it subjectively lacks belief in the validity of its act *or if its conduct is objectively unreasonable*." *Id.* (emphasis added); *see also Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05-00553 MHP, 2006 WL 8459988, at *3 (N.D. Cal. Jan. 4, 2006) ( "[I]n order to prove a breach of the covenant of good faith and fair dealing, plaintiff need not prove scienter.").  Direct evidence of "sabotage" is not required.  *See Hebei Hengbo New Materials Tech. Co. v. Apple, Inc.*, 344 F. Supp. 3d 1111, 1131 (N.D. Cal. 2018).  Even when considering the subjective aspect of the implied covenant, the court is mindful that "[a] subjective state of mind will rarely be susceptible of direct proof; usually the trier of fact will be required to infer it from

---

[9] This is also not a case where the express terms of the Development Agreement do not give rise to any of the implied obligations asserted by WTRI.  As the court held in its prior Order, the development of the Alpha 5 software was the lynchpin of the Parties' Development Agreement.  (Doc. No. 32 at 11).

circumstantial evidence." *Gemini Aluminum Corp. v. Cal. Custom Shapes*, 95 Cal. App. 4th 1249, 1263 (2002).

In this case, the Development Agreement and First Amendment to the Development Agreement granted PMI the ability to reject the "Alpha 5" or "Charlie" versions of the software project if these versions failed to meet "applicable Acceptable Criteria." PMI was, therefore, granted the sort of "discretionary power affecting the rights of another" in which the implied covenant of good faith and fair dealing finds "particular application." *Carma Developers*, 2 Cal. 4th at 372. "Such power must be exercised in good faith." *Id.*; *see also Locke v. Warner Bros.*, 57 Cal. App. 4th 354, 367 (1997) (implied covenant requires a party "to exercise [] discretion honestly and in good faith.").

The court finds there are multiple triable issues as to whether PMI acted objectively unreasonably or in bad faith by allegedly frustrating the development of the "Alpha 5" version software and then exercising its limited right of rejection. For example, there are genuine issues of fact as to whether PMI was frustrating the development of the project by staffing it with a disruptively large number of team members doing unnecessary tasks. (Doc. No. 182-5 at 49:14-21). There are also disputed factual questions as to whether PMI's team members were submitting large numbers of inappropriate bug reports (Doc. No. 190-9 at 382:4-19) or whether PMI was intentionally pulling resources away from the project because it had become incompatible with the strategic direction PMI was taking. (Doc. Nos. 190-4 at 36:9-38:2; 190-9 at 341:6-343:25).

Although PMI contends it was "well within its contractual rights" to reject and retain the "Alpha 5" version (Doc. No. 207 at 9), the Development Agreement did not give PMI the right to categorically reject the "Alpha 5" version for *any reason*. Instead, whether PMI violated the implied covenant in the exercise of its discretion is a question for the trier of fact.

For these reasons, the court **DENIES** PMI's Motion for Summary Judgment on WTRI's claim for breach of the implied covenant of good faith and fair dealing.

## III.   Damages

### A.   WTRI's Alleged Damages

PMI argues it is entitled to summary judgment on WTRI's breach of contract claims because: (1) WTRI cannot calculate its damages with reasonable certainty; and (2) WTRI cannot demonstrate PMI's alleged wrongful conduct proximately caused its damages.  (Doc. No. 190 at 24-30).

Under California law, "a party claiming damage must prove that he has suffered damage and prove the elements thereof with reasonable certainty." *Carpenter Found. v. Oakes*, 26 Cal. App. 3d 784, 799 (1972).  "Damages which are remote, contingent, or merely possible cannot serve as a legal basis for recovery." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 531 (1996) (quotations omitted); *see* Cal. Civ. Code § 3301 ("No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin.").

"Causation of damages in contract cases . . . requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain." *Vu v. Cal. Commerce Club, Inc.*, 58 Cal. App. 4th 229, 233  (1997). "A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage." *US Ecology, Inc. v. State of Cal.*, 129 Cal. App. 4th 887, 909 (2005).  The term "substantial factor" "has no precise definition, but 'it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.'" *Id.* (quoting *Espinosa v. Little Co. of Mary Hospital*, 31 Cal. App. 4th 1304, 1314 (1995).

Here, PMI's arguments are directed to the methods and evidence relied upon by WTRI's damages expert, Ryan LaMotta, to calculate WTRI's total damages.  (Doc. Nos. 183-1 at ¶¶ 118-161; 190 at 25-27).  In his report, Mr. LaMotta opined WTRI suffered "at least $20.1 million" in damages caused by PMI's alleged conduct, comprising:

(1) $1,500,000 in time-based milestone payments owed by PMI to WTRI; (2) $774,292 in additional costs incurred by WTRI to perform various tasks assigned to PMI under the Development Agreement and Services Agreement; (3) $1,050,000 in lost grants from the NSF; (4) $120,000 in unpaid reimbursements in connection with a brain engagement study conducted by WTRI; (5) $15,172,426 in lost profits from would-be licenses of the software project to corporate customers; and (6) $1,474,234 of additional lost profits from the loss of existing customers as a result of their recruitment to the pilot study and subsequent lack of a commercialized product.  (Doc. No. 190-14 at ¶ 10).

