# EXHIBIT B



# Transcript of Jesse Sardina, Corporate Designee, Volume 2

**Date:** March 11, 2021

**Case:** Workplace Technologies Research, Inc. -v- Project Management Institute, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Jesse Sardina, Corporate Designee, Volume 2  
Conducted on March 11, 2021

1 (1 to 4)

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   -------------------------------x
 5   WORKPLACE TECHNOLOGIES RESEARCH, :
 6   INC.,                           :
 7              Plaintiff,           : Case No.
 8        vs.                        : 3:18-cv-01927-JM-MSB
 9   PROJECT MANAGEMENT INSTITUTE,   :
10   INC.,                           :
11              Defendant.           :
12   -------------------------------x
13   AND RELATED CROSS-ACTION        :
14   -------------------------------x
15                   VOLUME 2
16                VIDEOTAPED DEPOSITION OF
17          WORKPLACE TECHNOLOGIES RESEARCH, INC.
18           By and through its Corporate Designee
19                    JESSE SARDINA
20                  Conducted Virtually
21                Thursday, March 11, 2021
22
23   Stenographically Reported by:
     LORI STOKES
24   CSR No. 12732
25   Job No. 357692-B
     Pages 1-91
```

**Page 2**

```
 5        The Videotaped Deposition of JESSE SARDINA,
 6   was taken via videoconference on behalf of
 7   Plaintiff and Counter-Defendant, beginning at 8:31
 8   a.m., Pacific Standard Time, on March 11, 2021,
 9   before LORI STOKES, RPR, Certified Shorthand
10   Reporter   No. 12732
```

**Page 3**

```
 1   APPEARANCES VIA VIDEOCONFERENCE:
 2
 3     FOR PLAINTIFF AND COUNTERDEFENDANT
 4        EVERSHEDS SUTHERLAND (US) LLP
 5        BY:  JUSTIN E. GRAY
 6        Attorney at Law
 7        12255 El Camino Real
 8        Suite 100
 9        San Diego, California 92130
10        858.252.6502
11        justingray@eversheds-sutherland.com
12
13     FOR DEFENDANT AND COUNTERCLAIMANT
14        VENABLE LLP
15        BY:  NICOLE N. KING
16        Attorney at Law
17        2049 Century Park East
18        Suite 2300
19        Los Angeles, California 90067
20        310.229.9900
21        nnking@venable.com
22
23
24   REMOTE TECHNICIAN: Jeanetta Gregory
25   VIDEOGRAPHER:      Derek Stanley
```

**Page 4**