In contrast, PMI argues WTRI's damages should be "at most" $457,000, and WTRI's purported damages figure is instead improperly based on: (1) double-counting damages arising from the same source; (2) false assumptions regarding whether the Parties' software project would have been completed and commercialized; (3) speculative out-of-pocket expense calculations; (4) speculative lost profit projections; and (5) speculative claims the NSF would have funded WTRI's grant proposals absent WTRI's relationship with PMI.   (Doc. No. 190 at 25-26).  PMI cites varyingly to the report of its damages expert, Carlyn Irwin, and marketability expert, Dr. Mickey Ferri in support.  (Doc. No. 183-1 at ¶¶ 118-161; 190 at 25-26).

At this stage, the court is not persuaded WTRI's damages elude reasonable ascertainment as a matter of law.  In a breach of contract case, "'[w]here the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'"  *Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1184 (2015) (emphasis added) (quoting *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 774 (2012).  Rather, "[t]he precise amount of damages is a question of fact, inappropriate for summary adjudication."  *Young v. Wideawake Death Row Ent. LLC*, No. CV 10-1019 CAS JEMX, 2011 WL 12565250, at *12 (C.D. Cal. Apr. 19, 2011); *see Cal. Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 486-87 (1955) ("[W]hen it clearly appears

1    that a party has suffered damage a liberal rule should be applied in allowing a court or a

2    jury to determine the amount, and that, given proof of damage, uncertainty as to the exact

3    amount is no reason for denying all recovery.") (quotations omitted).

4    As for proximate causation, this is "rarely an issue suitable to disposition by

5    summary judgment when material facts are disputed." *San Joaquin Valley Ins. Auth. v.*

6    *Gallagher Benefit Servs., Inc.*, No. 1:17-CV-00861-EPG, 2019 WL 6173166, at *5 (E.D.

7    Cal. Nov. 20, 2019); *see also Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 666 (2001)

8    ("Causation is generally a question of fact for the jury, unless reasonable minds could not

9    dispute the absence of causation.").

10    Here, there are triable issues of fact as to whether PMI's alleged conduct was a

11    "substantial factor" in bringing about WTRI's damages. Dr. DiBello testified: (1) the

12    software project could have been completed absent PMI's alleged breaches; (2) WTRI

13    had between twelve to twenty-four prospective purchasers for the final product engaged

14    in a pilot study; (3) WTRI was planning to charge $250,000 to $500,000 per purchaser

15    depending on the size of the company; (4) WTRI had spent $600,000 to meet

16    requirements PMI "didn't seem to have the money to pay for"; (5) WTRI outsourced

17    work that PMI allegedly did not do or did not have the budget for; (6) WTRI normally

18    obtained $750,000 a year on average in grants from the NSF, but began receiving

19    pushback due to WTRI's relationship with PMI; and (7) WTRI suffered harm to its

20    relationships with both the NSF and to its repeat customers. (Doc. No. 183-2 at 17:17-

21    25; 52:12-22; 85:12-15; 88:14-89:8; 144:21-145:25; 251:2-15; 251:24-252:13). This is

22    not a case where "reasonable minds could not dispute the absence of causation."

23    *Lombardo*, 91 Cal. App. 4th at 666.

24    As to PMI's arguments Mr. LaMotta's damages figure is speculative, WTRI need

25    only show at this stage it's alleged damages can be ascertained with reasonable certainty,

26    not mechanical precision, especially where "it is the [alleged] wrongful acts of the

27    defendant that have created the difficulty in proving the amount of loss of profits or

28    where it is the [alleged] wrongful acts of the defendant that have caused the other party to

31

not realize a profit to which that party is entitled." *Sargon*, 55 Cal. 4th at 774-75 (citations omitted). "Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have been" or "eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative." *Id.* at 775. "A reasonable certainty only is required, not absolute certainty." *Id.*

While there may be concerns with Mr. LaMotta's analysis—an issue on which the court does not yet opine—there is at least a disputed issue as to the *fact* of damages. Questions concerning the reliability of Mr. LaMotta's opinions are more appropriately addressed in PMI's co-pending *Daubert* motion (Doc. No. 136) and not on a motion for summary judgment.

In sum, the court does not find WTRI's claims to be so speculative as to render its claims fatal. *Britz Fertilizers*, 665 F. Supp. 2d at 1172 ("[T]hat damages are hard to measure does not make them unrecoverable."). Instead, WTRI's burden to prove the *amount* of damages is an evidentiary hurdle WTRI will have to contend with at trial.[10]

### B.    PMI's Alleged Damages

WTRI contends it is entitled to summary judgment on PMI's breach of contract and breach of the implied covenant of good faith and fair dealing counterclaims, because PMI has not shown it's damages were proximately caused by WTRI's alleged breaches. (Doc. No. 188 at 25-29).

///

///

---

[10] As to PMI's argument WTRI failed to apportion its damages with respect to each individual cause of action, PMI does not cite any legal authority that *requires* WTRI to do so. *See Tektel, Inc. v. Maier*, 813 F. Supp. 1331, 1334 (N.D. Ill. 1992) ("[I]t is perfectly acceptable for a plaintiff to seek the same damages under different theories of recovery.").