```
 1                    INDEX
 2   WITNESS                          EXAMINATION
 3   JESSE SARDINA
 4        BY MR. GRAY ............................8
```

Transcript of Jesse Sardina, Corporate Designee, Volume 2
Conducted on March 11, 2021
7 (25 to 28)

---

**Page 25**

1  project at PMI at that point in time. So we were
2  not recording employee hours against projects at
3  that point.
4  BY MR. GRAY:
5     Q   So you started -- did PMI start using the
6  Replicon system in 2016?
7     A   As far as I know.
8     Q   I'd like you to look at row 16, column A,
9  of the PIVOT tab.
10       Do you see that it refers to IQ
11 Workforce?
12    A   Yes, I do.
13    Q   Who is IQ Workforce?
14    A   So IQ Workforce, that's the -- who is IQ
15 Workforce. From the project -- the PAL project
16 perspective, IQ Workforce was David Traugott, a
17 consultant brought in for market research purposes.
18    Q   So was the role of IQ Workforce for the
19 PAL project market research?
20    A   Yes.
21    Q   What was the results of the work that IQ
22 Workforce performed for the PAL project?
23       MS. KING: Objection. Calls for
24 speculation.
25       THE WITNESS: IQ Workforce would have

---

**Page 26**

1  produced a report as a result of the market
2  research conducted.
3  BY MR. GRAY:
4     Q   Why was IQ Workforce brought in to work
5  on the PAL project?
6        MS. KING: Objection. Calls for
7  speculation.
8        THE WITNESS: Yeah. So without reviewing
9  the specific SOW, the effort for IQ Workforce would
10 have been to assess market viability of the
11 product, attractiveness, and inform decisions PMI
12 would need to make in the event that the product
13 was introduced or launched in the market.
14 BY MR. GRAY:
15    Q   How are -- well, let me ask a different
16 question.
17       Do you see on the spreadsheet, the PIVOT
18 tab, that there is about $193,000 of costs that are
19 linked to IQ Workforce?
20       THE STENOGRAPHER: I think he might be
21 frozen.
22       MR. GRAY: Yes. It looks like it.
23       THE REMOTE TECHNICIAN: Would you like to
24 go off the record?
25       MR. GRAY: Sure. Let's go off the

---

**Page 27**

1  record.
2        THE VIDEOGRAPHER: Going off the record.
3  The time is 8:57 a.m.
4        (Recess taken from 8:57 a.m. to
5        8:59 a.m.)
6        THE VIDEOGRAPHER: Going back on record.
7  The time is 8:59 a.m.
8  BY MR. GRAY:
9     Q   Welcome -- pardon me. Welcome back.
10       I'm going to take a little sip of water
11 here, so I don't...
12       Before we had our technical issue, I had
13 asked a question about if you had seen -- if you
14 could see on the spreadsheet --
15       MR. GRAY: Actually, let's put the
16 spreadsheet back up, Exhibit 2, on the screen,
17 please.
18       Great.
19 BY MR. GRAY:
20    Q   So we were talking about row 17 -- or,
21 actually, row 16 for IQ Workforce.
22       And do you see that there are about
23 $193,000 in costs on the spreadsheet that are
24 related to IQ Workforce's work?
25    A   I do.

---

**Page 28**

1     Q   How are those costs attributable to
2  WTRI's alleged breach of contract in this case?
3        MS. KING: Objection as to form. Calls
4  for legal conclusion. And calls for speculation.
5  BY MR. GRAY:
6     Q   You can go ahead and answer.
7     A   I don't know how those costs would be
8  attributable to the alleged breach of contract.
9     Q   Did -- at any point during the project,
10 did WTRI ask PMI to get IQ Workforce involved?
11       MS. KING: Objection. Calls for
12 speculation.
13       THE WITNESS: Specifically IQ Workforce,
14 no.
15 BY MR. GRAY:
16    Q   I'd like you to -- I'd like to direct you
17 to row 20 of this PIVOT tab, column A, which is
18 "KMS Technology, Inc."
19       Do you see that?
20    A   I do.
21    Q   Who is KMS Technology?
22    A   KMS Technology is a firm that we used on
23 the -- that we leveraged on the PAL project. PMI
24 had been doing business with them in other areas
25 for testing purposes; quality assurance, functional

---

**29**

1  testing, port- -- web portal testing.
2      Q   What was KMS Technology's role in the PAL
3  project specifically?
4      A   So for PAL, they did -- they covered the
5  majority of the functional testing of the
6  simulation that WTRI was building as part of this
7  project, as well as the web components that PMI was
8  responsible for and, essentially, the solution as a
9  whole, with all the components integrated, to
10 include the underlying data structure, the data
11 model that would have been used to collect
12 performer -- participants' performance throughout
13 the simulation.
14     Q   So could you be a little more specific.
15         Did KMS Technology do any writing of
16 code, or were they -- were they doing testing or
17 both?
18     A   They were doing testing.
19         KMS Technology also did evaluation of
20 code on behalf of PMI.
21     Q   And I see in the spreadsheet that there
22 is close to about $747,000 of costs for KMI
23 [verbatim] Technology.
24         Do you see that?
25     A   I do.

**30**

1      Q   How is the costs for KMS Technology's
2  work on the PAL project attributable to WTRI's
3  alleged breach of the contract?
4          MS. KING: Objection as to form. Calls
5  for a legal conclusion. Calls for speculation.
6  BY MR. GRAY:
7      Q   You can go ahead and answer.
8      A   So KMS Technology, a portion of that cost
9  is specific to an evaluation of the code provided