### 1. PMI's Damages Resulting from WTRI's Alleged Breaches of the Development Agreement

The court first addresses PMI's attempt to expand the scope of its counterclaims with respect to WTRI's alleged breach of the Development Agreement. In PMI's counterclaims, it alleged WTRI breached the Development Agreement by: (1) advertising accelerated learning tools for project management professionals in violation of the "Field of Use" provision of the Development Agreement; and (2) misappropriating PMI's trade secrets in violation of the confidentiality provision of the Development Agreement. (Doc. No. 47 at ¶ 51).

In its summary judgment briefs, PMI contends it never intended to limit its allegations to these two examples and WTRI breached the Development Agreement in "myriad other ways." (Doc. No. 185 at 24). This argument is unavailing. PMI "may not amend [it's counterclaims] through arguments in [it's] brief in opposition to a motion for summary judgment." *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997); *see also Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) ("Federal Rule of Civil Procedure 8(a)(2) requires that allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.").

The court's consideration of PMI's new theories would effectively amend PMI's counterclaims after the close of discovery. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 5411590, at *5 (N.D. Cal. Nov. 6, 2012) (rejecting attempt to raise new theory of breach of contract at summary judgment stage); *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1082 (E.D. Cal. 2010) ("[A] plaintiff cannot oppose summary judgment based on a new theory of liability because it would essentially blind side the defendant with a new legal issue after the bulk of discovery has likely been completed.").

Indeed, the two theories set forth in PMI's counterclaims are also the only two theories set forth in PMI's interrogatory response to WTRI's request to "[i]dentify all

33

alleged breaches of the 2015 Development Agreement by WTRI." (Doc. No. 126-11 at 8-9). In addressing this point, PMI contends WTRI did not provide an "exhaustive list" of WTRI's alleged breaches in discovery. (Doc. No. 184 at 24). However, PMI cites no legal authority requiring WTRI to do so. Instead, this appears to be an unconvincing attempt by PMI to shift its burden of proof. *See Sander/Moses Prods., Inc. v. NBC Studios, Inc.*, 142 Cal. App. 4th 1086, 1095 (2006) ("[I]n the normal allocation of the burden of proof, the rule in California is that 'a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting.'") (quotations omitted). For these reasons, the court will consider the two theories of WTRI's alleged breaches of the Development Agreement pled in PMI's counterclaims only.

At this stage, the court finds there is a triable issue of fact as to damages. PMI contends it suffered damages as a result of WTRI's alleged misappropriation (and breach of contract based on the same operative facts) resulting from the diminution in value of PMI's alleged trade secrets. (Doc. No. 185 at 25-26). Ms. Irwin further analyzed PMI's damages for WTRI's alleged "theft" of PMI's trade secrets under an unjust enrichment disgorgement theory. (Doc. No. 185-3, Ex. 14 at ¶¶ 45-51). And "[u]nder California law, a defendant's unjust enrichment can satisfy the 'damages' element of a breach of contract claim, such that disgorgement is a proper remedy." *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665, 669 (9th Cir. 2010). A jury could reasonably conclude WTRI was unjustly enriched by its alleged breach of the Development Agreement and misappropriation of PMI's trade secrets.

### 2. PMI's Damages from WTRI's Alleged Breaches of the Services Agreement

PMI alleges WTRI breached the Services Agreement by: (1) failing to meet its promotional obligations; (2) refusing to make technical and content development contributions; (3) misappropriating PMI's trade secrets without permission for use in

WTRI's products and services; and (4) using the software beyond the expiration of the two-year term.  (Doc. No. 47 at ¶ 52).

In its Motion for Summary Judgment, WTRI contends there is no evidence in the record WTRI proximately caused PMI's damages.   (Doc. No. 188 at 28).   Specifically, WTRI contends PMI improperly included PMI's expenses (from 2014 to early 2018) that occurred *prior* to the Services Agreement being signed.   *Id.*   This argument, however, goes to the *amount* of damages, and not to the *fact* of damages.  As the court has already stated, "[t]he precise *amount* of damages is a question of fact, inappropriate for summary adjudication."  *Young*, 2011 WL 12565250, at *12.

Regardless, WTRI's argument misses the mark.  Ms. Irwin based her damages figure on the assumption the Parties would have successfully completed, tested, and commercialized the software technology at issue if WTRI had met its obligations (including WTRI's duties under the Services Agreement).  (Doc. No. 185-3, Ex. 14 at ¶¶ 38 ("In determining damages under Scenarios 2 and 3—both of which assume that the parties would have successfully completed, tested, and commercialized the software technology at issue . . ."), 54 ("All of my damages figures provided are conservatively based only on the costs incurred by PMI in connection with co-developing the software technology at issue.").   This figure, therefore, logically encompasses PMI's expenses prior to the Services Agreement being signed.  The question of whether WTRI's alleged failure to meet its obligations under the Services Agreement proximately caused PMI's damages is a question of fact for the jury.  *Lombardo*, 91 Cal. App. 4th at 666.