10 by WTRI to PMI.
11         The remainder of the costs that are
12 attributable -- that are, I guess, related to the
13 quality assurance, the testing piece -- are
14 attributable in part to the breach -- the alleged
15 breach of contract, in that the -- there was an
16 extensive amount of functional testing required
17 of -- for the virtual world as we received it from
18 WTRI.
19     Q   The testing that was done by KMS
20 Technology for this project would have needed to
21 be -- work needed -- would have needed to be
22 performed regardless of if WTRI had breached the
23 contract or not.
24         Is that fair?
25         MS. KING: Objection as to form. Calls

**31**

1  for speculation. And misstates prior testimony.
2          THE WITNESS: That's a fair statement.
3  BY MR. GRAY:
4      Q   I'd like you to turn to row 22 of the
5  PIVOT tab of Exhibit 2, which is Neudesic, LLC in
6  column A.
7          Do you see that?
8      A   I do see that.
9      Q   What was Neudesic's role in the PAL
10 project generally?
11     A   Generally speaking, Neudesic was brought
12 in to -- as a technology development partner for
13 PMI to implement a -- "commercial wrapper" is a
14 term that we use to define the solution as a whole,
15 the ability to deliver the PAL simulation or the
16 simulations built by WTRI to a global audience, as
17 well as to provide a structure for development --
18 co-development between PMI and WTRI in an Agile
19 fashion -- Agile project management fashion.
20     Q   And when you say "Agile project
21 management fashion," what do you mean?
22     A   So Agile project management is a
23 methodology, if you will, of -- develop -- commonly
24 utilized by software development entities.
25         It's a way to prioritize work for the

**32**

1  development -- for the development team -- the
2  developers, the quality assurance testers -- based
3  on the value that it delivers to the end-user.
4          It's -- Agile development typically takes
5  place over a timebox period, called a sprint, in
6  its most basic form, where -- at its simplest
7  component.
8          And development activities are taken on
9  in that timebox. At the end of that period, the
10 next sprint will start. And in that sprint, the
11 work that's determined to be the highest priority
12 for that sprint is taken on. And this continues.
13 It's an iterative development modality, if you
14 will.
15     Q   Do you see on the spreadsheet, the PIVOT
16 tab in Exhibit 2, that there are approximately
17 $1,677,000 worth of costs that have been allocated
18 to -- or related to the work Neudesic did on the
19 project?
20     A   Yes, I do.
21     Q   How is the cost for the work Neudesic did
22 on the project attributable to WTRI's alleged
23 breach of the contract?
24         MS. KING: Objection as to form. Calls
25 for a legal conclusion. And calls for speculation.

## Page 89

1 Exhibit 5, thank you.
2      Would you mind if we took a five-minute
3 break?
4      I think I may be done, but I just want to
5 check my notes.
6      Is that okay with you, Mr. Sardina?
7      THE WITNESS:  Oh, absolutely.
8 Absolutely, yes.
9      MR. GRAY:  Is that okay with you,
10 Ms. King?
11      MS. KING:  Yes, that's fine.
12      MR. GRAY:  Okay.  Let's go off the
13 record.
14      MS. KING:  Okay.
15      THE VIDEOGRAPHER:  Going off the record.
16 The time is 10:30 a.m.
17      (Recess taken from 10:30 a.m. to
18      10:36 a.m.)
19      THE VIDEOGRAPHER:  Going back on the
20 record.  The time is 10:36 a.m.
21 BY MR. GRAY:
22   Q  Welcome back, Mr. Sardina.
23      I just actually have a final question for
24 you.
25      Did you bring any type of written notes

## Page 90

1 or anything like that to your deposition here
2 today?
3   A  No.  Not at all.
4   Q  Okay.  You have a very good memory then.
5      Thank you for your time today.  I have no
6 further questions.
7   A  Thank you.
8      THE VIDEOGRAPHER:  This marks the end of
9 the deposition of corporate designee of Project
10 Management Institute, Inc.  We're going off the
11 record at 10:36 a.m.
12      THE STENOGRAPHER:  Same orders for this
13 one, Counsel?
14      MS. KING:  Yes, please.
15      MR. GRAY:  Yep, that will work.
16      THE STENOGRAPHER:  Okay.  Thank you so
17 much.
18      (Time noted 10:37 a.m.)
19
20           ---o0o---
21
22
23
24
25

## Page 91

1                    )
  STATE OF CALIFORNIA   )
2                    )
3      CERTIFICATE OF REPORTER
4   I, LORI STOKES, do hereby certify that the
5 witness in the foregoing deposition was by me duly
6 affirmed to tell the truth, the whole truth and
7 nothing but the truth in the within-entitled cause;
8 that said deposition was taken at the time and
9 place therein stated; that the testimony of said
10 witness was reported by me and was thereafter
11 transcribed under my direction and supervision;
12 that the foregoing is a full, complete and true
13 record of said testimony; that the witness was
14 given an opportunity to read and, if necessary,
15 correct said deposition and to subscribe the same.
16    I further certify that I am not of counsel or
17 attorney for either or any of the parties in the
18 foregoing deposition and caption named, or in any
19 way interested in the outcome of the cause named in
20 said caption.
21    IN WITNESS WHEREOF, I have hereunto set my
22 hand this 24TH day of March, 2021.
23       *[signature: Lori Stokes]*
24    _____
25       LORI STOKES, CSR No. 12732