### 3.    PMI's Damages from WTRI's Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing

The court briefly addresses WTRI's proximate causation argument with respect to PMI's implied covenant claim.  (Doc. No. 188 at 29).   WTRI concedes its argument on this point is essentially identical to its arguments on PMI's alleged damages resulting from the Development Agreement and Services Agreement.  *Id.*  Because the court has already found triable issues of fact regarding PMI's damages with respect to the

35

Development Agreement and Services Agreement, the court finds it unnecessary to reach this issue.[11]

For the above reasons, the Court **DENIES** WTRI and PMI's Motions for Summary Judgment with respect to the Parties' respective claims and counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing.

## IV. Trade Secret Misappropriation

PMI asserts trade secret misappropriation claims against WTRI under both the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq.*, and Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*. (*See* Doc. No. 47 at ¶¶ 63-80). Specifically, PMI alleges it independently developed flow activity templates and corresponding spreadsheets ("Flows") that WTRI currently passes off as its own technology, for example, through WTRI's MAXX product. *Id.* at ¶¶ 40, 43-44.

Both Parties move for summary judgment on PMI's trade secret misappropriation claim. WTRI argues summary judgment is warranted because: (1) PMI cannot establish it owned any trade secrets; and (2) PMI cannot establish WTRI misappropriated PMI's alleged trade secrets. (Doc. No. 188 at 9-23). PMI moves for partial summary judgment that its Flows are legally protectable as trade secrets. (Doc. No. 190 at 32-36).

### A. Legal Standard

"The elements of misappropriation under the DTSA are similar to those under the CUTSA, except that the DTSA applies only to misappropriations that occur or continue to occur on or after its date of enactment on May 11, 2016." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (quotations omitted). Courts have analyzed DTSA and CUTSA claims together "because the elements are substantially

---

[11] The test for causation for a breach of the implied covenant of good faith and fair dealing claim is the same as for a breach of contract claim. *See Citri-Lite Co. v. Cott Bevs., Inc.*, 721 F. Supp. 2d 912, 929 (E.D. Cal. 2010).

18cv1927 JM(MSB)

similar." *Inteliclear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020).  The court likewise concludes that it is appropriate to do so here.

To prevail on a DTSA or CUTSA claim, a plaintiff must prove: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) (citation omitted); *CytoDyn of New Mexico, Inc. v. Amerimmune Pharm., Inc.*, 160 Cal. App. 4th 288, 297 (2008).

## B.   Identification of Trade Secrets

A party "who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993).  Generally, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Founder Starcoin, Inc. v. Launch Labs, Inc.*, No. 18-CV-972 JLS (MDD), 2018 WL 3343790, at *6 (S.D. Cal. July 9, 2018)  (quotations omitted).

The definition of a "trade secret" under the DTSA and CUTSA are nearly identical.  Under the DTSA, a "trade secret" is:

> [F]inancial, business, scientific, technical, economic, or engineering information . . . if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

Under the CUTSA, a "trade secret"  is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) [d]erives independent economic value, actual or potential,

37

> from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).

The court first addresses WTRI's argument PMI impermissibly expanded the definition of PMI's alleged trade secrets through Dr. Valerdi's report. (Doc. No. 188 at 19-20). WTRI's argument primarily rests on California Code of Civil Procedure Section 2019.210, which states:

> In any action alleging the misappropriation of a trade secret under the [CUTSA], before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code.

Cal. Civ. Proc. Code § 2019.210.

In its response to WTRI's Interrogatory No. 1 requesting that PMI "[d]escribe in detail the PMI Trade Secrets with reasonable particularity pursuant to Cal. Code Civ. P. § 2019.210," PMI identified its trade secrets as "proprietary flow activity templates and corresponding spreadsheet designs" that "work in tandem" known as "Flows." (Doc. No. 126-4 at 6-7). The Flows are purported "story-writing tools used by programmers of gamified virtual environments to model increasingly complex and varied scenarios in virtual learning games." *Id.* at 6.

In his expert report, Dr. Valerdi identified thirteen specific PMI trade secrets in four categories: "(1) flow templates, (2) fast track to expertise, (3) progress reporting innovations, and (4) scoring metrics." (Doc. No. 188-1 at ¶ 22). WTRI argues Dr. Valerdi's identification expanded the scope of PMI's alleged trade secrets.

The court is not convinced. First, the Ninth Circuit has not yet decided whether Section 2019.210 applies in federal court and district courts that have considered the issue have reached differing conclusions. *See M/A-COM Tech. Sols., Inc. v. Litrinium,*

*Inc.*, No. SACV1900220JVSJDEX, 2019 WL 4284523, at *1 (C.D. Cal. June 11, 2019) (collecting cases).  Even if the court were to find that Section 2019.210 applies, the court is not persuaded this section prevents PMI from refining its initial identification of trade secrets.  The "'[r]easonable particularity' mandated by section 2019.210 does not mean that the party alleging misappropriation has to define every minute detail of its claimed trade secret at the outset of the litigation."  *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005).

It is also not clear to the court *how* Dr. Valerdi's identification is inconsistent with PMI's discovery disclosures.  Trade Secret Nos. 1 and 2, as identified by Dr. Valerdi, both reference PMI's Flows.  (Doc. No. 127-1 at ¶ 27).  Trade Secret No. 3 is identified as collecting "user data" in a spreadsheet (Doc. No. 127-1 at ¶ 27) and PMI's discovery disclosures discuss the content of PMI's spreadsheets in some detail:

> Individual spreadsheet cells contain the underlying learning scenario that a project management learner utilizing a virtual world can choose (e.g., schedule team meeting) that correspond to a particular flow. The spreadsheets also facilitate prompt scoring of in-game interactions and measure proficiency advancement for each choice the user makes.

(Doc. No. 126-4 at 7).  Trade Secret Nos. 4-12 are identified as "customized simulations for project management training" that use a "spreadsheet and flow." (Doc. No. 127-1 at ¶ 27).  Finally, Trade Secret No. 13 is simply defined as a "combination" of Trade Secret Nos. 1-12.  *Id.*  Each of these is consistent with PMI's broader discovery disclosure that its alleged trade secrets are "proprietary flow activity templates and corresponding spreadsheet designs." (Doc. No. 126-4 at 6).   At this stage, the court rejects WTRI's premise that Dr. Valerdi's expert report impermissibly expanded the scope of PMI's alleged trade secrets.

///

///

///

39

18cv1927 JM(MSB)

### C.   Ownership of Trade Secrets

#### 1.   Reasonable Efforts to Maintain Secrecy

WTRI argues PMI's trade secret claim must fail because PMI failed to use reasonable efforts to maintain the secrecy of its Flows.   (Doc. No. 188 at 11-16). "Axiomatically, a trade secret must be a secret to merit legal protection." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1193 (S.D. Cal. 2012).   "Efforts at maintaining secrecy need not be extreme, just reasonable under the circumstances." *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 923 F. Supp. 1231, 1254 (N.D. Cal. 1995).   "Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling [] access." *Courtesy Temp. Serv. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (quotations omitted).   A business "is not required to turn itself into an 'impregnable fortress' to protect its trade secrets." *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1091 (E.D. Cal. 2012).

Whether a party's efforts are "reasonable" is ordinarily an issue for the trier of fact. *In Re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 306 (2002) ("[W]hether a party claiming a trade secret undertook reasonable efforts to maintain secrecy is a question of fact."); *see also InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. SACV111062JVSANX, 2015 WL 13357646, at *3 (C.D. Cal. May 6, 2015) ("[T]he reasonable efforts analysis is a 'fact intensive' one.").

Here, WTRI argues summary judgment is appropriate because PMI did not take reasonable steps to protect the secrecy of its Flows.   Specifically, WTRI contends "hundreds" of third-party subject matter experts ("SMEs") had access to PMI's alleged trade secrets, and yet there is no evidence these SMEs signed NDAs.   (Doc. No. 201 at 4-5).   WTRI further contends PMI: (1) failed to mark the alleged trade secrets as confidential, despite PMI's verifiable practice of applying confidentiality designations to other documents; and (2) failed to provide any training to its employees on how to handle confidential information.   (Doc. No. 188 at 14-16).

The court finds PMI has submitted sufficient evidence to raise a triable issue of fact as to whether it made a reasonable effort to maintain the secrecy of its alleged trade secrets.  Specifically, PMI asserts it: (1) disclosed its Flows to third-parties only on an as-needed basis; (2) required all such third-parties to sign NDAs or confidentiality agreements; and (3) maintained the Flows in secure repositories.  (Doc. No. 185 at 10).  In support, PMI submits a number of confidentiality agreements it entered with third-party consultants (Doc. No. 185-3, Exs. 1-3) and "Confidentiality and Records Compliance Agreements" for "PMI Members and Non-Member Volunteers" working on the PAL project (Doc. No. 185-3, Exs. 4-8).  Although it is not clear from the record whether these are exemplars of the SME agreements WTRI is referring to, it is at least some indication PMI required individuals working on the PAL project to sign NDAs.

Even setting aside these NDAs, PMI also submits the declarations of Karen Holloway, a Content Developer and former Lead Instructional Designer at PMI (Doc. No. 185-4) and Betsy Redden, a Project Manager at PMI (Doc. No. 185-5).  Ms. Holloway declares she was the "sole custodian and administrator of PMI's Flows" and "[a]ll employees and third parties working on the PAL project were required to sign non-disclosure [] or confidentiality agreements."  (Doc. No. 185-4 at ¶ 17).  Ms. Holloway additionally declares PMI's Flows were stored in secure locations.  *Id.*  Similarly, Ms. Redden declares PMI required third parties who gained access to PMI's Flows to sign non-disclosure or confidentiality agreements.  (Doc. No. 185-5 at ¶ 25).   Although declarations in support of summary judgment motions are "often self-serving" and the "source of the evidence may have some bearing on its credibility, and thus on the weight it may be given by a trier of fact," this is "not a basis for the district court to disregard that evidence at the summary judgment stage." *Nigro v. Sears, Roebuck & Co.*, 778 F.3d 1096, 1098 (9th Cir. 2015).

WTRI argues PMI has not met its burden of showing the files PMI's Flows were stored in were password protected.  WTRI has not, however, proffered any legal authority that PMI was required to do so.  Instead, this fact merely goes to whether a trier of fact

would assess PMI's efforts to maintain the secrecy of its Flows as reasonable.  A trier of fact for example, would also take into account PMI's evidence that its Flows were maintained on password-protected shared drives or local password-protected individual computers.  (Doc. No. 185-3, Exs. 10 at 135:3-8; 11 at 142:1-8; 12 at 84:9-15; 13 at 197:9-198:4).

There are further genuine disputes as to whether PMI provided sufficient instruction to its employees on handling confidential information.  For example, WTRI contends (and submits evidence) PMI did not provide formal training to its employees on what constitutes a trade secret and how to handle confidential information.  (Doc. No. 188 at 15-16).  However, there is evidence in the record that PMI had at least set forth formal policies on the handling of confidential information.  For example, Mr. Sardina testified that while PMI did not provide formal training, he recalled certain confidentiality policies outlined in an employee handbook.  (Doc. No. 188-9 at 31:13-25). The "Confidential and Records Compliance Agreements" PMI produced also reference a "PMI Confidentiality Policy."  (*See* Doc. No. 185-3, Ex. 4).

WTRI's contention a number of PMI's Flows were not marked with explicit confidentiality designations (which PMI does not seriously dispute) is certainly a factor that may weigh against PMI.  However, it is not dispositive.  Instead, a failure to mark is simply one factor to be considered.  *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 304 (2002) ("[A]mong the factors repeatedly noted are restricting access and physical segregation of the information, confidentiality agreements with employees, and marking documents with warnings or reminders of confidentiality.").

A reasonable jury could determine PMI's failure to explicitly mark its Flows with confidentiality designations is fatal.  However, a reasonable jury could also determine PMI's measures were adequate under the circumstances despite PMI's failure to mark. *See SPS Techs., LLC v. Briles Aero., Inc.*, No. CV 18-9536-MWF (ASx), 2021 U.S. Dist. LEXIS 169467, at *24-25 (C.D. Cal. Sep. 3, 2021).

18cv1927 JM(MSB)

1   Given this conflicting evidence, the court finds the question of whether PMI took

2   reasonable efforts to maintain the secrecy of its alleged trade secrets is an issue best left

3   to the trier of fact.

4   ## 2.   Independent Economic Value

5   WTRI argues PMI's trade secret claim must also fail because PMI's alleged trade

6   secrets do not have sufficient independent economic value to qualify for trade secret

7   protection.   (Doc. No. 188 at 16-17).   "To have independent economic value, a trade

8   secret must be sufficiently valuable and secret to afford an actual or potential economic

9   advantage over others."   *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336,

10   at *3 (C.D. Cal. Aug. 16, 2017).

11   In the present case, WTRI contends PMI has provided no evidence that quantifies

12   the actual value of PMI's Flows.   (Doc. No. 188 at 16-17).   Specifically, WTRI argues

13   PMI provided no expert analysis on what quantifiable value its alleged trade secrets

14   actually possessed.   *Id.* at 16.

15   The court is not persuaded there are no triable issues as to whether PMI's Flows

16   possess independent economic value.   Notably, WTRI cites no legal authority that PMI is

17   *required* to provide expert opinion on the quantifiable value of its trade secrets.   Instead,

18   "[t]he value of information claimed as a trade secret may be established by direct

19   or circumstantial evidence."   *Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal.

20   App. 4th 26, 62 (2014) (quotations omitted).   Of course, "[d]irect evidence relating to the

21   content of the secret and its impact on business operations is clearly relevant."   *Id.*

22   However, circumstantial evidence may also establish the value of an alleged trade secret,

23   and can include "the amount of resources invested by the plaintiff in the production of the

24   information, the precautions taken by the plaintiff to protect the secrecy of the

25   information . . . and the willingness of others to pay for access to the information."   *Id.*

26   In the present case, PMI has submitted evidence sufficient to raise a triable issue of

27   fact that its alleged trade secrets derive independent actual or potential economic value

28   from not being generally known to the public.   For example, although WTRI is correct

43

Ms. Holloway left the question of what the exact "monetary value" of PMI's Flows was to the experts, Ms. Holloway did testify the value of PMI's Flows derived from the speed by which users could elicit and put information into a virtual simulation.  (Doc. No. 185-3, Ex. 15 at 68:5-17).  Similarly, Alicia Sanchez, who worked on PMI's Flows through a third-party vendor, testified PMI's Flows were "unique" because they provided the "ability to dynamically change a spreadsheet and automatically ingest it" into a virtual environment which offered "safety and extensibility and the ability to update elements" without requiring hard-coded programming techniques.  (Doc. No. 185-3, Ex. 13 at 193:2-194:3).

WTRI is also correct Dr. Valerdi conceded he had not quantified (or been asked to quantify) the time savings from using PMI's Flows.  However, Dr. Valerdi did testify that it was his "general opinion" PMI's approach would "accelerate things," even if by a "small amount."  (Doc. No. 127-2 at 166:14-168:23).  The court is cognizant that the potential economic advantage of a trade secret "need not be great," it simply "must be more than trivial."  *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007) (quotations omitted).  A reasonable jury could find that PMI's alleged trade secrets had potential economic value through the reduction in time needed to create and modify virtual environments.

There is also circumstantial evidence of the independent economic value of PMI's Flows, through evidence of PMI's investment in creating them.  *See Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1154 (E.D. Cal. 2017) (a party can show economic value by "using circumstantial evidence of its investment of resources in producing the information."); *Courtesy Temp. Serv. v. Camacho*, 222 Cal. App. 3d 1278, 1287 (1990).  Specifically, PMI submits the declarations of Ms. Redden and Mr. Sardina, who state PMI had at least three full-time employees working on the PAL project to develop PMI's Flows from January to September of 2017 and that PMI hired two other third-party vendors and at least three other third-party consultants to help recruit SMEs and assist in development.  (Doc. Nos. 185-5 at ¶ 26; 185-6 at ¶ 21).

This is nevertheless a close case.  As the California Court of Appeal has held:

> Merely stating that information was helpful or useful to another person in carrying out a specific activity, or that information of that type may save someone time, does not compel a factfinder to conclude that the particular information at issue was "sufficiently valuable . . . to afford an . . . economic advantage over others."  The fact finder is entitled to expect evidence from which it can form some solid sense of *how* useful the information is, e.g., *how much* time, money, or labor it would save, or at least that these savings would be "more than trivial."

*Yield Dynamics*, 154 Cal. App. 4th at 564-65 (internal citations omitted).

Without expert evidence providing a more concrete understanding of *how* exactly PMI's flows are useful, PMI may struggle at trial to show its Flows constitute a trade secret.  Nonetheless, the inquiry here is fact intensive, and the court finds the better course would be to submit the issue to the trier of fact.

For these reasons, the Court **DENIES** the Parties' Motions for Summary Judgment on the legal status of PMI's trade secrets.

### D.   Alleged Misappropriation

Having determined that factual questions remain with respect to the legal status of PMI's trade secrets, the court turns to the Parties' dispute on misappropriation.  To show misappropriation, PMI must prove that WTRI "acquired, disclosed or used" PMI's trade secrets through improper means.  *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003); Cal. Civ. Code § 3426.1(b).

WTRI argues PMI has failed to produce evidence of misappropriation because: (1) there is no evidence WTRI actually possessed any of the alleged trade secrets; and (2) there is no evidence WTRI used PMI's alleged trade secrets in developing its MAXX product.  (Doc. No. 188 at 17-23).  Specifically, WTRI argues there is no evidence WTRI ever possessed PMI's alleged trade secrets.  *Id.* at 17-18.  WTRI further argues there is no genuine dispute of fact that its MAXX product operates in an "undeniably different" way

than PMI's Flows, because WTRI's "Flows" do not work in tandem with any external document (such as a spreadsheet).  *Id.* at 20-21.

In response, PMI submits evidence that WTRI allegedly had access to PMI's Flows.  (Doc. No. 185 at 16-17).  PMI further contends WTRI merely "cherry-picked" an example of one of WTRI's Flow Charts, which does not conclusively demonstrate misappropriation.  *Id.* at 19-20.

It is well recognized with respect to trade secrets that:

> Misappropriation and misuse can rarely be proved by convincing direct evidence.  In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place.  Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

*Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) (quoting *Q-Co Indus. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985)).

Here, there is evidence that WTRI at least had *access* to PMI's alleged trade secrets.  (Doc. No. 185-3, Ex. 12 at 84:9-13; Ex. 15 at 152:3-153:19; Ex. 17).  The question before the court is whether PMI presented sufficient direct or circumstantial evidence to permit a jury to reasonably infer WTRI *used* PMI's Flows in developing WTRI's MAXX product.

WTRI contends there is no triable issue as to whether it used PMI's flows because: (1) WTRI's MAXX flow charts do not function in the same way as PMI's alleged trade secrets; and (2) WTRI "originated" the content it is accused of misappropriating prior to PMI's creation of its Flows.  (Doc. No. 188 at 20-23).

With respect to WTRI's first point, "misappropriation includes not only wholesale pirating of an idea, but also the unauthorized utilization of an idea as a starting point or guide in developing a process or as a means to understand what pitfalls to avoid."

46

*Applied Biological Lab'ys, Inc. v. Diomics Corp.*, No. 3:20-CV-2500-AJB-LL, 2021 WL 4060531, at *4 (S.D. Cal. Sept. 7, 2021) (quotations omitted).  "Information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived."  *SkinMedica, Inc.*, 869 F. Supp. 2d at 1197.

In the court's view, comparing the features of WTRI's MAXX product with PMI's alleged trade secrets to determine whether WTRI improperly "used" PMI's Flows is a fact intensive task best left to the jury.  *Spring Design, Inc. v. Barnesandnoble.com, LLC*, No. C 09-05185 JW, 2010 WL 5422556, at *7 (N.D. Cal. Dec. 27, 2010).

As to WTRI's second point, there is conflicting evidence on the record as to whether WTRI conceived of the functions of PMI's Flows prior to its relationship with PMI.  For example, WTRI submits an e-mail from Dr. DiBello to Ms. Redden discussing the necessity for an "agile software development solution."  (Doc. No. 188-17 at 2).  However, Ms. Holloway testified WTRI was not familiar with "flows" prior to the PAL project.  (Doc. No. 190-13 at 96:16-22).   The existence of these genuine issues of material fact precludes summary judgment on PMI's misappropriation claim.

For these reasons, the Court **DENIES** WTRI's Motion for Summary Judgment on misappropriation.

## V.   Affirmative Defenses

WTRI seeks summary judgment on the twenty-four affirmative defenses identified in PMI's Answer.  (Doc. Nos. 46 at Affirmative Defenses ¶¶ 1-24; 188 at 29-32).  Despite this, the *only* affirmative defense WTRI addresses in any detail is PMI's twenty-second affirmative defense of "business justification."  (Doc. No. 188 at 31).

As to PMI's other affirmative defenses, WTRI simply states in a conclusory fashion that PMI's affirmative defenses of: (1) Failure to State a Claim; (2) No Injury; (3) No Breach; (4) Failure to State a Claim for Attorneys' Fees; and (5) No Entitlement to Prejudgment Interest are not "recognized affirmative defense[s] to a breach of contract claim."  *Id.*   WTRI then contends, in an equally conclusory fashion, that WTRI is

47

"unaware of any facts or records that would support" the remainder of PMI's affirmative defenses. *Id.* at 32.

WTRI's sparse briefing appears to reflect a fundamental misunderstanding of its burden of proof at the summary judgment stage. Although PMI bears the burden of proving its affirmative defenses at trial, WTRI has "both the initial burden of production and the ultimate burden of persuasion on the motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To meets its burden of production, WTRI "must either produce evidence negating an essential element of" PMI's affirmative defenses or demonstrate that PMI does "not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* To carry its ultimate burden of persuasion, WTRI "must persuade the court that there is no genuine issue of material fact." *Id.*

WTRI's conclusory arguments on all of PMI's affirmative defenses (save one), are insufficient to prevail on a motion for summary judgment. *BMG Rights Mgmt. U.S., LLC v. Glob. Eagle Entm't, Inc.*, No. 2:18-CV-03723-VAP-JEMx, 2019 U.S. Dist. LEXIS 206738, at *26 (C.D. Cal. Sep. 9, 2019). "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex*, 477 U.S. at 328 (White, J., concurring); *see also El Corte Ingles, S.A. v. City Lights, LLC*, No. 119CV00213AWIJLT, 2019 WL 6918276, at *9 (E.D. Cal. Dec. 19, 2019) ("[I]t is never enough [for the moving party] simply to state that the non-moving party cannot meet its burden at trial.") (quoting *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991)). To the extent WTRI attempts to remedy the conspicuous deficiencies in its moving papers in its reply brief, the court declines to consider these new arguments. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

As to WTRI's briefing on PMI's "business justification" affirmative defense, WTRI correctly notes PMI failed to substantively respond to this point in its Opposition.

(Doc. No. 185 at 28-31).  Proceeding to the merits, the court further agrees with WTRI that California's business judgment rule has no application here.

California's business judgment rule has two parts.  The first part is statutory and "immunizes corporate directors from personal liability if they act in accordance with certain conditions."  *Scheenstra v. Cal. Dairies, Inc.*, 213 Cal. App. 4th 370, 386 (2013).  As PMI's counterclaims do not attempt to impose personal liability on WTRI's directors, "the first part of the business judgment rule has no application in this case."  *Id.* at 387.

The second part of the business judgment rule "is based on the common law and insulates from court intervention those management decisions made by directors in good faith in what the directors believe is the organization's best interest."  *Id.*  The second part of the business judgment rule is most commonly invoked, for example, in a shareholder derivative action against a for-profit corporation.  PMI has not cited, nor has the court found, any case employing the business judgment rule in the context of the instant case.  The court further finds no logic in employing the business judgment rule in this case to immunize PMI's actions.

For these reasons, the court **GRANTS** WTRI's Motion for Summary Judgment on PMI's twenty-second affirmative defense of "business justification."  The court **DENIES** WTRI's Motion for Summary Judgment with respect to the remainder of PMI's affirmative defenses.

## VI.    Doe Counter-Defendants

PMI asserts counterclaims against WTRI and fifteen unknown "Doe" Counter-Defendants.  (Doc. No. 47).  WTRI requests that these "Doe" Counter-Defendants now be dismissed.  (Doc. No. 188 at 32).  As a general rule, the use of "Doe" Parties is not favored.  *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  Here, discovery in this action is closed and PMI has identified no additional named counter-defendants nor opposed or otherwise responded to WTRI's motion to dismiss the "Doe" Counter-Defendants.  Under these circumstances, the court finds it appropriate to **DISMISS** the Doe Counter-Defendants in their entirety.

18cv1927 JM(MSB)

## CONCLUSION

For the reasons stated above:

1.     PMI's Motion for Summary Judgment is **DENIED** in its entirety.

2.     WTRI's Motion for Summary Judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.   The court **GRANTS** WTRI's motion on PMI's twenty-second affirmative defense of "business justification" and WTRI's request to dismiss the Doe Counter-Defendants from PMI's Counterclaims.  WTRI's Motion is **DENIED** in all other respects.

**IT IS SO ORDERED.**

DATED: October 20, 2021

JEFFREY T. MILLER
United States District Judge

18cv1927 JM(MSB)